UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

LEON PETERS,

                                        Plaintiff,

v.                                                              9:22-cv-0638
                                                               (DNH/CBF)


ULSTER COUNTY SHERIFFS DEPARTMENT/EMPLOYEES, et al.,

                                        Defendants.

_____

APPEARANCES:                                          OF COUNSEL:

LEON PETERS
*Plaintiff, pro se*
22-R-1965
Woodbourne Correctional Facility
99 Prison Road
PO Box 1000
Woodbourne, NY 12788

SOKOLOFF STERN LLP                            KIMBERLY H. LEE, ESQ.
Attorneys for Defendants
80 Washington Street - Suite 100
Poughkeepsie, NY 12601

**CARLA B. FREEDMAN**, United States Magistrate Judge

## REPORT-RECOMMEDNATION AND ORDER

## I.      INTRODUCTION

This matter has been referred for a report and recommendation by the Honorable David

N. Hurd, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule

72.3(c).  Plaintiff Leon Peters ("Plaintiff") commenced this action alleging violations of his

rights under the United States Constitution while he was confined at the Ulster County Jail.  *See*

Dkt. Nos. 4, 23, 64, 67. Currently before the Court is a motion to dismiss filed by Defendant County of Ulster. Dkt. No. 72. For the reasons set forth below, the undersigned recommends Defendant's motion to dismiss be granted.

## II.    BACKGROUND

Plaintiff commenced this action by filing a complaint in the Southern District of New York on May 31, 2022. *See generally*, Dkt. No. 4.[1] Following transfer to this district and Plaintiff's submission of a completed application to proceed *in forma pauperis* ("IFP"), *see* Dkt. Nos. 8, 10, the Hon. Gary L. Sharpe, Senior United States District Judge, granted Plaintiff's application to proceed IFP, construed the complaint as containing First Amendment claims related to Plaintiff's religious freedoms pursuant to 42 U.S.C. § 1983, dismissed Plaintiff's claims without prejudice pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b)(1), and gave Plaintiff thirty days to file an amended complaint. *See generally*, Dkt. No. 14.

Plaintiff subsequently filed an amended complaint, Dkt. No. 23, which Judge Sharpe accepted for filing and, upon sufficiency review, dismissed Plaintiff's First Amendment and Religious Land Use and Institutionalized Persons Act ("RLUIPA") claims for failure to state a claim upon which relief may be granted. *See generally*, Dkt. No. 24. Plaintiff appealed the dismissal to the Second Circuit Court of Appeals, *see* Dkt. Nos. 26-27, and the Second Circuit vacated in part and remanded the District Court's judgment dismissing the amended complaint. *See generally*, Dkt. No. 28. In accordance with the Second Circuit's mandate, Judge Sharpe ordered the case reopened and a response was required as to Plaintiff's "(1) First Amendment and RLUIPA claims against Ulster County Sheriff's Department/Employees, Ulster County Jail

---

[1] Citations refer to the pagination generated by CM/ECF, the Court's electronic filing system. Unless otherwise indicated, excerpts from the record are reproduced exactly as they appear in the original and errors in spelling, punctuation, and grammar have not been corrected.

Administration/Employees, and Doe defendants; (2) Establishment Clause claims against Ulster County Sheriff's Department/Employees, Ulster County Jail Administration/Employees, and Doe defendants; and (3) equal protection claims against Ulster County Sheriff's Department/Employees, Ulster County Jail Administration/Employees, and Doe defendants." Dkt. No. 30 at 2.[2]

Counsel appeared on behalf of the Ulster County Sheriff's Department and Ulster County Jail, *see* Dkt. Nos. 34-35, and subsequently filed a motion to dismiss Plaintiff's amended complaint pursuant to Fed. R. Civ. P. 12(b)(6). *See generally*, Dkt. No. 44.[3] On February 28, 2025, the Hon. Thérèse Wiley Dancks, United States Magistrate Judge, issued a Report-Recommendation and Order recommending: (1) the then-defendants' motion to dismiss be granted; (2) the County of Ulster be substituted in place of then-defendants Ulster County Jail and Ulster County Sheriff's Department; (3) the District Court require an answer to Plaintiff's amended complaint, to the extent it asserted First Amendment Free Exercise and Fourteenth Amendment Equal Protection claims against Ulster County; and (4) Plaintiff be afforded leave to amend the operative pleading, to the extent he sought to assert a First Amendment Free Exercise claim against any individual defendant pursuant to 42 U.S.C. § 1983. Dkt. No. 58 at 21-22. Judge Hurd subsequently issued an Order accepting and adopting the Report-Recommendation in all respects. *See generally*, Dkt. No. 59.[4]

---

[2] By Text Order dated February 21, 2024, this case was reassigned to Judge Hurd for all further proceedings. Dkt. No. 43.

[3] Plaintiff opposed Defendants Ulster County Sheriff's Department and Ulster County Jail's motion to dismiss. *See generally*, Dkt. No. 48. The Defendants filed a reply in further support of the motion. *See generally*, Dkt. No. 50.

[4] On April 2, 2025, Defendant County of Ulster filed an answer to Plaintiff's amended complaint. Dkt. No. 60.

Plaintiff filed a second amended complaint on April 17, 2025.  Dkt. No. 64.  On April 28, 2025, Magistrate Judge Dancks issued a Text Order which stated:

> It is hereby ORDERED in the event that Plaintiff intends to pursue the *Monell* First Amendment free exercise and equal protection clause claims against Ulster County set forth in his amended complaint (Dkt. No. 23), he shall submit for initial review by this Court within thirty (30) days of the filing of this Order a single pleading entitled "third amended complaint" containing all claims he intends to pursue, including any *Monell* claims against Ulster County.  Plaintiff is further advised any amended pleading should include a request for relief.  It is further ORDERED that in the event Plaintiff fails to file a third amended complaint for review within thirty (30) days, the Court will assume that Plaintiff intends to abandon the First Amendment claims against the County in the amended complaint and for the second amended complaint to be a superseding complaint, fully replacing the original complaint, and will undertake an initial review of the second amended complaint under 28 U.S.C. § 1915(e)(2)(B)(i)-(iii).

Dkt. No. 66.  Plaintiff filed a third amended complaint on May 15, 2025.  Dkt. No. 67.

Upon sufficiency review, Magistrate Judge Dancks recommended the Court allow Plaintiff's third amended complaint to proceed, to the extent it asserts a First Amendment Free Exercise claim against Ulster County Sergeant Jane Doe.  Dkt. No. 69 at 6.  On September 25, 2025, Judge Hurd issued an Order which: (1) accepted the Report and Recommendation in all respects; (2) accepted the third amended complaint as the operative pleading; (3) directed Defendant County of Ulster to file an answer to the third amended complaint; (4) allowed Plaintiff to serve discovery requests upon the County of Ulster for the limited purpose of identifying Sergeant Jane Doe; and (5) directed Plaintiff to file a fourth amended complaint within sixty days substituting the true name of Sergeant Jane Doe or otherwise show good cause in writing as to why he had not done so.  Dkt. No. 71 at 4-5.

4

On October 16, 2025, Defendant County of Ulster (hereinafter, "Defendant") filed a motion to dismiss Plaintiff's third amended complaint. Dkt. No. 72.[5] Defendant argues the operative pleading fails to plausibly allege a claim of municipal liability, therefore, Plaintiff's claims against the County of Ulster must be dismissed. *See generally*, Dkt. No. 72-3 at 10-18.[6]

On November 5, 2025, Plaintiff filed a response to Defendant's motion which states, "I Leon Peters choose not to file a response, because I belief that my third amended complaint states and is sufficient to state my claims also there is no way to find Sgt. Jane Doe because she has retired." Dkt. No. 76 (cleaned up). Defendant subsequently filed a reply in further support of the motion to dismiss arguing Plaintiff has abandoned his claims. *See generally*, Dkt. No. 77.[7]

## III. LEGAL STANDARD

A defendant may move to dismiss a complaint "for failure to state a claim upon which relief can be granted" under Rule 12(b)(6) of the Federal Rules of Civil Procedure. The motion tests the legal sufficiency of the complaint and whether it conforms to Rule 8(a)(2) of the Federal Rules of Civil Procedure. To survive a motion to dismiss, the complaint must "contain sufficient

---

[5] On October 17, 2025, the Court issued notice to Plaintiff of the November 6, 2025, deadline to respond to Defendant's motion to dismiss the third amended complaint. Dkt. No. 17.

[6] Defendant's brief further avers "[s]ervice has not been properly effectuated [as to Corrections Officer Hunt], and the complaint against him must be dismissed," Dkt. No. 72-3 at 18, and, "[e]ven if the [third amended complaint] was served on C.O. Hunt, it still does not state a viable claim against him." Dkt. No. 72-3 at 19. However, it is unclear why such arguments were included given, in assessing the sufficiency of Plaintiff's third amended complaint as to the individual defendants, Magistrate Judge Dancks recommended "*only* Plaintiff's First Amendment Free Exercise claim against *Sergeant Jane Doe* be permitted to proceed," Dkt. No. 69 at 6 (emphasis added), and Judge Hurd's order accepting such Report and Recommendation made clear the operative pleading was accepted "to the extent that it asserts a First Amendment Free Exercise claim against defendant County of Ulster Sergeant Jane Doe," Dkt. No. 71 at 4, and "First Amendment Free Exercise and Fourteenth Amendment Equal Protection Clause claims against County of Ulster," Dkt. No. 71 at 4, n.1.

[7] By Text Order dated February 13, 2026, this case was reassigned to the undersigned for all further proceedings. Dkt. No. 79.

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

> Determining whether a complaint states a plausible claim for relief . . . requires the reviewing court to draw on its judicial experience and common sense . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief.

*Iqbal*, 556 U.S. at 679 (internal quotations and citations omitted). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

A complaint may be dismissed pursuant to Rule 12(b)(6) only where it appears that there are not "enough facts to state a claim that is plausible on its face." *Id*. at 570. While Rule 8(a)(2) "does not require detailed factual allegations, . . . it demands more than an unadorned, the-defendant-harmed-me-accusation." *Iqbal*, 556 U.S. at 678 (citation and internal quotation marks omitted). A complaint which "tenders 'naked assertion[s]' devoid of 'further factual enhancement'" does not suffice. *Id*. (citation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994); *see also Harris v. Mills*, 572 F.3d

66, 72 (2d Cir. 2009) (courts remain obligated to construe *pro se* complaints liberally even after

*Twombly*).  In considering a Rule 12(b)(6) motion, "the court considers the complaint, any

written documents attached to them, and any matter of which the court can take judicial notice

for the factual background of the case."  *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422

(2d Cir. 2011) (citation and internal quotation marks omitted).  Furthermore,

> [t]he mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual allegations are consistent with the allegations of the plaintiff's complaint.

*Robles v. Bleau*, No. 9:07-CV-0464, 2008 WL 4693153, at *6 and n.41 (N.D.N.Y. Oct. 22,

2008) (collecting cases); *see also*, *e.g.*, *Donhauser v. Goord*, 314 F. Supp. 2d 119, 121

(N.D.N.Y. 2004) (where a *pro se* plaintiff is faced with a motion to dismiss, a court may consider

materials outside of the complaint "to the extent they are consistent with the allegations in the

complaint."), *vacated in part on other grounds*, 317 F. Supp. 2d 160 (N.D.N.Y. 2004).

Alternatively, where a plaintiff fails to respond to a defendant's motion to dismiss, such a

failure to respond "is not, by itself, a sufficient reason [to] grant [the] defendant's motion."

*Coleman v. Erie Painting & Maint., Inc.*, No. 5:24-CV-1239, 2025 WL 1331745, at *3

(N.D.N.Y. May 7, 2025); *see also*, *e.g.*, *Mendez v. Cayuga Cnty.*, No. 9:21-CV-1090

(BKS/TWD), 2024 WL 1469060, at *4 (N.D.N.Y. Feb. 1, 2024), *report and recommendation*

*adopted*, 2024 WL 1251541 (N.D.N.Y. Mar. 25, 2024); *Malloy v. Sopchak*, No. 1:18-CV-1460

(BKS/DJS), 2020 WL 4432631, at *2 (N.D.N.Y. July 31, 2020) ("A plaintiff's failure to respond

to a motion to dismiss does not relieve the Court of its obligation to consider the merits of

plaintiff's claims . . . .") (internal quotations and citations omitted).  "If a complaint is sufficient

to state a claim on which relief can be granted, the plaintiff's failure to respond to a Rule

12(b)(6) motion does not warrant dismissal." *McCall v. Pataki*, 232 F.3d 321, 323 (2d Cir. 2000); *see also Goldberg v. Danaher*, 599 F.3d 181, 183 (2d Cir. 2010) ("Because a motion under Rule 12(b)(6) presents a pure legal question, based on allegations contained within the four corners of the complaint, the district court is equipped to make a determination on the merits.").

## IV.    ANALYSIS

As previously stated, Defendant contends Plaintiff's third amended complaint fails to plausibly set forth a basis for municipal liability. *See generally*, Dkt. No. 72-3 at 10-18. The undersigned agrees.

A municipality "is liable under section 1983 only if the deprivation of the plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality." *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 62 (2d Cir. 2014) (citing *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978)); *see also*, *e.g.*, *Thomas v. Town of Lloyd*, 711 F. Supp. 3d 122, 138 (N.D.N.Y. 2024) ("To bring a claim for municipal liability under *Monell*, [plaintiff] must plausibly allege the existence of an official policy or custom that caused him to be denied a constitutional right."). Municipal liability under *Monell* may be established by way of:

> (1) a policy formally adopted and endorsed by the municipality; (2) actions taken by policymaking officials that caused the particular deprivation alleged; (3) practices by subordinate officials that are not expressly authorized but are so widespread and consistent that policymakers must have been aware of them; or (4) a failure by policymakers to train or supervise that amounts to "deliberate indifference" to the rights of those who come into contact with the inadequately trained or supervised municipal employees.

*Crawley v. City of Syracuse*, 496 F. Supp. 3d 718, 729 (N.D.N.Y. 2020) (citing *Deferio v. City of Syracuse*, 770 F. App'x 587, 589 (2d Cir. 2019) (Summary Order)) (additional citation omitted).

8

However, "'boilerplate statements that county employees were acting in accord with a municipal policy, with no facts to support those statements, are not sufficient to support a *Monell* claim.'" *Thomas*, 711 F. Supp. 3d at 138 (quoting *Forrest v. Cnty. of Greene*, 676 F. Supp. 3d 69, 76 (N.D.N.Y. June 7, 2023), *reconsideration denied*, 2023 WL 5097970 (N.D.N.Y. Aug. 9, 2023)).

In the operative pleading, Plaintiff asserts "while detained at the Ulster County Jail in the County of Ulster, from April 1, 2021, to August 30, 2022, several employees acting under governmental policy or custom violated my *Monell* First Amendment Free Exercise and Equal Protection rights under the Constitution." Dkt. No. 67 at 2 (cleaned up). More specifically, Plaintiff avers he was "denied [his] muslim religious diet, hal'lal," while housed at the Ulster County Jail from April 1, 2021, to August 30, 2022, and he was additionally "denied hal'lal meats and sweets to fulfill [his] Islamic observance of Eid-ul-fitr" on May 2, 2022. *Id*. (cleaned up). When Plaintiff was not provided halal meals, he was "told by countless employees of the Ulster County Jail that they do not need to provide or do [not] wish to provide any allowance for the Muslim religion." *Id*. (cleaned up). Plaintiff also claims he was "denied Juma'ah service," which is "commanded the holy Qur'an (the principal book) of the Muslim religion," and "was told that the Ulster County Jail does not provide Juma'ah service by officers, sergeants, and corporals." *Id*. at 3 (cleaned up). Further, Plaintiff asserts he was denied a "Muslim spiritual leader" and "told by countless employees at the Ulster County Jail that there is only going to be Christian and Jewish spiritual leaders at their facility, there is no room nor is there going to be any room for a Muslim spiritual leader and to stop asking cause ain't nothing changing." *Id*. (cleaned up).

Significantly, however, Plaintiff's third amended complaint fails to attribute the denial of his religious meals and services to an Ulster County *policy or custom*. First, even afforded a

liberal construction, nothing in Plaintiff's third amended complaint suggests the *existence* of *any* policy formally adopted and endorsed by the County of Ulster, much less that such a policy *caused* the deprivation of his constitutional rights. *See*, *e.g.*, *McLennon v. City of New York*, 171 F. Supp. 3d 69, 95 (E.D.N.Y. 2016) ("To survive a motion to dismiss a municipal liability claim, 'a plaintiff must allege facts tending to support, at least circumstantially, an inference that . . . a municipal policy or custom exists.'") (quoting *Santos v. New York City*, 847 F. Supp. 2d 573, 576 (S.D.N.Y. 2012)); *see also Mendez*, 2024 WL 1469060, at *6 ("Once a plaintiff has demonstrated the existence of a municipal policy, a plaintiff must then establish a causal connection, or an 'affirmative link,' between the policy and the deprivation of his constitutional rights.") (quoting *Deferio*, 770 F. App'x at 589).  Plaintiff's failure to articulate the Ulster County policy or custom responsible for the alleged deprivations of his rights hinders his claims against the County.

Nor does the pleading assert the alleged deprivations were caused by actions taken by policymaking officials, indeed, the complaint fails to suggest involvement of *any* individuals with policymaking authority.  *See*, *e.g.*, *Kweller v. Cnty. of Broome*, No. 3:25-CV-343 (AJB/ML), 2025 WL 3280821, at *31 (N.D.N.Y. Nov. 25, 2025) ("Where a plaintiff seeks to hold a municipality liable for a single decision by [a] municipal policymaker, . . . the plaintiff must show that the official had final policymaking power . . . . The critical inquiry is not whether an official generally has final policymaking authority; rather, the court must specifically determine whether the government official is a final policymaker with respect to the particular conduct challenged in the lawsuit.") (citing *Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008)) (internal quotations and citations omitted).  Further, the pleading lacks any indication the alleged constitutional deprivations were the result of a policymaker's failure to train or supervise

10

amounting to deliberate indifference.  *See*, *e.g.*, *Jenkins v. City of New York*, 478 F.3d 76, 94 (2d Cir. 2007) ("Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983.") (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989)) (additional quotations omitted).

Finally, insofar as the third amended complaint can be construed as asserting the deprivation of Plaintiff's rights was caused by the practices of subordinate officials so widespread and consistent as to support a claim of municipal liability, Plaintiff has failed to demonstrate the existence of a custom or practice *so prominent that policymaking officials must have been aware.  See*, *e.g.*, *Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 871 (2d Cir. 1992) (explaining, "before the actions of subordinate [municipal] employees can give rise to § 1983 liability, their discriminatory practice must be so manifest as to imply the constructive acquiescence of senior policy-making officials.") (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 130 (1988); *Krulik v. Board of Educ. of the City of New York*, 781 F.2d 15, 23 (2d Cir. 1986)); *see also*, *e.g.*, *Wilson v. Cnty. of Ulster*, No. 1:20-CV-0104 (TJM), 2022 WL 813958, at *16 (N.D.N.Y. Mar. 17, 2022) ("Plaintiff's conclusory allegation that a policy should be inferred because the 'flagrant deprivations of constitutionally protected rights could not and would not occur without the tacit approval or deliberate indifference regarding the commission of such violations by the policymakers or supervisors of the Town and County of Ulster,' . . . is insufficient.") (citations omitted).  To that end, as Defendant emphasizes, *see* Dkt. No. 72-3 at 13-14, Plaintiff cannot establish the alleged deprivations were the result of a "consistent and widespread practice" based solely on his own experiences.  *See*, *e.g.*, *Aragon v. New York*, No. 14-CV-9797, 2017 WL 2703562, at *6 (S.D.N.Y. June 22, 2017) ("Plaintiff seems to allege the

11

existence of a practice adopted by the City solely based on Plaintiff's alleged experience. However, a 'single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy.' . . . . Therefore, Plaintiff's claims against the City must be dismissed . . . .") (quoting *DeCarlo v. Fry*, 141 F.3d 56, 61 (2d Cir. 1998)) (additional citations omitted); *Maloney v. Cnty. of Nassau*, 623 F. Supp. 2d 277, 289-90 (E.D.N.Y. 2007) (dismissing the plaintiff's claims against the defendant county and county police department where the "plaintiff's Amended Complaint does not even identify a municipal policy or custom that resulted in the alleged Constitutional violations . . . the Amended Complaint does not allege facts which suggest the existence of a municipal policy or custom.  At most, plaintiff's pleading describes a single incident in which municipal employees allegedly violated plaintiff's Constitutional rights.") (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985)); *Mendez*, 2024 WL 1251541, at *4 (dismissing claims against the defendant county where "the Court has no basis to plausibly infer from the allegations in the second amended complaint that at the time of Plaintiff's injuries, Cayuga County officials were aware of 'widespread and consistent' deliberate indifference by jail officials to the emergency medical needs of detainees such that the alleged failure to adequately respond to Plaintiff's medical needs may be considered a policy choice by Cayuga County.").

In sum, Plaintiff's third amended complaint fails to plausibly attribute the alleged violation of his First and Fourteenth Amendment rights while housed at the Ulster County Jail to any policy or custom of the County of Ulster; therefore, the pleading fails to state a claim of municipal liability against the Defendant County of Ulster.  *See*, *e.g.*, *Hillman v. City of Oswego*, No. 5:24-CV-1448, 2026 WL 35505, at *7 (N.D.N.Y. Jan. 6, 2026) ("[Plaintiff]'s allegations as to the [municipality are] entirely conclusory and devoid of any specific facts from which a

plausible allegation of municipal liability under *Monell* could be found.  Accordingly, defendants' motion to dismiss plaintiff's § 1983 claim . . . as to the [municipality] will be granted.").

Furthermore, while Judge Hurd's September 25, 2025, Order: (1) found Plaintiff's First Amendment Free Exercise claim against Ulster County Sergeant Jane Doe survived *sua sponte* review; (2) allowed Plaintiff to serve discovery requests upon the Defendant County of Ulster for the limited purpose of identifying the Doe defendant; and (3) directed Plaintiff to file an amended pleading identifying the true name of the Doe defendant or otherwise show good cause as to why he had not done so within sixty days, *see* Dkt. No. 71 at 4-5, Plaintiff has not done so. Accordingly, the undersigned recommends Plaintiff's claim against Ulster County Sergeant Jane Doe be dismissed pursuant to Fed. R. Civ. P. 16(f) for failure to comply with Judge Hurd's Order.  *See*, *e.g.*, *Davis v. Doe*, No. 9:16-CV-0994 (MAD/DJS), 2017 WL 8640829, at *5 (N.D.N.Y. Dec. 29, 2017), *report and recommendation adopted*, 2018 WL 1582230 (N.D.N.Y. Mar. 27, 2018).

Finally, because Plaintiff has been afforded *multiple* opportunities to amend his complaint, the undersigned recommends dismissal of Plaintiff's claims without leave to amend. *See*, *e.g.*, *Mendez*, 2024 WL 1251541, at *5 (explaining, "an opportunity to amend is not required where the plaintiff has already been afforded the opportunity to amend.") (collecting cases).

## V.    CONCLUSION

After carefully reviewing the record, the parties' submissions, and the applicable law, and for the reasons stated herein, it is hereby

**RECOMMENDED** that Defendant's motion to dismiss (Dkt. No. 72) be **GRANTED**; and it is further

**RECOMMENDED** that Plaintiff's third amended complaint (Dkt. No. 67) be **DISMISSED**; and it is further

**ORDERED** that the Clerk provide to Plaintiff a copy of this Report-Recommendation and Order, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report.[8]  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

**IT IS SO ORDERED.**

Dated: March 20, 2026
      Syracuse, New York

Carla B. Freedman
U.S. Magistrate Judge

---

[8] If you are proceeding *pro se* and are served with this Report-Recommendation and Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Report-Recommendation and Order was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

2008 WL 4693153

2008 WL 4693153
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Raymond ROBLES, Plaintiff,

v.

K. BLEAU, Correctional Officer, Riverview C.F.; Peacock, Correctional Sergeant, Riverview C.F.;
R. Varkiar, Senior Counsel, Riverview C.F.; and New York State Dep't of Corr. Servs., Defendants.

No. 9:07-CV-0464.
|
Oct. 22, 2008.

**Attorneys and Law Firms**

Raymond Robles, Cape Vincent, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, David L. Cochran, Esq., of Counsel, New York, NY, for Defendants.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior District Judge.

**\*1** This *pro se* civil rights action, brought pursuant to 42 U.S.C. § 1983, was referred to the Hon. George H. Lowe, United States Magistrate Judge, for a Report-Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).

The Report-Recommendation dated September 12, 2008 recommended that Defendants motion to dismiss be granted in part and denied in part. Specifically, Judge Lowe recommended that Plaintiff's Fourteenth Amendment procedural due process claim against Defendant Varkiar regarding his disciplinary hearing be dismissed if, within thirty (30) days from the filing of this Final Order, Plaintiff does not file an Amended Complaint that successfully states a Fourteenth Amendment procedural due process claim. It was recommended that Plaintiff's remaining claims be dismissed with prejudice.

Plaintiff filed objections to the Report-Recommendation, essentially raising the same arguments presented to the Magistrate Judge.

When objections to a magistrate judge's Report-Recommendation are lodged, the Court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *See* 28 U.S.C. § 636(b)(1). After such a review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions." *Id.*

Having reviewed the record *de novo* and having considered the issues raised in the Plaintiff's objections, this Court has determined to accept and adopt the recommendation of Magistrate Judge Lowe for the reasons stated in the Report-Recommendation.

It is therefore

2008 WL 4693153

**ORDERED** that Defendants motion to dismiss be **GRANTED** in part and **DENIED** in part.

**IT IS SO ORDERED.**

## *REPORT-RECOMMENDATION*

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me by the Honorable Thomas J. McAvoy, Senior United States District Judge, for Report and Recommendation with regard to any dispositive motions filed, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Generally, in his Complaint, Raymond Robles ("Plaintiff") alleges that three employees of the New York State Department of Correctional Services ("DOCS"), as well as DOCS itself, violated his rights under the Eighth and Fourteenth Amendments when they (1) required him to submit to a random urinalysis test when they knew he was taking a medication that would prevent him from providing a urine sample, and (2) charged, convicted, and punished him with eighty-seven days in a Special Housing Unit for refusing to provide a urine sample. (*See generally* Dkt. No. 1 [Plf.'s Compl.].) Currently pending before the Court is Defendants' motion to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). (Dkt. No. 16.) For the reasons that follow, I recommend that Defendants' motion be granted in part and denied in part.

## I. BACKGROUND

### A. Summary of Plaintiff's Complaint

**\*2** As Defendants correctly observe in their Memorandum of Law, Plaintiff's Complaint-which describes the events giving rise to his claims in two brief paragraphs without identifying any role played by Defendants in those events-is hardly a model of *fair notice* under Fed.R.Civ.P. 8(a)(2). (Dkt. No. 1, ¶¶ 6-7 [Plf.'s Compl.].) However, as explained below in Part II of this Report-Recommendation, the mandate to read the papers of *pro se* civil rights litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint.[1] Here, I find that the factual allegations contained in Plaintiff's Response Affidavit are consistent with the factual allegations of his Complaint. As a result, in construing Plaintiff's Complaint, I will consider his Response Affidavit as effectively amending the factual allegations of his Complaint. Thus construed, Plaintiff's Complaint alleges as follows:

1. On November 6, 2006, at about 7:28 a.m., Plaintiff was directed to report to the drug testing center at Riverview C.F.;[2]

2. Upon arriving at the drug testing center, Plaintiff was informed by Correctional Officer K. Bleau ("Defendant Bleau") that he had been randomly selected to submit to urinalysis drug testing;[3]

3. Defendant Bleau asked Plaintiff if he would provide a urine sample, and Plaintiff responded yes;[4]

4. Defendant Bleau then asked Plaintiff if he was taking any medications, and Plaintiff explained that (1) yes, he was taking Flomax and Omeprazole due to a prostate condition and a stomach problem, and (2) "d[ue] to the medication [s]" and the fact that he had used the bathroom at approximately 7:10 a.m. that morning, he would need more water in order to urinate;[5]

5. As Plaintiff was explaining these facts to Defendant Bleau, Defendant Bleau became upset and walked away from Plaintiff;[6]

Robles v. Bleau, Not Reported in F.Supp.2d (2008)

2008 WL 4693153

6. When he returned, Defendant Bleau then informed Plaintiff that, pursuant to DOCS Directive 4937, Plaintiff had three hours provide a urine sample or he would be considered to be refusing to provide the urine sample; [7]

7. Defendant Bleau then gave Plaintiff a cup of water at approximately 7:30 a.m., and a second cup of water at approximately 9:30 a.m., but did not give him a third cup of water at approximately 8:30 a.m., as required by Part D.4. of DOCS Directive 4937; [8]

8. At approximately 10:30 a.m., Plaintiff was still unable to provide a urine sample; [9]

9. At that time, Defendant Bleau notified Correctional Sergeant Peacock ("Defendant Peacock") that Plaintiff was refusing a direct order to provide a urine sample; [10]

10. When Plaintiff tried to explain to Defendant Peacock that his medical condition prevented him from providing the urine sample, Defendant Peacock responded, "Shut up and put [your] hands behind [your] back"; [11]

*3 11. Both Defendants Bleau and Peacock failed to investigate or inquire as to why Plaintiff had been prescribed Flomax and Omeprazole, or what the potential side effects of those drugs were, although that information was readily obtainable from medical staff at Riverview C.F.; [12]

12. Instead, Defendants Bleau and/or Peacock escorted Plaintiff to the Riverview C.F. Special Housing Unit ("S.H.U."); [13]

13. On November 7, 2006, at about 8:55 a.m., while Plaintiff was in S.H.U., he was served with a copy of a misbehavior report authored by Defendant Bleau, charging him with (1) failing to comply with the urinalysis testing procedure, and (2) refusing a direct order to provide a urine sample; [14]

14. On November 10, 2006, Senior Correctional Counselor R. Varkiar conducted Plaintiff's disciplinary hearing on the misbehavior report; [15]

15. At the hearing, when Plaintiff entered a plea of "Not guilty, with an explanation," Defendant Varkiar gave Plaintiff "an opportunity to explain [him] self"; [16]

16. Plaintiff explained that he had a medical condition that prevented him from providing a urine sample, that he had attempted to inform Defendant Bleau of this medical condition (but Defendant Bleau walked away from Plaintiff), and that he had attempted to inform Defendant Peacock of this medical condition (but Defendant Peacock told Plaintiff to "[s]hut up"); [17]

17. Defendant Varkiar then made a telephone call; when he was done with the call, he told Plaintiff that (1) he had called the medical unit at Riverview C.F. to ask whether or not the medication that Plaintiff was taking would prevent him from urinating, and (2) someone in the medical unit had responded that no, the medication should not prevent Plaintiff from urinating; [18]

18. Plaintiff then attempted to explain to Defendant Varkiar *why* he was taking one of the medications, specifically, to remedy a prostate problem that itself interfered with his ability to urinate; [19]

19. However, Defendant Varkiar failed to call back the person in the medical unit at Riverview C.F. and request that he or she again answer the question he had posed before, taking into account Plaintiff's prostate condition as shown by his medical records; [20]

20. As a result, Defendant Varkiar found Plaintiff guilty of both disciplinary charges, and sentenced him to ninety (90) days in S.H.U ., with a corresponding loss of privileges; [21]

21. At the conclusion of the hearing, Plaintiff received a written copy of the hearing disposition, which stated that the evidence relied on included (1) the statements in the written misbehavior report of Defendant Bleau (which Defendant Varkiar stated were credible), and (2) Plaintiff's own hearing testimony (which Defendant Varkiar stated was not credible); [22]

22. On November 27, 2006, Plaintiff appealed his conviction to DOCS Director of Special Housing, Donald Selsky, who reversed the conviction on January 19, 2007; [23] and

**\*4** 23. On February 1, 2007, Plaintiff was finally released from S.H.U., after spending eighty-seven (87) days there. [24]

It should be noted that, in addition to asserting constitutional claims against Defendants Bleau, Peacock, and Varkiar in their individual or personal capacities, Plaintiff's Complaint asserts a constitutional claim also against DOCS itself. It should also be noted that, as relief for Defendants' actions, Plaintiff requests money damages but no injunctive relief. [25]

### B. Summary of Grounds in Support of Defendants' Motion

Generally, Defendants' motion to dismiss for failure to state a claim is premised on two grounds: (1) Plaintiff's claim against DOCS is barred by the Eleventh Amendment; and (2) the allegations of Plaintiff's Complaint are too lacking in detail to give Defendants *fair notice* under Fed.R.Civ.P. 8(a)(2). (Dkt. No. 16, Part 2, at 2-5 [Defs.' Memo. of Law].)

## II. LEGAL STANDARD GOVERNING MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM

Under Fed.R.Civ.P. 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). It has long been understood that a defendant may base such a motion on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed.R.Civ.P. 8(a)(2); [26] or (2) a challenge to the legal cognizability of the claim. [27]

Rule 8(a)(2) requires that a pleading contain "a short and plain statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) [emphasis added]. By requiring this "showing," Fed.R.Civ.P. 8(a)(2) requires that the pleading contain a short and plain statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." [28] The main purpose of this rule is to "facilitate a proper decision on the merits." [29] A complaint that fails to comply with this rule "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." [30]

The Supreme Court has long characterized this pleading requirement under Fed.R.Civ.P. 8(a)(2) as "simplified" and "liberal," and has repeatedly rejected judicially established pleading requirements that exceed this liberal requirement. [31] However, it is well established that even this liberal notice pleading standard "has its limits." [32] As a result, several Supreme Court decisions, and Second Circuit decisions, exist holding that a pleading has failed to meet this liberal notice pleading standard. [33]

Most notably, in the recent decision of *Bell Atlantic Corporation v. Twombly,* the Supreme Court, in reversing an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1, "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 550 U.S. 544, ---- - ----, 127 S.Ct. 1955, 1968-69, 167 L.Ed.2d 929 (2007). [34] Rather than

2008 WL 4693153

turning on the *conceivability* of an actionable claim, the Court clarified, the Fed.R.Civ.P. 8 "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965-74.

**\*5** More specifically, the Court reasoned that, by requiring that a pleading "show[ ] that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2) requires that the pleading give the defendant "fair notice" of (1) the nature of the claim and (2) the "grounds" on which the claim rests. *Id.* at 1965, n. 3 [citation omitted]. While this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading contain at least "some factual allegation[s]." *Id.* [citations omitted]. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]" assuming, of course, that all the allegations in the complaint are true. *Id.* at 1965 [citations omitted]. What this means, on a practical level, is that there must be "plausible grounds to infer [actionable conduct]," or, in other words, "enough fact to raise a reasonable expectation that discovery will reveal evidence of [actionable conduct]." *Id.*

As have other Circuits, the Second Circuit has repeatedly recognized that the clarified plausibility standard that was articulated by the Supreme Court in *Twombly* governs *all* claims, not merely antitrust claims brought under 15 U.S.C. § 1 (as were the claims in *Twombly* ). [35] The Second Circuit has also recognized that this *plausibility* standard governs claims brought even by *pro se* litigants (although the plausibility of those claims is be assessed generously, in light of the special solicitude normally afforded *pro se* litigants). [36]

It should be emphasized that Fed.R.Civ.P. 8's plausibly standard, explained in *Twombly,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which the Court stated, "Specific facts are not necessary" to successfully state a claim under Fed.R.Civ.P. 8(a)(2). *Erickson v. Pardus,* 551 U.S. 89, ----, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) [citation omitted]. That statement was merely an abbreviation of the often-repeated point of law-first offered in *Conley* and repeated in *Twombly*-that a pleading need not "set out in detail the facts upon which [the claim is based]" in order to successfully state a claim. *Twombly,* 127 S.Ct. 1965, n. 3 (citing *Conley v. Gibson,* 355 U.S. 41, 47 [1957] ). That statement in no way meant that all pleadings may achieve the requirement of giving a defendant "fair notice" of the nature of the nature of the claim and the "grounds" on which the claim rests without ever having to allege any facts whatsoever. [37] There must still be enough fact alleged to raise a right to relief above the speculative level to a plausible level, so that the defendant may know what the claims are and the grounds on which they rest (in order to shape a defense).

Having said all of that, it should also be emphasized that, "[i]n reviewing a complaint for dismissal under Fed.R.Civ.P. 12(b) (6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." [38] "This standard is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se.*" [39] In other words, as stated above, while all pleadings are to be construed liberally under Fed.R.Civ.P. 8(e), *pro se* civil rights pleadings are to be construed with an *extra* degree of liberality . [40]

**\*6** For example, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint. [41] Moreover, "courts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest." [42] Furthermore, when addressing a *pro se* complaint, generally a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." [43] Of course, an opportunity to amend is not required where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it." [44] In addition, granting a *pro se* plaintiff an opportunity to amend is not required where the plaintiff has already been given a chance to amend his pleading. [45]

However, while this special leniency may somewhat loosen the procedural rules governing the form of pleadings (as the Second Circuit very recently observed), [46] it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Fed.R.Civ.P. 8, 10 and 12. [47] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Fed.R.Civ.P. 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow. [48] Stated more plainly, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." [49]

## III. ANALYSIS

### A. Whether Plaintiff's Claim Against DOCS is Barred by the Eleventh Amendment

For the reasons offered by Defendants in their Memorandum of Law, I agree with them that Plaintiff's constitutional claims against Defendant DOCS are barred by the Eleventh Amendment to the United States Constitution. (Dkt. No. 16, Part 2, at 2-3 [Defs.' Mem. of Law].) In the interest of brevity, I will not repeat the well-established points of law that they correctly cite in support of their argument. Instead, I will only add three points that Defendants do *not* make in their succinct argument: (1) where it has been successfully demonstrated that a defendant is entitled to sovereign immunity under the Eleventh Amendment, the federal court lacks subject matter jurisdiction over the case (or claim), and "the case [or claim] *must* be stricken from the docket"; [50] (2) Plaintiff's civil rights claims against Defendant DOCS (an entity) are barred also by the express language of 42 U.S.C. § 1983, which confers liability upon only any *"person* who ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws .... " [51]; and (3) because the defect with this claim is substantive rather than merely formal, better pleading will not cure it, and thus it should be dismissed with prejudice. [52]

**\*7** For all of these reasons, I recommend that the Court dismiss with prejudice Plaintiff's claims against Defendant DOCS.

It should be noted that, in addition to barring Plaintiff's constitutional claims against Defendant DOCS, the Eleventh Amendment would also bar any claim by Plaintiff against Defendants Bleau, Peacock and Varkiar in their official capacities. [53] However, because I do not even liberally construe Plaintiff's Complaint (and Response Affidavit) as asserting such claims, no need exists to recommend the dismissal of those claims. (*See generally* Dkt. No 1, 17.)

### B. Whether the Allegations of Plaintiff's Complaint Are Too Lacking in Detail to Give Defendants *Fair Notice* under Fed.R.Civ.P. 8(a)(2)

For the reasons offered by Defendants in their Memorandum of Law, I agree with them that Plaintiff's Complaint-when considered alone-is too lacking in detail to give Defendants the fair notice that is required under Fed.R.Civ.P. 8(a)(2). (Dkt. No. 16, Part 2, at 3-5 [Defs.' Mem. of Law].) However, as explained above in Part II of this Report-Recommendation, the mandate to read the papers of *pro se* civil rights litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint. [54] Here, when construing Plaintiff's Complaint together with his Response Affidavit, I find that Plaintiff's allegations *are* detailed enough to give Defendants the fair notice that is required under Fed.R.Civ.P. 8(a)(2). *See, supra,* Part I.A. of this Report-Recommendation.

However, this does not end the Court's analysis of Plaintiff's Complaint because, even where a defendant has not advanced a certain argument on a motion to dismiss in a *pro se* prisoner civil rights case, a district court may (and, indeed, has a duty to) *sua sponte* address whether the pleading in such a case has successfully stated a claim upon which relief may be granted. [55] Here, Plaintiff's Complaint is plagued by several defects (some substantive and some formal) [56] that simply cannot be overlooked.

2008 WL 4693153

**C. Whether Plaintiff Has Stated an Actionable Claim Against Defendants Bleau, Peacock and Varkiar Arising Out of Plaintiff's Being Required to Provide a Urine Sample Given Their Knowledge of His Medications and/or Medical Condition**

Among Plaintiff's claims is a claim that "[i]t is neither lawful nor [ ] reasonable to expect an Inmate to perform a bodily function on command when you know or should know that his medical condition and prescribed treatment plan indicate that when he urinates[,] and when he [can] not[,] can be beyond his control." (Dkt. No. 17, at 5 [Plf.'s Response Affid.].) I liberally construe this claim as one of harassment or perhaps inadequate-prison-conditions under the Eighth Amendment. (To the extent that this allegation is also used to support a procedural due process claim under the Fourteenth Amendment, I address that claim below in Parts III.D. and III.E. of this Report-Recommendation.)

**\*8** The problem with Plaintiff's Eighth Amendment claim is that the rather detailed facts alleged by him in support of that claim do not suggest in any way that any of the three individual Defendants were acting with the sort of mental state that is required for them to incur liability under the Eighth Amendment, namely, *deliberate indifference.* Deliberate indifference is a state of mind akin to *criminal recklessness,* which involves *knowing* of and disregarding an excessive risk to inmate health or safety. [57] Here, Plaintiff himself alleges that the three individual Defendants did not in fact *understand* that he could not urinate due to his prostate condition. Indeed, as he was trying to explain his medical condition to Defendants, (1) Defendant Bleau became angry and "walked away" from Plaintiff, (2) Defendant Peacock told Plaintiff to "[s]hut up," and (3) Defendant Varkiar failed to call back the person in the medical unit of Riverview C.F. and ask him or her to report (to Varkiar) the impact of Plaintiff's prostate condition on his ability to urinate. *See, supra,* Part I.A. of this Report-Recommendation. [58]

At its heart, Plaintiff's Eighth Amendment claim alleges that the three individual Defendants *should have known* that he could not urinate during the time in question due to his enlarged prostate, but that they did not know that fact because they *failed to investigate* the nature and effects of his prostate condition. In other words, his Eighth Amendment claim is one of *negligence.* Such a claim is simply not actionable under the Eighth Amendment (or any constitutional provision). As is often observed, "[D]eliberate indifference describes a state of mind more blameworthy than negligence." [59] Finally, because the defect with this detailed claim is substantive rather than merely formal, I find that better pleading will not cure it. [60]

For all of these reasons, I recommend that the Court dismiss with prejudice Plaintiff's Eighth Amendment claim.

**D. Whether Plaintiff Has Stated an Actionable Claim Against Defendants Bleau and Peacock Arising Out of His Receipt of an Erroneous or False Misbehavior Report**

It is well established that "a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (citing *Freeman v. Rideout,* 808 F.2d 949, 951 [2d Cir.1986] ). [61] Rather, the only way that false accusations contained in a misbehavior report can rise to the level of a constitutional violation is when there is "more, such as retaliation against the prisoner for exercising a constitutional right." *Boddie,* 105 F.3d at 862; *accord, Murray v. Pataki,* 03-CV-1263, 2007 U.S. Dist. LEXIS 26959, at \*26, 2007 WL 965345 (N.D.N.Y. March 5, 2007) (Treece, M.J.) [citations omitted].

Here, Plaintiff alleges no actionable conduct regarding his being issued the misbehavior report in question, such as retaliation against him for exercising a constitutional right. *See, supra,* Part I.A. of this Report-Recommendation. Moreover, because the defect with this detailed claim is substantive rather than merely formal, I find that better pleading will not cure it. [62]

**\*9** For these reasons, I recommend that the Court dismiss with prejudice Plaintiff's Fourteenth Amendment false-misbehavior-report claim.

2008 WL 4693153

### E. Whether Plaintiff Has Stated an Actionable Claim Against Defendant Varkiar Arising Out of Plaintiff's Erroneous or Unjustified Disciplinary Conviction

"[Courts] examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State ...; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient .... " *Kentucky Dept. of Corr. v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989). With regard to the first question, in 1995, the Supreme Court held in *Sandin v. Connor* that liberty interests protected by the Fourteenth Amendment's Due Process Clause will not arise from the use of mandatory language of a particular state law or regulation, but "will generally be limited to freedom from restraint which ... imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Connor,* 515 U.S. 472, 483-484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).

Here, Plaintiff alleges that the disciplinary hearing conducted by Defendant Varkiar resulted in a sentence of eighty-seven (87) days in the Riverview C.F. S.H.U. with a corresponding loss of privileges. *See, supra,* Part I.A. of this Report-Recommendation. Numerous district courts in this Circuit have issued well-reasoned decisions finding no atypical and significant hardship experienced by inmates who served sentences in S.H.U. of far more than the eighty-seven (87) days alleged here-even where the conditions of confinement in the S.H.U. were, to varying degrees, more restrictive than those in the prison's general population. [63] As a result, I find that Plaintiff has not alleged facts plausibly suggesting that he possessed, during the disciplinary hearing, a liberty interest that was protected by the Fourteenth Amendment.

However, such a finding leads only to a recommendation that this claim be dismissed *without* prejudice. This is because it is conceivable to me that Plaintiff's Complaint and Response Affidavit-which are silent with regard to the conditions of confinement he experienced in the Riverview C.F. S.H.U.-may be amended so as to allege facts plausibly suggesting that those conditions were so restrictive as to impose on Plaintiff an *atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life* (thus conferring on him a protected liberty interest under the Fourteenth Amendment).

I should also point out that, even assuming (for the sake of argument) that Plaintiff possessed a protected liberty interest with regard to his disciplinary hearing, I find that he has alleged facts plausibly suggesting that he was, in fact, given all the process that he was due under the circumstances. Specifically, Plaintiff alleges that he was given the following: (1) timely notice of the misbehavior report: (2) an "opportunity to explain [him]self" at his disciplinary hearing; (3) a written disciplinary hearing disposition; (4) a disciplinary hearing disposition that was based on at least some evidence (e.g., his own hearing testimony, which Defendant Varkiar found to be not credible); and (5) an opportunity to appeal the disciplinary hearing disposition (which he did so successfully). *See, supra,* Part I.A. of this Report-Recommendation.

 **\*10**  Of course, the defect that Plaintiff alleges occurred at his disciplinary hearing was Defendant Varkiar's failure to use the telephone to call back the person in the medical unit at Riverview C .F. and request that he or she again answer the question of whether Plaintiff was physically unable to urinate, taking into account his prostate condition as shown by his medical records. *Id.* Generally, it is not the duty of an impartial hearing officer to conduct an investigation of the merit of the disciplinary charges against an inmate; rather, the duty of a hearing officer is merely to review the evidence presented to him at the disciplinary hearing, and in *certain circumstances* identify defense witnesses for the inmate. [64] Here, I find that Plaintiff has alleged no circumstances conferring on Defendant Varkiar a duty to call back the medical unit at Riverview C.F. For example, I find that Plaintiff's Complaint and Response Affidavit are devoid of any allegation that, at his disciplinary hearing, he requested and was denied an adjournment of the hearing so that, with the help of a legal assistant, he could obtain his medical records and call as a witness a member of the medical unit, in order that he himself could introduce testimony that his prostate condition prevented him from urinating during the time in question. *See, supra,* Part I.A. of this Report-Recommendation. However, again, such a finding leads only to a recommendation that this claim be dismissed *without* prejudice, because it is conceivable to me that Plaintiff's Complaint and Response Affidavit may be amended to allege facts plausibly suggesting that, at his disciplinary hearing, he made, and was denied, such a request.

2008 WL 4693153

For these reasons, I recommend that the Court dismiss Plaintiff's Fourteenth Amendment procedural due process claim regarding his disciplinary hearing if, within thirty (30) days from the date of the Court's final Order on this Report-Recommendation, Plaintiff does not file an Amended Complaint that successfully states a Fourteenth Amendment procedural due process claim regarding his disciplinary hearing.

Finally, two points bear mentioning. First, to the extent that Plaintiff is attempting to allege that his procedural due process rights were violated at his disciplinary hearing also because Defendant Bleau violated Part D.4. of DOCS Directive 4937 by giving Plaintiff only two cups of water during the three-hour period in question, that allegation is not actionable under the circumstances. Section 1983 provides, in pertinent part, "Every person who ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by *the Constitution and laws,* shall be liable to the party injured ...." 42 U.S.C. § 1983 [emphasis added]. The term "the Constitution and laws" refers to the United States Constitution and *federal* laws. [65] A violation of a state law or regulation, *in and of itself,* does not give rise to liability under 42 U.S.C. § 1983. [66] Furthermore, the violation of a DOCS Directive, alone, is not even a violation of New York State law or regulation; [67] this is because a DOCS Directive is "merely a system the [DOCS] Commissioner has established to assist him in exercising his discretion," which he retains, despite any violation of that Directive. [68]

 **\*11** Second, in making the above recommendation (that Plaintiff be required to file an Amended Complaint that successfully states a Fourteenth Amendment procedural due process claim regarding his disciplinary hearing, upon penalty of dismissal), I am in no way "issuing specific instructions [to Plaintiff] mandating the content and format of the putative amended complaint"-instructions that the Second Circuit recently found erroneous in the case of *Sealed Plaintiff v. Sealed Defendant # 1,* No. 06-1590, 2008 WL 3294864, at \*6 (2d Cir. Aug.12, 2008). Rather, I am merely reporting my finding that Plaintiff's current Fourteenth Amendment procedural due process claim regarding his disciplinary hearing fails to state a claim upon which relief might be granted, as pleaded.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion to dismiss for failure to state a claim (Dkt. No. 16) be ***GRANTED* in part** and ***DENIED* in part** in the following respects:

(1) Plaintiff's Fourteenth Amendment procedural due process claim against Defendant Varkiar regarding his disciplinary hearing be ***DISMISSED*** if, within thirty (30) days from the date of the Court's final Order on this Report-Recommendation, Plaintiff does not file an Amended Complaint that successfully states a Fourteenth Amendment procedural due process claim regarding his disciplinary hearing; and

(2) The other claims asserted in Plaintiff's Complaint (as effectively amended by his Response Affidavit) be ***DISMISSED* with prejudice,** and without condition.

**ANY OBJECTIONS to this Report-Recommendation must be filed with the Clerk of this Court within TEN (10) WORKING DAYS, PLUS THREE (3) CALENDAR DAYS from the date of this Report-Recommendation (unless the third calendar day is a legal holiday, in which case add a fourth calendar day).** *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b); N.D.N.Y. L.R. 72.1(c); Fed.R.Civ.P. 6(a)(2), (d).

**BE ADVISED that the District Court, on** *de novo* **review, will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance.** [69]

Robles v. Bleau, Not Reported in F.Supp.2d (2008)
2008 WL 4693153

**BE ALSO ADVISED that the failure to file timely objections to this Report-Recommendation will PRECLUDE LATER APPELLATE REVIEW of any Order of judgment that will be entered.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of H.H.S.,* 892 F.2d 15 [2d Cir.1989] ).

30      *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion), *accord, Hudson v. Artuz,* 95-CV-4768, 1998 WL 832708, at *2 (S.D.N.Y. Nov.30, 1998), *Flores v. Bessereau,* 98-CV-0293, 1998 WL 315087, at *1 (N.D.N.Y. June 8, 1998) (Pooler, J .). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Technol., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 [2d Cir.1996] ).

1       *See, infra,* note 41 of this Report-Recommendation (citing cases).

2       (Dkt. No. 17, at 4 [Plf.'s Response Affid.].)

3       (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 4 [Plf.'s Response Affid.].)

4       (Dkt. No. 17, at 4 [Plf.'s Response Affid.]; Dkt. No. 17, at 8 [Ex. 1 to Plf.'s Response Affid., attaching completed form entitled, "Request for Urinalysis Test"].)

5       (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 4 [Plf.'s Response Affid.]; Dkt. No. 17, at 8 [Ex. 1 to Plf.'s Response Affid., attaching completed form entitled, "Request for Urinalysis Test"]; Dkt. No. 17, at 14 [Ex. 7 to Plf.'s Response Affid., attaching Plaintiff's letter of appeal, dated November 27, 2006].)

6       (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 14 [Ex. 7 to Plf.'s Response Affid., attaching Plaintiff's letter of appeal, dated November 27, 2006].)

7       (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 4 [Plf.'s Response Affid.]; Dkt. No. 17, at 10 [Ex. 3 to Plf.'s Response Affid ., attaching page from DOCS Directive 4937].)

8       (Dkt. No. 1, ¶ 7 [Plf.'s Compl.]; Dkt. No. 17, at 4, 5 [Plf.'s Response Affid.]; Dkt. No. 17, at 10 [Ex. 3 to Plf.'s Response Affid., attaching page from DOCS Directive 4937].)

9       (Dkt. No. 1, ¶¶ 6-7 [Plf.'s Compl.]; Dkt. No. 17, at 4 [Plf .'s Response Affid.]; Dkt. No. 17, at 11 [Ex. 4 to Plf.'s Response Affid., attaching Inmate Misbehavior Report].)

10      (Dkt. No. 17, at 11 [Ex. 4 to Plf.'s Response Affid., attaching Inmate Misbehavior Report].)

11      (Dkt. No. 17, at 5 [Plf.'s Response Affid.].)

12      (Dkt. No. 1, ¶ 7 [Plf.'s Compl.]; Dkt. No. 17, at 4, 5 [Plf.'s Response Affid.]; Dkt. No. 17, at 9 [Ex. 2 to Plf.'s Response Affid., attaching page of his Ambulatory Health Record].)

13      (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 5 [Plf.'s Response Affid.].)

14      (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 3 [Plf.'s Response Affid.]; Dkt. No. 17, at 11 [Ex. 4 to Plf.'s Response Affid ., attaching Inmate Misbehavior Report].)

15      (Dkt. No. 17, at 3 [Plf.'s Response Affid.]; Dkt. No. 17, at 12-13 [Ex. 5 to Plf.'s Response Affid., attaching Superintendent Hearing Disposition].)

16    (Dkt. No. 17, at 3 [Plf.'s Response Affid.]; Dkt. No. 17, at 12-13 [Ex. 5 to Plf.'s Response Affid., attaching Superintendent Hearing Disposition].)

17    (*Id.*)

18    (Dkt. No. 17, at 3 [Plf.'s Response Affid.]; Dkt. No. 17, at 12-13 [Ex. 5 to Plf.'s Response Affid., attaching Superintendent Hearing Disposition]; Dkt. No. 17, at 15 [Ex. 7 to Plf.'s Response Affid., attaching Plaintiff's letter of appeal, dated November 27, 2006].)

19    (Dkt. No. 17, at 2-3 [Plf.'s Response Affid.]; Dkt. No. 17, at 14-15 [Ex. 7 to Plf.'s Response Affid., attaching Plaintiff's letter of appeal, dated November 27, 2006]; Dkt. No. 17, at 17 [Ex. 6 to Plf.'s Response Affid., attaching page of information about Flomax].)

20    (Dkt. No. 1, ¶ 7 [Plf.'s Compl.]; Dkt. No. 17, at 3 [Plf.'s Response Affid.]; Dkt. No. 17, at 17 [Ex. 6 to Plf.'s Response Affid ., attaching page of information about Flomax].)

21    (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 3 [Plf.'s Response Affid.]; Dkt. No. 17, at 12-13 [Ex. 5 to Plf.'s Response Affid., attaching Superintendent Hearing Disposition].)

22    (Dkt. No. 17, at 12-13 [Ex. 5 to Plf.'s Response Affid., attaching Superintendent Hearing Disposition]; Dkt. No. 17, at 3 [Plf.'s Response Affid.].)

23    (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 3-4 [Plf.'s Response Affid.]; Dkt. No. 17, at 15 [Ex. 7 to Plf.'s Response Affid., attaching Plaintiff's letter of appeal, dated November 27, 2006]; Dkt. No. 17, at 16 [Ex. 8 to Plf.'s Response Affid., attaching Donald Selsky's Review of Superintendent's Hearing, issued on January 19, 2007].)

24    (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 2 [Plf.'s Response Affid.].)

25    (Dkt. No. 1, ¶ 6 [Plf.'s Compl.].)

26    *See* 5C Wright & Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") [citations omitted]; *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr.S.D.N.Y.1984) ("The motion under F.R.Civ.P. 12(b) (6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a) (2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

27    *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ("These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest.... In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ("There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.") [citation omitted]; *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing between a failure to meet Rule 12[b][6]'s requirement of stating a cognizable claim and Rule 8[a]'s requirement of disclosing sufficient information to put defendant on fair notice); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 379 F.Supp.2d 348, 370 (S.D.N.Y.2005) ( "Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim [under Rule 12(b)(6) ].") [citation omitted]; *Util. Metal Research & Generac Power Sys.,* 02-CV-6205, 2004 U.S. Dist. LEXIS 23314, at *4-5, 2004 WL 2613993 (E.D.N.Y. Nov. 18, 2004) (distinguishing between the legal sufficiency of the cause of action under Rule 12[b][6] and the sufficiency of the complaint under Rule 8[a]

); *accord, Straker v. Metro Trans. Auth.,* 331 F.Supp.2d 91, 101-102 (E.D.N.Y.2004); *Tangorre v. Mako's, Inc.,* 01-CV-4430, 2002 U.S. Dist. LEXIS 1658, at *6-7, 2002 WL 313156 (S.D.N.Y. Jan. 30, 2002) (identifying two sorts of arguments made on a Rule 12[b] [6] motion-one aimed at the sufficiency of the pleadings under Rule 8 [a], and the other aimed at the legal sufficiency of the claims).

28 *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 1634, 161 L.Ed.2d 577 (2005) (holding that the complaint failed to meet this test) [citation omitted; emphasis added]; *see also Swierkiewicz,* 534 U .S. at 512 [citation omitted]; *Leathernman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) [citation omitted].

29 *Swierkiewicz,* 534 U.S. at 514 (quoting *Conley,* 355 U.S. at 48); *see also Simmons v. Abruzzo,* 49 F.3d 83, 86 (2d Cir.1995) ("Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial.") [citation omitted]; *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988) ("[T]he principle function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial.") [citations omitted].

31 *See, e.g., Swierkiewicz,* 534 U.S. at 513-514 (noting that "Rule 8(a)(2)'s simplified pleading standard applies to all civil actions, with limited exceptions [including] averments of fraud or mistake.").

32 2 *Moore's Federal Practice* § 12.34[1][b] at 12-61 (3d ed.2003).

33 *See, e.g., Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, ---- - ----, 127 S.Ct. 1955, 1964-1974, 167 L.Ed.2d 929 (2007) (pleading did not meet Rule 8[a][2]'s liberal requirement), *accord, Dura Pharmaceuticals,* 125 S.Ct. at 1634-1635, *Christopher v. Harbury,* 536 U.S. 403, 416-422, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002), *Freedom Holdings, Inc. v. Spitzer,* 357 F.3d 205, 234-235 (2d Cir.2004), *Gmurzynska v. Hutton,* 355 F.3d 206, 208-209 (2d Cir.2004). Several unpublished decisions exist from the Second Circuit affirming the Rule 8(a)(2) dismissal of a complaint after *Swierkiewicz. See, e.g., Salvador v. Adirondack Park Agency of the State of N.Y.,* No. 01-7539, 2002 WL 741835, at *5 (2d Cir. Apr.26, 2002) (affirming pre-*Swierkiewicz* decision from Northern District of New York interpreting Rule 8[a] [2] ). Although these decisions are not themselves precedential authority, *see* Rules of the U.S. Court of Appeals for the Second Circuit, § 0.23, they appear to acknowledge the continued precedential effect, after *Swierkiewicz,* of certain cases from within the Second Circuit interpreting Rule 8(a)(2). *See Khan v. Ashcroft,* 352 F.3d 521, 525 (2d Cir.2003) (relying on summary affirmances because "they clearly acknowledge the continued precedential effect" of *Domond v. INS,* 244 F.3d 81 [2d Cir.2001], after that case was "implicitly overruled by the Supreme Court" in *INS v. St. Cyr,* 533 U.S. 289 [2001] ).

34 The Court in *Twombly* further explained: "The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been adequately stated, it may be supported by showing any set of facts consistent with the allegations in the complaint.... *Conley,* then, described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." *Twombly,* 127 S.Ct. at 1969.

35 *See, e.g., Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (in civil rights action, stating that "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim up relief that is plausible on its face.' ") [citation omitted]; *Goldstein v. Pataki,* 07-CV-2537, 2008 U.S.App. LEXIS 2241, at *14, 2008 WL 269100 (2d Cir. Feb. 1, 2008) (in civil rights action, stating that "*Twombly* requires ... that the complaint's '[f]actual allegations be enough to raise a right to relief above the speculative level ....' ") [internal citation omitted]; *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98, n. 2 (2d Cir.2007) ("We have declined to read Twombly's flexible 'plausibility standard' as relating only to antitrust cases.") [citation omitted]; *Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) (in prisoner civil rights action, stating, "[W]e believe the [Supreme] Court [in *Bell Atlantic Corp. v. Twombly* ] is ... requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible."* ) [emphasis in original].

2008 WL 4693153

36    *See, e.g., Jacobs v. Mostow,* 281 F. App'x 85, 87 (2d Cir. March 27, 2008) (in pro se action, stating, "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim up relief that is plausible on its face.' ") [citation omitted] (summary order, cited in accordance with Local Rule 32.1[c][1] ); *Boykin v. KeyCorp.,* 521 F.3d 202, 215-16 (2d Cir.2008) (finding that borrower's *pro se* complaint sufficiently presented a *"plausible* claim of disparate treatment," under Fair Housing Act, to give lenders fair notice of her discrimination claim based on lenders' denial of her home equity loan application) [emphasis added].

37    For example, in *Erickson,* a district court had dismissed a *pro se* prisoner's civil rights complaint because, although the complaint was otherwise factually specific as to how the prisoner's hepatis C medication had been wrongfully terminated by prison officials for a period of approximately 18 months, the complaint (according to the district court) failed to allege facts plausibly suggesting that the termination caused the prisoner "substantial harm." 127 S.Ct. at 2199. The Supreme Court vacated and remanded the case because (1) under Fed.R.Civ.P. 8 and *Twombly,* all that is required is a "a short and plain statement of the claim" sufficient to "give the defendant fair notice" of the claim and "the grounds upon which it rests," and (2) the plaintiff had alleged that the termination of his hepatitis C medication for 18 months was "endangering [his] life" and that he was "still in need of treatment for [the] disease." *Id.* at 2200. While *Erickson* does not elaborate much further on its rationale, a careful reading of the decision (and the dissent by Justice Thomas) reveals a point that is perhaps so obvious that it did not need mentioning in the short decision: a claim of deliberate indifference to a serious medical need under the Eighth Amendment involves two elements, i.e., the existence of a sufficiently serious medical need possessed by the plaintiff, and the existence of a deliberately indifferent mental state possessed by prison officials with regard to that sufficiently serious medical need. The *Erickson* decision had to do with only the first element, not the second element. *Id.* at 2199-2200. In particular, the decision was merely recognizing that an allegation by a plaintiff that, during the relevant time period, he suffered from hepatis C is, in and of itself, a factual allegation plausibly suggesting that he possessed a sufficiently serious medical need; the plaintiff need not *also* allege that he suffered an independent and "substantial injury" as a result of the termination of his hepatis C medication. *Id.* This point of law is hardly a novel one. For example, numerous decisions, from district courts within the Second Circuit alone, have found that suffering from hepatitis C constitutes having a serious medical need for purposes of the Eighth Amendment. *See, e .g., Rose v. Alvees,* 01-CV-0648, 2004 WL 2026481, at *6 (W.D.N.Y. Sept.9, 2004); *Verley v. Goord,* 02-CV-1182, 2004 WL 526740, at *10 n. 11 (S.D.N.Y. Jan.23, 2004); *Johnson v. Wright,* 234 F.Supp.2d 352, 360 (S.D.N.Y.2002); *McKenna v. Wright,* 01-CV-6571, 2002 WL 338375, at *6 (S.D.N.Y. March 4, 2002); *Carbonell v. Goord,* 99-CV-3208, 2000 WL 760751, at *9 (S.D.N.Y. June 13, 2000).

38    *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) [citation omitted]; *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

39    *Hernandez,* 18 F.3d at 136 [citation omitted]; *Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003) [citations omitted]; *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999) [citation omitted].

40    *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) ("[A] *pro se* complaint ... must be held to less stringent standards than formal pleadings drafted by lawyers ....") [internal quotation marks and citation omitted]; *McEachin v. McGinnis,* 357 F.3d 197, 200 (2d Cir.2004) ("[W]hen the plaintiff proceeds pro se, ... a court is obliged to construe his pleadings liberally, particularly when they allege civil rights violations.") [citation omitted].

41    "Generally, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum." *Gadson v. Goord,* 96-CV-7544, 1997 WL 714878, at *1, n. 2 (S.D.N.Y. Nov.17, 1997) (citing, *inter alia, Gil v. Mooney,* 824 F.2d 192, 195 [2d Cir.1987] [considering plaintiff's response affidavit on motion to dismiss] ). Stated another way, "in cases where a pro se plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they 'are consistent with the allegations in the complaint.' " *Donhauser v. Goord,* 314 F.Supp.2d 119, 212 (N.D.N.Y.2004) (considering factual allegations contained in plaintiff's opposition papers) [citations omitted], *vacated in part on other grounds,* 317 F.Supp.2d 160

Case 9:22-cv-00638-DNH-CBF    Document 80    Filed 03/20/26    Page 28 of 146
Robles v. Bleau, Not Reported in F.Supp.2d (2008)
2008 WL 4693153

(N.D.N.Y.2004). This authority is premised, not only on case law, but on Rule 15 of the Federal Rules of Civil Procedure, which permits a plaintiff, as a matter of right, to amend his complaint once at any time before the service of a responsive pleading-which a motion to dismiss is not. *See Washington v. James,* 782 F.2d 1134, 1138-39 (2d Cir.1986) (considering subsequent affidavit as amending *pro se* complaint, on motion to dismiss) [citations omitted].

42     *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) [internal quotation and citation omitted].

43     *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) [internal quotation and citation omitted]; *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

44     *Cuoco,* 222 F.3d at 112 (finding that repleading would be futile) [citation omitted]; *see also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) [citation omitted].

45     *Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at \*2, n. 14 (N.D.Y.Y. July 11, 2007) (McAvoy, J., adopting report-recommendation of Lowe, M.J.); *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at \*5, n. 34 (N.D.N.Y. Jan.23, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Ariola v. Onondaga County Sheriff's Dept.,* 04-CV-1262, 2007 WL 119453, at \*2, n. 13 (N.D.N.Y. Jan.10, 2007) (Hurd, J., adopting report-recommendation of Lowe, M.J.); *Collins v. Fed. Bur. of Prisons,* 05-CV-0904, 2007 WL 37404, at \*4, n. 30 (N.D.N.Y. Jan.4, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Goros v. Cent. Office Review Comm.,* 03-CV-0407, 2006 WL 2794415, at \*5, n. 18 (N.D.N.Y. Sept., 26, 2006) (Sharpe, J., adopting report-recommendation of Lowe, M.J.); *Williams v. Weaver,* 03-CV-0912, 2006 WL 2799417, at \*4, n .16 (N.D.N.Y. Sept. 26, 2006) (Kahn, J., adopting report-recommendation of Lowe, M.J.).

46     *See Sealed Plaintiff v. Sealed Defendant # 1,* No. 06-1590, 2008 WL 3294864, at \*5 (2d Cir. Aug.12, 2008) ("[The obligation to construe the pleadings of *pro se* litigants liberally] entails, at the very least, a permissive application of the rules governing the form of pleadings.") [internal quotation marks and citation omitted]; *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) ("[R]easonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training ... should not be impaired by harsh application of technical rules.") [citation omitted].

47     *See Prezzi v. Schelter,* 469 F.2d 691, 692 (2d Cir.1972) (extra liberal pleading standard set forth in *Haines v. Kerner,* 404 U.S. 519 [1972], did not save *pro se* complaint from dismissal for failing to comply with Fed.R.Civ.P. 8] ); *accord, Shoemaker v. State of Cal.,* 101 F.3d 108 (2d Cir.1996) (citing *Prezzi v. Schelter,* 469 F.2d 691) [unpublished disposition cited only to acknowledge the continued precedential effect of *Prezzi v. Schelter,* 469 F.2d 691, within the Second Circuit]; *accord, Praseuth v. Werbe,* 99 F.3d 402 (2d Cir.1995).

48     *See McNeil v. U.S.,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Faretta v. California,* 422 U.S. 806, 834, n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *cf. Phillips v. Girdich,* 408 F.3d 124, 128, 130 (2d Cir.2005) (acknowledging that *pro se* plaintiff's complaint could be dismissed for failing to comply with Rules 8 and 10 if his mistakes either "undermine the purpose of notice pleading [ ]or prejudice the adverse party").

Case 9:22-cv-00638-DNH-CBF Document 80 Filed 03/20/26 Page 29 of 146
Robles v. Bleau, Not Reported in F.Supp.2d (2008)
2008 WL 4693153

49 *Stinson v. Sheriff's Dep't of Sullivan Cty.,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980); *accord, Standley v. Dennison,* 05-CV-1033, 2007 WL 2406909, at *6, n. 27 (N.D.N.Y. Aug.21, 2007) (Sharpe, J., adopting report-recommendation of Lowe, M.J.); *Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at *2 (N.D.Y.Y. July 11, 2007) (McAvoy, J., adopting report-recommendation of Lowe, M.J.); *DiProjetto v. Morris Protective Serv.,* 489 F.Supp.2d 305, 307 (W.D.N.Y.2007); *Cosby v. City of White Plains,* 04-CV-5829, 2007 WL 853203, at *3 (S.D.N.Y. Feb.9, 2007); *Lopez v. Wright,* 05-CV-1568, 2007 WL 388919, at *3, n. 11 (N.D.N.Y. Jan.31, 2007) (Mordue, C.J., adopting report-recommendation of Lowe, M.J.); *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at *5 (N.D.N.Y. Jan.23, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Ariola v. Onondaga County Sheriff's Dept.,* 04-CV-1262, 2007 WL 119453, at *2, n. 13 (N.D.N.Y. Jan.10, 2007) (Hurd, J., adopting report-recommendation of Lowe, M.J.); *Collins v. Fed. Bur. of Prisons,* 05-CV-0904, 2007 WL 37404, at *4 (N.D.N.Y. Jan.4, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.).

50 *McGinty v. State of New York,* 251 F.3d 84, 100 (2d Cir.2001) [citation omitted]; *see also* Fed.R.Civ.P. 12(h)(3).

51 42 U.S.C. § 1983 [emphasis added].

52 *See, supra,* note 44 of this Report-Recommendation.

53 *See Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993) ("The immunity to which a state's official may be entitled in a § 1983 action depends initially on the capacity in which he is sued. To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state."); *Severino v. Negron,* 996 F.2d 1439, 1441 (2d Cir.1993) ( "[I]t is clear that the Eleventh Amendment does not permit suit [under Section 1983] for money damages against state officials in their official capacities."); *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988) ("The eleventh amendment bars recovery against an employee who is sued in his official capacity, but does not protect him from personal liability if he is sued in his 'individual' or 'personal' capacity."); *see also Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) ("Obviously, state officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.... As such, it is no different from a suit against the State itself.... We hold that neither a State nor its officials acting in their official capacities are 'persons' under § 1983."); *Kentucky v. Graham,* 473 U.S. 159, 165-66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is not a suit against the official personally, for the real party in interest is the entity."); *see also Holloway v. Selsky,* 05-CV-0501, 2007 WL 433375, at *4 (N.D.N.Y. Feb.6, 2007) (Sharpe, J.) [citing cases].

54 *See, infra,* note 41 of this Report-Recommendation (citing cases).

55 The authority to conduct this *sua sponte* analysis is derived from two sources: (1) 28 U.S.C. § 1915(e)(2)(B)(ii), which provides that "the court shall dismiss [a] case [brought by a prisoner proceeding *in forma pauperis* ] at any time if the court determines that ... the action ... is frivolous or malicious[,] ... fails to state a claim on which relief may be granted[,] ... or ... seeks monetary relief against a defendant who is immune from such relief"; and (2) 28 U.S.C. § 1915A(b), which provides that, "[o]n review, the court shall ... dismiss the [prisoner's] complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted ...."

56 As explained above in Part II of this Report-Recommendation, a dismissal for failure to state a claim may be based not only on a successful challenge to the "sufficiency of the pleading" under Fed.R.Civ.P. 8(a)(2), but also on a successful challenge to the legal cognizability of the claims asserted in the pleading. *See, supra,* notes 26 and 27 of this Report-Recommendation.

57 *Farmer v. Brennan,* 511 U.S. 825, 827, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("[S]ubjective recklessness as used in the criminal law is a familiar and workable standard that is consistent with the Cruel and Unusual Punishments Clause

Case 9:22-cv-00638-DNH-CBF Document 80 Filed 03/20/26 Page 30 of 146
Robles v. Bleau, Not Reported in F.Supp.2d (2008)
2008 WL 4693153

as interpreted in our cases, and we adopt it as the test for "deliberate indifference" under the Eighth Amendment."); *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) ("The required state of mind [for a deliberate indifference claim under the Eighth Amendment], equivalent to criminal recklessness, is that the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; and he must also draw the inference.") [internal quotation marks and citations omitted]; *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) ("The subjective element requires a state of mind that is the equivalent of criminal recklessness ....") [citation omitted]; *accord, Koehl v. Greene,* 06-CV-0478, 2007 WL 2846905, at *17, n. 98 (N.D.N.Y. Sept.26, 2007) (Kahn, J.), *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at *15, n. 124 (N.D.N.Y. Jan.23, 2007) (Kahn, J.), *Salaam v. Adams,* 03-CV-0517, 2006 WL 2827687, at *10, n. 59 (N.D.N.Y. Sept.29, 2006) (Kahn, J.).

58  In addition, it is worth noting that Plaintiff's explanation to Defendant Bleau consisted of a statement that Plaintiff could not urinate because of his prostate *medication,* not because of his prostate *condition. See, supra,* Part I.A. of this Report-Recommendation. As a result, Defendant Bleau would not have become *aware* of the reason for Plaintiff's inability to urinate (which Plaintiff now alleges was his prostate *condition,* not his prostate *medication* ), even if Defendant Bleau had remained in Plaintiff's presence and listened to his explanation.

59  *Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("[D]eliberate indifference [for purposes of an Eighth Amendment claim] describes a state of mind more blameworthy than negligence."); *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Murphy v. Grabo,* 94-CV-1684, 1998 WL 166840, at *4 (N.D.N.Y. Apr.9, 1998) (Pooler, J .) ("Deliberate indifference, whether evidenced by [prison] medical staff or by [prison] officials who allegedly disregard the instructions of [prison] medical staff, requires more than negligence.... Disagreement with prescribed treatment does not rise to the level of a constitutional claim.... Additionally, negligence by physicians, even amounting to malpractice, does not become a constitutional violation merely because the plaintiff is an inmate.... Thus, claims of malpractice or disagreement with treatment are not actionable under section 1983.") [citations omitted].").

60  *See, supra,* note 44 of this Report-Recommendation.

61  *Accord, Lugo v. Van Orden,* 07-CV-0879, 2008 U.S. Dist. LEXIS 56707, at *7, 2008 WL 2884925 (N.D.N.Y. July 23, 2008) (McAvoy, J.); *Darvie v. Countryman,* 08-CV-0715, 2008 U.S. Dist. LEXIS 60931, 2008 WL 3286250 (N.D.N.Y. Aug. 7, 2008) (Sharpe, J.), *adopting* 2008 U.S. Dist. LEXIS 52797, at *18, n. 5, 2008 WL 2725071 (N.D.N.Y. July 10, 2008) (Lowe, M.J.); *Anderson v. Banks,* 06-CV-0625, 2008 U.S. Dist. LEXIS 60896, at *16-17, 2008 WL 3285917 (N.D.N.Y. May 19, 2008) (Homer, M.J.), *adopted by* 2008 U.S. Dist. LEXIS 60932, 2008 WL 3285917 (N.D.N.Y. Aug. 6, 2008) (Sharpe, J.); *Stewartson v. Almstead,* 04-CV-1097, 2008 U.S. Dist. LEXIS 22178, at *7, 2008 WL 783367 (N.D.N.Y. March 20, 2008) (McAvoy, J.); *McEachin v. Goord,* 06-CV-1192, 2008 U.S. Dist. LEXIS 27479, at *12, 2008 WL 1788440 (N.D.N.Y. Feb. 8, 2008) (Treece, M.J.), *adopted by* 2008 U.S. Dist. LEXIS 31879, 2008 WL 1788440 (N.D.N.Y. Apr. 17, 2008) (Hurd, J.); *Murray v. Pataki,* 03-CV-1263, 2007 U.S. Dist. LEXIS 26959, at *27, 2007 WL 965345 (N.D.N.Y. March 5, 2007) (Treece, M.J.), *adopted by* 2007 U.S. Dist. LEXIS 23065, 2007 WL 956941 (N.D.N.Y. March 29, 2007) (Kahn, J.); *Madera v. Goord,* 103 F.Supp.2d 536, 542 (N.D.N.Y.2000) (Kahn, J., adopting Report-Recommendation by Di Bianco, M.J.).

62  *See, supra,* note 44 of this Report-Recommendation.

63  *See, e.g., Spence v. Senkowski,* 91-CV-0955, 1998 WL 214719, at *3 (N.D.N.Y. Apr.17, 1998) (McCurn, J.) (180 days that plaintiff spent in S.H.U., where he was subjected to numerous conditions of confinement that were more restrictive than those in general population, did not constitute atypical and significant hardship in relation to ordinary incidents of prison life); *accord, Husbands v. McClellan,* 990 F.Supp. 214, 217-19 (W.D.N.Y.1998) (180 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Warren v. Irvin,* 985

Case 9:22-cv-00638-DNH-CBF Document 80 Filed 03/20/26 Page 31 of 146
Robles v. Bleau, Not Reported in F.Supp.2d (2008)
2008 WL 4693153

F.Supp. 350, 353-56 (W.D.N.Y.1997) (161 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Ruiz v. Selsky,* 96-CV-2003, 1997 WL 137448, at *4-6 (S.D.N.Y.1997) (192 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Horne v. Coughlin,* 949 F.Supp. 112, 116-17 (N.D.N.Y.1996) (Smith, M.J.) (180 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Nogueras v. Coughlin,* 94-CV-4094, 1996 WL 487951, at *4-5 (S.D.N.Y. Aug.27, 1996) (210 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Carter v. Carriero,* 905 F.Supp. 99, 103-04 (W.D.N.Y.1995) (270 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population).

64 *Jackson v. Onondaga County,* 05-CV-1393, 2008 U.S. Dist. LEXIS 64930, at *40 & n. 46, 549 F. Supp. 2d 204 (N.D.N.Y. Jan. 8, 2008) (Lowe, M.J.) [citations omitted], *adopted on* de novo *review by* 05-CV-1393, 2008 U.S. Dist. LEXIS 22175, 2008 WL 782655 (N.D.N.Y. March 20, 2008) (McAvoy, J.); *see also Martin v. Mitchell,* 92-CV-0716, 1995 U.S. Dist. LEXIS 19006, at *10-12, 1995 WL 760651 (N.D.N.Y. Nov. 24, 1995) (McAvoy, C.J.) (rejecting plaintiff's assertion that prison disciplinary hearing officer "had a duty to investigate the identity of [a correction officer identified by the plaintiff merely as] 'Budd' and call him to testify"); *Hampton v. McGinnis,* 89-CV-6344, 1992 U.S. Dist. LEXIS 15696, at *6, 1992 WL 309553 (S.D.N.Y. Oct. 15, 1992) ("[I]t was not [the disciplinary hearing officer's] duty to investigate [the prisoner's assault] claim, and plaintiff was not precluded from offering his own evidence on that subject."); *cf. Kingsley v. Bureau of Prisons,* 937 F.2d 26, 31 (2d Cir.1991) (under circumstances, a hearing officer did have a duty to identify the name of the plaintiff's desired witness because [1] the plaintiff had an "especially compelling" need for the witness, [2] the witness's identity was "readily available" to the hearing officer, [3] the plaintiff had arrived at the prison only five days earlier, [4] fulfilling the request would not have delayed the imposition of "swift discipline," and [5] "no other institutional objective was implicated").

65 *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 150, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) ("The terms of § 1983 make plain two elements that are necessary for recovery. First, the plaintiff must prove that the defendant has deprived him of a right secured by the 'Constitution and laws' *of the United States."* ) (emphasis added); *Patterson v. Coughlin,* 761 F.2d 886, 890 (2d Cir.1985) ("Recovery under 42 U.S.C. § 1983 ... is premised upon a showing, first, that the defendant has denied the plaintiff a constitutional or *federal* statutory right ....") (citation omitted; emphasis added); *Fluent v. Salamanca Indian Lease Auth.,* 847 F.Supp. 1046, 1056 (W.D.N.Y.1994) ("The initial inquiry in a § 1983 action is whether the Plaintiff has been deprived of a right 'secured by the Constitution and laws' *of the United States."* ) [emphasis added].

66 *See Doe v. Conn. Dept. of Child & Youth Servs.,* 911 F.2d 868, 869 (2d Cir.1990) ("[A] violation of state law neither gives [plaintiff] a § 1983 claim nor deprives defendants of the defense of qualified immunity to a proper § 1983 claim."); *Patterson,* 761 F.2d at 891 ("[A] state employee's failure to conform to state law does not in itself violate the Constitution and is not alone actionable under § 1983 ....") (citation omitted); *Murray v. Michael,* 03-CV-1434, 2005 WL 2204985, at * 10 (N.D.N.Y. Sept.7, 2005) (DiBianco, M.J.) ("[A]ny violations of state regulations governing the procedures for disciplinary hearings ... do not rise to the level of constitutional violations.") (citation omitted); *Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) ("[V]iolations of state law procedural requirements do not alone constitute a deprivation of due process since '[f]ederal constitutional standards rather than state law define the requirements of procedural due process.' ") (citing *Russell v. Coughlin,* 910 F.2d 75, 78 n. 1 [2d Cir.1990] ).

67 *See Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) (citation omitted); *Lopez v. Reynolds,* 998 F.Supp. 252, 259 (W.D.N.Y.1997).

68 *See Farinaro v. Coughlin,* 642 F.Supp. 276, 280 (S.D.N.Y.1986).

69 *See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137-38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World*

Case 9:22-cv-00638-DNH-CBF Document 80 Filed 03/20/26 Page 32 of 146
**Robles v. Bleau, Not Reported in F.Supp.2d (2008)**
2008 WL 4693153

*Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40 n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *Alexander v. Evans,* 88-CV-5309, 1993 WL 427409, at * 18 n. 8 (S.D.N.Y. Sept.30, 1993) (declining to consider affidavit of expert witness that was not before magistrate) [citation omitted]; s*ee also Murr v. U.S.,* 200 F.3d 895, 902, n. 1 (6th Cir.2000) ("Petitioner's failure to raise this claim before the magistrate constitutes waiver."); *Marshall v. Chater,* 75 F.3d 1421, 1426 (10th Cir.1996) ("Issues raised for the first time in objections to the magistrate judge's recommendations are deemed waived.") [citations omitted]; *Cupit v. Whitley,* 28 F.3d 532, 535 (5th Cir.1994) ("By waiting until after the magistrate judge had issued its findings and recommendations [to raise its procedural default argument] ... Respondent has waived procedural default ... objection [ ].") [citations omitted]; *Greenhow v. Sec'y of Health & Human Servs.,* 863 F.2d 633, 638-39 (9th Cir.1988) ("[A]llowing parties to litigate fully their case before the magistrate and, if unsuccessful, to change their strategy and present a different theory to the district court would frustrate the purpose of the Magistrates Act."), *overruled on other grounds by U.S. v. Hardesty,* 977 F.2d 1347 (9th Cir.1992); *Patterson-Leitch Co. Inc. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985, 990-91 (1st Cir.1988) ("[A]n unsuccessful party is not entitled as of right to de novo review by the judge of an argument never seasonably raised before the magistrate.") [citation omitted].

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 4693153

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:22-cv-00638-DNH-CBF    Document 80    Filed 03/20/26    Page 33 of 146

2025 WL 1331745
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Lekia COLEMAN, Plaintiff,

v.

ERIE PAINTING & MAINTENANCE, INC., Defendant.

5:24-CV-1239
|
Signed May 7, 2025

**Attorneys and Law Firms**

LEKIA COLEMAN, Plaintiff, pro se, 107 Mitchell Avenue, Syracuse, NY 13207.

ARIANNA E. KWIATKOWSKI, ESQ., ROSS M. GREENKY, ESQ., BARCLAY DAMON LLP, Attorneys for Defendant, 200 Delaware Avenue, Suite 1200, Buffalo, NY 14202.

## DECISION and ORDER

DAVID N. HURD, United States District Judge

## I. INTRODUCTION

 **\*1** On October 9, 2024, plaintiff Lekia Coleman ("Coleman" or "plaintiff"), acting *pro se*, filed this action against his former employer, defendant Erie Painting & Maintenance, Inc. ("defendant"), alleging racial discrimination in violation of both Title VII of the Civil Rights Act of 1964 ("Title VII") and the New York State Human Rights Law (the "NYSHRL"). [1] Dkt. No. 1. Along with his complaint, plaintiff moved for leave to proceed *in forma pauperis* ("IFP Application"). Dkt. No. 2.

[1]    Plaintiff filed a Northern District of New York form discrimination complaint bringing racial discrimination claims under both Title VII and the NYSHRL. Dkt. No. 1. While plaintiff has not explicitly stated his intention to do so, the Court also finds that plaintiff checked the box on his form complaint to indicate age also served as a basis for the alleged discrimination. Dkt. No. 1–1. In light of plaintiff's *pro se* status, the Court will construe plaintiff as having alleged that certain younger co-workers received preferential treatment. Further, given that that age is not a protected category under Title VII, his complaint will be deemed as bringing additional causes of action for discrimination on the basis of his age under both the Americans with Disabilities Act of 1967 ("ADEA") and the NYSHRL. *Id*. Plaintiff is 50 years old. Dkt. No. 1 at 4.

On December 30, 2024, U.S. Magistrate Judge Thérèse Wiley Dancks granted plaintiff's IFP Application and, after an initial review of the pleadings, found that plaintiff's complaint sufficiently stated claims for racial discrimination to survive initial review under 28 U.S.C. § 1915. Dkt. No. 4 at 2. [2]

[2]    Pagination corresponds to CM/ECF headers.

On March 7, 2025, defendant moved to partially dismiss the complaint pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6), arguing that: (1) plaintiff failed to exhaust his administrative remedies with respect to his ADEA claim; and (2) plaintiff's age-discrimination claims were time-barred under the NYSHRL. Dkt. No. 10–2. Plaintiff has not filed an opposition to this motion and the deadline to do so has passed. Dkt. No. 10.

2025 WL 1331745

The motion has been fully briefed and will be considered on the basis of the available submissions without oral argument. Dkt. No. 10–2.

## II. BACKGROUND

In the summer of 2017, defendant, who operates as a construction company, hired Coleman, a Black man, as a bridge painting apprentice. Dkt. No. 1. According to plaintiff's Equal Employment Opportunity Commission ("EEOC") complaint, he was hired by defendant as a bridge painting apprentice. EEOC Complaint, Dkt. No. 1-1 at 1–4. Plaintiff completed his apprenticeship and became a 'journeyman' in October of 2020. *Id.* at 1.

Sometime in May of 2021, defendant assigned Coleman to work on a project located in Hornell, New York (the "Hornell Project"), which is two hours away from his house in Syracuse.[3] Dkt. No. 1–1 at 1. Plaintiff alleges that one of defendant's project managers informed him that he was being assigned to the Hornell Project to satisfy a racial quota. *Id.* According to plaintiff, the racial quota made the bid more competitive. *See* Dkt. No. 1-1.

[3]    Plaintiff erroneously refers to this as "Hormel, New York" in his EEOC complaint.

 **\*2**  On June 2, 2021, Coleman arrived on the Hornell Project site expecting to perform journeyman-level work, *e.g.*, blasting. Dkt. No. 1–1 at 1. However, plaintiff alleges that the project foreman told him that all blasting work had already been promised to two younger, less experienced Caucasian apprentices. *Id.* Plaintiff alleges that he was directed to perform "gritting" work, which required far less skill or experience. *Id.*

The next day, on June 7, 2021, Coleman approached a project manager to complain about his work assignment on the Hornell Project. *Id.* Plaintiff alleges that he told the project manager that he believed he was being treated differently because of his race. *Id.*

Thereafter, Coleman alleges the project manager failed to meaningfully investigate his discrimination claims and that defendant retaliated against him for complaining to the project manager about racial discrimination complaint by removing him from work on an upcoming project near his home in Syracuse. Dkt. No. 1–1 at 1.[4] *Id.* In addition, plaintiff alleges that defendant reported him to his Union because he had "started a racial thing." *Id.* at 1–2. Plaintiff contends he was never offered work by defendant after the Hornell Project and was effectively terminated from his position.[5],[6] *Id.* at 2.

[4]    Per Coleman's EEOC complaint, this Syracuse project involved the same foreman as the Hornell Project.

[5]    According to plaintiff's form complaint, there was "gossiping in the union hall and job sites" after he lodged his complaint of racial discrimination to defendant. Compl. at 4. Plaintiff also alleges, *inter alia*, that his employment was terminated, that he was denied reasonable accommodations to complete the essential functions of his job and that defendant failed to promote him. Notably however, plaintiff has not alleged any facts detailing his termination, how defendant failure to promote him, or what reasonable accommodations were withheld. To the contrary, plaintiff alleges being promoted from journeyman. Dkt No. 1-1 at 1. While plaintiff was perhaps constructively terminated when he was no longer assigned to projects after lodging his complaint, the circumstances underlying his alleged termination are, at best, murky.

[6]    In plaintiff's EEOC complaint, he states that, to this day, he has never been given additional work from defendant. Dkt. No. 1–1.

On March 29, 2022, plaintiff filed a complaint with the EEOC. Dkt. No. 1–1. Plaintiff received notice of his right to sue on July 11, 2024. Notice of Right to Sue Letter, Dkt. No. 1–1 at 4–7.

## III. LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, the complaint's factual allegations must be enough to elevate the plaintiff's right to relief above the speculative level. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). While legal conclusions can provide a framework for the complaint, they must be supported with meaningful allegations of fact. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). In short, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

To assess this plausibility requirement, the court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in the non-movant's favor. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). In doing so, the court generally confines itself to the facts alleged in the pleading, any documents attached to the complaint or incorporated into it by reference, and matters of which judicial notice may be taken. *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (quoting *Concord Assocs., L.P. v. Ent. Props. Tr.*, 817 F.3d 46, 51 n.2 (2d Cir. 2016)).

## IV. DISCUSSION

 **\*3**  As noted *supra*, Judge Dancks reviewed Coleman's pleading and construed it as asserting race discrimination claims under Title VII and the NYSHRL. *See* Dkt. No. 4. However, plaintiff's EEOC charge also references age-based discrimination: he claimed that *younger* employees received the better work assignment. Accordingly, the Court construes plaintiff's complaint as asserting Title VII and NYSHRL race discrimination claims for disparate treatment and retaliation as well as ADEA and NYSHRL claims for age discrimination.

Defendant has moved to partially dismiss Coleman's complaint insofar as it brings age discrimination claims. Dkt. No. 10. Specifically, defendant moves to dismiss plaintiff's: 1) ADEA claim on the basis that plaintiff failed to exhaust his available administrative remedies; and 2) NYSHRL age discrimination claims as time-barred because they were not filed within the three-year statute of limitations. Def's. Mem., Dkt. No. 10–2 at 3–7.

### A. Plaintiff's Failure to Oppose Motion to Dismiss

As a threshold matter, Coleman did not oppose defendant's partial motion to dismiss. *See* Dkt. No. 10. But the fact that plaintiff has failed to respond to defendant's partial motion to dismiss for failure to state a claim is not, by itself, a sufficient reason grant defendant's motion. As the Second Circuit has cautioned:

> [T]he sufficiency of a complaint is a matter of law that the court is capable of determining based on its own reading of the pleading and knowledge of the law. If a complaint is sufficient to state a claim on which relief can be granted, the plaintiff's failure to respond to a Rule 12(b)(6) motion does not warrant dismissal.

*McCall v. Pataki*, 232 F.3d 321, 323 (2d Cir. 2000); *Goldberg v. Danaher*, 599 F.3d 181, 183 (2d Cir. 2010) ("Because a motion under Rule 12(b)(6) presents a pure legal question, based on allegations contained within the four corners of the complaint, the district court is equipped to make a determination on the merits."). In other words, even an unopposed motion to dismiss requires the movant to "demonstrate entitlement to the relief requested therein." N.D.N.Y. L.R. 7.1(a)(3).

Furthermore, plaintiff is *pro se*. His filings must be held to less stringent standards than formal pleadings drafted by an attorney. *See, e.g., Ahlers v. Rabinowitz*, 684 F.3d 53, 60 (2d Cir. 2012). As the Second Circuit has repeatedly explained, *pro se* filings must be "construed liberally" with "special solicitude" and interpreted to raise the strongest claims they suggest. *Hogan v.*

*Fischer*, 738 F.3d 509, 515 (2d Cir. 2013). "This is particularly so when the *pro se* plaintiff alleges that [his] civil rights have been violated." *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008).

### B. ADEA Claim

Defendant argues that Coleman's ADEA claim must be dismissed because he failed to exhaust his available administrative remedies. Def's Mem. at 3–5. Specifically, defendant argues that plaintiff's EEOC charge failed to include any allegations of age discrimination and therefore failed to put the EEOC on notice as to his ADEA and NYSHRL age discrimination claims. *Id.*

The ADEA makes it "unlawful for an employer ... to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). This protection applies to individuals who are at least forty (40) years of age. 29 U.S.C. § 631(a).

 **\*4**  To survive a Rule 12(b)(6) motion to dismiss, a plaintiff asserting an employment discrimination complaint under the ADEA must plausibly allege that adverse action was taken against [him] by [his] employer, and that [his] age was the "but-for" cause of the adverse action. *Marcus v. Leviton Mfg. Co., Inc.*, 661 F. App'x 29, 31–32 (2d Cir. 2016) (citing *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87 (2d Cir. 2015)). "A plaintiff must plead facts that give 'plausible support to a minimal inference' of the requisite discriminatory causality." *Id.* at 32. (quoting *Littlejohn v. City of N.Y.*, 795 F.3d 297, 310–11 (2d Cir. 2015)). A plaintiff must also allege sufficient facts, and not solely legal conclusions, "to push the misconduct alleged in the pleading beyond the realm of the 'conceivable' to the 'plausible.' " *Id.* (quoting *Vega*, 801 F.3d at 84) (cleaned up).

"A discrete retaliatory or discriminatory act 'occurred' on the day that it 'happened.' " *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002). "Where the plaintiff complains of discrete discriminatory or retaliatory acts such as 'termination, failure to promote, denial of transfer, or refusal to hire,' such claims are not actionable if they occurred prior to the 300-day period even though they may be 'related to' acts that occurred within the permissible 300-day period." *Id.* at 115. For purposes of the statute of limitations under the ADEA, claims accrue on the date that the employee learns of the employer's discriminatory conduct. *Dickens v. Hudson Sheraton Corp., LLC*, 167 F. Supp. 3d 499, 514 (S.D.N.Y. 2016) (citing *Delaware State College v. Ricks*, 449 U.S. 250, 258 (1980)).

An individual may not commence a civil action under the ADEA until sixty days after filing an unlawful discrimination charge with the EEOC. 29 U.S.C. § 626(d). That charge must be filed within 300 days after the alleged unlawful practice occurred.[7] *Id.* Thus, to bring an ADEA action in federal court, a plaintiff must first file a timely complaint with the appropriate administrative agency to pursue available administrative remedies.[8] *Deravin v. Kerik*, 335 F.3d 195, 200 (2d Cir. 2003); *see also McPherson v. N.Y. City Dep't of Educ.*, 457 F.3d 211, 213 (2d Cir. 2006) ("Under Title VII and the ADEA, a plaintiff can sue in federal court only after filing timely charges with the EEOC.") (cleaned up).

[7]     The 300-day deadline, as opposed to the 180-day deadline, applies to "deferral states." *See Holowecki v. Fed. Express Corp.*, 440 F.3d 558, 562 (2d Cir. 2006). Most, if not all, plaintiffs reside in referral states, which have their own age discrimination laws and age discrimination remedial agencies. *In re IBM Arb. Agreement Litig.*, 76 F.4th 74, 82 n. 4 (2d Cir. 2023).

[8]     Or, in New York, the New York State Division of Human *Rights* ("NYSDHR").

However, this rule is not without exception. Claims not asserted before the administrative agency can still be pursued in a later federal court action where they are "reasonably related" to the claims that were filed with the agency. *Deravin*, 335 F.3d at 200 (internal citations omitted). The exception applies where: "(1) the claim would fall within the reasonably expected scope of an EEOC investigation into charges of discrimination; (2) it alleges retaliation for filing the EEOC charge; or (3) the plaintiff alleges additional incidents of discrimination conducted in the exact manner alleged in the administrative charge." *Alfano v. Costello*, 294 F.3d 365, 381 (2d Cir. 2002) (cleaned up).

"In determining whether claims are reasonably related, the focus should be on the factual allegations made in the EEOC charge itself, describing the discriminatory conduct about which a plaintiff is grieving." *Deravin*, 335 F.3d at 201; *see also Alonzo v. Chase Manhattan Bank, N.A.*, 25 F. Supp. 2d 455, 458 (S.D.N.Y. 1998) ("[I]t is the substance of the charge and not its label that controls.").

**\*5**  Defendant argues that Coleman's EEOC charge only alleged race discrimination but made no claims regarding his age that might put the administrative agency on notice that he was bringing an age discrimination complaint. Def's. Mem, Dkt. No. 10–2 at 4.

That is inaccurate. Coleman referenced his age in the EEOC charge. Plaintiff alleged that the foreman at the Hornell Project informed him that blasting work had already been promised to "*younger*, Caucasian apprentices." [9] EEOC Complaint, Dkt. No. 1–1 at 1 (emphasis added). [10] Therefore, plaintiff put the EEOC on notice that he was treated differently than co-workers who, aside from being a different race, were also younger than him. Accordingly, plaintiff's age discrimination allegations were within the reasonably expected scope of an agency investigation into his charges of discrimination, thus placing the agency on notice that he experienced disparate treatment on the basis of his age. *Alfano*, 294 F.3d 365, 381 (2d Cir. 2002).

[9]  In their memorandum of law, defendant quoted this very language emphasizing plaintiff's use of the term "Caucasian" without giving any attention to the word "younger." Defendant nevertheless contends that the EEOC complaint "solely" focused on race.

[10] Put differently, it is reasonable to conclude that Coleman's EEOC charge, even when limited to the four corners of the document, would have alerted the EEOC that plaintiff might have been treated differently on the basis of his age. *Id.* Indeed, plaintiff's age- and race-related allegations arise from the same, single incident on the Hornell project.

Even so, Coleman's ADEA claim must be dismissed. While Coleman sufficiently exhausted his administrative remedies with respect to his discrimination claim under the ADEA, he nevertheless has failed to plausibly allege that claim. Coleman has plausibly alleged that he is over 40 years of age, which entitles him to protection under the ADEA. 29 U.S.C. § 631(a).

The problem for Coleman is that his operative pleading is devoid of any allegations about age-based discrimination aside from the sole, conclusory assertion discussed *supra*. Plaintiff has not offered any allegations as to why he was treated differently on the basis of his age. *Id.* Rather, plaintiff has pleaded facts that tend to suggest race-based discrimination was the reason for the adverse action he allegedly suffered. Indeed, plaintiff has given no factual matter to suggest defendant possessed any discriminatory intent or acted in a discriminatory manner towards him on the basis of his age. (Cite Vega?)

Therefore, because plaintiff's complaint fails to state a plausible claim for which relief could be granted as to disparate treatment on the basis of age under the ADEA, that claim will be dismissed.

### C. NYSHRL Claim

Defendant has also moved to dismiss Colemans' NYSHRL claims for age discrimination on the basis that they are time-barred under the statute of limitations. As defendant explains, plaintiff failed to bring this action within three years of the alleged discriminatory act. Def's. Mem. at 5–7.

First, defendant argues that the last allegedly discriminatory act took place in May of 2021, more than three years after this action was filed on October 9, 2024. *Id.* at 4. Second, defendant argues that equitable tolling does not save this claim because plaintiff failed to include any age-related allegations in his EEOC charge. Defendant further contends that plaintiff's EEOC claim was devoid of any allegations of age-based discrimination.

2025 WL 1331745

**\*6** NYSHRL claims have a three-year statute of limitations. *Kirkland-Hudson v. Mount Vernon City Sch. Dist.*, 665 F. Supp. 3d 412, 446 (S.D.N.Y. 2023) (citing *Franchitti v. Cognizant Tech. Sols. Corp.*, 2022 WL 2657171, at \*8 (July 8, 2022)). This limitations period is tolled during the pendency of a complaint with the EEOC. *Herrera v. Syracuse Univ.*, 2025 WL 874734, at \*14 (N.D.N.Y. Mar. 20, 2025) (citing *Lent v. CCNH, Inc.*, 2015 WL 3463433, at \*8 (N.D.N.Y. June 1, 2025)) ("Plaintiff's claims under the NYSHRL were timely filed, as the three-year statute of limitations was tolled during the pendency of [p]laintiff's complaint with the EEOC"). Specifically, the three-year limitations period is tolled "for the period between the filing of an EEOC charge and the issuance by the EEOC of a right-to-sue letter." *Sloth v. Constellation Brands, Inc.*, 883 F. Supp. 2d 359, 374 (W.D.N.Y. June 8, 2012).

Coleman alleges that the final discriminatory act occurred in either May or June of 2021. [11] Plaintiff then filed his EEOC charge on March 29, 2022, approximately ten to eleven months later. Dkt. No. 1–1. The filing of this charge tolled the statute. Then, on July 11, 2024, plaintiff received notice of his right to sue from the EOCC. Dkt. No. 1–1 at 4. At that point, because Coleman's complaint was no longer pending before the EEOC, the statute of limitations was once again running. Roughly three months later, on October 9, 2024, plaintiff filed his complaint. Dkt. No. 1. Therefore, the statute of limitations in this matter ran for no more than a total of fourteen months—less than the three-year limitations period allowed for bringing an EEOC.

[11]   Plaintiff's complaint alleges that the final discriminatory act took place in May 2021. However, the facts in plaintiff's EEOC charge suggest the final discriminatory act actually took place in June. Regardless, if plaintiff's EEOC complaint tolled the statute of limitations.

Therefore, the statute of limitations period for plaintiff's was tolled from March 29, 2022 to July 11, 2024—the time during which his charge was pending before the EEOC—and did not run for the full three-year period. Further, plaintiff's age discrimination claims were administratively exhausted for the same reasons described *supra.* Accordingly, plaintiff's NYSHRL age discrimination claims are not time-barred.

Even so, Coleman's NYSHRL age discrimination claims must be dismissed for failure to state a claim.

Claims of discrimination under the NYSHRL have traditionally been analyzed under the same standards as its federal counterparts. *Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 184 n.3 (2d Cir. 2006). However, "[t]he New York State Legislature passed several amendments to the NYSHRL in June 2019, the effect of which is to render the standard for claims closer to the standard of the [New York City Human Rights Law ("NYCHRL")]." *Id.* (quoting *Livingston v. City of N.Y.*, 563 F. Supp. 3d 201, 232 n.14 (S.D.N.Y. 2021)).

These state-law amendments have modified the standard for NYSHRL discrimination claims to more closely resemble that of the NYCHRL, which is generally a plaintiff-friendly law. *Cooper v. Franklin Templeton Invs.*, 2023 WL 3882977, at \*3 (2d Cir. June 8, 2023) (summary order) ("While New York courts have not yet produced any substantive analysis of how this amendment changes standards of liability under the NYSHRL, some courts in this Circuit have interpreted the amendment as rendering the standard for claims closer to the standard of the NYCHRL.").

**\*7** Unlike the ADEA, the NYCHRL does not require plaintiffs to plausibly allege that they suffered an adverse employment action. *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 114 (2d Cir. 2023). Instead, a plaintiff need only show differential treatment, *i.e.,* that they were treated less favorably because of defendant's discriminatory intent. *Id.* (citing *Mihalik*, 715 F. 3d at 110).

However, even under this more liberal NYCHRL standard, a plaintiff must still allege facts giving rise to "a minimal inference of discriminatory motivation." *Id.* (citing *Cruz v. Local 32BJ*, 2024 WL 4357036, at \*19 (S.D.N.Y. Sept. 30, 2024)) (quoting *Littlejohn v. City of N.Y.*, 795 F.3d 297, 321 (2d Cir. 2025)); *see also Ward v. Cohen Media Publ'ns LLC,* 2023 WL 5353342,

2025 WL 1331745

at *15 (S.D.N.Y. Aug 21, 2023) ("[E]ven under the more lenient requirements of the NYCHRL, [a] plaintiff's claims must be more than conclusory or speculative to survive a motion to dismiss.")

Measured against this standard, Coleman's NYSHRL claims fail for the same reason that his federal-law ADEA claims fail: the complaint's allegations of age discrimination are limited to a single reference that younger employees with less training or expertise were assigned work that plaintiff wanted to do. Plaintiff has not alleged any facts whatsoever that might describe defendant's decisions, motivations, intent, or even whether those younger employees were in fact assigned the work that plaintiff wanted to perform. Thus, plaintiff has failed to plausibly allege facts that would give rise to even "a minimal inference of discriminatory motivation." *Littlejohn*, 795 F.3d at 321.

Therefore, while plaintiff's NYSHRL claims are not time-barred under the statute of limitations, plaintiff has failed to plausibly allege facts to support a claim for age discrimination under the NYSHRL.

Therefore, it is

ORDERED that

1. Defendants' partial motion to dismiss (Dkt. No. 10) is GRANTED [12];

[12]   However, the motion is granted for different reasons than the ones argued by defendant. That is to say, plaintiff's age discrimination claims fail because they do not plausibly allege facts upon which relief could be granted as is required by Rule 12(b)(6). *Twombly*, 550 U.S. at 570.

2. Plaintiff's ADEA claim for disparate treatment is DISMISSED;

3. Plaintiff's NYSHRL claim for disparate treatment on the basis of his age is DISMISSED;

The Clerk of the Court is directed to terminate the pending motion.

IT IS SO ORDERED.

**All Citations**

Slip Copy, 2025 WL 1331745

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Mendez v. Cayuga County, Not Reported in Fed. Supp. (2024)

2024 WL 1469060

2024 WL 1469060
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Luis MENDEZ, Plaintiff,
v.
CAYUGA COUNTY, Defendant.

9:21-cv-01090 (BKS/TWD)
|
Signed February 1, 2024

**Attorneys and Law Firms**

LUIS MENDEZ, Plaintiff, pro se, 99001021, Onondaga County Justice Center, 555 South State Street, Syracuse, NY 13202.

JUDITH B. AUMAND, ESQ., BURKE, SCOLAMIERO LAW FIRM, Attorneys for Defendant, 7 Washington Square, Albany, NY 12205.

## <u>REPORT-RECOMMENDATION AND ORDER</u>

THÉRÈSE WILEY DANCKS, United States Magistrate Judge

### I. INTRODUCTION

 **\*1**  This matter has been referred for a report and recommendation by the Honorable Brenda K. Sannes, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Luis Mendez commenced this *pro se* action pursuant to 42 U.S.C. § 1983 ("Section 1983") asserting claims arising out of his confinement at the Cayuga County Jail as a federal pretrial detainee. (Dkt. No. 11.) Plaintiff, who is presently confined at the Onondaga County Justice Center, paid the full statutory filing fee. (Dkt. No. 9.) Following the Court's initial review of Plaintiff's amended complaint pursuant to 28 U.S.C. § 1915A, only Plaintiff's Section 1983 medical indifference claim against Defendant Cayuga County remains. (Dkt. Nos. 26, 29.) Currently before the Court is Defendant's unopposed motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt. No. 34.) For the reasons discussed below, the Court recommends Defendant's motion be granted.

### II. PROCEDURAL HISTORY

Plaintiff commenced this action in October of 2021. (Dkt. No. 11.) On January 19, 2022, the Court reviewed the complaint pursuant to 28 U.S.C. § 1915A, and found it failed to state a claim upon which relief may be granted. (Dkt. No. 12. [1] ) In light of Plaintiff's *pro se* status, he was afforded an opportunity to submit an amended complaint. *Id.* at 22-24. [2] Plaintiff was specifically advised that his failure to comply with the January 2022 Order within thirty days would result in dismissal of the action. *Id.* Plaintiff was also ordered to promptly notify the Clerk's Office, in writing, of any change in his address and was warned his failure to do so may result in the dismissal of this action. *Id.* at 23-24.

[1]    The procedural history of this case leading up to the January 2022 Order was discussed at length therein.

[2]    Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office.

On April 20, 2022, following several extensions of the amended pleading deadline and the return of certain mail as undeliverable, the Court dismissed this action without prejudice pursuant to 28 U.S.C. § 1915A(b)(1), Federal Rule of Civil Procedure 41(b),

and Local Rule 41.2(b), based on Plaintiff's failure to comply with the January 2022 Order and maintain a current address in accordance with Local Rule 10.1(c). (Dkt. No. 22.) That same day, judgment was entered dismissing this action. (Dkt. No. 23.) Both the April 2022 Order and the Order of Judgement were returned to the Court as undeliverable. (Dkt. No. 24.)

On September 8, 2022, the Court received a letter from Plaintiff's friend or relative, which provided a new address for Plaintiff, and requested an update on this case. (Dkt. No. 25.) In light of this submission, the Clerk sent a copy of the April 2022 Order and Order of Judgement to Plaintiff at this new address. *See id.* Shortly thereafter, Plaintiff filed a letter requesting this action be re-opened. (Dkt. No. 26.) On October 5, 2022, the Court granted Plaintiff's request to vacate the Judgment and afforded him a final opportunity to file an amended complaint within thirty days. (Dkt. No. 27.)

**\*2** Thereafter, Plaintiff timely submitted the amended complaint. (Dkt. No. 28.) Unlike the original, which named only employees of Cayuga County Jail and a treating physician as defendants, the caption of the amended complaint named the United States of America as the only defendant, and the body of the pleading asserted Section 1983 claims against only Cayuga County Jail. *Id.*

On initial review, the Court liberally construed the amended complaint to assert a Section 1983 medical indifference claim against Cayuga County based on a delay in medical treatment under the Due Process Clause of the Fifth Amendment,[3] and a medical negligence claim against the United States of America pursuant to the Federal Tort Claims Act ("FTCA"). (Dkt. No. 29.) As detailed therein, only Plaintiff's Section 1983 medical indifference claim against Cayuga County survived initial review and required a response. *Id.* In so ruling, the Court expressed no opinion as to whether this claim could withstand a properly filed dispositive motion. *Id.* All remaining federal claims were dismissed pursuant to 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted. *Id.* at 8-9.

3       In *Darnell v. Pineiro*, 849 F.3d 17 (2d Cir. 2017), the Second Circuit made clear that the standard governing conditions of confinement claims, which encompass claims for medical indifference, is the same whether brought by a state or federal pretrial detainee. *Id.* at 21 n.3 ("This case implicates the Due Process Clause of the Fourteenth Amendment because it involves state pretrial detainees who are seeking to vindicate their constitutional rights.... However, the analysis in this decision should be equally applicable to claims brought by federal pretrial detainees pursuant to the Due Process Clause of the Fifth Amendment.").

By Text Order entered January 11, 2023, Plaintiff was informed that because he paid the filing fee for this action, he was responsible for serving the summons and amended complaint on Cayuga County in accordance with Federal Rule of Civil Procedure 4. (Dkt. No. 30.) In relevant part, Plaintiff was advised Rule 4(c) of the Federal Rules of Civil Procedure also provides that "[a]t the plaintiff's request, the court may order that service be made by a United States marshal or deputy marshal or by a person specially appointed by the court." *Id.* On January 27, 2023, Plaintiff filed a letter request for the Marshals to effectuate service on his behalf and provided payment of the $8.00 service fee to the U.S. Marshal. (Dkt. No. 31.) On February 15, 2023, the Court granted Plaintiff's letter request and directed the Clerk to issue a summons and forward it along with a copy of the amended complaint to the U.S. Marshal for service of process on Cayuga County. (Dkt. Nos. 32, 33.)

On May 1, 2023, Cayuga County filed the instant counseled motion to dismiss for failure to state a claim upon which relief may be granted and for lack of personal jurisdiction. (Dkt. No. 34.) The Court notified Plaintiff his response was due by May 22, 2023. (Dkt. No. 35.) However, that text notice was returned as undeliverable. (Dkt. No. 36.) On June 12, 2023, the Court *sua sponte* granted Plaintiff a 30-day extension of time to respond to Defendant's motion. (Dkt. No. 37.) On June 15, 2023, Plaintiff filed a change of address. (Dkt. No. 38.) On June 29, 2023, the June 12, 2023, text order was returned as undeliverable. (Dkt. No. 39.) Because it was unclear if Plaintiff received a copy of the text order entered on June 12, 2023, on August 16, 2023, the Court *sua sponte* granted a second 30-day extension of time to respond to Defendant's motion. (Dkt. No. 41.) Plaintiff's response was therefore due by September 15, 2023. *Id.* To date, Plaintiff has not filed a response to Defendant's motion, and the time to do has expired. On October 12, 2023, the Clerk received a letter from Plaintiff requesting an update on the case and the Clerk mailed a copy of the docket sheet to Plaintiff. (Dkt. No. 42.)

Case 9:22-cv-00638-DNH-CBF    Document 80    Filed 03/20/26    Page 42 of 146

Mendez v. Cayuga County, Not Reported in Fed. Supp. (2024)

2024 WL 1469060

## III. FACTUAL BACKGROUND

**\*3**  The facts are drawn from the amended complaint. (Dkt. No. 28.) On December 29, 2020, Plaintiff was housed in the Special Housing Unit at Cayuga County Jail as a federal pretrial detainee. *Id.* at 1. At approximately 4:30 p.m., Plaintiff ingested "pieces" of a "metal wire" that were served in his dinner. *Id.* Plaintiff felt "great pain and started spitting out blood." *Id.* He immediately contacted "Cayuga staff to obtain medical assistance." *Id.* Corrections Officer Cowan responded to his request for assistance, spotted the metal wire, and contacted Corrections Sergeant ("Sgt.") Marvintino. *Id.* Sgt. Marvintino "arrived and witnessed [Plaintiff] spitting out blood and saw pieces of wire still in the food tray[.]" *Id.* He "took a slew of photos of the metal and blood spit up by [Plaintiff] with his cell phone." *Id.* Sgt. Marvintino told Plaintiff arrangements would be made for his transport to a hospital, but thereafter advised Plaintiff "the hospitals were closed and no medical was present[.]" *Id.* at 1-2. As a result, liberally construed, Plaintiff alleges he experienced a delay in medical treatment. *Id.* at 2. [4]

4    As the Court noted on initial review of the amended complaint, the nature of the alleged delay is unclear. (Dkt. No. 29 at 4 n.3.) Plaintiff states he received x-rays at Cayuga County Jail two days after the alleged incident, and was evaluated by a physician at a hospital "[a] month later." (Dkt. No. 28 at 2.) However, documents attached to the original complaint indicate that Plaintiff was taken for abdominal radiographs the morning after he allegedly swallowed metal material, and again a few days later. (Dkt. No. 2 at 1-2.) In addition, Plaintiff alleged in the original complaint that he spoke to a nurse the day after the alleged incident, and again less than two weeks later. (Dkt. No. 11 at 7.)

## IV. STANDARD OF REVIEW

A defendant may move to dismiss a complaint "for failure to state a claim upon which relief can be granted" under Rule 12(b)(6) of the Federal Rules of Civil Procedure. The motion tests the legal sufficiency of the complaint and whether it conforms to Rule 8(a)(2) of the Federal Rules of Civil Procedure. To survive a motion to dismiss, the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Determining whether a complaint states a plausible claim for relief ... requires the reviewing court to draw on its judicial experience and common sense ... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief. *Iqbal*, 556 U.S. at 679 (internal quotations and citations omitted). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

A complaint may be dismissed pursuant to Rule 12(b)(6) only where it appears that there are not "enough facts to state a claim that is plausible on its face." *Twombly*, 550 at 570. While Rule 8(a)(2) "does not require detailed factual allegations, ... it demands more than an unadorned, the-defendant-harmed-me-accusation." *Iqbal*, 556 U.S. at 678 (citation and internal quotation marks omitted). A complaint which "tenders 'naked assertion[s]' devoid of 'further factual enhancement' " does not suffice. *Id.* (citation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *See Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994); *see also Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (courts remain obligated to construe *pro se* complaints liberally even after *Twombly*). In considering a Rule 12(b)(6) motion, "the court considers the complaint, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (citation and internal quotation marks omitted).

**\*4** "A plaintiff's failure to respond to a motion to dismiss does not relieve the Court of its obligation to consider the merits of plaintiff's claims," and " '[i]f a complaint is sufficient to state a claim on which relief can be granted, the plaintiff's failure to respond ... does not warrant dismissal.' " *Malloy v. Sopchak*, No. 1:18-CV-1460 (BKS/DJS), 2020 WL 4432631, at \*2 (N.D.N.Y. July 31, 2020) (quoting *McCall v. Pataki*, 232 F.3d 321, 322 (2d Cir. 2000)).

## V. DISCUSSION

Defendant argues Plaintiff's amended complaint must be dismissed for (1) failure to state a claim of municipal liability; (2) failure to state a claim for deliberate indifference to a serious medical need; and (3) for lack of personal jurisdiction. (Dkt. No. 34-2.)

### A. Personal Jurisdiction

"Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied." *Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987). While Defendant's motion cites only Federal Rule of Civil Procedure 12(b)(6) as the basis of its motion, the Court construes it as, in part, being made under Rule 12(b)(5) for insufficient service of process. [5] To survive a motion to dismiss for insufficient service of process under Rule 12(b)(5), "the plaintiff bears the burden of establishing that service was sufficient." *Allstate Ins. Co. v. Rosenberg*, 771 F. Supp. 2d 254, 260 (E.D.N.Y. 2011) (quoting *Khan v. Khan*, 360 F. App'x 202, 203 (2d Cir. 2010) (summary order)).

[5]    A Rule 12(b)(5) motion to dismiss "is the proper vehicle for challenging the mode of delivery or lack of delivery of the summons and complaint." *Mhina v. Citizens Bank, N.A.*, No. 5:22-CV-427 (BKS/ML), 2022 WL 16572045, at \*2 (N.D.N.Y. Nov. 1, 2022).

"In deciding a Rule 12(b)(5) motion, a Court must look to Rule 4, which governs the content, issuance, and service of a summons." *DeLuca v. AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 64 (S.D.N.Y. 2010). Under Rule 4, a plaintiff must serve the summons and complaint on a defendant within 90 days of filing the complaint. Fed. R. Civ. P. 4(c)(1), (m). If a plaintiff fails to effect service on a defendant, the court "must dismiss the action without prejudice against that defendant or order that service be made within a specified time." Fed. R. Civ. P. 4(m). If, however, "the plaintiff shows good cause for the failure, the court *must* extend the time for service for an appropriate period." *Id.* (emphasis added); *Canady v. Correct Care Sols.*, No. 15-CV-4893 (KMK), 2017 WL 4280552, at \*9 (S.D.N.Y. Sept. 25, 2017) (noting that when a plaintiff has demonstrated good cause, the extension to serve is mandatory) (citing *Blessinger v. United States*, 174 F.R.D. 29, 31 (E.D.N.Y. 1997)). Accordingly, there are two means by which a court can grant an extension: (1) upon a showing of good cause; or (2) within its discretion. Fed. R. Civ. P. 4(m).

"The following two factors are relevant in a court's evaluation of good cause: (1) the reasonableness and diligence of plaintiff's efforts to serve; and (2) the prejudice to defendants from the delay." *Lopez v. Guziczek*, No. 21 CV 10099 (NSR), 2023 WL 6973732, at \*1 (S.D.N.Y. Oct. 23, 2023) (citations omitted); *see Patel v. Singh*, No. 21-CV-00759, 2023 WL 2262792, at \*5 (E.D.N.Y. Feb. 28, 2023) ("[I]f a defendant has received actual notice of a lawsuit, 'regardless of whether service was initially proper or whether good cause is found, the Court may still grant an extension of time given to a plaintiff to serve the defendant in its discretion.' ") *Id.* (declining to dismiss complaint for lack of service).

**\*5** Moreover, "[t]here is a strong federal policy in favor of resolving disputes on the merits." *Byrd v. Town of DeWitt*, No. 5:23-CV-390 (DNH), 2023 WL 6467921, at \*4 (N.D.N.Y. Oct. 5, 2023). "Consequently, as long as 'it appears that proper service may still be obtained,' *Grammenos v. Lemos*, 457 F.2d 1067, 1070 (2d Cir. 1972), the right remedy is typically to direct the plaintiff to re-serve the pleading." *Byrd*, 2023 WL 6467921 at \*4; see *Zapata v. City of New York*, 502 F.3d 192, 195-96 (2d Cir. 2007) (granting an extension "even in the absence of good cause").

As detailed above, the Court directed the U.S. Marshals to serve the summons and amended complaint on Cayuga County. (*See* Dkt. Nos. 32, 33.) As such, Plaintiff was "entitled to rely on the U.S. Marshals to effect service." *Burris v. Nassau Cnty. Dist. Att'y*, No. 14-CV-5540, 2023 WL 6450398, at \*5 (E.D.N.Y. Sept. 30, 2023).

Upon review, it appears the U.S. Marshals inadvertently served the amended complaint on Cayuga County District Attorney's Office on March 2, 2023. (Dkt. No. 34-2 at 3-5, 10-11; Dkt. No. 34-1 at 1-3.) As Defendant correctly points out, the Cayuga County District Attorney's Office is not authorized to accept service on behalf of Cayuga County. (Dkt. No. 34-2 at 10-11; Fed. R. Civ. P. 4(j), N.Y. C.P.L.R. § 311. [6] ) Plaintiff has therefore failed to effect proper service on Cayuga County.

[6]    Rule 4(j) of the Federal Rules of Civil Procedure permits service of process on a local government "by delivering a copy of the summons and of the complaint to its chief executive officer" or "serving a copy of each in the manner prescribed by the state's law for serving a summon or like process on such a defendant." Fed. R. Civ. P. 4(j). Pursuant to New York law, personal service upon a governmental subdivision shall be made by delivering the summons ... upon a county, to the chair or clerk of the board of supervisors, clerk, attorney or treasurer[.]" N.Y. C.P.L.R. § 311.

However, a *pro se* plaintiff may avoid dismissal under Rule 4(m) if he "indicated to the court his reliance on service by the Marshals[.]" *Romandette v. Weetabix Co.*, 807 F.2d 309, 311 (2d Cir. 1986). Such is the case here. (Dkt. Nos. 31, 32.) Thus, on the current record, the Court finds "the Marshals' failure to effect service automatically constitutes good cause within the meaning of Rule 4(m)." *Ruddock v. Reno*, 104 F. App'x 204, 206-07 (2d Cir. 2004).

Accordingly, Court recommends denying Defendant's motion to dismiss for improper service and lack of personal jurisdiction. [7]

[7]    Ordinarily, the Court would further recommend that Plaintiff be granted an extension of time under Federal Rule of Civil Procedure 4(m) to effectuate proper service on Cayuga County and direct the U.S. Marshals to re-attempt service of the amended complaint and summons within that time frame. However, because the Court recommends granting Defendant's motion to dismiss under Rule 12(b)(6), the Court declines to do so at this time.

### B. Municipal Liability

Defendant argues Plaintiff has failed to state a claim for municipal liability. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). The Court agrees.

Under *Monell*, a municipality may be liable for deprivation of constitutional rights "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Id.* at 694. "The policy or custom need not be memorialized in a specific rule or regulation," *Kern v. City of Rochester*, 93 F.3d 38, 44 (2d Cir. 1996), and it may be "reflected in either action or inaction," *Cash v. Cnty. of Erie*, 654 F.3d 324, 341-42 (2d Cir. 2011).

**\*6**  The existence of a municipal policy or custom may be plead in any of four ways: "(1) a policy formally adopted and endorsed by the municipality; (2) actions taken by policymaking officials that caused the particular deprivation alleged; (3) practices by subordinate officials that are not expressly authorized but are so widespread and consistent that policymakers must have been aware of them; or (4) a failure by policymakers to train or supervise that amounts to deliberate indifference to the rights of those who come into contact with the inadequately trained or supervised municipal employees." *Crawley v. City of Syracuse*, 496 F. Supp. 3d 718, 729 (N.D.N.Y. 2020) (internal quotation marks omitted) (citing *Deferio v. City of Syracuse*, 770 F. App'x 587, 589 (2d Cir. 2019) (summary order)). "Boilerplate statements" that county employees were acting in accord with a municipal policy, with no facts to support those statements, are not sufficient to support a *Monell* claim. *See Brown v. Oneida Cnty.*, No. 6:15-CV-0849, 2016 WL 4275727, at \*4 (N.D.N.Y. Aug. 12, 2016).

"To survive a motion to dismiss a municipal liability claim, a plaintiff must allege facts tending to support, at least circumstantially, an inference that a municipal policy or custom exists." *McLennon v. City of New York*, 171 F. Supp. 3d 69,

Case 9:22-cv-00638-DNH-CBF    Document 80    Filed 03/20/26    Page 45 of 146

Mendez v. Cayuga County, Not Reported in Fed. Supp. (2024)

2024 WL 1469060

95 (E.D.N.Y. 2016) (internal quotation marks and ellipsis omitted); *see also Cruz v. Vill. of Spring Valley*, No. 21-CV-2073, 2022 WL 428247, at *6 (S.D.N.Y. Feb. 11, 2022) (collecting cases). Put simply, to allege "there is a policy does not make it so." *Vassallo v. City of New York*, No. 15-CV-7125, 2016 WL 6902478, at *14 (S.D.N.Y. Nov. 22, 2016). "Once a plaintiff has demonstrated the existence of a municipal policy, a plaintiff must then establish a causal connection, or an 'affirmative link,' between the policy and the deprivation of his constitutional rights." *Deferio*, 770 F. App'x at 589 (citing *Vippolis v. Vill. of Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985)). [8]

[8]     Generally, "[e]stablishing the liability of the municipality requires a showing that the plaintiff suffered a tort in violation of federal law committed by the municipal actors [acting in furtherance of the municipality's] custom or policy." *Askins v. Doe No. 1*, 727 F.3d 248, 253 (2d Cir. 2013). However, the Second Circuit has also recognized that "constitutional injuries may be found to exist ... in the absence of individual liability, [where] the injuries complained of are not solely attributable to the actions of named individual defendants." *Barrett v. Orange Cnty. Hum. Rts. Comm'n*, 194 F.3d 341, 350 (2d Cir. 1999) ("[E]ven in situations where the acts or omissions of individual employees do not violate an individual's constitutional rights, 'the combined acts or omissions of several employees acting under a governmental policy or custom may violate' those rights.").

As noted, Plaintiff alleges that after he ingested metal material and was told by Sgt. Marvintino that arrangements would be made for his transport to a hospital, Sgt. Marvintino thereafter advised Plaintiff that he could not receive emergency medical treatment because "the hospitals were closed and no medical was present[.]" (Dkt. No. 28 at 1-2.) Plaintiff suggests his injuries "all originat[e] from lack of care and professional ethics and safety of the Cayuga County Jail" and the "County Jail ... violated their duty to serve safe and sanitary meals to inmates without mold, mercury or metal." *Id.* at 3.

Here, the Court finds Plaintiff has failed to plausibly allege Cayuga County maintained a policy or custom which deprived him of a constitutional right. (Dkt. No. 34-2 at 7.) To that end, Plaintiff has not identified any formal policy that delayed his medical treatment and, while the policy or practice need not be formally memorialized, in order to establish the existence of a municipal policy or custom for purposes of Section 1983 Plaintiff must demonstrate that Cayuga County has a "persistent and widespread" practice that is "so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Ruiz v. City of New York*, No. 14-cv-5231, 2015 WL 5146629, at *11 (S.D.N.Y. Sept. 2, 2015). The allegations in the amended complaint fall short of this high standard. [9] *See Schnauder v. Gibens*, 679 F. App'x 8, 10 (2d Cir. 2017) (no *de facto* policy alleged where "apart from a detailed recounting of his own experiences," the complaint contained "only general conclusory allegations that there was a policy") (internal quotation marks omitted); *Iacovangelo v. Correctional Med. Care, Inc.*, 624 F. App'x 10, 14 (2d Cir. 2015) (widespread practice not pled where other than the plaintiff, the pleading provides only one additional example of a similar incident); *Santana v. City of New York*, No. 15-CV-6715, 2018 WL 1633563, at *10 (S.D.N.Y. Mar. 29, 2018) ("[I]t is well-settled that a "single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy.").

[9]     The Court notes "the absence of a policy is not a policy and is not actionable under *Monell*." *Zachary v. City of Newburgh*, No. 13-CV-5737, 2014 WL 1508705, at *5 (S.D.N.Y. Apr. 1, 2014) (citation omitted); *see also Quinones v. New York City*, No. 19-CV-5400, 2020 WL 5665142, at *19 (S.D.N.Y. Aug. 17, 2020) ("[B]ut, under *Monell*, a municipality's failure to put a formal policy in place to prevent unlawful conduct is not the same thing as an actionable policy."), *report and recommendation adopted*, 2020 WL 6901340 (S.D.N.Y. Nov. 23, 2020). "Nonetheless, the Supreme Court has left a narrow opening for § 1983 claims ... seeking liability based not on affirmative conduct but on a government official's failure to act." *Reynolds v. Giuliani*, 506 F.3d 183, 191-92 (2d Cir. 2007) (citation omitted). When a municipality "does not have an adequate policy ...*Monell* liability exists 'where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions." *Fraser v. City of N.Y.*, No. 20-CV-4926, 2021 WL 1338795, at *10 (S.D.N.Y. Apr. 9, 2021) (quoting *Reynolds*, 506 F.3d at 192). "Such a pattern, if sufficiently persistent or widespread as to acquire the force of law, may constitute a policy or custom within the meaning of *Monell*." *Id.* Plaintiff's amended complaint does not plausibly allege a "pattern of misconduct." (Dkt. No. 28.) Rather, as Defendant points out, the facts alleged indicate

singular interactions with employees of the jail done in response to his specific situation. (Dkt. No. 34-2 at 7.) *See Brogdon v. City of New Rochelle*, 200 F. Supp. 2d 411, 427 (S.D.N.Y. 2002) ("A single incident by itself is generally insufficient to establish the affirmative link between the municipal policy or custom and the alleged unconstitutional violation.").

**\*7** Further, Plaintiff has not identified any actions taken by policymaking individuals resulting in the alleged delay, nor does the amended complaint contain allegations describing a failure by policymakers to provide adequate training or supervision to subordinates. *See, e.g.*, *Dosiak v. Town of Brookhaven*, No. 16-cv-6658, 2017 WL 7048912, at \* 11 (E.D.N.Y. Nov. 27, 2017); *Boonmalert v. City of New York*, 2017 WL 1378274, at \* 7 (S.D.N.Y. Apr. 12, 2017).

Moreover, Plaintiff has not responded to Defendant's motion to dismiss, and therefore he "has failed to identify how any of the allegations contained in his amended complaint support imposing municipal liability on [Cayuga] County." *Rowles v. Doe*, No. 19-CV-6933, 2021 WL 3946291, at \*3 (W.D.N.Y. Sept. 3, 2021); *see, e.g.*, *Isaac v. City of New York*, No. 17-CV-1021, 2018 WL 1322196, at \*6 (S.D.N.Y. Mar. 13, 2018) (*de facto* policy not plausibly alleged where plaintiff merely asserted that "the City of New York has been aware of the routine, dangerous, and constitutionally inadequate medical care [in its jail]").

Because Plaintiff has failed to plausibly allege municipal liability on the part of Cayuga County, the Court recommends granting Defendant's motion for failure to state a claim upon which relief may be granted and recommends dismissing Plaintiff's Section 1983 medical indifference claim against Defendant Cayuga County. [10]

10      As such, the Court does not reach Defendant's remaining argument. (Dkt. No. 34-2 at 7-10.)

## VI. LEAVE TO AMEND

Despite the rather extensive history of this litigation, it remains only in the earliest stages. As noted, Plaintiff did not oppose Defendant's motion to dismiss or seek leave to amend. However, given Plaintiff's *pro se* status, the Court recommends Plaintiff's Section 1983 medical indifference claim against Defendant Cayuga County be dismissed without prejudice and with leave to amend. *See Maharishi Hardy Blechman Ltd. v. Abercrombie & Fitch Co.*, 292 F. Supp. 2d 535, 555 (S.D.N.Y. 2003) (noting that courts routinely grant leave to replead following judgment on the pleadings, unless amendment would be futile); *see Levinson v. United States Fed. Bureau of Prisons, Metro. Corr. Ctr. - New York*, 594 F. Supp. 3d 559, 567 (S.D.N.Y. 2022) ("[W]hen a motion to dismiss is granted, the usual practice is to dismiss the claims without prejudice and grant plaintiff leave to amend the complaint.").

## VII. CONCLUSION

**WHEREFORE**, for the reasons set forth herein, it is hereby

**RECOMMENDED** that Defendant's motion to dismiss (Dkt. No. 34) be **GRANTED**; and it is further

**RECOMMENDED** that Plaintiff's Section 1983 medical indifference claim against Defendant Cayuga County be **DISMISSED WITHOUT PREJUDICE AND WITH LEAVE TO AMEND**; and it is further

**ORDERED** that the Clerk serve a copy of the Report-Recommendation and Order on all parties in accordance with Local Rules, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2008) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. [11] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984

Case 9:22-cv-00638-DNH-CBF    Document 80    Filed 03/20/26    Page 47 of 146

**Mendez v. Cayuga County, Not Reported in Fed. Supp. (2024)**
2024 WL 1469060

F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

11    If you are proceeding *pro se* and are served with this Report-Recommendation and Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Report-Recommendation and Order was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

**\*8  IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2024 WL 1469060

---

**End of Document**    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 1251541
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Luis MENDEZ, Plaintiff,
v.
CAYUGA COUNTY, Defendant.

9:21-cv-1090 (BKS/TWD)
|
Signed March 25, 2024

**Attorneys and Law Firms**

Plaintiff pro se: Luis Mendez, 05357-509, FCI Sandstone, P.O. BOX 1000, Sandstone, MN 55072.

For Defendant: Judith B. Aumand, Burke, Scolamiero Law Firm, 7 Washington Square, Albany, NY 12205.

**MEMORANDUM-DECISION AND ORDER**

Brenda K. Sannes, Chief United States District Judge:

**I. INTRODUCTION**

 **\*1** Plaintiff Luis Mendez commenced this civil rights action asserting claims under 42 U.S.C. § 1983 ("Section 1983") arising out of his incarceration at the Cayuga County Jail as a federal pretrial detainee. (Dkt. No. 11). Following this Court's review of the complaint pursuant to 28 U.S.C. § 1915A, plaintiff filed an amended complaint. (Dkt. No. 28). On May 1, 2023, Defendant Cayuga County filed a motion to dismiss the amended complaint under Fed. R. Civ. P. 12(b)(6) for failure to state a claim. (Dkt. No. 34). Plaintiff did not oppose the motion. This matter was assigned to United States Magistrate Judge Thérèse Wiley Dancks who, on February 1, 2024, issued a Report-Recommendation and Order recommending that Defendant's motion to dismiss be granted, and that Plaintiff's Section 1983 medical indifference claim against Cayuga County – the only claim remaining in the action – be dismissed without prejudice and with leave to amend. (Dkt. No. 43 ["Report-Recommendation"], at 15). Magistrate Judge Dancks advised the parties that under 28 U.S.C. § 636(b)(1), they had fourteen days within which to file written objections to the report, and that the failure to object to the report within fourteen days would preclude appellate review. (*Id.*). No objections to the Report-Recommendation have been filed. Instead, the Court has received the following from Plaintiff: (1) a second amended complaint, Dkt. No. 47 ("SAC"); and (2) a motion for appointment of counsel, Dkt. No. 48 ("Motion for Counsel").

**II. MOTION TO DISMISS**

As no objection to the Report-Recommendation has been filed, and the time for filing objections has expired, the Court reviews the Report-Recommendation for clear error. *See Petersen v. Astrue*, 2 F. Supp. 3d 223, 228-29 (N.D.N.Y. 2012); Fed. R. Civ. P. 72(b) advisory committee's note to 1983 amendment. Having reviewed the Report-Recommendation for clear error and found none, the Report-Recommendation is adopted in its entirety.

Accordingly, the motion to dismiss is granted.

**III. SUFFICIENCY OF THE SECOND AMENDED COMPLAINT**

  **A. Relevant Legal Standard**

Because Plaintiff is an inmate suing one or more government employees, his second amended complaint must be reviewed in accordance with 28 U.S.C. § 1915A(b). The legal standard governing the review of a pleading pursuant to 28 U.S.C. § 1915A(b) was discussed at length in the Court's Decision and Order entered on January 19, 2022, and it will not be restated herein. *See* Dkt. No. 12 ("January 2022 Order") at 2-3.

### B. Overview of the Amended Complaint and Report-Recommendation

Plaintiff's amended complaint alleged that on December 29, 2020, he ingested "a large piece of metal wire" served in his food, and thereafter experienced a delay in medical treatment. (Dkt. No. 28). By Decision and Order entered on December 12, 2022, this Court liberally construed the allegations in the amended complaint to assert a medical indifference claim against Cayuga County. (Dkt. No. 29, at 3-4).

In recommending dismissal of Plaintiff's medical indifference claim against Cayuga County, Judge Dancks discussed the legal standard governing Section 1983 claims for municipal liability and noted that the amended complaint failed to identify (1) any formal policy of Cayuga County that delayed Plaintiff's access to medical treatment, (2) a persistent and widespread practice of denying detainees access to emergency medical treatment, (3) wrongdoing by policymaking individuals that resulted in the alleged delay in treatment, or (4) a failure by policymakers to provide adequate training or supervision to subordinates. *See* Report-Recommendation at 12-13.

### C. Overview of the Second Amended Complaint

**\*2**  The allegations in the second amended complaint are materially similar to, albeit less detailed than, the allegations in Plaintiff's prior pleadings. The following facts are set forth as alleged in the second amended complaint.

During Plaintiff's confinement at Cayuga County Jail, he was "provided a meal that contained a 'piece of metal[,]' " which he ingested. SAC at 1. "When Plaintiff brought his concerns to the jail officials[,] they acknowledged his medical condition," but "opted to delay emergent medical care." *Id.* "This delay resulted in serious adverse effects to Plaintiff's health[.]" *Id.* According to Plaintiff, the delay in emergency medical treatment occurred as a result of Cayuga County not having a "policy or regulation" for handling medical emergencies, which resulted in jail officials not knowing how to properly respond to Plaintiff's situation. *See* SAC at 1.

The Court liberally construes the allegations in the second amended complaint to assert a medical indifference claim against Cayuga County, the only named defendant. [1]

[1]     As noted in the January 2022 Order, "a municipality may not be liable on the basis of respondeat superior." *See* January 2022 Order at 10 (citing *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978)). Moreover, the second amended complaint does not allege that one or more Cayuga County Jail officials placed metal inside of Plaintiff's food, or that this occurred pursuant to a custom or policy of Cayuga County, or as a result of inaction by policymakers to a "pattern of misconduct" involving food contamination. *See Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007) (noting that *Monell* liability may exist "where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions"). Thus, the Court does not construe the second amended complaint to assert a Section 1983 claim against Cayuga County based on the metal object contained within Plaintiff's food.

### D. Analysis

Municipal liability is limited under Section 1983 by *Monell v. Dep't of Soc. Servs. of City of New York*. In *Monell*, the Supreme Court found that municipal liability existed "where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006). Thus, to successfully state a claim for *Monell* liability, a plaintiff must "make factual allegations that support a plausible inference

that the [alleged] constitutional violation took place pursuant either to a formal course of action officially promulgated by the municipality's governing authority or the act of a person with policy making authority for the municipality." *Missel v. Cnty. of Monroe*, 351 Fed. App'x 543, 545 (2d Cir. 2009) (citing *Vives v. City of N.Y.*, 524 F.3d 346, 350 (2d Cir. 2008)). "Absent such a custom, policy, or usage, a municipality cannot be held liable on a respondeat superior basis for the tort of its employee." *Jones v. Town of East Haven*, 691 F.3d 72, 80 (2d Cir. 2012); *see also Los Angeles County, Cal. v. Humphries*, 562 U.S. 29, 36 (2010) ("[I]n *Monell* the Court held that 'municipality cannot be held liable' solely for the acts of others, e.g., 'solely because it employs a tortfeasor.' " (quoting *Monell*, 436 U.S. at 691)); *Sims v. City of New York*, No. 15-CV-2485, 2018 WL 11605048, at *4 (S.D.N.Y. Dec. 17, 2018) ("*Monell* ... does not conclude that plaintiffs may hold municipalities liable under separate causes of action—there must be an underlying constitutional violation that occurred because of the municipality's unconstitutional custom or policy.... When there is no underlying constitutional violation, therefore, there can be no municipal liability under *Monell*." (citing, *inter alia, Segal*, 459 F.3d at 219)), *aff'd*, 788 Fed. App'x 62 (2d Cir. 2019).

 **\*3** The existence of a municipal policy or custom may be plead in any of four ways: "(1) a policy formally adopted and endorsed by the municipality; (2) actions taken by policymaking officials that caused the particular deprivation alleged; (3) practices by subordinate officials that are not expressly authorized but are so widespread and consistent that policymakers must have been aware of them; or (4) a failure by policymakers to train or supervise that amounts to deliberate indifference to the rights of those who come into contact with the inadequately trained or supervised municipal employees." *Crawley v. City of Syracuse*, 496 F. Supp. 3d 718, 729 (N.D.N.Y. 2020) (internal quotation marks omitted) (citing *Deferio v. City of Syracuse*, 770 Fed. App'x 587, 589 (2d Cir. 2019) (summary order)). "Once a plaintiff has demonstrated the existence of a municipal policy, a plaintiff must then establish a causal connection, or an 'affirmative link,' between the policy and the deprivation of his constitutional rights." *Deferio*, 770 Fed. App'x at 590 (2d Cir. 2019) (citing *Vippolis v. Vill. of Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985)). "Boilerplate statements" that county employees were acting in accord with a municipal policy, with no facts to support those statements, are not sufficient to support a *Monell* claim. *See Brown v. Oneida Cnty.*, No. 6:15-CV-0849, 2016 WL 4275727, at *4 (N.D.N.Y. Aug. 12, 2016).

As with the original and amended complaints, the second amended complaint does not identify a policy that resulted in Plaintiff's lack of access to emergency medical treatment. Indeed, the second amended complaint is devoid of allegations which plausibly suggest that at the time of Plaintiff's injuries, Cayuga County imposed any type of restriction on detainee access to medical treatment, the jail's access to outside hospitals, or the services necessary to facilitate such access.

Instead, Plaintiff alleges, for the first time, that he experienced a delay in medical treatment after ingesting metal as a result of the *absence* of a policy informing officials at the Cayuga County Jail how to respond to a medical emergency. *See* SAC. In other words, according to Plaintiff, the delay in medical treatment that he experienced was as a result of Cayuga County's failure to prepare for, and train officials on, medical emergencies. [2] Thus, the Court focuses its analysis herein on whether Plaintiff has adequately alleged the existence of a municipal policy, for purposes of municipal liability, through either (1) "widespread and consistent" wrongdoing by subordinate officials related to the handling of medical emergencies, or (2) a failure by policymakers to train or supervise that amounts to deliberate indifference to Plaintiff's rights. *See Crawley*, 496 F. Supp. 3d at 729.

[2]    To be clear, the second amended complaint does not contain any allegations which plausibly suggest that Plaintiff did not receive medical treatment as a result of any sort of formal policy by Cayuga County, or the direct actions of any policymaker.

### 1. Practices of Subordinate Officials

Insofar as the second amended complaint may be construed as attempting to assert a municipal policy through the wrongdoing of subordinate officials, as noted in the January 2022 Order, Plaintiff's underlying medical indifference claim must be analyzed under the pretrial detainee standard set forth in *Darnell v. Pineiro*, 849 F.3d 17 (2d Cir. 2017). *See* January 2022 Order at 11-12 (citations omitted); *see also Bruno v. City of Schenectady*, 727 Fed. App'x 717, 720 (2d Cir. 2018). To state a medical

2024 WL 1251541

indifference claim under that standard, a pleading must allege (1) "an objective prong showing that the challenged conditions were sufficiently serious to constitute objective deprivations of the right to due process," and (2) "a subjective prong showing that the defendants acted with at least deliberate indifference to the challenged conditions." *Sims*, 788 Fed. App'x at 63 (internal quotation marks and alterations omitted).

"The serious medical needs standard contemplates a condition of urgency such as one that may produce death, degeneration, or extreme pain." *Charles v. Orange County*, 925 F.3d 73, 86 (2d Cir. 2019). "[W]here the allegations amount to a delay in medical treatment (rather than a complete deprivation of treatment), courts look at the particular risk of harm faced by an inmate due to the delay in treatment, rather than the severity of the inmate's underlying medical condition." *Robinson v. Broome Cnty. Sheriff*, No. 22-CV-0023 (GLS/CFH), 2022 WL 2914476, at *2 (N.D.N.Y. July 25, 2022) (citing, *inter alia, Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003)); *see also Benjamin v. Pillai*, 794 Fed. App'x 8, 11 (2d Cir. 2019) (distinguishing between cases where the prisoner is denied all medical care with those where the prisoner alleges a temporary delay or interruption in care). With respect to the second prong, an official does not act with deliberate indifference "unless the official 'acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety.' " *Bruno*, 727 F. App'x at 720 (emphasis omitted) (quoting *Darnell*, 849 F.3d at 35).

 **\*4** As a threshold matter, the second amended complaint fails to identify the nature or cause of the delay in Plaintiff's receipt of medical treatment after he ingested metal, or what treatment, if any, Plaintiff could have received sooner that may have improved his condition and/or alleviated his pain. [3] Instead, Plaintiff vaguely alleges only that jail officials "conciencly [sic] and intentionally delayed" his access to medical care after becoming aware of his condition. SAC at 1. Such conclusory allegations – particularly in light of the allegations in Plaintiff's prior pleadings – are insufficient to plausibly suggest either (1) that Plaintiff faced a serious risk of harm based on the delay in medical treatment that he experienced, or (2) that any official at the Cayuga County Jail acted with deliberate indifference to Plaintiff's medical needs. *See, e.g., Charles*, 925 F.3d at 86 ("In most cases, the actual medical consequences that flow from the denial of care are highly relevant in determining whether the denial of [or delay in] treatment subjected the detainee to a significant risk of serious harm."); *Burroughs v. Mitchell*, 325 F. Supp. 3d 249, 274 (N.D.N.Y. 2018) ("[The] [p]laintiff's conclusory allegation that [the defendant] refused to treat him or send him to a hospital fails to plausibly suggest that the defendant was deliberately indifferent to any serious medical need."); *Jimenez v. Sommer*, No. 14-CV-5166, 2017 WL 3268859, at *8 (S.D.N.Y. July 28, 2017) (holding "conclusory assertion" that the defendant "was aware of [the plaintiff's injury] but failed to recommend proper medical treatment" fails to "indicate that [the defendant] had the requisite culpable state of mind to satisfy the subjective prong of a deliberate[ ] indifference claim" (citation omitted) (collecting cases)). [4] Accordingly, Plaintiff cannot state a claim against Cayuga County based on any alleged wrongdoing by subordinate officials. *See Segal*, 459 F.3d at 219 ("Because the District Court properly found no underlying constitutional violation, its decision not to address the municipal defendants' liability under *Monell* was entirely correct.").

3    The original complaint alleged that Plaintiff ingested metal during his dinner meal on December 29, 2020, and was taken for abdominal radiographs at approximately 6:00 a.m. on December 30, 2020. Dkt. No. 2 at 1. In addition, the amended complaint alleged that Plaintiff did not receive emergency medical treatment sooner because "the hospitals were closed and no medical was present[.]" Am. Compl. at 1-2. The second amended complaint does not repeat either of these factual allegations, let alone elaborate on them.

4    Based on the allegations in Plaintiff's original and amended complaints, which, again, Plaintiff has not repeated or corrected in his second amended complaint, the Court can only infer that (1) he experienced a delay in emergency medical of approximately twelve hours based on circumstances outside the control of jail officials working at the time, and (2) his treatment initially consisted of examining the metal within his body – through a radiograph – after it was fully digested.

Furthermore, even if the Court were to overlook the conclusory nature of Plaintiff's allegations of medical deliberate indifference, the second amended complaint is also devoid of any allegations which plausibly suggest that Plaintiff was denied

medical treatment as part of a "pattern of misconduct." *See Reynolds*, 506 F.3d at 192 (noting that *Monell* liability exists "where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions"). In fact, the second amended complaint does not identify any past incidents in which other detainees at the Cayuga County Jail were denied emergency medical treatment. Nor does the pleading contain allegations which plausibly suggest that emergency medical treatment was repeatedly unavailable at certain times, or that transports to outside hospitals were prohibited or limited in some respect. Rather, the second amended complaint identifies one incident of inadequate medical treatment – the incident involving Plaintiff. Thus, the Court has no basis to plausibly infer from the allegations in the second amended complaint that at the time of Plaintiff's injuries, Cayuga County officials were aware of "widespread and consistent" deliberate indifference by jail officials to the emergency medical needs of detainees such that the alleged failure to adequately respond to Plaintiff's medical needs may be considered a policy choice by Cayuga County. *See Reynolds*, 506 F.3d at 192; *Outlaw v. City of Hartford*, 884 F.3d 351, 373 (2d Cir. 2018) ("[I]nherent in the principle that a municipality can be liable under § 1983 only where its policies are the moving force [behind] the constitutional violation, is the concept that the plaintiff must show a direct causal link between a municipal policy or custom and the alleged constitutional deprivation."); *Wilson v. Cnty. of Ulster*, No. 1:20-CV-00104, 2022 WL 813958, at *16 (N.D.N.Y. Mar. 17, 2022) (noting, where a municipal liability claim was asserted based on an isolated incident, that "Plaintiff's conclusory allegation that a policy should be inferred because the 'flagrant deprivations of constitutionally protected rights could not and would not occur without the tacit approval or deliberate indifference regarding the commission of such violations by the policymakers or supervisors of the Town and County of Ulster,' ... is insufficient."); *Maloney v. Cnty. of Nassau*, 623 F. Supp. 2d 277, 289-90 (E.D.N.Y. 2007) ("[P]roof of a single incident of unconstitutional activity is not sufficient to impose liability on a municipality unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy that can be attributed to a municipal policymaker.").

### 2. Failure-to-Train

**\*5** As the Second Circuit has explained, a municipality's "failure to train its subordinates satisfies the policy or custom requirement" under *Monell* "only where the need to act is so obvious, and the inadequacy of current practices so likely to result in a deprivation of federal rights, that the municipality or official can be found deliberately indifferent to the need." *Reynolds*, 506 F.3d at 192 (citing *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)).

Once again, as a threshold matter, Plaintiff has failed to adequately allege that he suffered an underlying violation of his Fourteenth Amendment rights in connection with the delay in emergency medical treatment that he experienced. For this reason alone, Plaintiff has failed to state a municipal liability claim against Cayuga County. *See Segal*, 459 F.3d at 219.

Furthermore, setting aside the conclusory nature of Plaintiff's allegations of medical deliberate indifference, the second amended complaint also does not identify the jail's practice of responding to medical emergencies at the time of Plaintiff's injuries, let alone explain how it should have been obvious to a policymaker that the practice would result in Plaintiff's receipt of inadequate medical treatment. *See Reynolds*, 506 F.3d at 192. In addition, the second amended complaint does not allege what type of training may have resulted in Plaintiff's receipt of different (or more immediate) medical treatment, or how the absence of such training resulted in a deprivation of his federal rights. *See Amberslie v. Prisoner Transp. Serv. of Am., LLC*, No. 9:17-CV-0564 (TJM/DEP), 2019 WL 1024183, at *15 (N.D.N.Y. Mar. 4, 2019) ("Plaintiff contends that defendant's employees do not receive training in 'medical and mental health education,' which would plaintiff alleges would 'prevent [the] deprivation of life, [and] minimize[ ] the risk of injuries' suffered by prisoners during transport.... Yet, plaintiff has not pleaded any facts with respect to how this alleged failure to train resulted in a deprivation of plaintiff's rights."), *report and recommendation adopted by* 2019 WL 1368860 (N.D.N.Y. Mar. 26, 2019). Thus, the Court also has no basis to plausibly infer from the allegations in the second amended complaint that Plaintiff suffered a denial of emergency medical treatment as a result of a failure by policymakers to train or supervise subordinate officials regarding how to respond to Plaintiff's situation.

Case 9:22-cv-00638-DNH-CBF    Document 80    Filed 03/20/26    Page 53 of 146

Mendez v. Cayuga County, Not Reported in Fed. Supp. (2024)
2024 WL 1251541

In light of the foregoing, Plaintiff's medical indifference claim against Cayuga County is once again dismissed pursuant to 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

## IV. NATURE OF THE DISMISSAL

Generally, when a district court dismisses a pro se action sua sponte, the plaintiff will be allowed to amend his action. *See Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 796 (2d Cir. 1999). However, an opportunity to amend is not required where the plaintiff has already been afforded the opportunity to amend. *Abascal v. Hilton*, No. 04-CV-1401, 2008 WL 268366, at *8 (N.D.N.Y. Jan. 13, 2008) (Kahn, J., adopting, on de novo review, Report-Recommendation by Lowe, M.J.) ("Of course, granting a pro se plaintiff an opportunity to amend is not required where the plaintiff has already been given a chance to amend his pleading."), *aff'd*, 357 Fed. App'x 388 (2d Cir. 2009*); accord, Shuler v. Brown*, No. 07-CV-0937, 2009 WL 790973, at *5 & n. 25 (N.D.N.Y. Mar. 23, 2009) (McAvoy, J., adopting Report-Recommendation by Lowe, M.J.), *Smith v. Fischer*, No. 07-CV-1264, 2009 WL 632890, at *5 & n. 20 (N.D.N.Y. Mar. 9, 2009) (Hurd, J., adopting Report-Recommendation by Lowe, M.J.). [5]

[5]    *See also Foman v. Davis*, 371 U.S. 178, 182 (1962) (explaining that denial of leave to amend was not an abuse of discretion where movant has repeatedly failed to cure deficiencies in pleading); *Coleman v. brokersXpress, LLC*, 375 Fed. App'x 136, 137 (2d Cir. 2010) ("Nor can we conclude that the district court abused its discretion in denying Coleman leave to amend. The district court afforded Coleman one opportunity to amend the complaint, and Coleman made no specific showing as to how he would cure the defects that persisted if given a second opportunity to amend.").

**\*6** Moreover, an opportunity to amend is not required where the defects in the plaintiff's claims are substantive rather than merely formal, such that any amendment would be futile. Indeed, as the Second Circuit has explained, "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993) (citations omitted*), accord, Brown v. Peters*, No. 6:95-CV-1641 (RSP/DS), 1997 WL 599355, at *1 (N.D.N.Y. Sept. 22, 1997) ("[T]he court need not grant leave to amend where it appears that amendment would prove to be unproductive or futile.") (citation omitted); *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) ("The problem with Cuoco's causes of action is substantive; better pleading will not cure it. Repleading would thus be futile. Such a futile request to replead should be denied.") (citation omitted). This rule applies even to pro se plaintiffs. *See, e.g., Cuoco*, 222 F.3d at 103; *Brown*, 1997 WL 599355, at *1.

Although Plaintiff was afforded another opportunity to amend his pleading, he failed to cure the deficiencies identified in the Report-Recommendation. In fact, Plaintiff's pleading is even more vague than his earlier pleadings, particularly as it relates to alleged inadequacies with the medical treatment that he received, and the timing of such treatment. Furthermore, Plaintiff's deficient pleading comes on the heels of his failure to oppose the motion to dismiss. Thus, the Court is not convinced that allowing Plaintiff to amend his pleading for a third time is likely to be productive.

Accordingly, this action is dismissed pursuant to 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

## V. MOTION FOR COUNSEL

In light of the dismissal of this action, Plaintiff's Motion for Counsel is denied as moot.

## VI. CONCLUSION

In light of the foregoing, it is

**ORDERED** that the Report-Recommendation (Dkt. No. 43) is **ADOPTED** in its entirety; and it is further

**ORDERED** that Defendant's motion to dismiss (Dkt. No. 34) the amended complaint (Dkt. No. 28) is **GRANTED**; and it is further

**ORDERED** that any and all federal claims asserted in the second amended complaint (Dkt. No. 47) are **DISMISSED** pursuant to 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted, as set forth above; and it is further

**ORDERED** that Plaintiff's Motion for Counsel (Dkt. No. 48) is **DENIED as moot**; and the Clerk is directed to close this case and enter Judgment; and it is further

**ORDERED** that the Clerk shall provide Plaintiff with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam), and serve a copy of this Order upon the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2024 WL 1251541

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 4432631
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Javar MALLOY, Plaintiff,
v.
Jacob SOPCHAK, et al., Defendants.

1:18-cv-1460 (BKS/DJS)
|
Signed 07/31/2020

**Attorneys and Law Firms**

Plaintiff pro se: Javar Malloy, 199-A-1946, Washington Correctional Facility, Box 180, 72 Lock 11 Lane, Comstock, NY 12821.

For Defendants Megan Spillane, P. David Soares, and County of Albany: Daniel C. Lynch, Albany County Attorney, Michael L. Goldstein, Assistant Albany County Attorney, 112 State Street, 6th Floor, Albany, NY 12207.

**MEMORANDUM-DECISION AND ORDER**

Brenda K. Sannes, United States District Judge:

**I. INTRODUCTION**

 **\*1** Plaintiff *pro se* Javar Malloy brings this action asserting claims under 42 U.S.C. §§ 1983, 1985 and 1986; 42 U.S.C. § 2000d and 3789d; and New York state law arising out of his arrest by Albany Police Department Officers and subsequent prosecution. (Dkt. No. 1). Presently before the Court is Assistant District Attorney ("ADA") Megan Spillane, District Attorney ("DA") P. David Soares, and the County of Albany's ("Defendants" or "Moving Defendants") motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). (Dkt. No. 24). Plaintiff has failed to respond to Moving Defendants' motion, and the last two text orders mailed to Plaintiff were returned as undeliverable. (Dkt. Nos. 28, 30). For the following reasons, Moving Defendants' motion is granted.

**II. PROCEDURAL HISTORY**

Plaintiff commenced this action on December 19, 2018, and sought leave to proceed *in forma pauperis*. (Dkt. Nos. 1–2). This matter was assigned to United States Magistrate Judge Daniel J. Stewart who reviewed the Complaint under 28 U.S.C. §§ 1915(e) and 1915A and, on January 28, 2019, issued a Report-Recommendation and Order, granting Plaintiff leave to proceed *in forma pauperis* and recommending that certain claims be dismissed. *Malloy v. Sopchak ("Malloy I")*, No. 18-cv-1460, 2019 WL 1024354, at \*4–5, 2019 U.S. Dist. LEXIS 14099, at \*12–13 (N.D.N.Y. Jan. 28, 2019), *report and recommendation adopted*, 2019 WL 1025765, 2019 U.S. Dist. LEXIS 33460 (N.D.N.Y. Mar. 4, 2019). Specifically, Magistrate Judge Stewart recommended that the following claims be dismissed with prejudice: 1) conspiracy to commit false arrest and prosecution (the Fifth Cause of Action); 2) claims under 42 U.S.C. § 2000d; and 3) claims against Defendants Albany County District Attorney's Office and Albany Police Department. *Id.* He recommended that Plaintiff's First Cause of Action, an alleged violation of 42 U.S.C. § 1983 without reference to a constitutional violation, and his claim under 34 U.S.C. § 10228 be dismissed without prejudice to amendment, and that Plaintiff's remaining claims, assault and battery, false arrest, First Amendment retaliatory arrest, and municipal liability under *Monell* proceed. *Id.* The Court adopted the Report-Recommendation in its entirety. *Malloy v. Sopchak ("Malloy II")*, No. 18-cv-1460, 2019 WL 1025765, at \*1, 2019 U.S. Dist. LEXIS 33460, at \*2 (N.D.N.Y. Mar. 4, 2019).

## III. FACTS [1]

[1]      The facts are drawn from the Complaint. (Dkt. No. 1). The Court assumes the truth of, and draws reasonable inferences from, the well-pleaded factual allegations. *Lynch v. City of New York*, 952 F.3d 67, 74–75 (2d Cir. 2020).

On July 4, 2018, Plaintiff attended an Independence Day celebration "with family and friends" at his aunt's house in the City of Albany, New York. (Dkt. No. 1, ¶ 18). "Shortly after 12:30 am" on July 5, 2018, Plaintiff "exited [his] [a]unt's residence with two (2) African-American males attending [the] family gathering" to go to a store nearby. (*Id.* ¶ 19). Plaintiff, who is African-American, was "wearing [a] white T-shirt, blue and black Hawaiian shorts with blue and black sneakers." (*Id.* ¶¶ 9, 23). He was "on parole" and was "within ... Albany County/City beyond curfew mandates." (*Id.* ¶ 24).

**\*2** "At approximately 1:14 am" two members of the Albany Police Department ("APD"), Jacob Sopchak and Matthew Seeber, "received a dispatch call alleging ... that one (1) 'Black Male,' wearing [a] white T-shirt, black pants, black and white sneakers was observed possessing [a] gun in [the] vicinity of 175 Second Street." (*Id.* ¶¶ 10, 20). "Neither Plaintiff or [the] two (2) African-American males accompanying him to the store matched the description provided to" Sopchak and Seeber. (*Id.* ¶ 24). As Plaintiff and his companions were "returning to [his] [a]unt's residence" on foot, Sopchak and Seeber "quickly approached" them "with [a] police cruiser, then immediately exited [the] police cruiser with hands on their guns in [a] threatening manner implying imminent unwarrantable police contact." (*Id.* ¶ 25).

"Plaintiff ran in route to [his] [a]unt's house and into [a] dark alley." (*Id.* ¶ 26). Despite having "no affirmative basis for arrest," Sopchak and Seeber "overzealously pursued Plaintiff." (*Id.* ¶ 27). Two other police officers "came to the aid of" Sopchak and Seeber. (*Id.*). "Defendants tackled Plaintiff to [the] ground, twisted [his] arm to [the] point of extreme pain and forced handcuffs on Plaintiff" while repeatedly screaming "stop resisting" even though "Plaintiff was not resisting arrest during this assault." (*Id.* ¶ 28). Plaintiff was then taken in for processing. (*Id.* ¶ 29). Plaintiff "sustained bruises on [his] body, swelling/bruising and soreness on wrists, back, [and] arms." (*Id.* ¶ 35).

Sopchak "manufactured false police arrest business records alleging Plaintiff 'fled on foot ... through a yard, ignoring multiple lawful commands to stop.' " (*Id.* ¶ 31). ADA Spillane, "acting under the direction of" DA Soares, "introduced APD testimony misrepresenting to the Albany County/City grand jury that:" (1) "Plaintiff's arrest was based upon probable cause," (2) APD defendants "acted upon specific and/or identical description given depicting Plaintiff as 'Black Male' possessing alleged gun," (3) "Plaintiff was the 'Black Male' suspect APD police defendants were looking for," and (4) "Plaintiff obstructed APD police defendants' valid post-pursuit arrest." (*Id.* ¶ 34(a)–(d)).

## IV. STANDARD OF REVIEW

The standard of review for a motion under Rule 12(c) is the same as for a motion under Rule 12(b)(6). *Bank of N.Y. v. First Millennium, Inc.*, 607 F.3d 905, 922 (2d Cir. 2010). "For both motions, the Court must accept the allegations contained in the pleadings as true and draw all inferences in the non-movant's favor." *Neopharm Ltd. v. Wyeth–Ayerst Int'l LLC*, 170 F. Supp. 3d 612, 614 (S.D.N.Y. 2016) (citing *Bank of N.Y.*, 607 F.3d at 922). A complaint "must provide 'enough facts to state a claim to relief that is plausible on its face.' " *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "Although a complaint need not contain detailed factual allegations, it may not rest on mere labels, conclusions, or a formulaic recitation of the elements of the cause of action, and the factual allegations 'must be enough to raise a right to relief above the speculative level.' " *Lawtone-Bowles v. City of New York*, No. 16-cv-4240, 2017 WL 4250513, at *2, 2017 U.S. Dist. LEXIS 155140, at *5 (S.D.N.Y. Sept. 22, 2017) (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955).

The Court accepts as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See EEOC v. Port Auth.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). "While *pro se* complaints

2020 WL 4432631

must contain sufficient factual allegations to meet the plausibility standard, we read them with 'special solicitude' and interpret them 'to raise the strongest arguments that they *suggest.*' " *Roman v. Donelli*, 347 Fed. Appx. 662, 663 (2d Cir. 2009) (summary order) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474–75 (2d Cir. 2006)). "A plaintiff's failure to respond to a motion to dismiss does not relieve the Court of its obligation to consider the merits of plaintiff's claims," and " '[i]f a complaint is sufficient to state a claim on which relief can be granted, the plaintiff's failure to respond ... does not warrant dismissal.' " *Crenshaw v. Dondrea*, 278 F. Supp. 3d 667, 669 (W.D.N.Y. 2017) (quoting *McCall v. Pataki*, 232 F.3d 321, 322 (2d Cir. 2000)). The Court will grant a motion for judgment on the pleadings "if, from the pleadings, the moving party is entitled to judgment as a matter of law." *VCG Special Opportunities Master Fund Ltd. v. Citibank, N.A.*, 594 F. Supp. 2d 334, 340 (S.D.N.Y. 2008).

## V. DISCUSSION

**\*3** The Complaint asserts three causes of action against Moving Defendants. (Dkt. No. 1). Plaintiff brings a claim under 42 U.S.C. § 1983 alleging that ADA Spillane and DA Soares violated his constitutional rights (First Claim) and a claim alleging that they conspired to falsely arrest and prosecute Plaintiff, violating 42 U.S.C. §§ 1985 & 1986 (Fifth Claim). (*Id.* ¶¶ 41–42, 52–54). He also brings a *Monell* [2] claim against Albany County (Seventh Claim). (*Id.* ¶¶ 57–63).

2    *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

### A. Previously Dismissed Claims

The Report-Recommendation recommended dismissing Plaintiff's First and Fifth Claims. *Malloy I*, 2019 WL 1024354, at \*4–5, 2019 U.S. Dist. LEXIS 14099, at \*12–13. Specifically, Magistrate Judge Stewart recommended that Plaintiff's First Claim arising under § 1983 "be dismissed with leave to reple[a]d so that Plaintiff can specifically identify the factual and legal basis" of the claim because "he fails to articulate precisely what constitutional rights are at issue." *Malloy I*, 2019 WL 1024354, at \*2, 2019 U.S. Dist. LEXIS 14099, at \*6. As for Plaintiff's Fifth Claim, Magistrate Judge Stewart recommended that it be dismissed with prejudice because "Defendant Spillane ... is protected by absolute immunity," and that DA "Soares is entitled to the same absolute immunity." *Malloy I*, 2019 WL 1025765, at \*3 & n.4, 2019 U.S. Dist. LEXIS 14099, at \*9 & \*10 n.4. The Court adopted the Report-Recommendation in its entirety, dismissing Plaintiff's First Claim without prejudice—"grant[ing] [Plaintiff] leave to file an Amended Complaint within thirty (30) days"—and dismissing the Fifth Claim with prejudice. *Malloy II*, 2019 WL 1025765, at \*1, 2019 U.S. Dist. LEXIS 33460, at \*3 (emphasis omitted).

Moving Defendants contend that both claims should now be dismissed with prejudice, because "ADA Spillane and DA Soares are entitled to absolute immunity." (Dkt. No. 24-1, at 11). As to Plaintiff's Fifth Claim, as described above, it has already been dismissed with prejudice and thus Moving Defendants' argument is moot. As to Plaintiff's First Claim against ADA Spillane and DA Soares, Moving Defendants argue that it should now be dismissed with prejudice because "[t]he entirety of Plaintiff's allegations asserted against ADA Spillane revolve around the district attorney's decision to introduce false or misleading testimony at a grand jury proceeding," and "[i]t is well recognized that a district attorney's actions before a grand jury constitute 'circumstances intimately associated with the judicial phase of the criminal process' and an attorney acting in that realm is entitled to absolute immunity." (*Id.* at 12 (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430–31, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976))).

"To determine whether an official enjoys absolute immunity," courts take a " 'functional approach,' examining 'the nature of the function performed, not the identity of the actor who performed it.' " *Simon v. City of New York*, 727 F.3d 167, 171 (2d Cir. 2013) (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 269, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993) (internal quotation marks omitted)). A prosecutor "acting in the role of an advocate in connection with a judicial proceeding is entitled to absolute immunity for all act 'intimately associated with the judicial phase of the criminal process.' " *Id.* (quoting *Imbler*, 424 U.S. at 430, 96 S.Ct. 984)). "Examples of 'intimately associated' prosecutorial acts include ... evaluating and organizing evidence for presentation at a trial or *grand jury.*" *Turner v. Boyle*, 116 F. Supp. 3d 58, 79 (D. Conn. 2015) (quoting *Dory v. Ryan*, 25 F.3d 81, 83 (2d Cir. 1994) (emphasis added)); *see also Hill v. City of New York*, 45 F.3d 653, 661 (2d Cir. 1995) (holding that a prosecutor had absolute immunity for "conspiring to present falsified evidence to, and to withhold exculpatory evidence from, a

grand jury"); *Pinaud v. Cty. of Suffolk*, 52 F.3d 1139, 1149 (2d Cir. 1995) (determining that a prosecutor had absolute immunity for alleged misrepresentations to a grand jury).

**\*4** The Court agrees with Moving Defendants that ADA Spillane and DA Soares have absolute immunity. Though the Court granted him leave to replead, Plaintiff failed to "identify the factual and legal basis" for his First Claim. *Malloy I*, 2019 WL 1024354, at \*2, 2019 U.S. Dist. LEXIS 14099, at \*6. The only allegations pertaining to ADA Spillane and DA Soares in the Complaint involve ADA Spillane's misrepresentations to the grand jury, which she gave "acting under the direction of" DA Soares. (Dkt. No. 1, ¶ 34). Thus, any § 1983 claims arising out of these actions would be barred because their actions were "intimately associated with the judicial phase of the criminal process." *Imbler*, 424 U.S. at 430, 96 S.Ct. 984. Given that leave to amend a complaint "need not be given when amendment would be futile," *Castro v. Cusack*, No. 15-cv-6714, 2019 WL 3385218, at \*9, 2019 U.S. Dist. LEXIS 125411, at \*25 (E.D.N.Y. July 26, 2019) (quoting *Sodhi v. Mercedes Benz Fin. Servs., USA, LLC*, 957 F. Supp. 2d 252, 255 (E.D.N.Y. 2013)), and Plaintiff, who did not respond to Moving Defendants' motion, has identified no facts suggesting a viable claim. Thus, the Court dismisses Plaintiff's First Claim against ADA Spillane and DA Soares with prejudice.

### B. *Monell* Claim

The Complaint asserts *Monell* claims against the City and County of Albany, alleging that they had a "longstanding perpetual policy, custom, or practice" to "inadequately supervise and train police officials, [and] support retaliatory arrest animus conduct" including the "defendant officers and coconspirator prosecuting defendant attorneys, thereby failing to adequately discourage further constitutional violations." (Dkt. No. 1, ¶ 60). According to Plaintiff, the City and County of Albany "did not require appropriate in-service training or re-training of APD officials or prosecuting attorneys who were known to have engaged in police or prosecutorial conduct," and "as a consequence" the defendants in this case "believed that their actions and omissions would not be properly monitored ... and that misconduct would not be investigated or sanctioned." (*Id.* ¶ 62). Plaintiff describes three "incidents" that illustrate this "policy and/or custom," including: (1) "On November 9, 1988, Roland James was unlawfully arrested and imprisoned," (2) "In 2006 civilian Constance Hines' vehicle was unlawfully seized and retained," and (3) "In June of 2014 civilian Andre Cantay was unlawfully arrested." (*Id.* ¶ 59(a)–(c)). Moving Defendants contend that Plaintiff's *Monell* claim should be dismissed as to Albany County because Plaintiff "asserts in conclusory fashion that the County inadequately supervises and trains its prosecuting attorneys without providing any detail or factual support." (Dkt. No. 24-1, at 16).

"It is well established that 'under § 1983, local governments are responsible only for 'their own illegal acts.' " *Outlaw v. City of Hartford*, 884 F.3d 351, 372 (2d Cir. 2018) (quoting *Connick v. Thompson*, 563 U.S. 51, 60, 131 S.Ct. 1350, 179 L.Ed.2d 417 (2011)). Local governments "are not vicariously liable under § 1983 for their employees' actions." *Id.* (quoting *Connick*, 563 U.S. at 60, 131 S.Ct. 1350); *see also, e.g.*, *Bd. of Cty Comm'rs v. Brown*, 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) ("We have consistently refused to hold municipalities liable under a theory of *respondeat superior*.").

"To establish liability under *Monell*, a plaintiff must show that he suffered the denial of a constitutional right that was caused by an official municipal policy or custom." *Bellamy v. City of New York*, 914 F.3d 727, 756 (2d Cir. 2019). " '[A] municipal policymaker's failure to act, generally pleaded as a failure to train/supervise claim, can trigger municipal liability where was a failure 'amounts to deliberate indifference to the rights' of those with whom municipal employees will come into contact.' " *Santos v. New York City*, 847 F. Supp. 2d 573, 576 (S.D.N.Y. 2012) (quoting *Walker v. City of New York*, 974 F.2d 293, 297 (2d. Cir. 1992)). A plaintiff "must do more than simply state that a municipal policy or custom exist" but that "must allege facts tending to support, at least circumstantially, an inference that such a municipal policy or custom exists." *Id.* (quoting *Dwares v. City of New York*, 985 F.2d 94, 100 (2d Cir. 1993). "Normally, 'a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the [municipality].' " *Triano v. Town of Harrison, NY*, 895 F. Supp. 2d 526, 532 (S.D.N.Y. 2012) (quoting *Newton v. City of New York*, 566 F. Supp. 2d 256, 271 (S.D.N.Y. 2008)). "Although there is no heightened pleading requirement for complaints alleging municipal liability under § 1983," a complaint "does not 'suffice if it tenders naked assertion[s] devoid of further factual enhancement.' " *Id.* (quoting *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937).

**\*5** The Court agrees with Moving Defendants that the Complaint is insufficient to allege a *Monell* claim against Albany County based on a custom of tolerating prosecutorial misconduct. "Plaintiff has not alleged any facts to support an inference that [the County] has a custom or practice of tolerating [prosecutorial misconduct], or of failing to discipline and supervise miscreant [prosecutors]." *Triano*, 895 F. Supp. 2d at 535 (S.D.N.Y. 2012) (dismissing a *Monell* claim based on failure to train/supervise because, inter alia, "mere allegations of a municipal custom or practice of tolerating official misconduct are insufficient to demonstrate the existence of such a custom unless supported by factual details"). As Moving Defendants argue, Plaintiff "does not reference a single previous incident of alleged prosecutorial misconduct." (Dkt. No. 24-1, at 16). While the Complaint lists three other "incidents" related to Plaintiff's *Monell* claim, these pertain to unlawful arrests and seizures, and Plaintiff does not connect them in any way to prosecutorial misconduct.

To the extent Plaintiff is attempting to bring a *Monell* claim against the County based on the actions of the APD officers—rather than the prosecutors—it likewise fails because the allegations regarding the County's alleged involvement with the City of Albany Police Department policies are conclusory and do not lead to a plausible inference that they caused Plaintiff's unlawful arrest. *See Outlaw*, 884 F.3d at 373 (explaining that a *Monell* claim requires the plaintiff to show "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation") (citation omitted); *see also Grantley v. City of New York*, No. 12-cv-8294, 2013 WL 6139688, at \*3, 2013 U.S. Dist. LEXIS 165800, at \*8 (S.D.N.Y. Nov. 21, 2013) (dismissing a plaintiff's *Monell* claim where the complaint was "light on facts and heavy on conclusory language").

Accordingly, the Court dismisses Plaintiff's *Monell* claim against the County of Albany.[3] Given Plaintiff's *pro se* status, this claim is dismissed with leave to replead so that Plaintiff can specifically identify facts which lead to a reasonable inference that he suffered a denial of a constitutional right that was caused by an Albany County policy or custom. *See Maharishi Hardy Blechman Ltd. v. Abercrombie & Fitch Co.*, 292 F. Supp. 2d 535, 555 (S.D.N.Y. 2003) (noting that courts routinely grant leave to replead following judgment on the pleadings, unless amendment would be futile).

[3]    Given that the City of Albany is not a party to the current motion, the Court has not considered the *Monell* claim to the extent it is alleged against the City.

#### C. Duty to Update Address
The last two text orders mailed to Plaintiff were returned as undeliverable, and Plaintiff failed to file a response to Moving Defendants' motion despite the Court granting him an extension. (Dkt. Nos. 27–28, 30). "Parties have an obligation to notify the Court of any change of address," and "[t]his rule applies to both represented parties as well as *pro se* litigants." *Kalamaras v. Sposato*, No. 16-cv-459, 2017 WL 6459567, at \*1, 2017 U.S. Dist. LEXIS 206721, at \*3 (E.D.N.Y. Nov. 3, 2017) (citing *Rossman v. Suffolk Times*, No. 13-cv-3142, 2013 WL 4065020, at \*1, 2013 U.S. Dist. LEXIS 113072, at \*3 (E.D.N.Y. Aug. 12, 2013)), *report and recommendation adopted*, 2017 WL 6493229, 2017 U.S. Dist. LEXIS 206677 (E.D.N.Y. Dec. 14, 2017); *see also* Northern District of New York Local Rule 10.1(c)(2) ("All ... *pro se* litigants must immediately notify the Court of any change of address."). The Court therefore orders Plaintiff to provide the Clerk of the District Court with a current address within thirty (30) days of this Order. The Court advises Plaintiff that failure to follow this order and "the failure to maintain such an address with the Court is a ground for failure to prosecute," *Laney v. Ramirez*, No. 10-cv-9063, 2011 WL 6594491, at \*1, 2011 U.S. Dist. LEXIS 147770, at \*2 (S.D.N.Y. Dec. 22, 2011) (collecting cases), and will result in the dismissal of this case. *See LeSane v. Hall's Sec. Analyst, Inc.*, 239 F.3d 206, 209–11 (2d Cir. 2001).

## VI. CONCLUSION
**\*6** For these reasons, it is

**ORDERED** that Moving Defendants' Motion to Dismiss (Dkt. No. 24) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's § 1983 claim (First Claim) against ADA Spillane and DA Soares is **DISMISSED with prejudice**; and it is further

2020 WL 4432631

**ORDERED** that Plaintiff's *Monell* claim (Seventh Claim) against Albany County is **DISMISSED without prejudice with leave to amend**; and it is further

**ORDERED** that Plaintiff is granted leave to file an Amended Complaint **within thirty (30) days** of the date of this Order. Any Amended Complaint must be a complete pleading which will replace the current Complaint in total; and it is further

**ORDERED** that Plaintiff must provide his address to the Court **within thirty (30) days** of this Order; and it is further

**ORDERED** that if no Amended Complaint is filed within thirty (30) days of the date of this Order, the Clerk is directed to terminate Albany County as a defendant in this case.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2020 WL 4432631

---

**End of Document**
© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 5097970
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Taylor FORREST et al., Plaintiffs,

v.

COUNTY OF GREENE et al., Defendants.

1:22-cv-276 (GLS/ML)

|

Signed August 9, 2023

**Attorneys and Law Firms**

Mark Fraiden, Fraiden & Fraiden LLP, Bronx, NY, for Plaintiffs.

Thomas K. Murphy, Murphy Burns LLP, Loundonville, NY, for Defendants.


**SUMMARY ORDER**

Gary L. Sharpe, United States District Judge

 **\*1** Plaintiffs Taylor Forest and Jimmy Diresta brought this action alleging violations of the Fourth and Fourteenth Amendments pursuant to 42 U.S.C. § 1983, Article I, § 12 of the New York Constitution, and New York State law against the County of Greene, Sheriff of Greene County, Meghan Downey, Charles Cole II, and Peter Kusminsky, in their individual and official capacities. (Am. Compl., Dkt. No. 12.) In a June 7, 2023 Memorandum-Decision and Order (hereinafter "the Decision and Order"), the court granted in part and denied in part a motion to dismiss the amended complaint brought by the County, Sheriff of Greene County, and Kusminsky. (Dkt. No. 21.) Specifically, the motion to dismiss was: granted as to all claims against Sheriff of Greene County, granted as to all § 1983 claims against the County and Kusminsky, granted as to plaintiffs' first cause of action for unlawful search and seizure under New York State law, only as against Kusminsky, and denied in all other respects. (*See id.* at 25.) Now pending before the court is Kusminsky's motion for reconsideration of the Decision and Order. (Dkt. No. 23.) For the reasons that follow, Kusminsky's motion is denied.

Kusminsky requests that the court reconsider the Decision and Order "to the extent that it permitted Plaintiffs' third and fifth [c]auses of [a]ction for the intentional torts of false arrest and failure to intervene under state law, respectively, to proceed against [him]." (Dkt. No. 23, Attach. 1 at 1.) Kusminsky's primary contention is that the court "erred in not dismissing all claims against [him] after finding plaintiff[s] failed to allege" he was personally involved in the underlying events. (*Id.* at 2-4.) Plaintiffs argue that Kusminsky's motion is null because he did not file and serve a notice of motion,[1] that he fails to meet his burden of demonstrating a change in controlling law, the existence of new evidence, or a need to correct a clear error of law or to prevent manifest injustice, that the court correctly determined that Kusminsky only moved for dismissal of the § 1983 claims and the first cause of action,[2] that the court did not use a strained, irrational, or unintended interpretation of the complaint in concluding the term "defendants" includes Kusminsky, and that plaintiffs would be unduly prejudiced if the court were to impart a different meaning to the plain language of the complaint. (Dkt. No. 28, Attach. 1 at 4-7.)

[1]     On July 7, 2023, counsel for defendants explained in a letter that Kusminsky did, in fact, file a notice of motion, (Dkt. No. 25), and, on July 10, 2023, plaintiffs acknowledged this to be true and withdrew their argument, (Dkt. No. 28).

Case 9:22-cv-00638-DNH-CBF    Document 80    Filed 03/20/26    Page 62 of 146
Forrest v. County of Greene, Not Reported in Fed. Supp. (2023)
2023 WL 5097970

2    The court granted the motion to dismiss as to the first cause of action for unlawful search and seizure under New York State law as against Kusminsky because plaintiffs did not have a private right of action when an adequate alternative remedy is available under § 1983. (Dkt. No. 21 at 19-24.) The Decision and Order notes that this theory may have applied to the other causes of action brought under New York State law against Kusminsky, however, the motion only sought dismissal of the unlawful search and seizure claim under this theory, not any of the other state-constitutional claims. (*Id.* at 19, n.9; Dkt. No. 16, Attach. 2 at 4-5.)

**\*2**  Motions for reconsideration proceed in the Northern District of New York under Local Rule 60.1 (formerly Rule 7.1(g)). [3] "In order to prevail on a motion for reconsideration, the movant must satisfy stringent requirements." *In re C-TC 9th Ave. P'ship v. Norton Co.*, 182 B.R. 1, 2 (N.D.N.Y. 1995). Such motions "will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995). The prevailing rule "recognizes only three possible grounds upon which motions for reconsideration may be granted; they are (1) an intervening change in controlling law, (2) the availability of new evidence not previously available, or (3) the need to correct a clear error of law or prevent manifest injustice." *In re C-TC 9th Ave. P'ship*, 182 B.R. at 3 (citation omitted). "[A] motion to reconsider should not be granted where the moving party seeks solely to re[-]litigate an issue already decided." *Shrader*, 70 F.3d at 257.

3    Local Rule 60.1 provides:
> Unless otherwise provided by the Court, by statute or rule ..., a party may file and serve a motion for reconsideration or reargument no later than FOURTEEN DAYS after the entry of the challenged judgment, order, or decree. All motions for reconsideration shall conform with the requirements set forth in L.R. 7.1(a)(1) and (2). The briefing schedule and return date applicable to motions for reconsideration shall conform to L.R. 7.1(a) .... The Court will decide motions for reconsideration or re-argument on submission of the papers, without oral argument, unless the Court directs otherwise.

First, Kusminsky contends that a review of plaintiff's fifth cause of action for failure to intervene under New York law "reveals that it expressly states it is being alleged against 'those defendants that were present [at the traffic stop] ... and failed to intervene,' " that the videos attached to the complaint demonstrate that only Downey and Cole were present, and that, therefore, he is not a defendant to this cause of action. (Dkt. No. 23, Attach. 1 at 2.) However, contrary to Kusminsky's contention, "a plain reading of the [a]mended [c]omplaint" demonstrates that the fifth cause of action was alleged against him. (*Id.* at 3.) The amended complaint alleges that Kusminsky, as sheriff of Greene County, was "responsible for the appointment, hiring, training, supervision, discipline, retention, and conduct of ... [Downey] and [Cole]." (Dkt. No. 12 ¶ 25.) The amended complaint also alleges that Kusminsky, acting through agents, servants, and/or employees, unlawfully seized plaintiffs and their property, falsely arrested plaintiffs, and unlawfully searched their property. (*Id.* ¶¶ 40, 42, 44, 47, 50, 51.) There is no intervening change in controlling law, new evidence not previously available, clear error of law, or manifest injustice that would justify reconsideration of the court's finding that Kusminsky was a party to the fifth cause of action—particularly in light of the fact that, on a motion to dismiss, the complaint is construed in the light most favorable to the non-moving party. [4]

4    The court explicitly set out this well-settled standard of review for a motion to dismiss, as it applied to the fifth cause of action, in the Decision and Order and, therefore, any re-litigation of this point is improper and has not been taken into consideration. *See Shrader*, 70 F.3d at 257.

Second, Kusminsky asserts that plaintiffs' third cause of action for false arrest and false imprisonment under New York State law was alleged against "[t]he defendants" and that the court "erred in considering 'defendants' to include ... Kusminsky." (Dkt. No. 23, Attach. 1 at 3.) Kusminsky is, of course, a defendant to this action. (*See generally* Dkt. No. 12.) And, even if the words "the defendants" were ambiguous, as explained above, plaintiffs explicitly allege in the amended complaint that "[*Kusminsky*] acting through [his] agents, servants, and/or employees, *detained the plaintiffs and their property*" and "[*Kusminsky*] acting through [his] agents, servants, and/or employees, *falsely arrested the plaintiffs*." (*Id.* ¶¶ 42, 44 (emphasis added).) As such, the third cause of action was alleged against Kusminsky on the face of the amended complaint.

**\*3**  Third, Kusminsky contends that he "relied on the lack of any alleged personal involvement as the reason for all claims against [him] to be dismissed." (Dkt. No. 23, Attach. 1 at 3.) As explained in the Decision and Order, "personal involvement" is a requirement to maintain an action under § 1983. (Dkt. No. 21 at 17.) Kusminsky did not argue in his motion to dismiss that personal involvement was also required to maintain claims for false arrest, false imprisonment, or failure to intervene under New York law; Kusminsky argued, correctly, that personal involvement is required to maintain a § 1983 claim, explained why any § 1983 claim against him must be dismissed for this reason and then, without any authority to suggest the same standard applied to claims other than those brought pursuant to § 1983, suggested that "all claims" against him must be dismissed. (*See generally* Dkt. No. 16, Attach. 2.) He acknowledges that he did not explicitly move to dismiss these New York State claims, and, instead, blames the court for not dismissing them *sua sponte*. (Dkt. No. 23, Attach. 1 at 4) (citing *Alki Partners L.P. v. Vatas Holding GmbH*, 769 F. Supp. 2d 478, 499 (S.D.N.Y. 2011).) While *Alki Partners L.P.* may support an argument that, under the proper circumstances, a court *may* dismiss a complaint as to a non-moving defendant, it does not, as Kusminsky ostensibly suggests, hold that it is an error of law when a court does not exercise this discretion. *See* 769 F. Supp. 2d at 499.

Kusminsky has merely demonstrated that he is dissatisfied with the Decision and Order and has not submitted any intervening change in controlling law, the availability of new evidence not previously available, or the need to correct a clear error of law or prevent manifest injustice. *See In re C-TC 9th Ave. P'ship*, 182 B.R. at 3 (citation omitted). Because he has failed to meet the stringent standard that governs reconsideration, Kusminsky's motion is denied.

Accordingly, it is hereby

**ORDERED** that Kusminsky's motion for reconsideration (Dkt. No. 23) is **DENIED**; and it is further

**ORDERED** that the Clerk provide a copy of this Order to the parties.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2023 WL 5097970

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:22-cv-00638-DNH-CBF    Document 80    Filed 03/20/26    Page 64 of 146

2025 WL 3280821

2025 WL 3280821
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Leor KWELLER and Zoe Liberman, Plaintiffs,
v.
The COUNTY OF BROOME et al., Defendants.

3:25-CV-343 (AJB/ML)
|
Signed November 25, 2025

**Attorneys and Law Firms**

Andrea L. Zellan, Sarafa Zellan PLLC, New York, NY, Karen A. Newirth, Newirth Linehan PLLC, New York, NY, Oscar Michelen, Michelen Law, P.C., Mineola, NY, for Plaintiffs.

James C. Knox, Alishah Elena Bhimani, Hacker Murphy LLP, Troy, NY, for Defendant Alyssa Congdon.

Kavitha Janardhan, Lawrence M. Ordway, Jr., Bousquet Holstein PLLC—Syracuse Office, Syracuse, NY, for Defendant Samantha Herceg.

## DECISION and ORDER

Anthony J. Brindisi, United States District Judge:

**I. INTRODUCTION**

**\*1** On March 18, 2025, Leor Kweller ("plaintiff") and his wife, Zoe Liberman ("Ms. Liberman") filed this 42 U.S.C. § 1983 action against defendants Hailey Demkovich, Samantha Herceg, the City of Binghamton (the "City"), City Police Chief Joseph Zikuski ("Chief Zikuski"), City Police Captain Cory Minor ("Captain Minor"), City Police Investigator Amanda Miller ("Investigator Miller"), the County of Broome (the "County"), County District Attorney Michael Korchak ("DA Korchak"), County Chief Assistant District Attorney Mark Loughran ("Chief ADA Loughran"), County Assistant District Attorneys Alyssa Congdon ("ADA Congdon") and Amanda Cronin ("ADA Cronin"), Broome County District Attorney's Office Investigator Jeff Wagner ("BCDA Investigator Wagner"), and unidentified Broome County District Attorney's Office and City Police Department employees numbered one through ten (the "Does"). Dkt. No. 1.

In short, plaintiff alleges that Hailey Demkovich and Samantha Herceg falsely accused him of rape, the Binghamton Police Department ("BPD") inadequately investigated those false allegations, and the Broome County District Attorney's Office (the "BCDA") deliberately disregarded exculpatory evidence and chose to prosecute him anyway. *See generally* Dkt. No. 1. The Broome County Court ultimately granted plaintiff's motion to dismiss all criminal charges against him on May 31, 2023, and the BCDA's appeal of that decision was withdrawn on February 20, 2024. *Id.* ¶¶ 191–92.

The twelve-count complaint asserts § 1983 claims for "False Arrest and Malicious Prosecution" (Count I), "Due Process and Denial of the Right to a Fair Trial" (Count II), "Failure to Intervene" (Count III), "Supervisory Liability" (Count IV), "*Monell* Liability" (Counts V & VI), "Civil Rights Conspiracy" (Count VII), as well as related state law claims for "False Arrest and Malicious Prosecution" (Count VIII), "Intentional, Reckless, or Negligent Infliction of Emotional Distress" (Count IX), violations of Article I, sections 6 and 12 of the New York State Constitution (Count X), "*Respondeat Superior*" (Count XI), and "Abuse of Process" (Count XII). Dkt. No. 1, ¶¶ 191–302. [1]

1      The complaint is sequentially numbered by line. Accordingly, citations to the pleading correspond with that document's internal pagination.

Defendants Hailey Demkovich and Samantha Herceg answered the complaint, Dkt. Nos. 37, 39, but the remaining defendants moved to dismiss the pleading pursuant to Federal Rule of Civil Procedure 12(b)(6). Dkt. Nos. 19, 27, 29–31, 37

Defendants' motions have been fully briefed,[2] *see* Dkt. Nos. 43–44, 46–47, 53–54, 56, 58, 61, and will be considered on the basis of the submissions without oral argument.

2      Pagination corresponds to the electronically generated CM/ECF headers.

## II. BACKGROUND

The following facts are taken from the complaint and will be assumed true for the purpose of assessing defendants' motions to dismiss.

On the night of November 26, 2021, plaintiff accompanied his brother, Yaron Kweller ("Yaron"), to downtown Binghamton, New York, to visit "several of the bars and restaurants Yaron ... owns in partnership with others," including Dos Rios Cantina, the Colonial, and the Stone Fox. Dkt. No. 1 ("Compl.") ¶ 28.

**\*2** Around 10:00 p.m., the brothers arrived at Dos Rios Cantina, staying for some time before going to the Colonial and, eventually, the Stone Fox. Compl. ¶ 30. At the Stone Fox, the brothers met up with Jordan Rindgen ("Rindgen"). *Id.* ¶ 31. Rindgen was the general manager of the Stone Fox, the Colonial, and Dos Rios Cantina. *Id.*

After Rindgen completed his shift at the Stone Fox, he and the brothers went to Dillinger's, a nearby bar not owned by Yaron. Compl. ¶ 31. The three arrived at Dillinger's sometime after midnight. *Id.* ¶ 32. There, an unknown woman, later identified as Samantha Herceg ("Herceg"), approached plaintiff, Yaron, and Rindgen. *Id.* Herceg purchased a round of alcoholic beverages and shots of alcohol for the men. *Id.*

Around 2:00 a.m., plaintiff, Yaron, Rindgen, and Herceg walked to the Stone Fox. Compl. ¶¶ 32–33. The Stone Fox had closed for the night, but Rindgen went inside to retrieve a bottle of wine and canned alcoholic seltzers for the group. *Id.* at 33. The four then traveled to Yaron's business office, which was located nearby. *Id.* ¶ 34. While at Yaron's office, Herceg texted her friends in a group message and invited them to come to the office. *Id.* ¶ 35. Among those invited was Demkovich, who agreed to join, arriving at Yaron's office a short time later. *Id.* ¶¶ 37–38.

Once Demkovich arrived, the group—now consisting of plaintiff, Yaron, Rindgen, Herceg, and Demkovich—returned to the Colonial. Compl. ¶ 41. There, Herceg and Demkovich (the "complainants") ordered shots of alcohol and began to kiss each other. *Id.* ¶ 43. The complainants approached and kissed Rindgen, who was socializing with plaintiff and Yaron. *Id.* ¶ 44. Then, the complainants "danced together in a sexual manner," and "danced sexually with Yaron." *Id.* At some point, Herceg kissed plaintiff. *Id.* ¶ 59. Surveillance cameras inside the Colonial captured footage of these events. *Id.* ¶ 45.

Around 3:00 a.m., the Colonial closed for the night, and the five returned to Yaron's office. Compl. ¶ 46. The complainants went into the bathroom together, emerging partially undressed before disrobing completely and engaging in sexual contact with one another in front of plaintiff, Yaron, and Rindgen. *Id.* ¶¶ 49–50. After that, Rindgen and the complainants used cocaine together. *Id.* ¶ 51.

Then, Ringden and Demkovich "began kissing and touching each other sexually." Compl. ¶ 53. "Herceg [went] over to the couch where [plaintiff] was sitting and tried to kiss him." *Id.* ¶ 52. Herceg "stated that she wanted [plaintiff] to have sex with her and ejaculate inside her," but plaintiff "took no action towards ... Herceg at that time or at any time during the encounter." *Id.*

Meanwhile, "Demkovich initiated oral sex on Yaron." *Id.* ¶ 53. Rindgen moved away from Demkovich and Yaron and "began having consensual contact with ... Herceg." *Id.* ¶ 54.

"[A]pproximately forty-five minutes after the group had returned to the office for the second time ... Herceg and Demkovich told [p]laintiff, his brother Yaron, and ... Rindgen that they were ready to go home." Compl. ¶ 55. Before leaving, the complainants "appeared to be in a good mood and were joking with [plaintiff], Yaron ..., and [ ] Rindgen." *Id.* ¶ 56. Surveillance footage showed complainants leaving plaintiff's office and walking toward a parking garage at 3:48 a.m. on November 27, 2021. *Id.* ¶ 91.

 **\*3** Later that day, the complainants reported to the New York State Police that they had been sexually assaulted and underwent rape examinations. Compl. ¶¶ 76, 175(a). The State Police advised the complainants to contact BPD. *Id.* ¶ 76. That evening, Demkovich's boyfriend called the Colonial to report that the owners had drugged and raped Demkovich the night before. *Id.* ¶ 62. Rindgen, who was also the general manager of the Colonial, informed Yaron that Demkovich's boyfriend had called, and Yaron contacted a friend in BPD, Detective Bob Fimbres, who confirmed that a report had been filed against the men. *Id.* ¶¶ 64–65. Yaron advised plaintiff of the complaint, and both men retained counsel. *Id.* ¶¶ 66–67.

On November 28, 2021, BPD Investigator Miller was assigned to investigate the complainants' allegations. Compl. ¶ 77. Investigator Miller separately interviewed the complainants, who restated their accusations and provided text messages and photographs from the night of the alleged assault. *Id.* ¶¶ 78–79. Demkovich allegedly told Investigator Miller that she was questioning if she was, in fact, raped, or if the physical or sexual contact was consensual, but this statement was never recorded. *Id.* ¶ 82. Two days later, plaintiff's attorney provided Investigator Miller with surveillance footage from inside the Colonial. *Id.* ¶ 88.

One week after the alleged sexual assaults, Investigator Miller and her supervisor, Captain Minor, executed a search warrant at Yaron's office, where the alleged assaults occurred, but they did not recover any physical evidence. Compl. ¶ 90. BPD also obtained surveillance footage from third parties that covered the street area surrounding Yaron's office. *Id.* ¶ 91.

On December 8, 2021, newly hired ADA Congdon attended a meeting with DA Korchak, Chief ADA Loughran, Captain Minor, and Investigator Miller to discuss the complainants' allegations and the ongoing investigation. Compl. ¶¶ 103–04. Chief ADA Loughran suggested that BPD and the BCDA attempt to obtain the complainants' phones. *Id.* ¶ 105. After the meeting, DA Korchak and Chief ADA Loughran assigned ADA Congdon to the investigation. *Id.* ¶ 106. ADA Congdon had previously worked as a criminal defense lawyer for nearly a decade, but she had no experience working as a prosecutor. *Id.* ¶ 103(f).

Meanwhile, rumors of the complainants' allegations spread throughout the Binghamton community. Compl. ¶ 96. Public outrage intensified as local news outlets picked up the story. *Id.* On December 10, 2021, BPD issued a press release stating that it was "investigating a[n] ... incident involving the owners of the Colonial," and that it was "aware of additional allegations being made on social media." *Id.* ¶ 98. Likewise, DA Korchak issued a video statement, acknowledging that "his office received 'numerous' emails and phone calls regarding 'several incidents that occurred recently' in Broome County," and "encourag[ing] those with knowledge to contact the BCDA[ ] or local police departments." *Id.* ¶ 99. The next day, "more than 500 protestors gathered in front of the Colonial and Dos Rios and marched to the Stone Fox." *Id.* ¶ 100.

On December 14, 2021, Chief ADA Loughran, Investigator Miller, and ADA Congdon met separately with the complainants, seeking consent to access their electronic data, but the complainants refused. Compl. ¶ 109. On December 22, 2021, plaintiff's defense attorney filed an order to show cause in county court requesting preservation of the complainants' cell phone data. *Id.* ¶ 113. The BCDA opposed this motion, but continued its own attempts to obtain the complainants' consent to access this data. *Id.* ¶¶ 114–15. Plaintiff's motion was denied on January 21, 2022, because, at that time, there was no criminal action pending against plaintiff or Yaron. *Id.* ¶ 121.

 **\*4** Sometime during the investigation, the complainants retained attorney Thomas Saitta. Compl. ¶ 114. On January 14, 2022, Saitta informed ADA Congdon that he had a folder containing printouts of the complainants' electronic data (the "Saitta folder").

*Id.* ¶ 115. ADA Congdon directed BCDA Investigator Jeff Wagner to pick up the Saitta folder, but he never did. *Id.* ¶¶ 116–17. Throughout January 2022, members of the BCDA, including ADA Congdon and Chief ADA Loughran, continued to request the complainants' consent to extract electronic data from their phones. *Id.* ¶ 118. Those attempts were unsuccessful. *Id.*

Though ADA Congdon held "ultimate decision-making authority" over the investigation, she met with DA Korchak and Chief ADA Loughran multiple times between November 2021 and February 2022. Compl. ¶¶ 123–25. ADA Congdon also worked closely with BPD during the investigation. *Id.* ¶ 120. For instance, she worked with Investigator Miller to draft a search warrant for plaintiff's DNA. *Id.* According to the complaint, "[ADA] Congdon did not know that she could apply directly to a court to obtain a suspect's DNA and neither she, ... [Investigator] Miller, or anyone at BCDA[ ] or BPD knew how to draft an appropriate application." *Id.* Consequently, "[n]o search warrant or motion to compel a buccal swab or a DNA sample was ever completed." *Id.* ¶ 121.

Eventually, on February 22, 2022, ADA Congdon met with BPD officers and decided to file criminal charges against plaintiff, Yaron, and Rindgen in local court. Compl. ¶ 131. Members of the press were present at the courthouse when the three were arrested and charged. *Id.* ¶ 133. Plaintiff was charged with "Rape in the Third Degree in violation of New York Penal Law section 130.25(d)," a Class E felony. *Id.* ¶ 134. He entered a plea of not guilty. *Id.* ¶ 131.

At some point, the BCDA hired ADA Cronin to assist ADA Congdon with plaintiff's prosecution. Compl. ¶ 127. By that time, ADA Cronin had worked as a sex crimes prosecutor for several years. *Id.*

Even after his arrest, plaintiff continued to urge members of BPD and the BCDA to obtain the complainants' electronic data. Compl. ¶ 144. On or around March 10, 2022, plaintiff "filed a motion pursuant to C.P.L. § 245.50(3) seeking to compel preservation and disclosure of forensic images of [the complainants'] cell phones." *Id.* ¶ 144(b). But BPD and the BCDA opposed, and plaintiff's motion was denied, "based, in part, on the allegedly speculative nature of [plaintiff]'s arguments that the phones would contain relevant, material, admissible evidence and due in part to the lack of jurisdiction over what was at that time a local court matter." *Id.* Plaintiff also subpoenaed cell phone carriers and social media companies in an attempt to independently obtain the complainants' electronic data. *Id.* ¶ 144(c). Unbeknownst to plaintiff at that time, Herceg had obtained a new phone and iCloud account sometime in March 2022. *Id.* ¶ 185.

At the end of March 2022, ADA Congdon presented the case to the grand jury with assistance from Chief ADA Loughran and ADA Cronin. Compl. ¶¶ 167, 169. According to plaintiff, ADA Congdon inaccurately instructed the grand jury on the law. *Id.* ¶ 169(a). The grand jury returned an indictment as to plaintiff, charging him with: "Rape in the First Degree in violation of New York Penal Law § 130.35(2), a Class 'B' violent felony... and Sexual Abuse in the First Degree, in violation of New York Penal Law § 130.65(2), [a] [C]lass 'D' violent felony." *Id.* ¶ 170. Plaintiff was arraigned in Broome County Court and pleaded not guilty to all charges on March 31, 2022. *Id.* ¶ 171.

 **\*5** In June 2022, plaintiff consented to a buccal DNA swab. Compl. ¶ 175. His DNA was compared with the material obtained during Herceg's rape examination. *Id.* ¶ 175(a). A two-male DNA profile mixture was obtained from Herceg's sample, despite her earlier claim that she had not had any other sexual partners for more than a month prior to the alleged assault. *Id.* ¶ 175(b). At some point during the investigation, though, Herceg informed authorities of a possible consensual sexual partner from the relevant period, but investigators excluded that person as a contributor. *Id.* ¶ 175 (d). Plaintiff was also excluded as a contributor to the mixture obtained from Herceg's rape kit. *Id.* ¶ 175(c).

On July 11, 2022, counsel for plaintiff, Yaron, and Rindgen moved to compel production of the complainants' phones. Compl. ¶ *177.* On August 5, 2022, while the motion to compel was still pending, ADA Congdon notified the defense that the complainants agreed to let BPD image their phones. *Id.* ¶ 178. Three months later, the BCDA received a hard drive with the extractions of the complainants' electronic data. *Id.* ¶ 179. The BCDA insisted that plaintiff's counsel review the data at BCDA's office, despite lacking the technology needed to review the materials efficiently. *Id.* ¶ 181. Plaintiff's counsel repeatedly requested access to the hard drive, but the BCDA refused to do so absent a protective order. *Id.* ¶ 182.

In January 2023, plaintiff's counsel sought court intervention, and the presiding judge ordered ADA Congdon and ADA Cronin to turn over the hard drive. Compl. ¶ 183. The parties executed a protective order, and ADA Congdon tendered a report containing the data extracted from Demkovich's phone (the "BCDA report"). *Id.* ¶ 186. Plaintiff never received a copy of the relevant data from Herceg's phone because she had obtained a new phone and iCloud account in March 2022. *Id.* ¶ 185.

On February 14, 2023, plaintiff's attorney and private investigators began reviewing the BCDA report. Compl. ¶ 186. They discovered relevant exculpatory and impeaching text messages. *Id.* They also learned that both complainants turned over their electronic data from the relevant period to their attorney, Saitta, before Herceg obtained a new cell phone. *Id.* ¶ 188. For some reason, though, the BCDA still had not retrieved the Saitta folder. *Id.* ¶ 189.

According to plaintiff, the following messages were exchanged between the complainants and third parties and between the complainants themselves: [3]

a. November 27, 2021 - Defendant Demkovich to a Third Party: "I don't want anyone to know...." "And it was consensual. I knew what was happening. But those guys should be fucking disgusted with themselves."

b. November 27, 2021 - Defendant Demkovich to Defendant Herceg: "And I remember saying to Jordan I was like I better not get denied at any of ur bars."

c. November 27, 2021 - Defendant Herceg to Defendant Demkovich: "Like I can't have this get out..."

d. November 28, 2021 - Exchange between Defendant Herceg and Defendant Demkovich (referencing Defendant Miller): "I am not gonna show her those" Herceg: "I don't think you should" Demkovich: "I am 100% not going to" Herceg: "I am worried about her calling stupid f**king Bianca"

e. November 29, 2021 - Defendant Herceg to Defendant Demkovich and a Third Party: "I'm settling for nothing Less then a million"

f. November 29, 2021 - Defendant Herceg to Defendant Demkovich and a Third Party: (referring to Plaintiff and Mr. Rindgen) "I want the Benz and the Beamer" "And both their houses"

g. November 29, 2021 - Defendant Herceg and Defendant Demkovich and a Third Party: (referring to Plaintiff and Mr. Rindgen) "I want all their bars ..."

h. November 29, 2021 - Defendant Herceg to Defendant Demkovich: "Yup 100% but i do remember being at Alisha's and when she said we were at Jordan's i was like wtf we were w them? And she was like yeah haikey said u guys got raped and obviously I'm still drunk I'm like whattt no way it doesn't even feel like I've had sex i don't think anything happened and Alisha was like exactly"

*6 i. November 30, 2021 - Defendant Demkovich to Defendant Herceg and Third Parties: "the reason i had to call 911 is because when i told my parents my dad literally got in the car and was headed straight to downtown"

j. December 3, 2021 - Defendant Demkovich instant messages to Defendant Herceg and Third Parties: "if you guys have any photos of us drinking if u could delete them that would be good" "we can't erase everything but minimize it as much as possible" "Danayah maybe archive ur disposals of them on insta" "i might just delete any risky pics" "i need to go on my computer to delete my vsco"

k. December 3, 2021 - Defendant Herceg instant message to Defendant Demkovich: "I've deleted all my posts and changed my user name to no lastnight and trying to delete all my republishes"

l. December 3, 2021 from a Third Party to Defendant Demkovich, Defendant Herceg, and Third Parties: "i already deleted everything w [Herceg] in it and everything hailet sent me to delete"

m. December 7, 2021 from a Third Party ("T.P.") to Defendant Demkovich: T.P.: "it da took me 5 mins of silence to go all the way back up to the messages that night" Demkovich.: "mad far and i don't even have them bc i think i accidentally deleted them that night" T.P.: "yeah i deleted them all out of your phone bc u were going to dylan's [Demkovich's then boyfriend]"

n. December 7, 2021 from a Third Party to Defendant Demkovich: "and then i told her that when [Herceg] came over she told me she didn't have sex but she turned the corner and saw you but thats all she could remember" "bro yeah she [Herceg] was like that whole night i would know if i got fucked i don't feel anything in my vagina but it was prob bc bitch was numb af"

o. December 8, 2021 - Defendant Demkovich. to Defendant Herceg: "okay so i'm"

p. slightly panicking at work because i was just reading my texts from the day after the incident and i said to danayah that it was consensual and that i knew what was happening. but the whole day after the incident i was questioning if i got raped and i thought it might be classified as consensual because i didn't say no."

q. December 8, 2021 - Defendant Herceg to Defendant Demkovich: "Trust me i was panicking too [about the text messages] Bc i said in the groupchat that night "I'd fuck"

r. December 8, 2021 - Defendant Herceg to Defendant Demkovich: "I don't think you have anything to worry about. Bc if she did get the subpoena [for the phone messages] I'm sure she only got it from the times of like 1-4am"

s. December 8, 2021 - from Defendant Herceg. to Defendant Demkovich and Third Parties: "Yes i deleted everything then made it private and changed everything"

t. December 27, 2021 - Defendant Demkovich to her mother - (after defense counsel served and filed an Order to Show Cause on December 22, 2021, requesting preservation of the Defendants Herceg and Demkovich's cell phones): "i told you i have a message of me saying it was consensual the day after, because i was confused and not in the right head space if the defense sees it, i'm done"

u. December 27, 2021 - Defendant Demkovich. to Defendant Herceg.: "and i have a message of me saying it's consensual" "the day after"

v. December 27, 2021 - Defendant Herceg to Defendant Demkovich: "I have messages w Alisha saying I'd fuck ring ding [Jordan Rindgen]"

*7 w. December 27, 2021 - Defendant Demkovich. to Defendant Herceg: "yeah they will take the message of me saying it's consensual and i'm done" "the lawyer tom [Saitta] needs to make it so they can't get our phones period"

x. December 28, 2021 - Defendant Demkovich to her mother: "I told them [BPD] the next day I was questioning if what happened to me was actually rape ..."

y. December 28, 2021 - Defendant Demkovich to her mother: "i accidentally deleted one text it was in the group text"

z. December 28, 2021 - text message from Defendant Demkovich to Defendant Herceg: "i told him i said it was consensual" "i'm just worried that I said more than once it was consensual" "i said something about it being consensual"

aa. January 13, 2022 - Defendant Demkovich to her mother: "I just don't want [Herceg's] parents to judge me for saying it was consensual"

bb. January 14, 2022 - Defendant Demkovich to Defendant Herceg: "i really don't see why they'd still want to supoena our phones after i've provided all of That" "so fingers crossed"

2025 WL 3280821

cc. June 6, 2022 - Defendant Demkovich to her mother: "and the text messages i sent really fuck me up" "i didn't know because i didn't say no"

dd. June 13, 2022 - Defendant Herceg to Defendant Demkovich: "... Fuck you hailey you're a piece of shit. You think you sit in a high horse bc you 'came looking for me' that night 'only one who cared' no you didn't. If you thought I was in such danger like you say then you would've called the cops you would've brought everyone there w you to get me out. You came for what you thought was gonna be a good time. You're a garbage human who see nothing wrong w their actions."

ee. June 15, 2022 - Defendant Herceg to a Third Party: "She [Demkovich] told Bianca on FaceTime on her walk to 'save me' that she wanted to fuck Jordan [Rindgen], she wanted to go because she wanted to sleep w Jordan. Not to come save me" ... "And she came for what she thought was going to be a good time" ... "I don't remember anything from that night" "Everything I know is from he[r] [Demkovich]"

ff. July 25, 2022 - Defendant Demkovich to her mother: "i wanna drop the charges" Demkovich's mother: "[Herceg] got a new phone..." "No access to her old cloud" Demkovich: "and i texted [Herceg] and she got a new phone so they didn't subpoena hers"

Compl. ¶ 74(a)–(ff) (errors in original).

3    Plaintiff does not indicate whether these messages were obtained from the BCDA report or the subsequently obtained Saitta folder. Compl. ¶ 74.

On February 24, 2023, counsel for plaintiff, Yaron, and Rindgen filed a joint motion seeking dismissal of all charges. Compl. ¶ 191. Plaintiff's motion was granted, and the Broome County Court dismissed all charges against him. *Id.* ¶ 192.

"In June 2023, [DA] Korchak and [ADA] Congdon filed a notice of appeal of the decision dismissing the indictment as to [p]laintiff." Compl. ¶ 196. Plaintiff's attorney "made repeated attempts to contact [DA] Korchak and [ADA] Congdon ... to try to meet to discuss the case and lack of any evidence against the [p]laintiff and to urge the BCDA[ ]not to perfect the appeal of the criminal case dismissal." *Id.* ¶ 197.

"On October 31, 2023, Yaron ... and ... Rindgen were acquitted of all charges" after a jury trial. Compl. ¶ 200. Thereafter, Yaron's former defense attorney, Paul Battisti, was elected Broome County District Attorney, and a special prosecutor was appointed to handle the BCDA's appeal of plaintiff's case. *Id.* ¶ 202. The special prosecutor withdrew the appeal on or about February 20, 2024. *Id.* ¶ 203.

## III. LEGAL STANDARD

**\*8** The Federal Rules of Civil Procedure permit a party to move to dismiss a pleading for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*; *see also Ginsburg v. City of Ithaca*, 839 F. Supp. 2d 537, 540 (N.D.N.Y. 2012) ("[T]he '[f]actual allegations must be enough to raise a right to relief above the speculative level.' ") (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955).

To assess this facial plausibility requirement, the court "must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007), and draw all reasonable inferences in favor of the plaintiff, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). In doing so, the court generally

2025 WL 3280821

confines itself to the facts alleged in the pleading, documents attached to the complaint or incorporated into it by reference, and matters of which judicial notice may be taken. *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016).

## IV. DISCUSSION

Chief Zikuski, Captain Minor, Investigator Miller, DA Korchak, Chief ADA Loughran, ADA Cronin, ADA Congdon, the City, and the County have moved to dismiss all of plaintiff's claims against them. *See* Dkt. No. 40, 57, 65, 67, 74.

Plaintiff asserts a number of § 1983 claims against the moving defendants, including:

(1) False arrest against Chief Zikuski, Captain Minor, Investigator Miller (collectively, the "individual BPD defendants"), DA Korchak, ADA Cronin, ADA Congdon, and BCDA Investigator Wagner, Compl. ¶¶ 220–27;

(2) Malicious prosecution against the individual BPD defendants, DA Korchak, ADA Cronin, ADA Congdon, and BCDA Investigator Wagner, *id.*;

(3) Violations of his fair trial and due process rights against Captain Minor, Investigator Miller, DA Korchak, ADA Cronin, ADA Congdon, and BCDA Investigator Wagner, *id.* ¶¶ 228–36;

(4) Failure to intervene against the individual BPD defendants, DA Korchak, Chief ADA Loughran, ADA Congdon, ADA Cronin, (collectively, the "prosecutor defendants"), BCDA Investigator Wagner, the City, and the County, *id.* ¶¶ 237–42;

(5) Supervisory liability against Chief Zikuski, Captain Minor, DA Korchak, and Chief ADA Loughran, *id.* ¶¶ 243–50;

(6) Municipal liability against Chief Zikuski, Captain Minor, the City, and the County, *id.* ¶¶ 251–95; and

(7) Civil rights conspiracy claims against the individual BPD defendants, the prosecutor defendants, BCDA Investigator Wagner, the City, and the County, *id.* ¶¶ 296–301.

Along with his § 1983 claims, plaintiff brings several related state law claims including:

(1) False arrest against the individual BPD defendants, the prosecutor defendants, BCDA Investigator Wagner, the City, and the County, Compl. ¶¶ 302–16;

(2) Malicious prosecution against the individual BPD defendants, the prosecutor defendants, BCDA Investigator Wagner, the City, and the County, *id.*;

(3) Intentional, reckless, or negligent infliction of emotional distress against the individual BPD defendants, the prosecutor defendants, BCDA Investigator Wagner, the City, and the County, *id.* ¶¶ 316–21;

(4) Violations of Article I, sections 6 and 12 of the New York State Constitution against the individual BPD defendants, the individual BCDA defendants, the BCDA, the City, and the County, *id.* ¶¶ 322–26;

**\*9** (5) *Respondeat superior* against the City and the County, *id.* ¶¶ 327–31; and

(6) Abuse of process against Chief Zikuski, DA Korchak, and the City, *id.* ¶¶ 332–39.

Plaintiff's wife, Ms. Liberman, is also a plaintiff in this action, and she brings a claim for damages that she allegedly suffered "as a ... result of her husband's wrongful arrest and malicious prosecution." Compl. ¶ 9.

Defendants primarily argue that plaintiff has failed to plausibly allege any of his claims against them, and that Ms. Liberman has similarly failed to state an actionable claim for damages. *See generally,* Dkt. Nos. 19-1 ("Korchak & Loughran Mem."); 27-1 ("County Mem."); 29-1 ("BPD Mem."); 30 ("Cronin Mem."); 31-1 ("Congdon Mem."); 37-1 ("Wagner Mem.").

2025 WL 3280821

In addition, the prosecutor defendants contend that, to the extent plaintiff might have plausibly alleged any of his claims against them, they are entitled to absolute or, alternatively, qualified immunity. Korchak & Loughran Mem. at 11–17; Cronin Mem. at 10–14; Congdon Mem. at 7–21.

In opposition, plaintiff contends that he has plausibly alleged his claims against each of the moving defendants, and maintains that neither absolute nor qualified immunity applies. *See* Dkt. No. 44 ("Pl.'s First Opp."); Dkt. No. 47 ("Pl.'s Second Opp.").

### A. Absolute Immunity

The prosecutor defendants argue that absolute prosecutorial immunity bars plaintiff's federal and state law claims against them. Korchak & Loughran Mem. at 11–16; Cronin Mem. at 10–12; Congdon Mem. at 7–18. In opposition, plaintiff maintains that the prosecutor defendants' alleged conduct falls "outside the scope of absolute immunity." Pl.'s Second Opp. at 41.

As the Second Circuit has repeatedly acknowledged, the principles affording prosecutors absolute prosecutorial immunity from § 1983 claims for damages are the same as those that protect prosecutors from civil liability under state law. *Shmueli v. City of N.Y.*, 424 F.3d 231, 237–38 (2d Cir. 2005) (citing *Rudow v. City of N.Y.*, 822 F.2d 324, 329 (2d Cir. 1987)).

Absolute prosecutorial immunity is broad, applying even in situations where a prosecutor is alleged to have acted maliciously. *Johnson v. Town of Colonie*, 102 A.D.2d 925, 925, 477 N.Y.S.2d 513 (N.Y. App. Div. 3d Dep't 1984) ("Actions performed by the prosecutor which are associated with the prosecutorial phase of the criminal process ... bar civil liability for such action, even if it be assumed that such actions were done maliciously."); *Giraldo v. Kessler*, 694 F.3d 161, 166 (2d Cir. 2012) ("[A]bsolute immunity applies to protect the prosecutor even in the face of a complaint's allegations of malicious or corrupt intent behind the acts.").

"In determining whether absolute prosecutorial immunity attaches, [courts] apply a 'functional approach.' " *Giraldo*, 694 F.3d at 165 (quoting *Hill v. City of N.Y.*, 45 F.3d 654, 660 (2d Cir. 1995)); *see also Rodrigues v. City of N.Y.*, 193 A.D.2d 79, 86, 602 N.Y.S.2d 337 (N.Y. App. Div. 1st Dep't 1993) ("[L]ike federal courts, the courts of [New York] take a functional approach when analyzing claims of immunity.").

#### 1. Advocacy Function

**\*10** Consistent with this functional approach, courts routinely find prosecutors are absolutely immune for actions taken in connection with their advocacy function. *Johnson v. Kings Cnty. Dist. Att'y's Off.*, 308 A.D.2d 278, 285, 763 N.Y.S.2d 635 (N.Y. App. Div. 2d Dep't 2003) ("District Attorneys are immune from civil liability for activities 'intimately associated with the judicial phase of the criminal process,' meaning 'initiating a prosecution and in presenting the State's case.' ") (quoting *Imbler v. Pachtman,* 424 U.S. 409, 430–31, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976)).

For instance, "a prosecutor enjoys absolute immunity when determining which offenses to charge, initiating a prosecution, presenting a case to a grand jury, and preparing for trial." *Anilao v. Spota*, 27 F.4th 855, 864 (2d Cir. 2022); *see also Blake v. City of N.Y.*, 148 A.D.3d 1101, 1104 (N.Y. App. Div. 2d Dep't 2017) (holding prosecutors entitled to absolute immunity for "activities in processing criminal charges after ... arrest ... based upon evidence assembled by police"); *Giraldo*, 694 F.3d at 167 (same, for interviewing putative victim after suspect was arrested); *Flagler v. Trainor*, 663 F.3d 543, 550 (2d Cir. 2011) (same, "for withholding/preserving evidence to be used in connection with a criminal prosecution").

#### 2. Investigative Function

However, absolute prosecutorial immunity does not shield a prosecutor's investigative activities from liability. *See Simon v. City of N.Y.,* 727 F.3d 167, 172 (2d Cir. 2013) ("Investigation, arrest, and detention have historically and by precedent been regarded

as the work of police, not prosecutors, and 'they do not become prosecutorial functions merely because a prosecutor has chosen to participate.' ") (quoting *Day v. Morgenthau,* 909 F.2d 75, 77–78 (2d Cir.1990)).

"Although all investigative activity could be considered in some sense to be 'preparing for the initiation of judicial proceedings,' ... the Supreme Court has sought to draw a line between ... preparatory steps that a prosecutor takes to be an effective advocate of a case already assembled and ... investigative steps taken to gather evidence." *Smith v. Garretto*, 147 F.3d 91, 94 (2d Cir. 1998) (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 273, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993)).

In doing so, "[t]he Court has identified 'evaluating evidence and interviewing witnesses' as falling on the absolute immunity side of the line, leaving 'searching for the clues and corroboration' that might lead to a recommendation for an arrest on the qualified immunity side." *Smith v. Garretto*, 147 F.3d at 94 (quoting *Buckley,* 509 U.S. at 273, 113 S.Ct. 2606); *Sculti v. Finley*, 167 A.D.3d 796, 797 (N.Y. App. Div. 2d Dep't 2018) ("Conduct in connection with the application for a search warrant is investigative in nature and, therefore, is governed by qualified immunity."); *Buckley*, 509 U.S. at 275, 113 S.Ct. 2606 (holding prosecutor not absolutely immune for fabricating evidence during preliminary investigation); *Kirchner v. Cnty. of Niagara*, 107 A.D.3d 1620, 1624, 969 N.Y.S.2d 277 (N.Y. App. Div. 4th Dep't 2013) (same, for coaching witness to provide false information to police in effort to reopen closed investigation).

### 3. Functional Analysis

The Court must look to the prosecutor defendants' alleged conduct to determine which acts, if any, are advocative in nature and shielded by absolute prosecutorial immunity.

### i. DA Korchak & Chief ADA Loughran

DA Korchak and Chief ADA Loughran argue that they are entitled to absolute immunity from plaintiff's claims because "their alleged activities were entirely prosecutorial in nature and were not of an investigatory nature." Korchak & Loughran Mem. at 11. Plaintiff disagrees, arguing that "[DA] Korchak and [Chief ADA] Loughran personally approved and authorized [p]laintiff's arrest." Pl.'s Second Opp. at 45.

**\*11** "The directing of an investigation by police and other law enforcement personnel[,]" is an investigative activity, falling outside the scope of absolute immunity. *Barbera v. Smith*, 836 F.2d 96, 101 (2d Cir. 1987); *Claude H. v. Cnty. of Oneida*, 214 A.D.2d 964, 965, 626 N.Y.S.2d 933, 935 (1995) ("Where a prosecutor goes outside his quasi-judicial role[,] and acts as an investigator or police officer, he is entitled only to qualified immunity."). Here, the complaint contains a number of allegations that detail DA Korchak and Chief ADA Loughran's involvement in the investigation.

First, plaintiff alleges that DA Korchak and Chief ADA Loughran worked together with ADA Congdon and police to plan and execute the investigation, Compl. ¶¶ 103–06, 123, and that Chief ADA Loughran also allegedly met with the complainants in an attempt to gather evidence. *Id.* ¶¶ 109, 118. These actions fall outside the scope of DA Korchak's and Chief ADA Loughran's prosecutorial function and are not shielded by absolute prosecutorial immunity.

Second, plaintiff alleges that DA Korchak issued a video statement "assert[ing] that his office received 'numerous' emails and phone calls regarding 'several incidents that occurred recently' in Broome County ... and encourag[ing] those with knowledge to contact the BCDA[ ] or local police departments." Compl. ¶ 99. Because a prosecutor's "statements to the media are not entitled to absolute immunity[,]" *Buckley*, 509 U.S. at 277, 113 S.Ct. 2606, DA Korchak is not entitled to absolute immunity for his alleged video statement.

Third, plaintiff alleges that DA Korchak and Chief ADA Loughran failed to (1) supervise and train ADA Congdon; (2) advise ADA Congdon of her discovery obligations; and (3) correct her various mistakes of law. Compl. ¶¶ 121–22, 165–66. However, prosecutors are absolutely immune for failing to train or supervise their subordinates as to their prosecutorial duties and obligations. *See Van de Kamp v. Goldstein*, 555 U.S. 335, 344, 129 S.Ct. 855, 172 L.Ed.2d 706 (2009) ("[P]rosecutors involved

Case 9:22-cv-00638-DNH-CBF   Document 80   Filed 03/20/26   Page 74 of 146
Kweller v. County of Broome, Slip Copy (2025)
2025 WL 3280821

in such supervision or training or information-system management enjoy absolute immunity from the kind of legal claims at issue here."); *see also Crawford v. N.Y. Cnty. Dist. Att'y*, 99 A.D.3d 600, 601, 953 N.Y.S.2d 23 (N.Y. App. Div. 1st Dep't 2012) (holding district attorney entitled to absolute immunity where he allegedly "discourage[d] ADAs from being respectful of individuals' constitutional rights when prosecuting gun possession cases") (citing *Van de Kamp*, 555 U.S. at 344–46, 129 S.Ct. 855). Accordingly, DA Korchak and Chief ADA Loughran are absolutely immune from liability for their alleged failure to instruct and advise ADA Congdon on her prosecutorial responsibilities.

Absolute prosecutorial immunity also protects the remainder of plaintiff's allegations against DA Korchak and Chief ADA Loughran because they concern activities routinely recognized as "intimately associated with the judicial process." Compl. ¶¶ 169 (presenting case to grand jury), 172 (filing certificate of compliance), 175(d) (failing to disclose evidence), 176 (failing to preserve evidence after plaintiff's indictment), 180 (failing to review evidence); 196 (filing notice of appeal).

In sum, DA Korchak and Chief ADA Loughran are shielded from liability for their involvement in plaintiff's prosecution following his arrest, but not for their earlier investigative conduct.

### ii. ADA Cronin

Like DA Korchak and Chief ADA Loughran, ADA Cronin argues that she is entitled to absolute prosecutorial immunity because the complaint contains "no allegation that [ADA] Cronin, at any point, worked outside of her prosecutorial function." Cronin Mem. at 11. Plaintiff disagrees, arguing that he has plausibly alleged that ADA Cronin "participated in investigative acts and decision[-]making pertaining to the investigation." Pl.'s Second Opp. at 45.

**\*12** "Among the acts for which a prosecutor is absolutely immune is the initiation of a prosecution." *Schloss v. Bouse*, 876 F.2d 287, 289 (2d Cir. 1989) (citing *Imbler*, 424 U.S. at 430, 96 S.Ct. 984). A prosecutor also "enjoys absolute immunity for failure to disclose exculpatory evidence, because deciding what disclosure to make is part of a prosecutor's role as advocate, and constitutes a core prosecutorial function." *Schnitter v. City of Rochester*, 556 F. App'x 5, 7 (2d Cir. 2014) (summary order) (citing *Warney v. Monroe Cnty.*, 587 F.3d 113, 125 (2d Cir.2009)).

Consequently, a prosecutor is protected by absolute immunity for withholding exculpatory evidence from a grand jury.[4] *See Hill*, 45 F.3d at 653 (holding absolute immunity protected assistant district attorney's decision to initiate prosecution and withhold alleged *Brady* material); *Drake v. City of Rochester*, 96 Misc.2d 86, 408 N.Y.S.2d 847, 857 (N.Y. Sup. Ct. 1978) ("[A] district attorney alleged to have withheld exculpatory evidence from a Grand Jury, given improper advice to a Grand Jury, suppressed and concealed evidence and conspired with others to obtain a Grand Jury indictment, permitted the presentation of false and misleading testimony to a Grand Jury, and took no action to correct the same was immune from liability."), *aff'd*, 74 A.D.2d 996, 429 N.Y.S.2d 394 (N.Y. App. Div. 4th Dep't 1980).

[4]  A prosecutor has no duty to present exculpatory evidence to a grand jury, either. *See United States v. Williams*, 504 U.S. 36, 37, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992) ("Because it has always been thought sufficient for the grand jury to hear only the prosecutor's side, and, consequently that the suspect has no right to present, and the grand jury no obligation to consider, exculpatory evidence, it would be incompatible with the traditional system to impose upon the prosecutor a legal obligation to present such evidence.").

Plaintiff's allegations against ADA Cronin concern wholly prosecutorial functions for which she enjoys absolute immunity. Specifically, Plaintiff alleges that ADA Cronin failed to identify and disclose exculpatory evidence, Compl. ¶¶ 137, 163, 166, 175(d), 187, withheld exculpatory evidence from the grand jury, *id.* ¶ 168, filed a certificate of compliance, *id.* ¶¶ 172–73, failed to preserve evidence, *id.* ¶ 176, and failed to review evidence, *id.* ¶ 180.

Contrary to plaintiff's assertions, none of these allegations plausibly suggest that ADA Cronin had any involvement in the pre-arrest investigation or the decision to arrest plaintiff. *Id.* ¶¶ 125 ("Beginning in December 2021, [DA] Korchak and [Chief ADA]

Loughran ceded ultimate decision-making authority over the investigation to ... *Congdon*."); 131 ("*ADA Congdon* ... decided with BPD to file criminal charges against [p]laintiff.") (emphases added).

In sum, ADA Cronin's alleged conduct is protected by absolute immunity, warranting dismissal of all claims against her.

### iii. ADA Congdon

Finally, ADA Congdon argues that she is entitled to absolute immunity from plaintiff's claims. Congdon Mem. at 7–18. Plaintiff disagrees, arguing that the complaint plausibly alleges ADA Congdon's extensive role in investigative acts and decision-making. Pl.'s Second Opp. at 45–46.

"[W]here the prosecutor advises the police [*Burns v. Reed,* 500 U.S. 478, 493–95, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991)] or performs investigative work in order to decide whether a suspect should be arrested [*Buckley*, 509 U.S. at 273–75, 113 S.Ct. 2606], the prosecutor is not entitled to absolute immunity." *Kirchner*, 107 A.D.3d at 1623, 969 N.Y.S.2d 277.

**\*13** Plaintiff alleges that, as early as December 8, 2021, ADA Congdon met with members of BPD and the BCDA to discuss the complainants' allegations and the ongoing investigation. Compl. ¶ 104. DA Korchak and Chief ADA Loughran assigned ADA Congdon to the investigation that same day, *id.* ¶ 106, and "ceded ultimate decision-making authority over the investigation" to her. *Id.* ¶ 125. On December 14, 2021, ADA Congdon and others met separately with the complainants and tried, unsuccessfully, to obtain the complainants' consent to extraction of their electronic data. *Id.* ¶ 109. On January 14, 2022, the complainants' attorney informed ADA Congdon "that he had a folder containing printouts of electronic data from the complainants' phones." *Id.* ¶ 115. ADA Congdon allegedly instructed BCDA Investigator Wagner to retrieve the folder, but he never did, and ADA Congdon continued to seek the complainants' consent to an extraction of their data throughout January 2022. *Id.* ¶¶ 116–18. At some point during the investigation, ADA Congdon also allegedly assisted Investigator Miller with trying to draft a search warrant for plaintiff's DNA. *Id.* ¶ 120.

Taken together, the complaint plausibly alleges that ADA Congdon worked alongside police to gather evidence during the pre-arrest investigation. Accordingly, ADA Congdon is not immune for her participation in the investigation in the months preceding plaintiff's arrest.

Relatedly, plaintiff alleges that, at trial, complainant Herceg testified that ADA Congdon allegedly instructed her "to destroy electronic data relating to the night in question," Compl. ¶ 72, and "to delete her social media accounts," *id.* ¶ 110. But, notably, the complaint does not indicate when this instruction allegedly occurred.

ADA Congdon argues that plaintiff has not plausibly alleged that she instructed Herceg to delete electronic data during the investigation. Congdon Mem. at 14. Indeed, ADA Congdon posits that plaintiff "strategically sandwich[ed]" these allegations "between ... paragraphs that do include dates ... to induce the reader to conclude that it occurred between December 14, 2022 [*sic*][,] and December 22, 2021." *Id.* [5]

[5]   ADA Congdon also insists that "[a] plain reading of the complaint ... makes clear that, prior to [ADA Congdon]'s assignment to the case ... the complainants themselves had already conspired to delete their social media accounts." Congdon Mem. at 15. But, the complainants' alleged conduct is irrelevant to whether ADA Congdon's alleged conduct occurred while acting in an investigative capacity.

Taking every reasonable inference in plaintiff's favor, the complaint plausibly alleges that ADA Congdon instructed Herceg to delete exculpatory data prior to plaintiff's indictment. Plaintiff's allegation that Herceg obtained a new phone prior to plaintiff's indictment provides additional support for the inference that ADA Congdon instructed her to delete exculpatory data before proceedings began. Compl. ¶ 185.

2025 WL 3280821

In any event, it is ADA Congdon's burden to demonstrate entitlement to absolute immunity, *Burns v. Reed*, 500 U.S. 478, 478, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991), and:

> Quite plainly, when it may not be gleaned from the complaint whether the conduct objected to was performed by the prosecutor in an advocacy or an investigatory role, the availability of absolute immunity from claims based on such conduct cannot be decided as a matter of law on a motion to dismiss.

*Hill*, 45 F.3d at 663. Accordingly, at this early stage, the Court cannot conclude that ADA Congdon is entitled to absolute immunity as a matter of law for allegedly instructing Herceg to delete exculpatory data.

ADA Congdon also argues that absolute prosecutorial immunity protects her decision to arrest plaintiff. Congdon Mem. at 10–14.

Plaintiff alleges that, "[o]n or about February 22, 2022," ADA Congdon "met ... and decided with BPD to file criminal charges against [p]laintiff." Compl. ¶ 131.

As the Supreme Court made clear in *Buckley*:

> a prosecutor may not shield his investigative work with the aegis of absolute immunity merely because, after a suspect is eventually arrested, indicted, and tried, that work may be retrospectively described as "preparation" for a possible trial; every prosecutor might then shield himself from liability for any constitutional wrong against innocent citizens by ensuring that they go to trial.

 **\*14** 509 U.S. at 276, 113 S.Ct. 2606; *see also Claude H*, 214 A.D.2d at 965, 626 N.Y.S.2d 933 (holding prosecutor acted "in an investigative, law-enforcement role when he directed the police to arrest plaintiff"); *Hill*, 45 F.3d at 661 (holding that assistant district attorney entitled to only qualified immunity for advising police to arrest). Thus, at this stage, ADA Congdon has not demonstrated that she is absolutely immune for advising BPD to arrest plaintiff.

ADA Congdon is entitled to absolute immunity for the remainder of plaintiff's allegations, because they pertain to actions taken in her role as advocate. *See* Compl. ¶¶ 137, 163, 166, 175(d), 187 (failing to identify and disclose exculpatory evidence); 167 (presenting case to grand jury); 168 (withholding exculpatory evidence from grand jury); 172–73 (filing certificate of compliance); 176 (failing to preserve evidence); 180 (failing to review evidence).

The remaining prosecutor defendants (DA Korchak, Chief ADA Loughran, and ADA Congdon) also argue that they are entitled to qualified immunity for any alleged conduct not protected by absolute immunity. Korchak & Loughran Mem. at 16, Congdon Mem. at 18–21. But "the better approach to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged a deprivation of a constitutional right at all." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 842 n.5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998).

### B. Section 1983 Claims

Plaintiff asserts § 1983 claims for false arrest, malicious prosecution, denial of the right to a fair trial, failure to intervene, civil conspiracy, and supervisory liability against the individual BPD defendants, the prosecutor defendants, and BCDA Investigator Wagner. Compl. ¶¶ 220–50, 296–301. He also brings those claims against the City and the County under a theory of municipal

2025 WL 3280821

liability pursuant to *Monell v. Dept. of Soc. Services of City of N.Y.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Compl. ¶¶ 251–95. All have moved to dismiss the § 1983 claims asserted against them.

### 1. Personal Involvement & Supervisory Liability [6]

[6]   For reasons that will be explained *infra*, the Court will address plaintiff's Fourth Cause of Action for "supervisory liability" in conjunction with personal involvement.

Because "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983," *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991), the Court addresses it first.

Investigator Miller, Chief Zikuski, Captain Minor, DA Korchak, Chief ADA Loughran, and BCDA Investigator Wagner argue that plaintiff has not plausibly alleged their personal involvement in any alleged constitutional violations. Korchak & Loughran Mem. at 25; BPD Mem. at 18–24; Wagner Mem. at 11–14. The City also argues that plaintiff has not sufficiently alleged the personal involvement of the unidentified BPD Doe defendants. BPD Mem. at 24 n.3.

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, *inter alia,* the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013). The same applies to supervisory officials. *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) ("[T]here is no special rule for supervisory liability. Instead, a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.' " (quoting *Iqbal*, 556 U.S. at 676, 129 S.Ct. 1937)).

#### i. Investigator Miller

**\*15**  Investigator Miller argues that plaintiff's § 1983 claims against her must be dismissed, because plaintiff's allegations against her are innocuous and demonstrate only that she "participated in routine investigatory tasks." BPD Mem. at 23. In opposition, plaintiff maintains that "the [c]omplaint clearly specifies Investigator [ ] Miller's personal involvement in investigative misconduct." Pl.'s Second Opp. at 21.

At this stage, plaintiff has sufficiently pleaded Investigator Miller's personal involvement in the allegedly violative conduct. Specifically, plaintiff alleges that Investigator Miller interviewed the complainants, Compl. ¶¶ 78, 109; collected evidence, *id.* ¶¶ 79, 88; executed a search warrant at plaintiff's office, *id.* ¶ 89; discussed the investigation at meetings with members of the BCDA, *id.* ¶¶ 104–05; assisted ADA Congdon in attempting to obtain a DNA sample from plaintiff, *id.* ¶ 120; neglected to retrieve, obtain, or otherwise preserve other evidence, *id.* ¶ 85; and failed to document exculpatory statements, *id.* ¶¶ 82, 74(w). Accordingly, Investigator Miller's motion to dismiss is denied on this ground.

#### ii. Wagner

BCDA Investigator Wagner argues that plaintiff's § 1983 claims against him must be dismissed because plaintiff's singular allegation against him cannot plausibly establish his personal involvement in any alleged constitutional violation. Wagner Mem. at 11. Plaintiff maintains that his allegation concerning BCDA Investigator Wagner's "continuing failure to collect the Saitta folder" is sufficient to avoid dismissal on this ground. Pl.'s First Opp. at 10–12.

As defendant points out, plaintiff alleges only that ADA Congdon directed him to retrieve the Saitta folder, but that he failed to do so. Compl. ¶¶ 116–17. Notably, the pleading does not allege that BCDA Investigator Wagner had any other involvement in plaintiff's investigation or prosecution. *See generally id.*

Absent additional non-conclusory allegations that Wagner was aware of the contents of the Saitta folder and intentionally suppressed it, plaintiff has not plausibly alleged BCDA Investigator Wagner's personal involvement in any constitutional violations. Accordingly, plaintiff's § 1983 claims against BCDA Investigator Wagner must be dismissed.

### iii. Supervisory Defendants

As an initial matter, Plaintiff asserts "Supervisory Liability" as an independent cause of action against DA Korchak, Chief ADA Loughran, Chief Zikuski, and Captain Minor. Compl. ¶¶ 243–50. Specifically, plaintiff claims that these defendants "provided grossly inadequate training, supervision, and discipline of the defendant assistant district attorneys and police officers," resulting in the deprivation of his constitutional rights. *Id.* ¶ 246.

Defendants argue that this claim must be dismissed because there is no longer a special rule for supervisory liability in the Second Circuit, and plaintiff has not otherwise alleged that they were personally involved in any alleged constitutional violations. BPD Mem. at 37; Korchak & Loughran Mem. at 25–26. Plaintiff maintains that his supervisory liability claim is proper, and, in any event, he has plausibly alleged that defendants violated his constitutional rights through their own individual actions. Pl.'s Second Opp. at 65–66.

Before the Second Circuit's decision in *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020), a plaintiff could impose supervisory liability by alleging one or more of the following:

> **\*16** (1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring.

*Hernandez v. Keane*, 341 F.3d 137, 145 (2d Cir. 2003) (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995)). But this is no longer good law. In *Tangreti*, the Second Circuit made clear that "[t]here is no special rule for supervisory liability." 983 F.3d at 618. "Instead, a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.' " *Id.* (quoting *Iqbal*, 556 U.S. at 676, 129 S.Ct. 1937).

Plaintiff improperly relies on the pre-*Tangreti* standard in support of his supervisory liability claim. Pl.'s Second Opp. at 65–66. Because such a claim is no longer cognizable, plaintiff's fourth cause of action is dismissed.

Still, plaintiff contends that he has plausibly alleged each supervisory defendant's personal involvement in the underlying constitutional violations. Pl.'s Mem. at 20, 66. Defendants disagree. BPD Mem. at 18–22; Korchak & Loughran Mem. at 25–26.

"[A] defendant in a § 1983 action may not be held liable for damages for constitutional violations merely because he held a high position of authority." *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996). Instead, "[t]he focus is on what the *supervisor* did or caused to be done, 'the resulting injury attributable to his conduct, and the *mens rea* required of him to be held liable, which can be no less than the *mens rea* required of anyone else.' " *Tangreti*, 983 F.3d at 618 (quoting *Porro v. Barnes*, 624 F.3d 1322, 1327–28 (10th Cir. 2010) (Gorsuch, J.)) (emphasis in original).

### a. Chief Zikuski and Captain Minor

2025 WL 3280821

Chief Zikuski and Captain Minor argue that plaintiff's § 1983 claims must be dismissed because "the [c]omplaint barely mentions them and contains no allegations that they individually engaged in unconstitutional conduct." BPD Mem. at 22. According to plaintiff, "the [c]omplaint explicitly identifies Defendants Zikuski and Minor as personally involved." Pl.'s Second Opp. at 20.

The complaint contains just two nonconclusory allegations concerning Captain Minor's individual actions: (1) on December 6, 2021, Captain Minor executed a search warrant on Yaron's office with Investigator Miller, Compl. ¶ 90; and (2) on December 8, 2021, Captain Minor met with DA Korchak, Chief ADA Loughran, ADA Congdon, and Investigator Miller, to discuss the complainants' allegations and the ongoing investigations, *id.* ¶ 104. As for Chief Zikuski, plaintiff alleges only that, sometime prior to December 10, 2021, he told someone that he "recommended against filing criminal charges" in plaintiff's case. *Id.* ¶ 98.

The remainder of plaintiff's factual allegations against Chief Zikuski and Captain Minor are speculative, conclusory, or based solely on their supervisory status, rather than their individual actions. *See* Compl. ¶¶ 77, 121–22, 142, 180.

In sum, even taking his nonconclusory factual allegations as true, plaintiff has not plausibly alleged that either Captain Minor or Chief Zikuski were personally involved in any alleged constitutional violations, warranting dismissal of plaintiff's § 1983 claims against them.

### b. DA Korchak and Chief ADA Loughran [7]

[7]     Plaintiff only asserts § 1983 claims for failure to intervene, supervisory liability, and civil rights conspiracy against Chief ADA Loughran. Compl. ¶¶ 206–10, 211–17, 263–66.

**\*17**  Of the remaining prosecutor defendants, only DA Korchak and Chief ADA Loughran argue that plaintiff has failed to plausibly allege their personal involvement in any constitutional violations. Korchak & Loughran Mem. at 25; Dkt. No. 99 ("Korchak & Loughran Reply") at 21. Plaintiff maintains that he has done so with the requisite specificity. Pl.'s Second Opp. at 66–67.

As an initial matter, the Court considers only allegations of investigative conduct, as DA Korchak and Chief ADA Loughran are absolutely immune for any conduct taken as advocates. *See, supra* Point IV.A.3.i. With that limitation in mind, plaintiff's primary allegations against DA Korchak and Chief ADA Loughran stem from their participation in early investigative meetings, prior to "ced[ing] ultimate decision-making authority over the investigation to ADA Congdon," sometime in December 2021. Compl. ¶¶ 104–06, 109, 125. Beyond that, plaintiff also alleges that Chief ADA Loughran and ADA Congdon agreed to continue seeking the complainants' permission to access their electronic data throughout January 2022. *Id.* ¶ 118.

Absent more, these allegations do not support a reasonable inference that either DA Korchak or Chief ADA Loughran personally violated plaintiff's constitutional rights while acting in an investigatory capacity. [8]

[8]     Plaintiff's allegations that (1) DA Korchak issued a public statement encouraging those with knowledge about recent "incidents" in Broome County to contact the BCDA or BPD, Compl. ¶ 99, and (2) DA Korchak and Chief ADA Loughran failed to correct false information circulating in the media, *id.* ¶ 124, fare no better. Taken as true, neither of these allegations amount to a violation of plaintiff's constitutional rights.

Plaintiff's remaining allegations amount to little more than supervision. For example, he alleges that DA Korchak and Chief ADA Loughran met with ADA Congdon throughout the investigation, but failed to correct her various mistakes of law. Compl. ¶¶ 121–23.

As the Court noted *supra*, to impose liability under § 1983, plaintiff must plausibly allege that DA Korchak and Chief ADA Loughran *individually* violated his constitutional rights. Because he has failed to do so, his § 1983 claims against them must be dismissed.

2025 WL 3280821

### iv. Doe Defendants

Plaintiff names ten Doe defendants who are "employees, agents and officers of either the "BCDA[ ] or BPD whose names are presently unknown but who violated Plaintiff's civil rights." Compl. ¶ 25. The BPD defendants argue that plaintiff's claims against any BPD employee Doe defendants should be dismissed, because plaintiff "fails to allege that any specific BPD Defendant arrested or decided to arrest [him], charged or decided to charge him, fabricated evidence that led to his arrest or prosecution, participated in his prosecution, or withheld any specific exculpatory evidence." BPD Mem. at 21, 24 n.3. In opposition, plaintiff maintains that "the John Doe Officers are alleged to have actively participated in investigative misconduct." Pl.'s Second Opp. at 22.

"[W]here, as in this case, [plaintiff] is suing 'John Doe' defendants, the pleading must nevertheless contain plausible allegations of wrongdoing by such defendants, even if their actual names are presently unknown.' " *James v. Monroe Cnty.*, 2022 WL 17155831, at *7 (W.D.N.Y. Nov. 22, 2022) (citing *Antonetti v. City of N.Y.*, 2022 WL 1105172, at *3 (E.D.N.Y. Apr. 13, 2022)). "The absence of allegations against them and lack of personal involvement is fatal to his claims against the John Does." *Azaryev v. City of N.Y.*, 2021 WL 3861722, at *4 (E.D.N.Y. Aug. 27, 2021); *see also Johnson v. N.Y.*, 2019 WL 13563241, at *3 (E.D.N.Y. Nov. 20, 2019) (dismissing § 1983 claims where pleading did not "provide any detail about the officers' particular roles in his arrest").

 **\*18**  As the BPD defendants correctly point out, *see* BPD Mem. at 19–20, plaintiff fails to attribute many of his allegations regarding BPD officers to any of the named BPD defendants or to any particular Doe defendant, instead referring to "BPD" or "members of BPD," generally. *See* Compl. ¶¶ 71, 91, 94–95, 98, 102–03, 108, 128, 131–32, 178. Plaintiff insists that this "limited use of collective allegations is proper and permissible." Pl.'s Second Opp. at 23.

Plaintiff has certainly alleged that other unknown BPD officers were involved in his investigation and arrest, but he has not plausibly alleged that any particular individual Doe defendant violated his constitutional rights. Even taken as true, allegations that some unnamed BPD officers "obtained footage from security cameras" that was never shown to the complainants, Compl. ¶ 91, failed to take steps to preserve the complainants' cell phone data, *id.* ¶ 108, and "effectuated and processed" plaintiff's arrest, *id.* ¶ 128, are insufficient to state a plausible § 1983 claim against any individual Doe defendant.

Accordingly, plaintiffs' § 1983 claims against the BPD Doe defendants are dismissed.

The BCDA defendants have not explicitly moved for dismissal of plaintiff's claims against the BCDA Doe defendants. This is understandable, as it is unclear how many of the Doe defendants are alleged to be BCDA employees and which claims plaintiff has asserted against them. Compl. ¶ 25.

Of course, courts may *sua sponte* dismiss Doe defendants on the pleadings where a plaintiff has failed to state a plausible claim against them. *See, e.g.*, *Darby v. Greenman*, 14 F.4th 124 (2d Cir. 2021) (affirming district court's dismissal of Doe defendants who had not appeared in the action where claims against them and appearing defendants were based on identical legal theories); *Baker v. Spinner*, 2019 WL 3430918, at *6 n.6 (N.D.N.Y. July 30, 2019) (dismissing unidentified and unserved Doe defendants *sua sponte* where defendants sought dismissal of entire complaint and their failure to appear on behalf of Does was likely "an oversight") *aff'd*, 826 F. App'x 105 (2d Cir. 2020); *see also Hanks v. City of Syracuse*, 2022 WL 4619877 (N.D.N.Y. Sept. 30, 2022), *aff'd*, 2023 WL 8889764 (2d Cir. Dec. 26, 2023).

Such is the case here. If anything, plaintiff's allegations against the BCDA Doe defendants are more tenuous than those asserted against the unidentified BPD officers. Plaintiff repeatedly alleges that "the BCDA[ ]," generally, failed to obtain or review certain evidence, failed to confront the complainants with evidence that undermined their allegations, and lacked fundamental knowledge as to certain investigative procedures regularly employed by prosecutors. Compl. ¶¶ 71, 94–95, 108, 113, 120, 146.

2025 WL 3280821

As with the BPD Doe defendants, plaintiff has failed to allege that any individual BCDA Doe defendant was personally involved in any constitutional violation. Accordingly, all Doe defendants that are "employees, agents, [ ] [or] officers" of the BCDA are dismissed.

### 2. False Arrest

The Court begins its assessment of the merits of plaintiff's § 1983 claims with plaintiff's "First Cause of Action," which he characterizes as a claim for "Fourth and Fourteenth Amendment False Arrest and Malicious Prosecution." Compl. at 51. "Although they often accompany one another, false arrest and malicious prosecution are distinct causes of action." *Spearman v. Dutchess Cnty.*, 2008 WL 2945991, at *3 (N.D.N.Y. July 25, 2008) (citing *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994)). Accordingly, the Court will address them separately, beginning with false arrest.

**\*19**  Of the remaining defendants to plaintiff's § 1983 claims, plaintiff asserts a false arrest claim against Investigator Miller and ADA Congdon. Compl. ¶¶ 220–27. Both moved to dismiss. *See* Dkt. Nos. 29, 31.

As a threshold matter, Investigator Miller argues that plaintiff's false arrest claim is time-barred. BPD Mem. at 26–27. Plaintiff has not addressed this argument. *See generally* Pl.'s Second Opp.

"Statutes of limitations establish the period of time within which a claimant must bring an action." *Heimeshoff v. Hartford Life & Acc. Ins. Co.*, 571 U.S. 99, 105, 134 S.Ct. 604, 187 L.Ed.2d 529 (2013). "Section 1983 does not provide a specific statute of limitations. Thus, courts apply the statute of limitations for personal injury actions under state law." *Hogan v. Fischer*, 738 F.3d 509, 517 (2d Cir. 2013). "[T]he applicable statute of limitations for § 1983 actions in New York is three years." *Murphy v. Lynn*, 53 F.3d 547, 548 (2d Cir. 1995).

"[A] statute of limitations begins to run when the cause of action accrues—that is, when the plaintiff can file suit and obtain relief." *Heimeshoff*, 571 U.S. at 105, 134 S.Ct. 604 (internal quotations omitted). "[A]lthough New York law provides the applicable statute of limitations, federal law governs the question of when a false arrest claim accrues." *Covington v. City of N.Y.*, 171 F.3d 117, 121 (2d Cir. 1999).

Under federal law, "it is the standard rule that [accrual occurs] when the plaintiff has a complete and present cause of action," *Wallace v. Kato*, 549 U.S. 384, 388, 127 S.Ct. 1091, 166 L.Ed.2d 973 (2007). As relevant here, "the statute of limitations upon a § 1983 claim seeking damages for a false arrest in violation of the Fourth Amendment, where the arrest is followed by criminal proceedings, begins to run at the time the claimant becomes detained pursuant to legal process." *Id.* at 397, 127 S.Ct. 1091. Put differently, the statute of limitations begins to run when the claimant is "bound over by a magistrate or arraigned on charges." *Id.* at 389, 127 S.Ct. 1091.[9]

9      In *Heck v. Humphrey*, the Supreme Court held that the accrual of a civil tort claim arising from an allegedly unlawful imprisonment or conviction should be deferred where that claim, if proven, would impugn the validity of an existing conviction. 512 U.S. 477, 484, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994). Under those circumstances, the statute of limitations would toll until "until the setting aside *of an extant conviction*." *Wallace*, 549 U.S. at 393, 127 S.Ct. 1091 (emphasis in original). But because plaintiff was never convicted, the deferred accrual rule established in *Heck* is inapplicable. *Id.* at 394–95.

The complaint alleges that, on February 22, 2022, "[d]espite there being no probable cause ... [ADA] Congdon met ... and decided with BPD to file criminal charges against [p]laintiff ... in local court." Compl. ¶ 131. The same day, plaintiff appeared at city court, where he was "arrested, charged, and arraigned." *Id.* ¶ 132.

Therefore, the statute of limitations on plaintiff's false arrest claim began to run once he was arraigned, on February 22, 2022. Plaintiff filed this action more than three years later, on March 18, 2025. Consequently, his § 1983 claim for false arrest is time-barred, and must be dismissed as to the remaining moving defendants. [10]

[10]    The Second Circuit "recognizes an equitable tolling doctrine in the context of § 1983 actions, and when a 'defendant fraudulently conceals the wrong, the time [limit of the statute of limitations] does not begin running until the plaintiff discovers, or by the exercise of reasonable diligence should have discovered, the cause of action.' " *Pinaud v. Cnty. of Suffolk*, 52 F.3d 1139, 1157 (2d Cir. 1995) (quoting *Keating v. Carey,* 706 F.2d 377, 382 (2d Cir. 1983)). However, equitable tolling applies "only in rare and exceptional circumstances, where ... extraordinary circumstances prevented a party from timely performing a required act, and that the party acted with reasonable diligence throughout the period he [sought] to toll." *Walker v. Jastremski*, 430 F.3d 560, 564 (2d Cir. 2005) (internal quotation omitted). No such circumstances exist here.

### 3. Malicious Prosecution

**\*20**  Of the remaining defendants, plaintiff asserts malicious prosecution claims against ADA Congdon and Investigator Miller. Compl. ¶¶ 220–27. Both moved to dismiss, arguing that plaintiff has failed to plausibly allege the elements of his claim. BPD Mem. at 28–32; Congdon Mem. at 23–24. Plaintiff maintains that his allegations state plausible malicious prosecution claims against both. Pl.'s Second Opp. at 19–20, 37–41, 54–56.

"To state a 42 U.S.C. § 1983 claim for malicious prosecution, a plaintiff must plead both 'a violation of his rights under the Fourth Amendment' and 'the elements of a malicious prosecution claim under state law.' " *Dettelis v. Sharbaugh*, 919 F.3d 161, 163 (2d Cir. 2019) (quoting *Manganiello v. City of N.Y.*, 612 F.3d 149, 160–61 (2d Cir. 2010)). "Under New York law, a malicious-prosecution claim requires a plaintiff to show '(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for the defendant's actions.' " *Dettelis*, 919 F.3d at 163–64 (quoting *Murphy v. Lynn*, 118 F.3d 938, 947 (2d Cir. 1997)).

### i. Initiation

"The first element of a malicious prosecution cause of action, under state law or § 1983, is ... 'that the defendant initiated a prosecution against the plaintiff.' " *Rohman v. N.Y. City Trans. Auth. (NYCTA)*, 215 F.3d 208, 217 (2d Cir. 2000) (quoting *Posr v. Ct. Officer Shield # 207*, 180 F.3d 409, 417 (2d Cir. 1999)). Both defendants argue that the complaint fails to establish initiation, but their arguments are premised on different theories.

Investigator Miller argues that plaintiff has not plausibly alleged that she, or any of the BPD defendants, commenced or continued the prosecution against plaintiff. BPD Mem. at 29–30. The Court disagrees.

"To initiate a prosecution, a defendant must do more than report the crime or give testimony. [Sh]e must 'play[ ] an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act.' " *Manganiello*, 612 F.3d at 163 (quoting *Rohman,* 215 F.3d at 217). "[P]olice officers can 'initiate' prosecution by filing charges or other accusatory instruments." *Cameron v. City of N.Y.*, 598 F.3d 50, 63 (2d Cir. 2010). "This element might be satisfied by, for example, showing that an officer generated witness statements or was regularly in touch with the prosecutor regarding the case." *Bermudez v. City of N.Y.*, 790 F.3d 368, 377 (2d Cir. 2015) (citing *Manganiello* 612 F.3d at 163).

Collectively and taken as true, plaintiff's allegations satisfy this requirement. According to plaintiff, Investigator Miller was the BPD officer assigned to plaintiff's case. Compl. ¶ 77. In this role, plaintiff alleges that Investigator Miller took witness statements, *id.* ¶¶ 78, 109, gathered evidence, *id.* ¶¶ 79, 88, 90, attended meetings with members of the BCDA, *id.* ¶¶ 104, 109, and worked directly with ADA Congdon on investigative tasks leading up to plaintiff's arrest and prosecution, *id.* at 120.

Case 9:22-cv-00638-DNH-CBF   Document 80   Filed 03/20/26   Page 83 of 146
Kweller v. County of Broome, Slip Copy (2025)
2025 WL 3280821

Moreover, allegations that a police officer "forwarded statements to a prosecutor without sharing that the statements were suspect," can also satisfy the initiation requirement of a malicious prosecution claim. *Dufort,* 874 F.3d at 353 (citing *Manganiello*, 612 F.3d at 163). Indeed, "New York law has long equated the civil defendant's failure to make a full and complete statement of the facts to the District Attorney or the court ... with that defendant's initiation of a malicious prosecution." *Ramos v. City of N.Y.*, 285 A.D.2d 284, 299–300, 729 N.Y.S.2d 678 (N.Y. App. Div. 1st Dep't 2001) (citing *Hopkinson v. Lehigh Val. R. Co.*, 249 N.Y. 296, 164 N.E. 104 (N.Y. 1928)); *see also Bailey v. City of N.Y.*, 79 F. Supp. 3d 424, 449 (E.D.N.Y. 2015) (holding that a police officer's "fail[ing] to make a complete and full statement of facts" to the prosecutor can constitute initiation).

**\*21**  Plaintiff alleges that:

> Demkovich told members of BPD that she was questioning whether she was, in fact, raped, or if the physical or sexual contact was consensual. This was not recorded by Defendant Miller or anyone else from BPD.

Compl. ¶ 82.

Investigator Miller argues that this allegation does not plausibly indicate that Demkovich told *her* that the sexual contact was consensual. BPD Mem. at 23. Again, the Court disagrees.

According to plaintiff, his encounter with the complainants took place in the early morning hours of November 27, 2021, Compl. ¶¶ 28, 32–55, Investigator Miller interviewed the complainants on November 28, 2021, *id.* ¶ 78, and Demkovich sent a text to her mother on December 28, 2021, stating that she "told them [BPD] the next day I was questioning if what happened to me was actually rape ...," *id.* ¶ 74(w). From these facts, the Court can infer that Demkovich told Investigator Miller, to whom she spoke *the next day*, that she was questioning whether she had sufficiently denied consent.

In sum, because plaintiff plausibly alleged that Investigator Miller was actively involved in the investigation, maintained regular contact with ADA Congdon, and failed to make a full and complete statement of the facts, he has plausibly alleged the initiation element as to Investigator Miller.

ADA Congdon makes a different argument. She contends that, as a prosecutor, she is absolutely immune for the commencement and continuation of a criminal proceeding. Congdon Mem. at 8.

As discussed *supra*, ADA Congdon *is* entitled to absolute immunity for her prosecutorial conduct: that is, any conduct undertaken as an advocate, in preparation for and during the prosecution of the criminal case against plaintiff. *See supra* Point IV.A.3.iii. Accordingly, the Court considers only whether her investigative conduct violated plaintiff's constitutional rights.

Plaintiff alleges that, while acting in an investigative capacity, ADA Congdon (1) participated in meetings, (2) worked closely with BPD, (3) met with the complainants, (4) instructed Herceg to delete electronic data, and (5) directed BPD to arrest plaintiff. Compl. ¶¶ 103–05, 120, 109–10, 131.

Ordinarily, "it would be impossible to satisfy the 'initiation' element of a malicious prosecution claim against the prosecutor." *Harris v. Tioga Cnty.*, 663 F. Supp. 3d 212, 241 (N.D.N.Y. 2023), *appeal dismissed*, 2024 WL 4179651 (2d Cir. Sept. 13, 2024). "After all, 'a prosecutor unquestionably acts as an advocate—and therefore receives absolute immunity—when she initiates and pursues a criminal prosecution.' " *Id.* (quoting *D'Alessandro v. City of N.Y.*, 713 F. App'x 1, 5 (2d Cir. 2017) (summary order)). But this protection ends "[w]hen a prosecutor performs the investigative functions normally performed by a detective or police officer[.]" *Buckley*, 509 U.S. at 273, 113 S.Ct. 2606.

"[T]he 'initiation' element of a malicious prosecution claim may be satisfied if a defendant fabricates evidence that is material to the probable cause determination." *Harris*, 663 F. Supp. 3d at 241 (citing *McDaniel v. City of N.Y.*, 585 F. Supp. 3d 503, 516–17 (S.D.N.Y. 2022) (collecting cases)). As relevant here, "government officials may be held liable for fabricating evidence through false statements *or omissions*." *Morse v. Fusto*, 804 F.3d 538, 547 (2d Cir. 2015) (emphasis added).

**\*22** Here, plaintiff alleges that ADA Congdon directed Herceg to delete electronic data prior to plaintiff's arrest. Compl. ¶¶ 66, 110, 185. Herceg's text messages from the relevant period undoubtedly undermine the veracity of her and Demkovich's allegations. *Id.* ¶ 74. Taken together, plaintiff has plausibly alleged that suppressing Herceg's text messages affected the probable cause analysis. Accordingly, at this stage, plaintiff's allegations satisfy the initiation element as to ADA Congdon.

#### ii. Probable Cause

Investigator Miller and ADA Congdon also argue that plaintiff's malicious prosecution claim must be dismissed, because he has failed to plausibly allege facts that rebut the presumption of probable cause established by his grand jury indictment. BPD Mem. at 27; Congdon Mem. at 23–24.

Because the third element of a malicious prosecution claim requires a plaintiff to allege that they were prosecuted without probable cause, "the existence of probable cause is a complete defense to a claim of malicious prosecution." *Savino*, 331 F.3d at 72 (citing *Colon v. City of N.Y.*, 60 N.Y.2d 78, 468 N.Y.S.2d 453, 455 N.E.2d 1248, 1250 (N.Y. 1983)). " 'Probable cause, in the context of malicious prosecution, has ... been described as such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty.' " *Kee v. City of N.Y.*, 12 F.4th 150, 166 (2d Cir. 2021) (quoting *Boyd v. City of N.Y.*, 336 F.3d 72, 76 (2d Cir. 2003)).

"[U]nder New York law, indictment by a grand jury creates a presumption of probable cause." *Savino*, 331 F.3d at 72. "[I]t is the plaintiff who bears the burden of proof in rebutting the presumption of probable cause that arises from the indictment." *Id.* at 73.

Because plaintiff concedes that "[t]he Grand Jury returned an indictment as to [him]," Compl. ¶ 170, the remaining inquiry is whether plaintiff has alleged sufficient facts to overcome the presumption of probable cause.

The presumption of probable cause "may *only* be rebutted by evidence that the indictment was procured by 'fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.' " *Savino*, 331 F.3d at 72 (quoting *Colon*, 468 N.Y.S.2d 453, 455 N.E.2d at 1250–51) (emphasis in original). "The rule in New York differs in this respect from that in some jurisdictions which permit the presumption to be overcome by any evidence tending to show the absence of probable cause." *Colon*, 468 N.Y.S.2d 453, 455 N.E.2d at 1251.

Plaintiff claims that he has rebutted the presumption of probable cause because the complaint "identif[ies] specific individuals, describe[s] the nature of the suppressed or omitted evidence, and explain[s] how the suppression affected the integrity of the grand jury process." Pl.'s Second Opp. at 39.

#### a. Investigator Miller

Broadly, plaintiff argues he has overcome the presumption of probable cause with respect to Investigator Miller by plausibly alleging that she failed to (1) show the complainants surveillance footage that contradicted their statements, Compl. ¶¶ 89, 91–94; (2) preserve the complainants' electronic data, *id.* ¶ 85; and (3) document Demkovich's statement that she was questioning whether the alleged sexual assault had actually been consensual, *id.* ¶ 82.

Plaintiff alleges that Investigator Miller obtained security camera footage from the Colonial depicting the complainants "cognizant, in control of their actions, initiating and engaging in consensual sexual contact ... with each other and with [p]laintiff, Yaron ... and ... Rindgen," in the hours preceding the alleged sexual assault. Compl. ¶¶ 88–89. According to plaintiff, Investigator Miller also possessed footage from street cameras showing the complainants "walking on their own and entering [a] car without

assistance," following the alleged assault. *Id.* ¶¶ 57, 91. Investigator Miller allegedly failed to confront Herceg with the footage at any point during the investigation. *Id.* ¶ 94.

**\*23** Plaintiff reasons that Investigator Miller's failure to confront the complainants with surveillance footage "showing [them] acting freely and consensually" amounts to bad faith misconduct sufficient to rebut the presumption of probable cause. Pl.'s Second Opp. at 38. There are two problems with this argument.

First, the surveillance footage, as described, does not exculpate plaintiff or otherwise impugn the veracity of the complainants' statements. Indeed, the footage corroborates the complainants' allegations that they were with plaintiff, Yaron, and Rindgen, at Yaron's office on the night in question. Further, footage that depicted the complainants "smiling and appearing in good spirits throughout the evening," and "walking through the basement area of their own free will," Compl. ¶ 81, did not undermine their allegations as to offenses occurring later in the night and outside the view of surveillance cameras. Likewise, footage of the complainants walking to a parking garage did not invalidate their recitation of events, absent an allegation that the complainants claimed to be unconscious or unable to walk after the alleged assault.

Second, plaintiff does not allege that Investigator Miller intentionally concealed or otherwise suppressed the footage from the prosecution in an effort to paint an incomplete picture of the facts and secure an indictment. He alleges only that Investigator Miller did not confront the complainants with the allegedly contradictory footage. Compl. ¶ 94.

Plaintiff's next allegation, that Investigator Miller failed to take "any steps during the early days of the investigation to obtain or preserve [the complainants'] electronic data," Compl. ¶ 85, similarly fails to rebut the presumption of probable cause.

According to plaintiff, the complainants provided Investigator Miller "with photographs and text messages from the night in question." Compl. ¶ 79. "The messages provided represented selected, non-continuous accounts of the night in question and did not provide a complete record of the relevant period." *Id.* ¶ 80. "The excluded text messages ... included messages stating that the sexual contact between [the complainants] and [p]laintiff ... had been consensual ..." *Id.* ¶ 81.

By plaintiff's own account, any exculpatory text messages were excluded from those provided to Investigator Miller, and plaintiff does not allege any facts suggesting that Investigator Miller knew that the complainants failed to turn over exculpatory text messages. Accordingly, her failure to obtain or otherwise preserve those messages does not amount to a suppression of evidence which could rebut the presumption of probable cause.

Lastly, plaintiff argues that Investigator Miller intentionally failed to document Demkovich's statement that she was questioning whether the alleged assault would be "classified" as consensual, thereby rebutting the presumption of probable cause established by plaintiff's indictment. Compl. ¶¶ 74(o), 82.

Importantly, "[w]hen information is received from a putative victim or an eyewitness, probable cause exists, [*Martinez*, 202 F.3d at 634], unless the circumstances raise doubt as to the person's veracity." *Curley v. Vill. of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) (citing *Singer v. Fulton Cnty. Sheriff,* 63 F.3d 110, 119 (2d Cir. 1995)). "[W]hile vastly inconsistent statements by a victim might undermine the victim's reliability, minor inconsistent statements do not automatically vitiate probable cause based solely on a victim's statements if the totality of the circumstances support probable cause." *Davenport v. City of N.Y.*, 2017 WL 4356883, at \*11 (E.D.N.Y. Sept. 28, 2017) (citing *Crawford v. City of N.Y.*, 477 F. App'x. 777, 779 (2d Cir. 2012) (summary order)).

**\*24** Even assuming Demkovich told Investigator Miller that she was questioning whether the alleged assault could be classified as rape, this statement, absent more, is not so "vastly inconsistent" that the remainder of her allegations must be discredited. Plaintiff does not contend, for example, that Demkovich told Investigator Miller that she and plaintiff did not engage in sexual activity, or that she was a willing participant in sexual activity. Compl. ¶ 74(w). Rather, it appears that Demkovich told police that she was questioning whether she had given sufficient indication that she did not want to engage in sexual activity, such that the encounter could be legally classified as "rape." *Id.* ¶ 74(o).

The Second Circuit addressed a similar situation in *Koester v. Lanfranchi*, 288 F. App'x 764, 766 (2d Cir. 2008) (summary order). The plaintiff in that case, who had been falsely accused of sexual abuse, similarly argued that "various circumstances cast doubt as to whether the victim provided a credible account of a forced, rather than consensual, sexual encounter." *Id.* The Second Circuit rejected that argument, holding that plaintiff was "wrong to suggest that defendants had to eliminate these doubts before reasonably relying on the victim's statement to arrest him." *Id.* The same logic applies here.

Investigator Miller had no duty to resolve all doubts as to Demkovich's statement before reasonably relying on it, particularly as she provided text messages and photos that corroborated other aspects of her account. Compl. ¶ 79. And, in any case, "for probable cause to dissipate, the groundless nature of the charges must be made apparent by the discovery of some intervening fact." *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996), *as amended* (May 21, 1996). Demkovich's alleged expression of uncertainty did not render the charges against plaintiff groundless, particularly in light of the other evidence Investigator Miller possessed. Compl. ¶¶ 65, 74(b)(b), 76, 79, 139.

In sum, plaintiff has failed to plausibly allege facts sufficient to rebut the presumption of probable cause as to Investigator Miller, and his § 1983 malicious prosecution claim against her must be dismissed.

### b. ADA Congdon

Plaintiff argues that he has rebutted the presumption of probable cause as to ADA Congdon through his allegations that she (1) suppressed exculpatory DNA evidence from the grand jury, Compl. ¶ 168; (2) failed to obtain and review exculpatory text messages, *id.* ¶¶ 167, 169(b); and (3) instructed Herceg to delete exculpatory data, *id.* ¶ 72.

Plaintiff alleges that the grand jury did not "learn of the exculpatory DNA results that were learned after the Grand Jury returned a voted indictment," because of ADA Congdon's misconduct. Compl. ¶ 168.

This allegation concedes that ADA Congdon did not possess the exculpatory DNA results until after plaintiff's indictment. Accordingly, they could not have been "suppressed." [11]

[11]    Regardless, ADA Congdon "had the discretion and authority to decide what evidence to present to the grand jury—[and] was under no duty to present every item of arguably exculpatory evidence in seeking an indictment." *Savino*, 331 F.3d at 75.

Next, plaintiff contends that the presumption of probable cause is rebutted by ADA Congdon's failure to timely obtain and review the Saitta folder.

However, a plaintiff cannot "rebut the presumption of probable cause with mere 'conjecture' and 'surmise' that his indictment was procured as a result of conduct undertaken by the defendants in bad faith." *Savino*, 331 F.3d at 73. In that regard, "[a]ny alleged failure to conduct further investigation or apply all procedures that could have been followed does not amount to fraud, bad faith or the suppression of evidence and is insufficient to overcome the presumption." *Gil v. Cnty. of Suffolk*, 590 F. Supp. 2d 360, 370 (E.D.N.Y. 2008) (citing *Colon*, 468 N.Y.S.2d 453, 455 N.E.2d at 1251).

**\*25** The complaint alleges that the complainants' attorney made ADA Congdon aware of the Saitta folder on January 14, 2022. Compl. ¶ 115. ADA Congdon allegedly directed BCDA Investigator Wagner to retrieve the Saitta folder, but he never did. *Id.* ¶¶ 115–17, 167, 169(b). At the end of March 2022, "[o]verwhelmed by the amount of discovery ... and having still not obtained the Saitta [folder], [ADA] Congdon ... decided to present the case to the grand jury." *Id.* ¶ 167.

Plaintiff admits that ADA Congdon directed BCDA Investigator Wagner to retrieve the Saitta folder once she became aware of its existence. Her failure to follow up with BCDA Investigator Wagner may constitute negligence, but, without more, cannot support a plausible inference of bad faith sufficient to rebut the presumption of probable cause. [12]

[12]   The same is true with respect to plaintiff's other allegations that ADA Congdon was generally inexperienced. *See* Compl. ¶¶ 106-07, 125, 165-67, 169.

Lastly, plaintiff argues that the presumption of probable cause was rebutted by his allegation that ADA Congdon instructed Herceg to destroy electronic data.

As discussed *supra*, plaintiff plausibly alleged that, during the pre-arrest investigation, ADA Congdon directed Herceg to delete electronic data, and Herceg's electronic data included text messages that substantially undermined the veracity of her and Demkovich's allegations against plaintiff. *See supra* Point IV.A.3.iii. At this stage, these allegations suffice to rebut the presumption of probable cause established by plaintiff's indictment.

### iii. Malice

ADA Congdon also argues that plaintiff failed to allege actual malice, the final element of his malicious prosecution claim. Congdon Mem. at 24. Specifically, ADA Congdon contends that any allegations of malice against her are conclusory. *Id.* In opposition, plaintiff maintains that the complaint "adequately alleges malice, both due to the lack of probable cause as well as the deliberate misconduct." Pl.'s Second Opp. at 55.

Under New York law:

> The "actual malice" element of a malicious prosecution action does not require a plaintiff to prove that the defendant was motivated by spite or hatred ... [r]ather, it means that the defendant must have commenced the prior criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served.

*Id.* at 976. "A lack of probable cause generally creates an inference of malice." *Boyd*, 336 F.3d at 78 (*Ricciuti,* 124 F.3d at 131).

Plaintiff has plausibly alleged facts that rebut the presumption of probable cause as to ADA Congdon, *see supra* Point IV.B.3.ii.b, thereby creating an inference of malice. Accordingly, at this stage, plaintiff has stated a plausible § 1983 malicious prosecution claim against ADA Congdon.

### 4. Due Process and Denial of the Right to a Fair Trial

Plaintiff's "Second Cause of Action," is identified as: "Fourteenth Amendment Deprivation of Liberty Without Due Process of Law and Denial of a Fair Trial by Fabricating Evidence, Withholding Material Exculpatory and Impeachment Evidence, and Deliberately Failing to Conduct a Constitutionally Adequate Investigation." Compl. at p. 53. Of the moving defendants, this claim remains only as to Investigator Miller and ADA Congdon. Both have moved to dismiss. BPD Mem. at 32–35; Congdon Mem. at 25.

"A fair trial claim is a civil claim for violations of a criminal defendant's Fourteenth Amendment due process rights." *Fappiano v. City of N.Y.*, 640 F. App'x 115, 118 (2d Cir. 2016) (summary order) (citing *Ramchair v. Conway,* 601 F.3d 66, 73 (2d Cir. 2010)).

**\*26** Plaintiff's fair trial claim is based, in part, on defendants' alleged failure to "conduct a constitutionally adequate investigation." However, "[a]s Defendants correctly argue, 'there is no constitutional right to an adequate investigation.' " *Buari v. City of N.Y.*, 530 F. Supp. 3d 356, 389 (S.D.N.Y. 2021) (quoting *Newton v. City of N.Y.*, 566 F. Supp. 2d 256, 278 (S.D.N.Y. 2008)); *see also Hicks v. Marchman*, 719 F. App'x 61, 64 (2d Cir. 2018) (summary order) (affirming dismissal of fair trial claim where plaintiff "cite[d] no authority for the proposition that there is a stand-alone fair trial claim based on officers' failure to conduct an adequate investigation"). Accordingly, plaintiff's fair trial claim based on defendants' alleged "failure to investigate" must be dismissed.

The remainder of this claim can reasonably be understood as a claim for denial of the right to a fair trial premised on two theories: (1) fabrication of evidence;[13] and (2) withholding of exculpatory and impeachment evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

[13]    In his opposition papers, plaintiff seemingly rejects fabrication as a basis for this claim, stating that "[a] fair trial claim does not have to involve fabricated evidence," and "the Second Circuit has explicitly recognized that suppression of exculpatory evidence—whether intentional or reckless—also gives rise to a cognizable fair trial claim." Pl.'s Second Opp. at 62. But, because the complaint alleges that defendants "deprived [plaintiff] of his right to due process by fabricating inculpatory evidence," Compl. ¶ 231, the Court addresses both theories.

Defendants argue that plaintiff has failed to state a plausible fair trial claim under either theory. BPD Mem. at 32–35; Congdon Mem. at 25. Plaintiff disagrees. Pl.'s Second Opp. at 56–57.

### i. Fabrication of Evidence

"When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983." *Ricciuti*, 124 F.3d at 130. To state a fair trial claim premised on the fabrication of evidence, a plaintiff must allege that " 'an (1) investigating official (2) fabricate[d] information (3) that is likely to influence a jury's verdict, (4) forward[ed] that information to prosecutors, and (5) the plaintiff suffer[ed] a deprivation of life, liberty, or property as a result.' " *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279 (2d Cir. 2016) (quoting *Ricciuti*, 124 F.3d at 130).

### a. Investigator Miller

Investigator Miller argues that plaintiff's allegations in support of his fabrication claim are boilerplate and do not state a plausible claim against her. BPD Mem. at 33–34.

Crucially, the Second Circuit has consistently held that "the second element of a fair trial claim based on fabricated evidence requires a plaintiff to prove that a defendant's use of inaccurate information was 'knowing, as opposed to mistaken.' " *Davis-Guider v. City of Troy*, 2024 WL 5199294, at \*3 (2d Cir. Dec. 23, 2024) (summary order) (quoting *Barnes v. City of N.Y.*, 68 F.4th 123, 129 (2d Cir. 2023)); *see also Ashley v. City of N.Y.*, 992 F.3d 128, 143 (2d Cir. 2021) ("The fabrication element requires only that the defendant knowingly make a false statement or omission.").

"[T]he requirements that the information be both false and likely to influence a jury's decision constrain the types of information that can serve as the basis for a denial of the right to a fair trial claim." *Garnett*, 838 F.3d at 280. "Information may be 'false' if material omissions render an otherwise true statement false." *Morse*, 804 F.3d at 548.

**\*27** Plaintiff does not allege that Investigator Miller personally testified falsely before any jury or affirmatively fabricated any evidence. Instead, plaintiff alleges that "Demkovich told members of BPD that she was questioning whether she was, in fact, raped, or if the physical or sexual contact was consensual" and, because that statement "was not recorded by Defendant

Miller," "the Grand Jury did not learn that ... Demkovich had reported that she was questioning whether a rape had occurred." Compl. ¶¶ 82, 168.

Investigator Miller's omission of that portion of Demkovich's statement did not render the rest of her statement "false." Even if it did, plaintiff has not plausibly alleged that Miller had reason to know that Demkovich's allegations were false. *See Davis-Guider*, 2024 WL 5199294, at *3 (rejecting argument that "relie[d] on the speculation that because Defendants provided prosecutors with inaccurate information, they must have fabricated evidence," and concluding that "[t]he mere fact that the parties present conflicting evidence does not mean that one side's evidence was fabricated.").

Indeed, at the time Investigator Miller interviewed the complainants, Herceg's allegations, the complainants' text messages and photos, and the surveillance footage all corroborated aspects of Demkovich's allegations. *See supra* Point IV.B.3.b; *see also Brown v. Vill. of Endicott*, 2025 WL 863105, at *30 (N.D.N.Y. Mar. 19, 2025) ("Insofar as the parties agree that [the complainant] provided inconsistent statements... the failure to present this inconsistency to the grand jury does not make the testimony 'false.' This is particularly true when [the complainant] made numerous other, consistent, statements concerning the alleged abuse.").

In sum, plaintiff has failed to state factual allegations that could support a reasonable inference that Investigator Miller knowingly fabricated evidence, either affirmatively or by omission. Therefore, plaintiff's fabrication claim against her must be dismissed.

### b. ADA Congdon

ADA Congdon argues that absolute prosecutorial immunity bars plaintiff's fabrication-of-evidence claim against her, as her allegedly violative conduct falls within the scope of her role as an advocate. Congdon Mem. at 25. Plaintiff disagrees, insisting that his "allegations detail a pattern of exculpatory evidence being deliberately destroyed or withheld by both police and prosecutors, well before any formal prosecution commenced." Pl.'s Second Opp. at 58.

In *Zahrey v. Coffey*, the Second Circuit explicitly recognized a constitutional "right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigating capacity." 221 F.3d 342, 349 (2d Cir. 2000). This includes prosecutors, as "a subsequent immunized act of a single official does not break the chain of causation traceable to his initial misconduct occurring in another capacity." *Id.* at 353 (citing *White v. Frank*, 855 F.2d 956, 961 (2d Cir. 1988)).

Thus, a prosecutor, acting in her investigative capacity, deprives a criminal defendant of the constitutional right to a fair trial where she deliberately omits material information from evidence that would likely influence a jury's decision. *See Morse*, 804 F.3d at 547–49 (finding prosecutor and investigator, acting in investigative capacities, deprived dentist of fair trial right through deliberate material omissions in billing summaries material to grand jury's decision to indict).

In November 2022, the BCDA allegedly "received a hard drive with the extractions of the cell phones of [the complainants]." Compl. ¶ 179. Three months later, the BCDA turned this information over to plaintiff's attorney in a report, but "none of ... Herceg's communications from November 27, 2021[,] through March 2022 were present" in the BCDA report, because Herceg obtained a new phone and iCloud account in March 2022. *Id.* ¶ 185. Herceg later testified that ADA Congdon instructed her to "destroy electronic data relating to the night in question ... and that she did in fact destroy that evidence." *Id.* ¶ 72. In July 2023, plaintiff obtained the Saitta folder, which contained Herceg's messages from that period, including "numerous exculpatory and impeaching text messages," not included in the BCDA report. *Id.* ¶ 117(e). Saitta also informed plaintiff that ADA Congdon had been aware of the Saitta folder at least two months prior to his indictment (and Herceg's alleged destruction of evidence), but she never retrieved it. *Id.* ¶¶ 115–17.

**\*28** Collectively, plaintiff has plausibly alleged that ADA Congdon (1) instructed Herceg to delete material electronic data prior to plaintiff's arrest and indictment; (2) failed to retrieve existing copies of that material electronic data, despite knowing of its availability before plaintiff's arrest and indictment; and (3) subsequently produced a hard drive of the complainants' electronic data that necessarily omitted the data Herceg destroyed at her request.

2025 WL 3280821

Thus, plaintiff has plausibly alleged that ADA Congdon fabricated or otherwise omitted material evidence. Accordingly, plaintiff's fabrication claim survives as to ADA Congdon.

### ii. Brady Violation

Plaintiff also alleges that defendants deprived him "of his right to due process by directing the destruction of material exculpatory and impeachment evidence in order to hide it from [plaintiff]'s defense counsel and the Court." Compl. ¶ 232. This "theory of liability is essentially a civil claim seeking damages for a *Brady* violation." *Fappiano*, 640 F. App'x at 118 (citing *Bermudez,* 790 F.3d at 376 n.4). "A classic *Brady* violation contains three elements: 'The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.' " *Fappiano*, 640 F. App'x at 118 (quoting *United States v. Rivas,* 377 F.3d 195, 199 (2d Cir. 2004)).

"To prevail on such a claim, a plaintiff must show the materiality of the nondisclosed evidence." *Bellamy v. City of N.Y.*, 914 F.3d 727, 751 (2d Cir. 2019). To determine materiality, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

Because "*Brady* is rooted in the constitutional right to a fair trial," a plaintiff "fails to allege any violation of his rights under *Brady*," where "the charges ... were dropped before any trial began." *Schnitter v. City of Rochester*, 556 F. App'x 5, 8 (2d Cir. 2014) (summary order) (affirming dismissal of § 1983 *Brady* claim); *see also Malik. v. City of N.Y.*, 2020 WL 2747979 (E.D.N.Y. May 27, 2020) (dismissing § 1983 *Brady* claim where charges were dismissed before trial), *aff'd sub nom. Malik v. City of N.Y.*, 841 F. App'x 281 (2d Cir. 2021) (summary order).

Plaintiff concedes that the charges were dismissed against him without a trial, Compl. ¶ 192, and that the BCDA ultimately withdrew their appeal of this dismissal, *id.* ¶¶ 6–7. Accordingly, plaintiff has failed to allege a *Brady* violation, and his fair trial claim premised on this theory must be dismissed as to the remaining moving defendants.

### 5. Failure to Intervene

Plaintiff's "Third Cause of Action" is identified as a "failure to intervene" claim. Compl. ¶¶ 237–242. As a threshold matter, failure to intervene is not a standalone cause of action, but rather a form of individual "bystander" liability imposed where a government official could have, but did not, intervene in a constitutional violation committed by another government official in his or her presence. *See Ellis v. City of Elmira*, 2018 WL 6047070, at *8 n.1 (W.D.N.Y. Nov. 19, 2018) ("[F]ederal courts uniformly have recognized a theory of 'bystander liability' based on a defendant's failure to intervene in § 1983 actions.") (citing *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)). In that regard, it may be asserted even where a defendant did not directly participate in an alleged constitutional violation.

**\*29** Accordingly, this claim remains as to the individual BPD defendants, DA Korchak, Chief ADA Loughran, ADA Congdon, and BCDA Investigator Wagner. Plaintiff also asserts this claim against the City and the County. All have moved to dismiss.

Liability for failure to intervene may attach "if '(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene.' " *Jackson v. City of N.Y.*, 939 F. Supp. 2d 219, 231–32 (E.D.N.Y. 2013) (quoting *Jean–Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y. 2008)).

As for the municipal defendants, the County argues that plaintiff has failed "fail to allege or articulate how the County, as a municipal entity, was positioned to prevent or remedy ... [alleged] violations in real time." County Mem. at 13. Plaintiff concedes this point in his opposition papers and voluntarily "withdraws the failure to intervene claim against the County only." Pl.'s Opp.

at 65. But the City of Binghamton is also a municipal entity. Compl. ¶ 17. To the extent plaintiff attempts to impose individual liability for failure to intervene against the City, that claim must be dismissed for substantially the same reasons.

Turning to the individual defendants, they argue that (1) plaintiff has not plausibly alleged an underlying constitutional violation; or (2) alternatively, plaintiff has not plausibly alleged that defendants had a realistic opportunity to intervene in any constitutional violations. Korchak & Loughran Mem. at 24–25; BPD Mem. at 36–37; Congdon Mem. at 25–26; Wagner Mem. at 22–24. Additionally, ADA Congdon argues that she "could never have had a reasonable opportunity to intervene in her own actions." Congdon Mem. at 26.

A failure to intervene claim "is predicated on there being an underlying violation of [plaintiff]'s constitutional rights that the defendants could have prevented." *McIntosh v. City of N.Y.*, 722 F. App'x. 42, 46 (2d Cir. 2018) (summary order) (citing *Terebesi v. Torreso*, 764 F.3d 217, 243 (2d Cir. 2014)).

Here, plaintiff has plausibly alleged constitutional violations against ADA Congdon. His surviving § 1983 claims against her are for malicious prosecution and the denial of the right to a fair trial premised on the fabrication of evidence. *See supra* Points IV.3–4.

"It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson*, 17 F.3d at 557 (citing *O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988)). [14] But, "[o]bviously, a person who is held liable under a theory of direct participation in the constitutional violation cannot also be held liable for a failure to intervene." *Rizk v. City of N.Y.*, 462 F. Supp. 3d 203, 226 (E.D.N.Y. 2020) (citing *Jackson*, 939 F. Supp. 2d at 231–32). Because plaintiff has only plausibly stated § 1983 claims against ADA Congdon, she cannot also be liable for failure to intervene in her own conduct.

[14]   While the Second Circuit has not addressed whether law enforcement officials or prosecutors have a duty to intercede in a *prosecutor's* alleged misconduct, plaintiff's surviving claims against ADA Congdon concern actions taken in her investigatory capacity, for which she, like a law enforcement officer, is entitled to qualified immunity at most. *See Buckley*, 509 U.S. at 273, 113 S.Ct. 2606 ("When a prosecutor performs the investigative functions normally performed by a detective or police officer, it is 'neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other.' " (quoting *Hampton,* 484 F.2d at 608)). Thus, for purposes of assessing defendants' failure to intervene in ADA Congdon's alleged constitutional violations, she will be treated as a law enforcement officer.

**\*30**  The remaining individual defendants argue that plaintiff has not alleged that they had a realistic opportunity to intervene in any constitutional violations. Korchak & Loughran Mem. at 24–25; BPD Mem. at 36–37; Wagner Mem. at 22–24.

Both of plaintiff's surviving § 1983 claims are premised on plaintiff's allegation that, prior to his arrest and indictment, ADA Congdon instructed Herceg to destroy electronic data related to the night of the alleged assault. Compl. ¶¶ 72, 110. Yet, plaintiff does not allege that any other individual defendant was present for, aware of, or had any realistic opportunity to intervene in or prevent ADA Congdon from instructing or directing Herceg to destroy the allegedly exculpatory electronic data. *See generally* Compl.

Accordingly, he fails to state a plausible § 1983 claim under a failure to intervene theory as to any moving defendant.

### 6. *Monell* Liability

Plaintiff's fifth and sixth causes of action are identified as "*Monell* Claim" and "*Monell* Claim for the Unconstitutional BPD Custom or Policy," respectively. Compl. ¶¶ 251–95. His first *Monell* claim is asserted against the County and his second, against the City, Chief Zikuski, and Captain Minor. All have moved to dismiss plaintiff's *Monell* claims. County Mem. at 8–11; BPD Mem. at 15–17.

2025 WL 3280821

As the Second Circuit has explained:

> In *Monell v. Department of Social Services,* 436 U.S. 658, 98 S. Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court established that "[l]ocal governing bodies ... can be sued directly under [42 U.S.C.] § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."

*Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 124–25 (2d Cir. 2004) (quoting *Monell*, 436 U.S. at 690, 98 S.Ct. 2018).

Plaintiffs proceeding under a *Monell* theory must " 'plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right.' " *Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 297 (2d Cir. 2020) (quoting *Wray v. City of N.Y.*, 490 F.3d 189, 195 (2d Cir. 2007)). "In other words, municipalities may not be held liable 'unless action pursuant to official municipal policy of some nature caused a constitutional tort.' " *Friend v. Gasparino*, 61 F.4th 77, 93 (2d Cir. 2023) (quoting *Monell*, 436 U.S. at 691, 98 S.Ct. 2018).

The Court addresses plaintiff's *Monell* claims in turn.

### i. County

Plaintiff alleges that the BCDA "failed to implement policies and procedures including training and supervision to ensure that criminal defendants ... would not have their constitutional rights violated," and "had unconstitutionally infirm policies and procedures that led to assistant district attorneys not knowing their obligations under *Brady, Giglio,* and discovery." Compl. ¶¶ 267–68.

The County argues that this claim must be dismissed, because plaintiff has not plausibly alleged a custom or policy of the County that caused any alleged violations. County Mem. at 9–10. Plaintiff disagrees. Pl.'s Second Opp. at 70–75.

" 'Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law.' " *Friend*, 61 F.4th at 93 (quoting *Connick v. Thompson*, 563 U.S. 51, 61, 131 S.Ct. 1350, 179 L.Ed.2d 417 (2011)).

**\*31**  A plaintiff can satisfy the official policy element by alleging, *inter alia*, that (1) "a municipal policy or ordinance is itself unconstitutional," *Amnesty Am.*, 361 F.3d at 125; (2) a municipality's persistent and widespread "practice, as opposed to its formal policy, is to engage in the constitutional violation at issue," *Green v. City of N.Y.*, 465 F.3d 65, 80 (2d Cir. 2006); (3) an official with final policymaking authority makes a "a deliberate choice to follow a course of action ... from among various alternatives," *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); or (4) "the municipality is aware that its policy for handling a given situation, although not unconstitutional in itself, may be applied unconstitutionally, but nevertheless consciously chooses not to train its employees in proper application of the policy," *Green*, 465 F.3d at 80.

First, plaintiff argues that the County is liable under *Monell* for the acts of the prosecutor defendants, because they are all alleged to be "final policymakers." Pl.'s Second Opp. at 70–75 (citing Compl. ¶¶ 252, 274).

"Where a plaintiff seeks to hold a municipality liable for a 'single decision by [a] municipal policymaker[ ],'... the plaintiff must show that the official had final policymaking power." *Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008) (quoting *Pembaur*, 475 U.S. at 480, 106 S.Ct. 1292). "Whether an official has final policymaking authority is a legal question, determined on the basis of state law." *Roe v. City of Waterbury*, 542 F.3d at 37. "[T]he critical inquiry is not whether an official generally has final policymaking authority; rather, the court must specifically determine whether the government official is a final policymaker with respect to the particular conduct challenged in the lawsuit." *Id.*

2025 WL 3280821

As an initial matter, plaintiff has not plausibly alleged any facts in support of his legal conclusion that DA Korchak, Chief ADA Loughran, ADA Congdon, or ADA Cronin are final policymakers. *See generally* Compl.

Setting that aside, the Second Circuit has held that a district attorney acts as a final policymaker when the "district attorney acts as the manager of the district attorney's office." *Walker v. City of New York*, 974 F.2d 293, 301 (2d Cir. 1992). Here, the complaint plausibly alleges that DA Korchak acted as a manager of the BCDA at various times. Compl. ¶¶ 103, 125.

Next, to prove the causation element, a plaintiff must plausibly allege "either that the official who is a final policymaker in the area directly committed or commanded the violation of the plaintiff's federal rights ... or that ... he indirectly caused the misconduct of a subordinate municipal employee." *Jeffes v. Barnes,* 208 F.3d 49, 61 (2d Cir. 2000).

Plaintiff alleges that DA Korchak assigned plaintiff's case to ADA Congdon, "whom [he] knew lacked the necessary prosecutorial experience, knowledge, and training to handle a serious felony investigation, and who repeatedly expressed concern to [him] ... that she was being given more responsibility than she could handle." Compl. ¶ 125.

This is not enough. "The fact that inadequate scrutiny of an applicant's background would make a violation of rights more *likely* cannot alone give rise to an inference that a policymaker's failure to scrutinize the record of a particular applicant produced a specific constitutional violation." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 410–11, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) (emphasis in original). Instead, "[a] plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." *Id.* at 411, 117 S.Ct. 1382.

Plaintiff also points out that the BCDA hired ADA Congdon, who had no prosecutorial experience, less than a month before assigning her to his case. Compl. ¶ 103(a). According to plaintiff, ADA Congdon was quickly promoted to Bureau Chief of the Special Victims Bureau, even though she had expressed "that she believed she lacked sufficient prosecutorial experience for the role." *Id.* ¶ 103(c). Plaintiff further contends that, "[d]espite having been a member of the Bar of the State of New York from 2012, and despite having practiced criminal defense for nearly a decade, Congdon did not understand her legal obligations as a prosecutor." *Id.* ¶ 103(f).

**\*32**  Still, taken as true, these allegations could not plausibly amount to an inference that defendants were deliberately indifferent in hiring and assigning ADA Congdon to plaintiff's case. An official's failure to adequately scrutinize an applicant's background amounts to deliberate indifference "[o]nly where adequate scrutiny of [the] applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire ... would be the deprivation of a third party's federally protected right." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl.*, 520 U.S. at 411, 117 S.Ct. 1382. Here, that is not the case.

Plaintiff admits that ADA Congdon had nearly ten years of experience as a criminal defense attorney. Compl. ¶ 103(f). The fact that she had never been a prosecutor and had expressed some reluctance about taking on a leadership role, without more, could not plausibly lead a policymaker "to conclude that the plainly obvious consequence of the decision to hire [ADA Congdon] ... would be the deprivation of [plaintiff]'s federally protected right." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl.*, 520 U.S. at 411, 117 S.Ct. 1382.

Next, plaintiff argues that the County should be held liable under *Monell* because the BCDA employed inadequate training procedures. Compl. ¶¶ 193, 268.

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61, 131 S.Ct. 1350. "Only where a failure to train reflects a 'deliberate' or 'conscious' choice by the municipality can the failure be properly thought of as an actionable city 'policy.' " *City of Canton, Ohio v. Harris*, 489 U.S. 378, 379, 109

S.Ct. 1197, 103 L.Ed.2d 412 (1989). "Moreover, the identified deficiency in the training program must be closely related to the ultimate injury." *Id.*

First, Plaintiff alleges ADA Congdon failed to recognize and disclose exculpatory evidence because the BCDA failed to train its assistant district attorneys regarding their disclosure obligations under *Brady*. Compl. ¶ 268. This allegation cannot support a plausible *Monell* claim.

To establish *Monell* liability, there must be "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton*, 489 U.S. at 385, 109 S.Ct. 1197. Because plaintiff has not plausibly alleged a *Brady* violation, *see supra* Point IV.B.4.ii, he cannot impose *Monell* liability on the County based on a custom or policy that allegedly caused such a violation.

Plaintiff's allegation that ADA Congdon erroneously instructed the grand jury because of the BCDA's "improper practices and procedures," Compl. ¶ 193, fails for largely the same reasons. Plaintiff has plausibly alleged that his constitutional rights were violated only when ADA Congdon instructed Herceg to delete electronic data during the investigation. *See supra* Point IV.B.3. There is no direct causal link between this constitutional violation and the BCDA's allegedly deficient training procedures with respect to grand jury instructions.

In sum, plaintiff has not plausibly alleged that an official policy or practice of the BCDA caused any alleged constitutional deprivation. Accordingly, plaintiff's *Monell* claim against the County must be dismissed.

### ii. City

Plaintiff's second *Monell* claim is asserted against "Defendants City of Binghamton, Zikuski, and Minor." Compl. p. 61.

In *Monell*, the Supreme Court noted that:

> Since official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent ... local government officials sued in their official capacities are "persons" under § 1983 in those cases in which, as here, a local government would be suable in its own name.

**\*33** 436 U.S. at 691 n.55, 98 S.Ct. 2018.

Conversely, "a suit against a government official in his or her personal capacity cannot lead to ... liability upon the governmental entity," because "a municipality cannot be made liable under 42 U.S.C. § 1983 on a *respondeat superior* basis." *Graham*, 473 U.S. at 167–68, 105 S.Ct. 3099. In other words, a municipal official, sued only in their personal or individual capacity, is not a proper defendant to a claim premised on *Monell* liability.

Plaintiff appears to be suing the individual BPD defendants in only their personal capacities, *see* Compl. at 1 (naming Chief Zikuski and Captain Minor "in their individual capacities"), warranting dismissal of his "*Monell* claim[s]" against them.

To the extent his claims are brought against either Chief Zikuski or Captain Minor in their official capacities, "they are redundant to the claims against the [City]," and are therefore dismissed. *Booker v. Bd. of Educ., Baldwinsville Cent. Sch. Dist.*, 238 F. Supp. 2d 469, 475 (N.D.N.Y. 2002).

As to the City's liability, the Second Circuit has held that:

> Where the plaintiff does proceed against both the municipal actors alleged to have inflicted the tort and the municipality that promulgated the offensive policy, the plaintiff's failure to secure a judgment against the individual actors would, indeed, preclude a judgment against the municipality if the ruling in favor of the individual defendants resulted from the plaintiff's failure to show that they committed the alleged tort.

*Askins v. Doe No. 1*, 727 F.3d 248, 253–54 (2d Cir. 2013).

Plaintiff's *Monell* claim against the City necessarily depends on his allegations against the individual BPD defendants. Compl. ¶¶ 276–95. Fatally, plaintiff has not plausibly alleged that any BPD defendant violated his constitutional rights. *See supra* Points IV.B.1–5. Thus, plaintiff's *Monell* claim against the City must be dismissed.

### 7. Civil Rights Conspiracy

Plaintiff's seventh cause of action is identified as a "Civil Rights Conspiracy" claim against all defendants. Compl. ¶¶ 296–301. Broadly, he alleges that defendants, "acting within the scope of their employment and under color of state law ... agreed among themselves and with other individuals to act in concert in order to deprive [p]laintiff of his clearly established" constitutional rights. Compl. ¶ 297.

Defendants argue that these claims must be dismissed because (1) plaintiff has not plausibly alleged the existence of an agreement between defendants; and (2) to the extent plaintiff's claims are premised on conspiracies between actors wholly within BPD or wholly within the BCDA, they are barred by the intra-corporate conspiracy doctrine. Korchak & Loughran Mem. at 28–30; County Mem. at 14–16; BPD Mem. at 37–39; Congdon Mem. at 26–28; Wagner Mem. at 24–26. In opposition, plaintiff maintains that (1) he has plausibly alleged all elements of his conspiracy claims; and (2) the intra-corporate conspiracy doctrine is inapplicable, because "[t]he Complaint sufficiently alleges that BPD defendants conspired with BCDA[ ]defendants, and both conspired with Herceg and Demkovich." Pl.'s Second Opp. at 76–80.

**\*34** "To survive a motion to dismiss, a conspiracy claim under 42 U.S.C. § 1983 must allege facts plausibly suggesting that (1) an agreement existed between two or more state actors to act in concert to inflict an unconstitutional injury on plaintiff, and (2) an overt act was committed in furtherance of that goal." *Vega v. Artus*, 610 F. Supp. 2d 185, 202 (N.D.N.Y. 2009) (citing *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 324–25 (2d Cir. 2002)). "A complaint containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss." *Sommer v. Dixon*, 709 F.2d 173, 175 (2d Cir. 1983).

Plaintiff alleges that either or both the BPD defendants and the BCDA defendants conspired with the complainants to fabricate the complainants' allegations against plaintiff. The Second Circuit addressed similar allegations in *Betts v. Shearman*, 751 F.3d 78 (2d Cir. 2014). There, the § 1983 plaintiff alleged that two police officers conspired with a private actor to arrest him based on a false allegation that plaintiff assaulted the private actor. *Id.* at 86. The Second Circuit affirmed a pre-answer dismissal of a conspiracy claim, finding plaintiff's "allegation that [the private actor] was coached by the Officers into making false accusations is not plausible given that [the private actor] first called the police and reported that she was assaulted *prior to* her interaction with the officers." *Betts*, 751 F.3d at 86 (emphasis added).

The logic of *Betts* applies with equal force to these facts. To the extent plaintiff's conspiracy claim depends on the alleged fabrication of the complainants' allegations, it, too, must fail. Plaintiff alleges that the complainants initially reported the alleged sexual assault to the New York State Police, who directed them to contact BPD. Compl. ¶ 76. Accordingly, he has not plausibly alleged that the complainants conspired with either BPD or the BCDA to generate their false allegations.

Plaintiff also argues that defendants conspired with one another and the complainants to disregard and suppress exculpatory evidence in order to arrest and prosecute him without probable cause and deny him the right to a fair trial. Compl. ¶¶ 297, 298(c).

As with failure to intervene, a plaintiff bringing "a § 1983 conspiracy claim must [plead and] prove an actual violation of constitutional rights." *Singer*, 63 F.3d at 119. Plaintiff has plausibly alleged that ADA Congdon violated his rights by instructing Herceg to delete electronic data relating to the night of the alleged assault. *See supra* Point IV.B.3–4. But he does not allege that any other defendants were aware of or involved in this violative conduct.

While plaintiff does allege that ADA Congdon worked closely with BPD officers and other BCDA employees during the investigation, Compl. ¶ 120, this allegation, without more, does not permit an inference that defendants entered an agreement with ADA Congdon to violate plaintiff's rights.

Because plaintiff has alleged that just ADA Congdon and Herceg were present at the time of the alleged violations, plaintiff has only plausibly alleged his civil conspiracy claims against them. Accordingly, plaintiff's civil conspiracy claims are dismissed as to all other moving defendants.

### 8. Qualified Immunity

ADA Congdon argues that she is entitled to qualified immunity for any alleged actions not protected by absolute immunity. Congdon Mem. 18–21. In opposition, plaintiff argues that courts generally deny qualified immunity where prosecutors allegedly fabricated evidence while acting in an investigative capacity. Pl.'s Second Opp. 50–53.

 **\*35** "Qualified immunity is available to officials so long as their actions do not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Chamberlain Est. of Chamberlain v. City of White Plains*, 960 F.3d 100, 110 (2d Cir. 2020) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).

"[A]s a general rule, 'the defense of qualified immunity cannot support the grant of a [Rule] 12(b)(6) motion.' " *Chamberlain Est. of Chamberlain*, 960 F.3d at 110 (quoting *Green v. Maraio*, 722 F.2d 1013, 1018 (2d Cir. 1983)). "Not only must the facts supporting the defense appear on the face of the complaint, but, as with all Rule 12(b)(6) motions, the motion may be granted only where it appears [that the alleged facts, if true, plausibly state a claim] that would entitle him to relief.' " *Chamberlain Est. of Chamberlain*, 960 F.3d at 110 (quoting *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004)).

"Thus, a qualified immunity defense presented on a Rule 12(b)(6) motion 'faces a formidable hurdle ... and is usually not successful.' " *Chamberlain Est. of Chamberlain*, 960 F.3d at 111 (quoting *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 191–92 (2d Cir. 2006)).

As noted *supra*, plaintiff's surviving § 1983 claims against ADA Congdon for malicious prosecution, fabrication of evidence, and civil rights conspiracy are all premised on his allegation that ADA Congdon instructed complainant Herceg to delete exculpatory electronic data.

"Government officials may be held liable for fabricating evidence through false statements *or omissions*," *Morse*, 804 F.3d at 547 (emphasis added), and the Second Circuit has explicitly held that the "right not to be deprived of liberty as a result of *any government officer's* fabrication of evidence ... was clearly established in 1996." *Zahrey*, 221 F.3d at 357 (emphasis in original).

According to plaintiff, ADA Congdon allegedly violated this clearly established right sometime during or after December 2021. Compl. ¶¶ 72, 110. Therefore, at this stage, ADA Congdon is not entitled to qualified immunity.

### C. State Law Claims

2025 WL 3280821

Plaintiff identifies his state law causes of action as: (1) false arrest and malicious prosecution; (2) intentional, reckless, or negligent infliction of emotional distress; (3) violation of sections 6 and 12 of Article I of the New York State Constitution; (4) *respondeat superior*; and (5) abuse of process. Compl. ¶¶ 302–339. The moving defendants seek dismissal of all state law causes of action asserted against them. Korchak & Loughran Mem. 17–21, 30–31; County Mem. at 17–26; BPD Mem. at 24–32, 35–36, 39–43; Congdon Mem. at 21–25, 28–29; Wagner Mem. at 16–21, 26–31.

As an initial matter, "[i]t is well-established ... that *respondeat superior* 'is not a cause of action at all, but a theory of liability that must attach to a separate claim.' " *Lederman v. Benepe*, 2016 WL 11588628, at *5 (S.D.N.Y. Mar. 11, 2016) (quoting *Alexander v. Westbury Union Free Sch. Dist.*, 829 F. Supp. 2d 89, 110 n.6 (E.D.N.Y. 2011)). Accordingly, the Court addresses *respondeat superior* liability in tandem with the underlying cause(s) of action for which it is asserted.

### 1. False Arrest

Plaintiff's eighth cause of action is identified as "false arrest and malicious prosecution" and is asserted against "All Defendants." Compl. ¶¶ 302–16.

**\*36** False arrest and malicious prosecution are distinct causes of action under state law. *See Broughton*, 373 N.Y.S.2d 87, 335 N.E.2d at 313 ("Although [false imprisonment and malicious prosecution] are kindred actions, each protects a different personal interest and is composed of different elements."). Accordingly, the Court addresses them separately.

Beginning with false arrest, the City and the individual BPD defendants argue that plaintiff's state law false arrest claim must be dismissed because it is time-barred. BPD Mem. at 26–28. In response, plaintiff has "withdraw[n] his cause[ ] of action for ... false arrest." Pl.'s Second Opp. at 80 n. 20.

Accordingly, plaintiff's state law false arrest claims are dismissed as to all moving defendants.

### 2. Malicious Prosecution

Defendants have moved to dismiss plaintiff's state law malicious prosecution claims, arguing that they are time-barred, BPD Mem. at 25–26, 28–29, and insufficiently pleaded. Korchak & Loughran Mem. at 19–21; County Mem. at 18–21; BPD Mem. at 28–32; Congdon Mem. at 23–24; Wagner Mem. at 18–21. The City also contends that plaintiff has failed to plead compliance with New York's notice of claim requirements. BPD Mem. at 24–26.

The City argues that plaintiff's state law malicious prosecution claims are time-barred because they accrued when Broome County Court dismissed the criminal charges against him, on May 20, 2023, and he filed this action more than one year and ninety days later. BPD Mem. at 25, 28–29.

Although, under New York law, "causes of action to recover damages for intentional torts ... are generally subject to a one-year period of limitations ... intentional tort causes of action asserted against municipal defendants must be commenced within the one–year–and–90–day statute of limitations contained in General Municipal Law § 50–i." *Williams v. City of N.Y.*, 153 A.D.3d 1301, 1305 (N.Y. App. Div. 2d Dep't 2017).

"Under New York law, the cause of action for malicious prosecution accrues 'when plaintiff first becomes entitled to maintain the action, (namely, when there is a determination favorable to plaintiff).' " *Riverhead Park Corp. v. Cardinale*, 881 F. Supp. 2d 376, 381 (E.D.N.Y. 2012) (quoting *10 Ellicott Square Court Corp. v. Violet Realty, Inc.,* 81 A.D.3d 1366, 1369 (N.Y. App. Div. 4th Dep't 2011)).

For example, a trial court's dismissal of criminal charges against a criminal defendant constitutes a "a determination favorable to plaintiff," notwithstanding the possibility or pendency of an appeal. *Marks v. Townsend*, 97 N.Y. 590, 595 (N.Y. 1885) (holding party may sue for malicious prosecution upon final judgment in trial court); *Ciferri v. State*, 118 A.D.2d 676, 676, 500 N.Y.S.2d

28 (1986) (holding statute of limitations on malicious prosecution action "begins to run upon dismissal of the charges by the trial court"); *Lombardo v. Cnty. of Nassau*, 6 Misc.3d 836, 791 N.Y.S.2d 292, 296 (N.Y. Sup. Ct. 2004) ("New York courts have held that the cause of action accrues when plaintiff first becomes entitled to maintain the action (*i.e.*, when there is a determination favorable to plaintiff), notwithstanding the pendency of an appeal"); *Karen v. State*, 111 Misc.2d 396, 444 N.Y.S.2d 381 (N.Y. Ct. Cl. 1981) ("[W]e believe consonance with the Court of Appeals' *Marks* decision calls for a finding of accrual on trial court dismissal.").

Plaintiff alleges that Broome County Court dismissed all charges against him on May 31, 2023. Compl. ¶¶ 192, 196. Accordingly, the one-year-and-90-day limitations period began to run from that day. Plaintiff filed this action over nearly two years later, on March 18, 2025. Consequently, his state law malicious prosecution claims are time-barred and must be dismissed as to all moving defendants.[15]

[15]    The limitations period set forth in N.Y. Gen. Mun. Law § 50-i also applies to an action against an employee of a municipality where the municipality is deemed "the real party in interest," *i.e.*, where the employee's alleged conduct occurred within the scope of their employment, such that the municipality would be required to indemnify them. *See Ruggiero v. Phillips*, 292 A.D.2d 41, 44, 739 N.Y.S.2d 797, 800 (2002); *Ripka v. Cnty. of Madison*, 162 A.D.3d 1371, 1373 (N.Y. App. Div. 3d Dep't 2018); *Clark v. City of Ithaca*, 235 A.D.2d 746, 746, 652 N.Y.S.2d 819 (N.Y. App. Div. 3d Dep't 1997).

Although plaintiff has alleged that the individual defendants were acting within the scope of their employment, Compl. ¶¶ 18–24, some courts have held that the limitations period set forth in N.Y. Gen. Mun. Law § 50-i does not apply to claims against municipal employees for intentional torts, like malicious prosecution, because municipalities do not have a duty to indemnify employees for their intentional wrongdoing or reckless. *Coker v. City of Schenectady*, 200 A.D.2d 250, 253–54, 613 N.Y.S.2d 746 (N.Y. App. Div. 3d Dep't 1994). Under those circumstances, courts apply the one-year statute of limitations provided by N.Y. C.P.L.R. § 215(3).

Regardless of which limitations period applies to plaintiff's malicious prosecution claims against the individual defendants, they are time-barred.

### 3. Intentional, Reckless, or Negligent Infliction of Emotional Distress

**\*37**  Plaintiff's ninth cause of action, for "Intentional, Reckless, or Negligent Infliction of Emotional Distress," is asserted against "All Defendants." Compl. ¶¶ 317–21. Defendants argue that New York law does not permit this claim under the facts alleged, and regardless, plaintiff has failed to state a plausible claim for relief under this theory. Korchak & Loughran Mem. at 30–31; County Mem. at 21–24; BPD Mem. at 39–40; Congdon Mem. at 28–29; Wagner Mem. at 26–29. In response, plaintiff has voluntarily withdrawn this cause of action. Pl.'s Second Opp. at 80 n.20. Accordingly, plaintiff's intentional, reckless, or negligent infliction of emotional distress claims are dismissed as to all defendants.

### 4. New York Constitutional Violations

Plaintiff's "Tenth Cause of Action," asserted against all defendants, alleges violations of Article I, sections 6 and 12 of the New York State Constitution. Compl. ¶¶ 322–26. Defendants have moved to dismiss this cause of action, because (1) it is precluded by the availability of traditional tort remedies and adequate alternative remedies under federal law; and (2) regardless, it is not plausibly alleged. Korchak & Loughran Mem. at 17–21; County Mem. at 24–25; BPD Mem. at 35–36; Congdon Mem. at 25; Wagner Mem. at 31. Plaintiff argues that the Court should deny defendants' motions as to this claim, because defendants "do not explain how these other remedies could reach them under a theory of [*respondeat superior*]." Pl.'s Second Opp. at 84.

The Court of Appeals has "recognized a private right of action to recover damages against the State for violations of the Equal Protection and Search and Seizure Clauses ... Finding neither injunctive, declaratory, nor exclusionary relief adequate to protect against the invasion of personal liberty interests suffered by the claimants." *Martinez v. City of Schenectady*, 276 A.D.2d 993, 996, 714 N.Y.S.2d 572 (N.Y. App. Div. 3d Dep't 2000) (citing *Brown v. State*, 89 N.Y.2d 172, 652 N.Y.S.2d 223, 674 N.E.2d 1129, 1140–41 (N.Y. 1996)), *aff'd*s 97 N.Y.2d 78, 735 N.Y.S.2d 868, 761 N.E.2d 560 (N.Y. 2001). "[H]owever, the Court of

Appeals made it clear that th[is] 'narrow remedy'... was not 'boundless.' " *Lyles v. State*, 2 A.D.3d 694, 695, 770 N.Y.S.2d 81 (N.Y. App. Div. 2d Dep't 2003) (quoting *Martinez v. City of Schenectady*, 97 N.Y.2d 78, 735 N.Y.S.2d 868, 761 N.E.2d 560, 563 (N.Y. 2001)), *aff'd*, 3 N.Y.3d 396, 787 N.Y.S.2d 216, 820 N.E.2d 860 (N.Y. 2004).

In *Lyles*, the Appellate Division for the Second Department held that:

> recognition of the claimant's State constitutional claims was neither necessary nor appropriate to ensure the full realization of his rights, because the alleged wrongs could have been redressed by an alternative remedy, namely, timely interposed common-law tort claims for assault and battery, false imprisonment, and the intentional and negligent injury to his property.

2 A.D.3d at 695, 770 N.Y.S.2d 81.

Similarly, here, plaintiff alleges that his rights under the New York State Constitution were violated by defendants when he was arrested, charged, and forced to spend "nearly two years fighting patently false allegations and criminal charges." Compl. ¶ 325. This is the same conduct that underlies his state law tort claims. *See id.* ¶ 323 ("The conduct of Defendants, described above, also violated Mr. Kweller's rights under the New York State Constitution, Article I, §§ 6 and 12."). Accordingly, it is not necessary to recognize a state constitutional claim, because plaintiff's alleged wrongs could have been redressed by timely interposed common-law tort claims, which permit a damages remedy. *See id.* ¶¶ 220–27.

### 5. Abuse of Process

Plaintiff's twelfth cause of action, for "abuse of process," is asserted against the City, DA Korchak, and Chief Zikuski. Compl. ¶¶ 332–39. Defendants argue that this claim must be dismissed, because plaintiff has failed to plausibly allege that they distorted regularly issued process to accomplish a collateral objective, or that they had an intent to do harm. Korchak & Loughran Mem. at 31–32; BPD Mem. at 41. In opposition, plaintiff argues that the "extraordinary level of public outcry" alleged in the complaint created a reasonable inference that defendants had an improper motive for continuing the prosecution. Pl.'s Second Opp. at 85.

**\*38** "Abuse of process has three essential elements: (1) regularly issued process, either civil or criminal, (2) an intent to do harm without excuse or justification, and (3) use of the process in a perverted manner to obtain a collateral objective." *Curiano v. Suozzi*, 63 N.Y.2d 113, 480 N.Y.S.2d 466, 469 N.E.2d 1324, 1326 (N.Y. 1984). "The mere commencement of an action, even with malicious intent, does not give rise to a cause of action for abuse of process." *Dixon v. City of Rochester*, 234 A.D.3d 1301, 1302 (N.Y. App. Div. 4th Dept. 2025).

Plaintiff alleges no facts that could support an inference that either DA Korchak or Chief Zikuski perverted the process brought against him. *See supra* Point IV.B.1. Instead, he alleges only that DA Korchak "was facing a re-election in the upcoming year," and there was "public outcry for the arrest and prosecution of [p]laintiff." Compl. ¶¶ 338–39.

However, "[i]t is not enough that the actor ha[s] an ulterior motive in using the process of the court. It must further appear that he did something in the use of the process outside of the purpose for which it was intended ... [t]here must be a further act done outside the use of the process—a perversion of the process." *Hauser v. Bartow*, 273 N.Y. 370, 7 N.E.2d 268, 269 (N.Y. 1937).

As discussed above, plaintiff has not plausibly alleged that either DA Korchak or Chief Zikuski were personally involved in any of the challenged conduct. *See supra* Point IV.B.1. The fact that DA Korchak or Chief Zikuski had reason to benefit from the perversion of the process against plaintiff cannot permit the inference, absent any other allegations, that they committed any acts to distort the process.

2025 WL 3280821

Accordingly, plaintiff's abuse of process claims against DA Korchak and Chief Zikuski must be dismissed. Plaintiff's abuse of process claim against the City must also be dismissed, because it is necessarily premised on *respondeat superior* liability, and plaintiff has failed to state a claim against Chief Zikuski.

### 6. Qualified Immunity

Because all of plaintiff's state law claims have been dismissed, the court need not reach the issue of qualified immunity under state law.

## D. Loss of Consortium

Plaintiff's wife, Ms. Liberman, does not assert any substantive causes of action against defendants. *See generally* Compl. Instead, she seeks damages for injuries she allegedly suffered as a result of defendants' arrest and prosecution of plaintiff. *Id.* ¶¶ 213–19. Defendants argue that this claim must be dismissed. BPD Mem. at 43–44; Congdon Mem. at 30–31; Wagner Mem. at 31–32. The Court agrees.

All of plaintiff's state law claims have been dismissed, *see supra* Point IV.C, and district courts have routinely held that § 1983 does not support derivative claims for damages, because a party seeking only derivative damages has not alleged a deprivation of their constitutional rights. *See Harrison v. Harlem Hosp.*, 2007 WL 2822231 (S.D.N.Y. Sept. 28, 2007) ("While the Second Circuit has not addressed whether a plaintiff may bring a loss of consortium claim pursuant to federal civil rights statutes, the weight of authority holds they may not."), *aff'd,* 364 Fed. Appx. 686 (2d Cir. 2010) (summary order); *Rakchi v. City of New York*, 800 F.Supp.3d 494, 502 (E.D.N.Y. 2025) (dismissing loss of services claim brought pursuant to § 1983); *Fleming v. Sharma*, 605 F. Supp. 2d 399, 409 (N.D.N.Y. 2009); *Chambers v. N. Rockland C. Sch. Dist.*, 815 F. Supp. 2d 753, 772 n.16 (S.D.N.Y. 2011) (collecting cases); *Dilworth v. Goldberg*, 914 F. Supp. 2d 433 (S.D.N.Y. 2012); *Reed v. Medford Fire Dept., Inc.*, 806 F. Supp. 2d 594, 606 (E.D.N.Y. 2011).

**\*39** Accordingly, Ms. Liberman's sole claim for loss of consortium claim must be dismissed.

## E. Leave to Amend

Finally, the Court must address plaintiff's request for leave to amend his complaint. Plaintiff argues that he should be granted leave to amend his complaint (1) to remedy his failure to plead compliance with New York notice of claim requirements, Dkt. Nos. 43, 46; and (2) "to address any [other] deficiency the Court identifies," Pl.'s Second Opp. at 12. Defendants oppose plaintiff's request because he has not complied with this District's Local Rules, and, regardless, any proposed amendment would be futile. Dkt. No. 53 at 25; Dkt. No. 56 at 5–6; Dkt. No. 61 at 11.

Under this District's Local Rules of Practice, "[a] party moving to amend a pleading ... must attach an unsigned copy of the proposed amended pleading to its motion papers." L.R. 15.1(a). "[T]he proposed amended pleading must be a complete pleading, which will supersede the pleading sought to be amended in all respects." *Id.* A motion to amend "must set forth specifically the proposed insertions and deletions of language and identify the amendments in the proposed pleading." *Id.*

Plaintiff has not complied with this Local Rule. His failure to attach a proposed amended pleading "precludes the Court from 'examin[ing] the exact amendment that it is being asked to permit[;] ... ensur[ing] that all of the allegations asserted ... are contained in a single document[;] ... [and] eliminat[ing] the confusing nature of piecemeal amended pleadings.' " *Wynn v. Lee*, 2019 WL 13546213, at *1 (N.D.N.Y. May 1, 2019) (quoting *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 508 (N.D.N.Y. 2009)).

Plaintiff's non-compliance with the Local Rules is a sufficient basis on which to deny his motion to amend. *Reynolds-Sitzer v. EISAI, Inc.*, 586 F. Supp. 3d 123 (N.D.N.Y. 2022) (denying motion for leave to amend where plaintiffs requested leave in a brief paragraph of their opposition papers and failed to comply with the Local Rules); *Webb v. Mentor Worldwide LLC*, 453 F. Supp. 3d 550 (N.D.N.Y. 2020) (denying plaintiff's motion for leave to amend, in part, for noncompliance with the Local Rules);

2025 WL 3280821

*Braxton v. Bell*, 2020 WL 13908846, at *1 (N.D.N.Y. July 7, 2020) (denying "motion to amend for failure to comply with the Local Rules for the Northern District of New York and Federal Rules of Civil Procedure.").

While plaintiff is correct that leave to amend should be freely given when justice so requires, Pl.'s Second Opp. at 87 (citing Fed. R. Civ. P. 15(a)(2)), "a court need not always allow a party to replead simply because it asked. In particular, denial of leave to amend is proper where the request gives no clue as to how the complaint's defects would be cured." *Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95, 107 (2d Cir. 2022) (internal quotation omitted); *Murphy Med. Assocs., LLC v. Yale Univ.*, 120 F.4th 1107, 1114 (2d Cir. 2024) (affirming denial of leave to amend where plaintiff failed to make formal motion to amend or offer proposed amended complaint).

The only discernable amendment plaintiff has proposed is an amendment to plead compliance with New York's notice of claim requirements. *See* Dkt. Nos. 43, 46. Defendants maintain that this amendment would be futile. Dkt. No. 61 at 11. The Court agrees.

**\*40** "Leave to amend may be denied on grounds of futility if the proposed amendment fails to state a legally cognizable claim." *AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 726 (2d Cir. 2010). For instance, "[c]laims barred by an applicable statute of limitations are futile." *Jones v. City of N.Y.*, 571 F. Supp. 3d 118, 126 (S.D.N.Y. 2021) (citing *Grace v. Rosenstock*, 228 F.3d 40, 53 (2d Cir. 2000)).

Plaintiff's proposed amendment would not save any of his state law claims. His state law malicious prosecution claims were filed after the statute of limitations had run, *see supra* Point IV.C.2, and he has not plausibly alleged any of his other state law claims, *see supra* Point IV.C.4–5. Accordingly, plaintiff's request for leave to amend must be denied.

## V. CONCLUSION
Therefore, it is

ORDERED that

1. Chief Zikuski, Captain Minor, Investigator Miller, DA Korchak, BCDA Investigator Wagner, Chief ADA Loughran, and ADA Cronin, are dismissed;

2. Does 1–10 are dismissed;

3. The City and the County are dismissed; and

4. Plaintiff's Third, Eighth, Ninth, Tenth, and Twelfth Causes of Action are dismissed against ADA Congdon.

5. Plaintiff's surviving claims against ADA Congdon are:

   -Section 1983 Malicious Prosecution;

   -Section 1983 Denial of the Right to a Fair Trial based on Fabrication of Evidence; and

   -Section 1983 Civil Rights Conspiracy.

The Clerk of the Court is directed to:

   a. Terminate the dismissed defendants from the docket report; and

   b. Terminate the moving defendants' pending motions (Dkt. Nos.19, 27, 29, 30, 31, 37).

2025 WL 3280821

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2025 WL 3280821

---

**End of Document**
© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2025 WL 3280821

Wilson v. County of Ulster, Not Reported in Fed. Supp. (2022)

2022 WL 813958

2022 WL 813958
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Spencer WILSON, Plaintiff,

v.

COUNTY OF ULSTER, Town of Ulster, Kyle Faulkner, William Moylan, Steven Fellows,
P.O. Sickler, P.O. Gramoglia, P.O. Reavy, and John or Jane Doe 1-10, Defendants.

1:20-cv-00104
|
Signed 03/17/2022

**Attorneys and Law Firms**

Samuel Christopher DePaola, Sang J. Sim, Sim & DePaola, LLP, Bayside, NY, for Plaintiff.

Michael T. Cook, Cook, Tucker Law Firm, Kingston, NY, for Defendants Town of Ulster, Kyle Faulkner, William Moylan, P.O. Sickler, P.O. Gramoglia, P.O. Reavy.

Adam T. Mandell, Maynard, O'Connor Law Firm, Saugerties, NY, for Defendant County of Ulster.

Adam T. Mandell, Maynard, O'Connor Law Firm, Saugerties, NY, Michael T. Cook, Cook, Tucker Law Firm, Kingston, NY, for Defendant John or Jane Doe 1-10.

**DECISION and ORDER**

THOMAS J. MCAVOY, Senior United States District Judge

**I. INTRODUCTION**

 **\*1**  This action was originally filed in New York State Court and removed to this Court by Defendants. Dkt. Nos. 1 & 2. The Complaint has been amended several times, with the operative pleading being the Second Amended Complaint, Dkt. No. 42 ("SAC"). This case concerns a confrontation between Plaintiff and an individual named Brandon Fellows and Plaintiff's subsequent interaction with law enforcement in Ulster County, New York in January 2019. *See generally* SAC. Plaintiff asserts various claims pursuant to 42 U.S.C. § 1983 and New York State law. *See id.*

Now before the Court are motions brought pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss this action by (1) Defendants Town of Ulster, Kyle Faulkner, William Moylan, P.O. Sickler, P.O. Gramoglia, P.O. Reavy, and John or Jane Doe 1-10 to the extent they are affiliated with the Town of Ulster (collectively, "Town Defendants"), Dkt. Nos. 43, 45; and, (2) County of Ulster and John or Jane Doe 1-10 to the extent they are alleged to be employees or acting on the behalf of the County of Ulster (collectively, "County Defendants"), Dkt. No. 44. Although Plaintiff's counsel requested a number of adjournments to the return date of the motions, and the Court set a new return date for August 9, 2021, Plaintiff has filed no opposition papers in response to these motions. For the reasons that follow, the Town Defendants' motion is granted in part and denied in part, and the County Defendants' motion is granted.

**II. STANDARD OF REVIEW**

On a Rule 12(b)(6) motion, the Court must accept "all factual allegations in the complaint as true, and draw[ ] all reasonable inferences in the plaintiff's favor." *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009) (internal quotation marks omitted).

Wilson v. County of Ulster, Not Reported in Fed. Supp. (2022)

2022 WL 813958

This tenet does not apply to legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Similarly, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements ... are not entitled to the assumption of truth." *Id.; see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)(stating that a court is "not bound to accept as true a legal conclusion couched as a factual allegation"). " '[I]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken.' " *Ayala-Rosario v. Westchester Cty.*, No. 19-CV-3052 (KMK), 2020 WL 3618190, at *3 (S.D.N.Y. July 2, 2020)(quoting *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks omitted)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.' " *Id.* (quoting *Twombly*, 550 U.S. at 557). The complaint must contain "more than labels and conclusions, and a formulaic recitation of a cause of action will not do." *Twombly,* 550 U.S. at 555. "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not shown–that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (internal citation and punctuation omitted). Unless a plaintiff's well-pleaded allegations have "nudged [his] claims across the line from conceivable to plausible," the complaint should be dismissed. *Twombly*, 550 U.S. at 570.

**\*2** The Local Rules provide that "[w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting ... of the motion." N.D.N.Y. L.R. 7.1(a)(3). "In the Northern District, where a plaintiff ... fails to oppose ... arguments by a defendant in its motion to dismiss, 'the movant's burden is lightened such that, in order to succeed, the movant need only show facial merit in support of its motion, which has appropriately been characterized as a lightened burden.' " *Baldwin v. United States*, No. 1:20-CV-214 (GLS/CFH), 2021 WL 431145, at *2 (N.D.N.Y. Feb. 8, 2021)(quoting *Breezee v. Colvin*, No. 5:14-CV-1114 GTS, 2015 WL 5725083, at *2 (N.D.N.Y. Sept. 28, 2015) (citations omitted), and citing *Lefevre v. Cty. of Albany*, No. 1:14-CV-155, 2015 WL 1626005, at *3 (N.D.N.Y. Apr. 13, 2015) (citations omitted) ("The failure to oppose a motion to dismiss a claim is deemed abandonment of the claim, and, in the Northern District of New York, is deemed consent to granting that portion of the motion."))(ellipses added).

**III. ALLEGATIONS IN THE SECOND AMENDED COMPLAINT**

On January 24, 2019, Plaintiff was involved in a violent physical altercation with his daughter's boyfriend, Brandon Fellows, during which a rifle was discharged. *See* Compl. Dkt. No. 2, ¶¶ 14-20. [1] Plaintiff alleges that "sometime after [he] became aware of Brandon Fellows' entry into the home, he called for emergency assistance." SAC ¶ 26. He does not state in the SAC who he called, but he asserts in the Complaint that he "called the town of Ulster Police and requested they come to the home. Plaintiff also texted his sister and asked her to come to the home." Compl., ¶ 25.

[1]     Plaintiff asserts in the Complaint:

14. On January 23, 2019 at about 2: 00 P.M., Plaintiff got into an argument with his daughter's boyfriend Brandon Fellows (Mr. Fellows) over unfinished home renovation that Mr. Fellows' father was supposed to have completed for Plaintiff. At all relevant times, Plaintiff, Plaintiffs daughter Alyssa and Mr. Fellows lived together at a home Plaintiff owns at 188 Wrentham Street, Town of Ulster, New York.

Case 9:22-cv-00638-DNH-CBF    Document 80    Filed 03/20/26    Page 105 of 146
Wilson v. County of Ulster, Not Reported in Fed. Supp. (2022)
2022 WL 813958

15. Plaintiff was carrying some tools, that belonged to Mr. Fellows' father, up the stairs when Mr. Fellows attacked Plaintiff causing Plaintiff to fall face down onto the stairs. Plaintiff's Daughter was present at the time and implored Mr. Fellows to stop his attack.

16. At the end of the altercation Plaintiff told Mr. Fellows that if he wanted to return to the house he would need to have police present.

17. After the altercation Plaintiff went to his room on the second floor of his home and fearing that Mr. Fellows would return used a nightstand to barricade his door. Plaintiff only left his room to walk his dogs and use the lavatory.

18. Plaintiff took out a rifle from the closet in his bedroom where said rifle was usually stored. The rifle was owned by and registered to Plaintiff. The plaintiff had not loaded the rifle, however, a magazine was attached but not locked.

19. On January 24, 2019 at approximately 11: 30 A.M., Mr. Fellows returned to the Plaintiffs home, entered the premises, and began pounding on Plaintiff's bedroom door. Mr. Fellows demanded to be let in but Plaintiff refused in fear for his safety.

20. Mr. Fellows eventually forced the door open and knocked over the nightstand that was barricading the door. Mr. Fellows saw the rifle leaning against the wall near the closet and went to grab it. Plaintiff also ran toward the rifle not wanting Mr. Fellows to gain possession of it.

21. Plaintiff got to the rifle first and put his arms around it but was forced to the ground by Mr. Fellows. During this struggle the rifle's magazine was locked into place and a bullet was chambered.

22. While Plaintiff was face down on top of the rifle Mr. Fellows began repeatedly punching Plaintiff in the head and upper body. Mr. Fellows gained control of the rifle and began to drag Plaintiff toward the bedroom door.

23. Plaintiff grabbed the barrel of the rifle which discharged with Mr. Fellows' finger on the trigger. Neither Plaintiff nor Mr. Fellows were hit with the bullet.

24. Mr. Fellows then left the room with the rifle and handed it to his friend Leo who had driven Mr. Fellows to the home that morning.

**\*3** When the police, including Defendants Faulkner, Moylan, Sickler, Gramoglia, Reavy and John or Jane Doe 1-10, arrived at Plaintiff's residence, he informed them that Brandon Fellows had just broken into his home, broke down the door to his bedroom, and then violently beat him. SAC ¶ 27. Nevertheless, "defendants, including Faulkner, Moylan, Sickler, Gramoglia, Reavy and John or Jane Doe 1-10, completely disregarded Mr. Wilson's allegations, directed him to lay face-down on the ground, placed him in handcuffs and informed plaintiff that he was being placed under arrest for the attempted felony assault of B. Fellows." *Id.* ¶ 28. The SAC asserts that "Defendants, including Faulkner, Moylan, Sickler, Gramoglia, Reavy and John or Jane Doe 1-10, violently impressed their knees and elbows into plaintiff's back, while he was compliantly lying face-down on the ground, as directed," *id.* ¶ 29, and that "Defendants, including Faulkner, Moylan, Sickler, Gramoglia, Reavy and John or Jane Doe 1-10, dragged Mr. Wilson along the ground by his handcuffs to a police vehicle, which he was violently thrown into by defendants." *Id.* ¶ 30. The SAC alleges that "defendants, including Faulkner, Moylan, Sickler, Gramoglia, Reavy, and John or Jane or Doe 1-10, were involved with the decision to arrest and incarcerate plaintiff without probable cause or failed to intervene when they observed plaintiff being arrested and prosecuted without probable cause and based upon fabricated evidence." *Id.* ¶ 70. Plaintiff further asserts that "defendants, including Faulkner, Moylan, Sickler, Gramoglia, Reavy and John or Jane Doe 1-10, arrested and criminally charged Mr. Wilson with Attempted First-Degree Assault, for allegedly attempting to shoot B. Fellows with his rifle." *Id.* ¶ 32. Plaintiff also asserts that "Defendants, including Faulkner, Moylan, Sickler, Gramoglia, Reavy and John or Jane Doe 1-10, arrested and prosecuted Mr. Wilson for Felonious Attempted First Degree Assault, despite the dearth of evidence to support such a charge, including the lack of any injury to B. Fellows, the absence of any corroborative witnesses or evidence, and the fact that B. Fellows was holding the rifle, the purported instrumentality of the alleged crime, when the police arrived." *Id.* ¶ 33. The SAC asserts that "Defendant Faulkner was plaintiff's arresting officer, who signed the felony complaint against plaintiff, falsely affirming, under the penalty of perjury that plaintiff committed the felony of Attempted Assault in the First Degree, against B. Fellows, by attempting to shoot defendant with a rifle, when he knew such claims to be untrue." *Id.* ¶ 35. Plaintiff contends that the allegations in the felony complaint "were based upon an investigation by defendant Faulkner and other law enforcement personnel from the Ulster Police Department, the Ulster County Sheriff's Office, Kingston Police Department and the New York State Police, named herein as defendants, John or Jane Doe 1-10, whose identities are not presently known to plaintiff." *Id.* ¶ 36.

2022 WL 813958

The SAC alleges that sometime after Plaintiff's arrest, "defendants, including Faulkner, Moylan, Sickler, Gramoglia, Reavy and John or Jane Doe 1-10, unlawfully entered and searched Mr. Wilson's residential home and property without his consent, a judicially authorized search warrant or any other legal justification to do so." *Id.* ¶ 31. The SAC also asserts that after his arrest, Plaintiff "was removed to Kingston Hospital for emergency medical treatment for his myriad serious injuries, including five (5) broken ribs, a fractured shoulder blade, a concussion, bleeding on the brain and a laceration on his head that required fifteen (15) staples to treat." *Id.* ¶ 40. Shortly after arriving at Kingston Hospital, Plaintiff was advised that he would need to be transferred "to another medical facility for proper treatment and care." *Id.* ¶ 41. "Defendants, including Faulkner, Moylan, Sickler, Gramoglia, Reavy and John or Jane Doe 1-10, then transported Mr. Wilson to the Intensive Care Unit of a different hospital." *Id.* ¶ 42. "For the full duration of Mr. Wilson's stays at both medical facilities, he was handcuffed to a bed or gurney by defendants, including Faulkner, Moylan, Sickler, Gramoglia, Reavy and John or Jane Doe 1-10." *Id.* ¶ 44 "Less than twenty-four (24) hours after his arrival at the other hospital, defendants, including Faulkner, Moylan, Sickler, Gramoglia, Reavy and John or Jane Doe 1-10, removed Mr. Wilson from the hospital's custody, despite his unstable condition and remaining need for emergency medical attention and treatment." *Id.* ¶ 43. Plaintiff contends that "Defendants, including Faulkner, Moylan, Sickler, Gramoglia, Reavy and John or Jane Doe 1-10, prevented or caused Mr. Wilson to be denied access to proper medical attention or treatment." *Id.* ¶ 45.

Plaintiff also contends that after being removed from the second medical facility, he was "taken to the Town of Ulster Police station, where he was illegally detained and interrogated without counsel by defendant Moylan and defendant Faulkner." *Id.* ¶ 46. Plaintiff "was eventually arraigned without legal counsel before a judge of the City of Kingston, who set bail at Two-Hundred-Thousand USD ($200,000.00), because of the recommendation by defendant Faulkner, plaintiff's arresting officer, and the fact that plaintiff's version of events, as well as the nature and extent of his present injuries and need for emergency medical attention, were not communicated to the arraigning judge." *Id.* ¶ 47. Plaintiff was "eventually granted an opportunity to contest his bail conditions with the assistance of counsel, at which time B. Fellows offered testimony that was largely inconsistent with his initial statement to the police." *Id.* ¶ 64. Plaintiff's bail was reduced and he was released from custody on February 1, 2019. *Id.* ¶ 65.

Plaintiff contends that after his release, "B. Fellows and Defendants, including S. Fellows, Faulkner, Moylan, Sickler, Gramoglia, Reavy, and John or Jane or Doe 1-10, knowingly offered false and perjurious testimony to the grand jury that was convened to determine whether there was reasonable cause to believe plaintiff had committed the crimes he stood accused of." *Id.* ¶ 66. Plaintiff also testified before the grand jury. *Id.* ¶ 67. The grand jury "voted to dismiss the charges against plaintiff." *Id.* ¶ 68. Plaintiff contends that this "is a clear indication of plaintiff's innocence and the obvious lack of probable cause to believe plaintiff committed any crime or arrestable offense, as such is the burden of proof required for a grand jury to return an indictment in the State of New York." *Id.* ¶ 68.

 **\*4** Plaintiff contends that prior to his arrest "but subsequent to the violent and brutal attack, B. Fellows contacted his uncle, defendant S. Fellows, who was either still actively employed or was recently retired from his over twenty-year career as a police officer and field training instructor with the Kingston Police Department." *Id.* ¶ 48. Plaintiff alleges that "B. Fellows informed defendant S. Fellows that he had committed a series of heinous crimes against Mr. Wilson, including his illegal entry into Mr. Wilson's home and beating Mr. Wilson until he was rendered unconscious and near death, and that plaintiff had previously called the police, who were likely to arrive shortly." *Id.* ¶ 49. Plaintiff further alleges:

51. Upon being informed of B. Fellows reprehensible conduct, defendant S. Fellows immediately reached out to his numerous close friends and contacts at the Kingston Police Department, Ulster County Sheriff's Office and Ulster Police Department, including Faulkner, Moylan, Sickler, Gramoglia and Reavy.

52. Defendant S. Fellows then informed defendants, including Faulkner, Moylan, Sickler, Gramoglia and Reavy, that B. Fellows had committed various serious felonies by severely beating plaintiff in plaintiff's own home.

53. Defendant S. Fellows then directed or importuned defendants, including Faulkner, Moylan, Sickler, Gramoglia and Reavy, to ensure that B. Fellows avoided arrest and subsequent criminal prosecution by any means necessary.

Case 9:22-cv-00638-DNH-CBF   Document 80   Filed 03/20/26   Page 107 of 146

Wilson v. County of Ulster, Not Reported in Fed. Supp. (2022)

2022 WL 813958

54. Defendants, including S. Fellows, Faulkner, Moylan, Sickler, Gramoglia and Reavy, then conspired with each other and B. Fellows, and various other law enforcement officers, including defendants John or Jane Doe 1-10, to conceal and suppress any evidence of B. Fellows' criminal activity, including plaintiff's allegation that B. Fellows violently attacked him in his own bedroom after breaking down the bedroom door, the physical evidence that corroborated plaintiff's allegations, namely plaintiff's broken bedroom door, plaintiff's blood spatter in the bedroom, the substantial injuries to plaintiff, the glaring absence of any injury to B. Fellows, and the fact that plaintiff called for emergency assistance prior to B. Fellows.

55. Defendants, including Faulkner, Moylan, Sickler, Gramoglia, Reavy, and John or Jane or Doe 1-10, also withheld materially relevant information from the prosecuting attorneys, including B. Fellows' numerous recent prior arrests or convictions for drugs and assault, the fact that B. Fellows had previously attacked plaintiff the day prior to the subject incident, that they were being unduly influenced because of their relationship with defendant S. Fellows, that the alleged instrumentality of the assault charge against plaintiff, the firearm, was recovered from B. Fellows, that Mr. Wilson made credible allegations against B. Fellows for illegally entering his home and physically assaulting him, that Mr. Wilson sustained serious physical injuries, that B. Fellows did not sustain any physical injury, and that all of the evidence gathered was unambiguously indicative of plaintiff's innocence and B. Fellows' guilt.

56. Defendants, including S. Fellows, Faulkner, Moylan, Sickler, Gramoglia, Reavy, and John or Jane or Doe 1-10, also conspired with each other and B. Fellows to fabricate evidence against plaintiff, namely with respect to the false account that depicted plaintiff as the aggressor and criminal suspect, who attempted to shoot B. Fellows with a rifle, as well as additional false evidence tending to support said fabricated account, despite defendants' full awareness that such an event never transpired and that there existed no reasonable cause to believe plaintiff committed any crime or violation of the law.

*5 57. B. Fellows and Defendants, including, S. Fellows, Faulkner, Moylan, Sickler, Gramoglia, Reavy, and John or Jane or Doe 1-10, therefore, caused false, fabricated, incomplete and misleading information to be forwarded to the Ulster County District Attorney's Office, so that plaintiff would be criminally prosecuted in the absence of probable cause.

58. B. Fellows and Defendants, including S. Fellows, Faulkner, Moylan, Sickler, Gramoglia, Reavy, and John or Jane or Doe 1-10, committed many acts in furtherance of said conspiracy, included instructing and directing B. Fellows regarding his interaction and statements to law enforcement, the immediate handcuffing and removal of plaintiff from the scene, the conveyance of fabricated evidence against plaintiff to the Ulster County District Attorney's Office, the suppression of any evidence that would either exculpate plaintiff or inculpate B. Fellows, as well as numerous other gross deviations from proper police procedure.

59. Defendants, including S. Fellows, Faulkner, Moylan, Sickler, Gramoglia, Reavy, and John or Jane or Doe 1-10, instructed B. Fellows how to avoid making any inculpatory statements, while also providing law enforcement with sufficient information, albeit patently false, to justify the arrest and criminal prosecution of plaintiff.

60. Defendants, including S. Fellows, Faulkner, Moylan, Sickler, Gramoglia, Reavy, and John or Jane or Doe 1-10, conspired with each other with B. Fellows, via the use of telephonic electronic or in-person communication, including verbal and written communication methods, via the use of their personal or official police issued cellular phones or radios.

61. Defendants, including S. Fellows, Faulkner, Moylan, Sickler, Gramoglia, Reavy, and John or Jane or Doe 1-10, along with B. Fellows, caused the arrest and criminal prosecution of plaintiff, not because they believed him to be guilty of any crime, but because of their desires to shield B. Fellows from any criminal liability and prevent any criminal charges from being levied against him.

*Id.* ¶¶ 51-61.

Plaintiff alleges that "[t]he Ulster Police Department, the Town and County of Ulster, and their respective policy and decision makers and supervisors have imposed or acquiesced to policies or customs with the Ulster Police Department and Ulster County Sheriff's Office that resulted in plaintiff's arrest and criminal prosecution without probable cause or reasonable suspicion." *Id.*

Case 9:22-cv-00638-DNH-CBF   Document 80   Filed 03/20/26   Page 108 of 146
Wilson v. County of Ulster, Not Reported in Fed. Supp. (2022)
2022 WL 813958

¶ 69. He also alleges that "[t]he County and Town of Ulster, and their respective policymakers, officials or supervisors have imposed, tacitly approved or acquiesced to policies, customs, or patterns and practices within the Ulster Police Department and Ulster County Sheriff's Office that resulted in Plaintiff's arrest and criminal prosecution without probable cause or reasonable suspicion." *Id.* ¶ 71. In addition, Plaintiff alleges that "[t]he The Town and County of Ulster, and their respective policymakers or supervisors have failed to provide adequate training regarding the identification of probable cause, reasonable suspicion or the appropriate amount of force to be used." *Id.* ¶ 72. The SAC alleges that "Defendants' actions, pursuant to plaintiff's underlying arrest, which occurred without even the semblance of probable cause, were so blatantly violative of plaintiff's civil rights that the tacit approval of identical or similar acts by the policymakers or supervisors of the Town and County of Ulster, as well as their deliberate indifference towards the rights of any individuals, who may come into contact with defendants, should be inferred, because such flagrant deprivations of constitutionally protected rights could not and would not occur without the tacit approval or deliberate indifference regarding the commission of such violations by the policymakers or supervisors of the Town and County of Ulster." *Id.* ¶ 73.

**\*6** The SAC asserts the following nineteen causes of action:

1) unlawful search & seizure under New York law;

2) unlawful search & seizure claims under 42 U.S.C. § 1983;

3) false arrest and false imprisonment under New York State law;

4) false arrest and false imprisonment claims under 42 U.S.C. § 1983;

5) state law assault and battery;

6) excessive force under section 1983;

7) malicious prosecution under state law;

8) malicious prosecution under section 1983;

9) abuse of process under state law;

10) abuse of process under section 1983;

11) denial of due process under state law;

12) denial of due process & a fair trial under section 1983;

13) unconstitutional conditions of confinement under section 1983;

14) deliberate indifference to serious medical needs under section 1983;

15) state law negligence or gross negligence in providing access to medical care;

16) state law failure to intervene;

17) failure to intervene under section 1983;

18) New York state law negligent hiring, training, retention & supervision; and

19) *Monell* municipal liability claim under section 1983.

*Id.* ¶¶ 80-204. Most of Plaintiff's state law claims are asserted against "all defendants" with the exception of the negligent hiring, training, retention & supervision claim that is asserted against "Defendants Town & County," his section 1983 claims

2022 WL 813958

are asserted against the "individual defendants," and his *Monell* municipal liability claims are asserted against "Defendants Town & County."

## IV. DISCUSSION

### a. Town Defendants' Motion, Dkt. Nos. 43, 45

#### 1. Unlawful Search and Seizure Claims

Plaintiff asserts in his First and Second Causes of Action that the "Defendants subjected Plaintiff and his property to unreasonable searches and seizures without a valid warrant and without reasonable suspicion or probable cause do so." SAC ¶¶ 81, 89. T hat much of these claims asserting that Defendants seized Plaintiff without a warrant, reasonable suspension, or probable cause are redundant of Plaintiff's false arrest claims, and will be analyzed as such.

#### A. False Arrest

In support of their motion to dismiss the false arrest claims, the Town Defendants point to the Town of Ulster Police Department's Incident Report from the date in question, Dkt. 5-2. Defendants contend that the Incident Report is incorporated by reference into the SAC because Plaintiff alleges in the SAC that he called "for emergency assistance" sometime after Brandon fellows entered into his home, and he asserted in the Complaint that he called the Town of Ulster Police Department after Fellow purportedly broke into his house. Defendants argue that the Incident Report establishes probable cause for Plaintiff's arrest. [2]

[2]   This Incident Report indicates that the police were summoned to Plaintiff's residence by a 911 call from Brandon Fellows in which he reported a domestic dispute during which he got into a fight with a male individual and the male individual fired a weapon at him. *Id.* The Incident Report further indicates that Fellows was able to grab the weapon and leave the residence with the weapon, but it was unknown whether other weapons were in the residence. *Id.* The Incident Report also indicates that Fellows was standing at the end of the driveway. *Id.* This last allegation appears to be consistent with Plaintiff's allegation that "B. Fellows was holding the rifle, the purported instrumentality of the alleged crime, when the police arrived." SAC ¶ 33.

**\*7**  If the arresting officers' knowledge as to what is alleged to have occurred at the time they arrested Plaintiff is what is stated in the Incident Report, then there would seemingly be a sufficient reason to dismiss the false arrest claims. *See Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)("The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest [.]")(internal citation and quotation omitted); *Wright v. Musanti*, 887 F.3d 577, 587 (2d Cir. 2018)("[P]robable cause [is] an absolute defense to the action."); *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997)(In evaluating the probable cause determination, the Court "consider[s] the facts available to the officer at the time of the arrest.")(citing *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 569 (2d Cir. 1996)); *Miloslavsky v. AES Eng'g Soc'y*, 808 F.Supp. 351, 355 (S.D.N.Y. 1992), *aff'd*, 993 F.2d 1534 (2d Cir. 1993)("[I]t is well-established that a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness."); *Acquah v. City of Syracuse*, No. 5:18-CV-1378 (LEK/DEP), 2019 WL 3975463, at *3 (N.D.N.Y. Aug. 22, 2019)("Probable cause is established when the arresting officer has knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested. The officer may have probable cause even if he relies on information that turns out to be mistaken, so long as it was reasonable to rely on that information at the time.")(internal quotation marks and citations omitted); *Curley v. Vill. of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001)("[O]nce a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest."); *Ryburn v. Huff*, 565 U.S. 469, 477 (2012)(The fact that a plaintiff may ultimately be proven innocent is irrelevant to the question whether probable cause existed

Case 9:22-cv-00638-DNH-CBF    Document 80    Filed 03/20/26    Page 110 of 146
Wilson v. County of Ulster, Not Reported in Fed. Supp. (2022)
2022 WL 813958

at the time of arrest.). However, and although it appears that Plaintiff amended his pleading to insulate himself from the use of the Incident Report (which was raised as a defense to these claims on a pre-amendment motion to dismiss), the Incident Report is not incorporated by reference in the SAC because it is based on Brandon Fellows' call to 911 – not on Plaintiff's call for "emergency assistance" or to the police.

At this stage of the proceedings, and without the Incident Report, the only relevant allegation to the arrest is that Plaintiff told the police that Brandon Fellows broke into his house and violently beat him yet the police arrested Plaintiff for assault.[3] Under these facts, assumed to be true for purposes of this motion, there did not appear to be probable cause to arrest Plaintiff, nor are there sufficient undisputed facts upon which to grant the individual defendants qualified immunity for Plaintiff's arrest at this time. Further, although Defendants argue that "facts demonstrate that [Plaintiff's] seizure was objectively reasonable for the purpose of transporting Plaintiff to the hospital," a reasonable inference could drawn from the facts that the Defendants kneed and elbowed Plaintiff while he was on the ground, dragged him by his handcuffs to a police car, and violently threw him in the police car that the police seized Plaintiff not because of concern for his physical health but to arrest him for a crime.

3      The Court notes that Judge Stewart determined that Plaintiff could not amend his pleading to bring a civil conspiracy claim because it would be futile.

That being the case, however, Defendants also argue that the false arrest claims must be dismissed because Plaintiff has not specified as to which individual defendant arrested Plaintiff. The Defendants have satisfied their light burden of establishing their entitlement to partial relief on this argument.

"An individually named defendant cannot be held liable for a plaintiff's alleged Section 1983 claim absent personal involvement in the alleged constitutional deprivation." *Johnson v. City of New York*, No. 1:15-CV-8195-GHW, 2017 WL 2312924, at *10 (S.D.N.Y. May 26, 2017)(citing *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013)). "In the context of a claim for false arrest, each individual must have been personally involved in the arrest in order to be held liable." *Id.* (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)). "The Second Circuit has defined 'personal involvement' to mean direct participation, such as 'personal participation by one who has knowledge of the facts that rendered the conduct illegal,' or indirect participation, such as 'ordering or helping others to do the unlawful acts.' " *Id.* (quoting *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001)(citation omitted)).

As a corollary to the personal-involvement rule, complaints that rely on "group pleading" and "fail to differentiate as to which defendant was involved in the alleged unlawful conduct are insufficient to state a claim." *Adamou v. Cty. of Spotsylvania, Va.*, No. 12-cv-7789 (ALC), 2016 WL 1064608, at *11 (S.D.N.Y. Mar. 14, 2016)(citing *Atuahene v. City of Hartford*, 10 Fed.Appx. 33, 34 (2d Cir. 2001))(observing that Federal Rule of Civil Procedure 8 "requires, at a minimum, that a complaint give each defendant fair notice of what the plaintiff's claim is and the ground upon which it rests," and that a complaint fails to meet that minimum where it "lump[s] all the defendants together in each claim and provide[s] no factual basis to distinguish their conduct"); *see also Spring v. Allegany-Limestone Cent. Sch. Dist.*, 138 F. Supp. 3d 282, 293 (W.D.N.Y. 2015) ("Because the personal involvement of a defendant is a prerequisite to an award of damages under § 1983, a plaintiff cannot rely on a group pleading against all defendants without making specific individual factual allegations."), *vacated in part on other grounds*, 655 Fed. Appx. 25 (2d Cir. 2016); *Thomas v. Venditto*, 925 F. Supp. 2d 352, 363 (E.D.N.Y. 2013) ("[I]t is insufficient for the plaintiffs to rely on group pleading against [these defendants] without making specific factual allegations [against them]." (internal quotation marks and citation omitted) (alterations in original)); *cf. Iqbal*, 556 U.S. at 676 ("[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.").

 **\*8** *Id.*

Here, Plaintiff's group pleading in the SAC[4] fails to plausibly establish personal involvement of any particular defendant on the Section 1983 false arrest claims, or provide fair notice to the defendants of the grounds upon which any of the false arrest claims rest. Indeed, Plaintiff's allegations as to his arrest involves fifteen police officers, *see* SAC ¶ 28 ("[D]efendants, including Faulkner, Moylan, Sickler, Gramoglia, Reavy and John or Jane Doe 1-10, completely disregarded Mr. Wilson's allegations,

directed him to lay face-down on the ground, placed him in handcuffs and informed plaintiff that he was being placed under arrest for the attempted felony assault of B. Fellows."), some of whom Plaintiff cannot even identify by the police agency for which they worked. *See id.* ¶ 19 ("At all relevant times, defendants, John or Jane Doe 1-10, were police officers, detectives, sheriffs, deputy sheriffs, supervisors, policymakers or officials employed by the Town of Ulster, County of Ulster or the State of New York. At this time, plaintiff does not know the true names or identities of John or Jane Doe 1-10, as such knowledge is presently within the exclusive possession of the defendants."). While Plaintiff indicates in another part of the SAC that "Defendant Faulkner was plaintiff's arresting officer," *id.* ¶ 35, that allegation does not clarify the roles the other fourteen individual defendants played in Plaintiff's arrest. Accordingly, Defendants' motion is granted in part. The false arrest claims and that much of the unlawful search and seizure claims asserting that Plaintiff was improperly seized as against Defendants Moylan, Sickler, Gramoglia, Reavy and John or Jane Doe 1-10, are dismissed.

4      Plaintiff asserts the false arrest claims against "all individual defendants" on the Section 1983 claims and against "all defendants" on the state law claims.

### B. Illegal Search

Plaintiff's illegal search claims suffer from the same lack of specificity as to the roles the individual defendants allegedly played in the purported search. *See* SAC ¶ 31. The Town Defendants challenge the sufficiency of the allegations in this regard. *See* Dkt. No. 45-1, at 14-15. Defendants have met their light burden of demonstrating facial merit to their argument demonstrating entitlement to dismissing the illegal search claims for this lack of specificity as to the roles the individual police officer defendants played in the purported search. Accordingly, the illegal search claims are dismissed as to all Town Defendants.

### 2. Excessive Force and Assault and Battery

Plaintiff's excessive force claims brought under Section 1983 and his assault and battery claims brought under New York state law suffer from the same lack of specificity as to the roles the Defendants allegedly played in the allegedly assaultive behavior. *See* SAC ¶¶ 28-30. The Town Defendants challenge the sufficiency of the allegations in this regard. *See* Dkt. No. 45-1, at 17. Defendants have met their light burden of demonstrating facial merit to their argument to dismiss the excessive force and assault and battery claims for lack of specificity as to the roles the police officer defendants played in the purportedly assaultive conduct. Accordingly, the excessive force and assault and battery claims illegal search claims are dismissed as to all Town Defendants.

### 3. Malicious Prosecution

**\*9** The Town Defendants move to dismiss Plaintiff's malicious prosecution claim brought under Section 1983 and New York law. Defendants have met their lightened burden of establishing facial merit to their arguments seeking to dismiss these claims.

" 'In order to prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his rights under the Fourth Amendment, and must establish the elements of a malicious prosecution claim under state law.' " *McGrier v. City of New York*, 849 F. App'x 268, 270 (2d Cir. 2021)(quoting *Manganiello v. City of New York*, 612 F.3d 149, 160–61 (2d Cir. 2010) (internal citations omitted)). "The elements of a malicious prosecution claim under New York law are '(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions.' " *Id.* (quoting *Manganiello*, 612 F.3d at 161 (internal quotation marks omitted)).

The existence of probable cause is a complete defense to a claim of malicious prosecution in New York. *Id.* "Probable cause may ... exist where the officer has relied on mistaken information, so long as it was reasonable for him to rely on it. *Manganiello*,

Case 9:22-cv-00638-DNH-CBF    Document 80    Filed 03/20/26    Page 112 of 146
Wilson v. County of Ulster, Not Reported in Fed. Supp. (2022)
2022 WL 813958

612 F.3d at 161 (citing *Hill v. California*, 401 U.S. 797, 803-04 (1971)). The existence of probable cause must be determined by reference to the totality of the circumstances. *See, e.g., Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

Plaintiff sought to include a cause of action for conspiracy related to the purported improper behavior of Steven Fellows. Although Judge Stewart denied the motion to amend to add a conspiracy cause of action, Plaintiff nonetheless included in the SAC the factual allegations upon which the conspiracy was based. However, despite Plaintiff's allegations of a conspiracy and the fact that the charges against him were ultimately dismissed, Plaintiff's causes of action for malicious prosecution are belied by the SAC. Specifically Plaintiff alleges that, at his grand jury proceeding, Brandon Fellows "offered testimony that was largely inconsistent with his initial statement to the police." SAC at ¶ 64. As a preliminary matter, this allegation aligns with the defendants' position that they relied upon statements from Brandon Fellows and, as such, their conduct was objectively reasonable under the circumstances. Of further significance is that Plaintiff's entire argument for malicious prosecution rests upon the alleged "fact" that the defendants knew that Brandon Fellows was the "guilty" party but, at the behest of Steven Fellows, fabricated or otherwise withheld evidence. Aside from the allegation contained in paragraph 64,[5] however, the SAC omits any direct interaction between Brandon Fellows and the moving defendants. As defendants argue, Brandon Fellows could not have offered testimony which was "largely inconsistent with his initial statement to the police" unless he did, in fact, speak to the police and claim that he had been attacked by Plaintiff. Thus, Plaintiff's own pleadings tacitly acknowledge that the defendant officers relied upon information from Brandon Fellows; the fact that such information may have been untrue or that the officers may have been otherwise mistaken is irrelevant. The claims for malicious prosecution are dismissed.

[5]     (64. Plaintiff was eventually granted an opportunity to contest his bail conditions with the assistance of counsel, at which time B. Fellows offered testimony that was largely inconsistent with his initial statement to the police.)

### 4. Malicious Abuse of Process

**\*10**  The Town Defendants move to dismiss Plaintiff's malicious abuse of process claims. This part of the motion will be granted.

"In the criminal context, malicious abuse of process is by definition a denial of procedural due process.... Procedural due process forbids the use of legal process for a wrongful purpose." *Abreu v. Romero*, 2010 WL 4615879, at *8 (S.D.N.Y. Nov. 9, 2010)(citation omitted). To state a claim for malicious abuse of process, Plaintiff must prove Defendant: 1) employed regularly issued legal process to compel performance or forbearance of some act; 2) with intent to do harm without excuse or justification; 3) to obtain a collateral objective outside the legitimate ends of the process. *See Devarnne v. City of Schenectady*, 2011 WL 219722, at *3 (N.D.N.Y. Jan. 21, 2011) (citing *Savino v. City of New York*, 331 F.3d 63, 76 (2d Cir. 2003)).

"The pursuit of a collateral objective must occur after the process is issued; the mere act of issuing process does not give rise to a claim." *Lopez v. City of New York*, 901 F. Supp. 684, 691 (S.D.N.Y. 1995) (citing *PSI Metals v. Firemen's Ins. Co.*, 839 F.2d 42, 43 (2d Cir. 1988)). In other words, Plaintiff "must claim that [Defendants] aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution." *Savino*, 331 F.3d at 77. "In New York ... wrongful [collateral] purposes have included economic harm, extortion, blackmail, and retribution." *Ketchuck v. Boyer*, 2011 WL 5080404 at *7 (N.D.N.Y. Oct. 25, 2011); *see Abreu*, 2010 WL 4615879, at *8; *Bd. of Educ. of Farmingdale Union Free Sch. Dist. v. Farmingdale Classroom Teachers Ass'n*, 38 N.Y.2d 397, 404 (1975). "Naked conclusory allegations" cannot support a claim for malicious abuse of process. *Oquendo v. City of New York*, No. 14-CV-2582 (ENV/RLM), 2017 WL 6729850, at *7 (E.D.N.Y. Nov. 15, 2017), *aff'd*, 774 F. App'x 703 (2d Cir. 2019); *see Duamutef v. Morris*, 956 F. Supp. 1112, 1119 (S.D.N.Y. 1997) ("[A] complaint which alleges [a collateral motive] in wholly conclusory terms may safely be dismissed on the pleadings alone.") (quoting *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)).

2022 WL 813958

Plaintiff had previously attempted to include a cause of action for conspiracy predicated upon the purported actions of Steven Fellows. The motion to include the conspiracy cause of action was denied because the "conclusory claim alleging a conspiracy," without personal knowledge of facts, was insufficient to withstand a motion to dismiss. *See* Dkt. No. 21 at pages 6-7. However, as Defendants argue, it is those same conclusory allegations upon which Plaintiff bases his claims for malicious abuse of process; without the conclusory allegations that Brandon Fellows contacted Steven Fellows, who thereafter "directed or importuned" the moving-defendants to act with an improper purpose, there are no facts which support a cause of action for malicious abuse of process. For the same reason that the conspiracy causes of action could not be added to the pleadings, the causes of action for malicious abuse of process must be dismissed because they rest upon "conclusory allegations" which are wholly rooted in speculation.

### 5. Denial of the Right to a Fair Trial/Denial of Due Process

**\*11** The Town Defendants seek to dismiss Plaintiff's claims for the denial of the right to a fair trial and denied of due process. Defendants have demonstrated their entitlement to relief dismissing these claims.

"A criminal defendant's 'right to a fair trial' is enshrined in the Due Process Clause of the Fourteenth Amendment." *Falls v. (Police Officer) Detective Michael Pitt*, No. 16-CV-8863 (KMK), 2021 WL 1164185, at \*35 (S.D.N.Y. Mar. 26, 2021)(citing *Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 244 (2d Cir. 2020)). "This right is violated 'when a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors.' " *Frost*, 980 F.3d at 244 (brackets omitted)(quoting *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997)). "Despite the 'nomenclature, a criminal defendant's right to a fair trial protects more than the fairness of the trial itself,' and, as relevant here, 'a criminal defendant can bring a fair trial claim even when no trial occurs at all.' " *Falls*, 2021 WL 1164185, at \*35 (quoting *Frost*, 980 F.3d at 249). A claim relating to the denial of a right to a fair trial requires a plaintiff to prove that 1) an investigating officer, 2) fabricated evidence, 3) that was likely to influence a jury's decision, 4) forwarded that information to prosecutors, and 5) that the plaintiff suffered a deprivation of liberty as a result. *Bailey v. City of New York*, 79 F. Supp.3d 424, 466 (E.D.N.Y. 2015)(citing *Jovanovic v. City of New York*, 486 Fed. Appx. 149, 152 (2d Cir. 2012)). "Thus, Plaintiff is required to establish not only that the police fabricated evidence, but also that this evidence *caused* his deprivation of liberty." *Falls*, 2021 WL 1164185, at \*36 (emphasis in original, citations omitted).

Plaintiff has not alleged any deprivation of liberty which flowed from any fabricated evidence which was forwarded to prosecutors. Rather, Plaintiff alleges that he was arraigned before a Judge in the City of Kingston, with bail set at $200,000.00, based upon the recommendation of Defendant Faulkner. *See* Dkt. 42 at ¶ 47. There is no indication that the recommendation was the result of any action by a prosecutor. Despite only naming Defendant Faulkner as involved in the City Court bail determination, Plaintiff alleges this cause of action "against all defendants" despite not making any factual allegations to support the claim against all of the defendants. Further, at a subsequent hearing, Plaintiff's bail was reduced and he was released; there is no allegation of any prosecutors who relied upon specific information relayed by the defendants. *See* SAC at ¶ 64-65. Plaintiff later testified before the grand jury, which decided not to indict him, and the charges were dismissed. *See id.* at ¶ 67-68.

Plaintiff does not offer any specific allegation of evidence which was fabricated or forwarded to prosecutors and ultimately resulted in a deprivation of liberty but, rather, merely offers broad allegations of evidence which was fabricated or concealed. Such conclusory allegations are insufficient to state causes of action for the denial of the right to a fair trial or the denied of due process. Furthermore, based upon the only specific allegations in the SAC, Plaintiff's bail was not set at the recommendation of any prosecutor but, rather, was set solely because of Defendant Faulkner's recommendation. Based upon the facts in the SAC, because Plaintiff suffered no deprivation of liberty as a result of any prosecutor, he has failed to state viable causes of action for Denial of the Right to a Fair Trial or Denial of the Right to Due Process. These claims must be dismissed.

Case 9:22-cv-00638-DNH-CBF   Document 80   Filed 03/20/26   Page 114 of 146

Wilson v. County of Ulster, Not Reported in Fed. Supp. (2022)

2022 WL 813958

### 6. Conditions of Confinement/Deliberate Indifference to Medical Needs/Negligent Denial of Medical Attention

**\*12** Defendants also move to dismiss Plaintiff's unconstitutional conditions of confinement and deliberate Indifference to his medical needs claims. The motion in this regard is granted.

Although confinement conditions are typically examined under the Eighth Amendment, pretrial detainees' claims are examined under the Due Process Clause of the Fourteenth Amendment. *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017); *Windley v. Westchester County*, 2021 WL 276542 at \*2 (S.D.N.Y. 2021). "A pretrial detainee may establish a § 1983 claim for allegedly unconstitutional conditions of confinement by showing that the officers acted with deliberate indifference to the challenged conditions." *Darnell*, 849 F.3d at 29 (citing *Benjamin v. Fraser*, 343 F.3d 35, 50 (2d Cir. 2003)). Benjamin, 343 F.3d at 50). "A Fourteenth Amendment unconstitutional conditions of confinement test requires the detainee to satisfy 'an 'objective prong' showing that the challenged conditions were sufficiently serious to constitute objective deprivations of the right to due process, and a 'subjective prong'—perhaps better classified as a 'mens rea prong' or 'mental element prong'—showing that the officer acted with at least deliberate indifference to the challenged conditions.' " *Windley*, 2021 WL 276542 at \*2 (quoting *Darnell*, 849 F.3d at 29).

> Regarding the objective prong, the conditions of confinement are deemed sufficiently serious if the detainee can show that "the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." [*Darnell*, 849 F.3d at 30] (quoting *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013)). There is no "static test" to determine whether a detainee's conditions of confinement were sufficiently serious to constitute a deprivation of the right to due process; "instead, 'the conditions themselves must be evaluated in light of contemporary standards of decency.' " Id. (quoting *Blissett v. Coughlin*, 66 F.3d 531, 537 (2d Cir. 1995)). At the motion to dismiss stage, the Court must determine whether the detainee's allegations lead to the plausible inference that the detainee was "deprived of [his] 'basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety' " or whether the detainee was "exposed 'to conditions that pose an unreasonable risk of serious damage to [his] future health.' " *Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012) (quoting *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002)).

*Windley*, 2021 WL 276542, at \*3.

To establish a claim of deliberate indifference to a serious medical condition, a plaintiff "must meet two requirements: (1) that [the] [p]laintiff[ ] had a serious medical need ..., and (2) that the [d]efendants acted with deliberate indifference to such need[ ]." *Charles v. Orange County*, 925 F.3d 73, 86 (2d Cir. 2019) (first citing *Estelle v. Gamble*, 429 U.S. 97, 105 (1976); and then citing *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017)). "Deliberate indifference requires, at a minimum, 'culpable recklessness, *i.e.*, an act or a failure to act that evinces a conscious disregard of a substantial risk of serious harm.' " *Darby v. Greenman*, 14 F.4th 124, 128 (2d Cir. 2021)(quoting *Charles*, 925 F.3d at 87). To prevail on a Fourteenth Amendment deliberate indifference claim, a plaintiff must prove "(1) that the alleged deprivation [of medical treatment] 'pose[d] an unreasonable risk of serious damage to his health,' and (2) 'that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed' " *Adamson v. Miller*, 808 F. App'x 14, 18 (2d Cir. 2020) (second alteration in original) (quoting *Darnell,* 849 F.3d at 30, 35).

**\*13** Plaintiff alleges that, upon being arrested, Defendants transported him to Kingston Hospital, at which time he was advised that he would need "proper treatment and care" at a different facility. SAC at ¶ 41. Defendants are then alleged to have transported Plaintiff to the intensive care unit at a separate facility. *Id.* at ¶ 42. Plaintiff further alleges that Defendants removed him from the second hospital "despite his unstable condition and the remaining need for emergency medical attention and treatment." However, as Defendants point out, there is no allegation that any doctor advised Plaintiff or any of the defendants about Plaintiff's need for ongoing treatment or how his removal could be detrimental to his health. Further, Plaintiff offers no allegations plausibly indicating that being handcuffed to a bed or gurney while at the hospital posed an unreasonable risk of serious damage to his health. Thus, as Defendants contend, Plaintiff offers nothing more than conclusory allegations to demonstrate that the defendants acted with deliberate indifference or that he was otherwise subjected to "unconstitutional conditions of

Wilson v. County of Ulster, Not Reported in Fed. Supp. (2022)

2022 WL 813958

confinement." Furthermore, as Defendants contend, the denial of medical attention claims are belied by the factual allegations that the defendants transported Plaintiff to two separate facilities for the purpose of securing "proper" treatment and, as such, he has not pled facts sufficient to demonstrate that the defendants acted with sufficiently culpable states of mind. Accordingly, Plaintiff's unconstitutional conditions of confinement and deliberate Indifference to his medical needs claims are dismissed.

To the extent the Town Defendants argue that "there is no allegation that any doctor advised Plaintiff or any of the defendants about this need for ongoing treatment or how his removal could be detrimental to his health," Dkt. No. 45-1 at 24, the Court applies this argument to Plaintiff's negligence claim where he alleges "Defendants knew or should have known that their conduct posed a danger to Plaintiff's health or safety." SAC ¶ 178. Without an allegation plausiblely supporting the conclusion that a medical provider advised Plaintiff or any of the defendants about Plaintiff's need for ongoing treatment or how his removal could be detrimental to his health, the state law negligence claim must be dismissed.

### 7. Failure to Intervene

For the reasons discussed in connection with Plaintiff's excessive force and assault and battery claims, Plaintiff fails to plead facts plausibly establishing the individual defendants' personal involvements in the failure to intervene claims, or enough facts to put the defendants on notice of the bases of these claims against them. Accordingly, the failure to intervene claims are dismissed.

### 8. Negligent Hiring, Retention, and Supervision

Defendants argue that "[i]t is well settled that a cause of action for negligent hiring, retention, and supervision cannot continue where the defendant is alleged to have been acting in the scope of his employment." Dkt. No. 45-1 at 25-26 (citing *Grant v. City of Syracuse*, No. 5:15-CV-445 (LEK/TWD), 2017 WL 5564605, at *16 (N.D.N.Y. Nov. 17, 2017)). Defendants contend that because Plaintiff alleges that the individual defendants were acting in "the capacity of an agent, servant, and employee" of the Defendant-Town, *see* SAC ¶ 15-20, the claims for negligent hiring, retention, and supervision should be dismissed. The Court agrees. *See Grant*, 2017 WL 5564605, at *16. [6] Plaintiff's claim for negligent hiring, retention, and supervision are dismissed.

[6]    In *Grant*, Judge Kahn wrote:

Plaintiffs' claim under New York law for negligent hiring and supervision must be dismissed, because Defendants have conceded that the Arresting Officers were acting within the scope of their employment. Mem. at 32; *see also Rosseti v. Bd. of Educ. of Schalmont Cent. Sch. Dist.*, 716 N.Y.S.2d 460, 461–62 (App. Div. 2000) ("After the School District stipulated that Marshall was acting within the scope of her employment, these causes of action are unnecessary for the purposes of imposing liability for plaintiff's damages against the School District."). "Where an employee is acting within the scope of her employment, the employer is liable under the theory of respondeat superior [for state law claims] and no claim may proceed against the employer for negligent hiring or retention." *Murns v. City of New York*, No. 00-CV-9590, 2001 WL 515201, at *5 (S.D.N.Y. May 15, 2001) (quoting *Rossetti*, 716 N.Y.S.2d at 461).
2017 WL 5564605, at *16.

### 9. *Monell* Liability

Town Defendants move to dismiss Plaintiff's municipal policy claim because Plaintiff fails to plausibly allege facts that would permit recovery under *Monell v. Dept. of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). The Court agrees.

 **\*14**  "[A] municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691. Rather, a municipality is liable when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Id.* at 694. "To hold a municipality liable in such

Case 9:22-cv-00638-DNH-CBF   Document 80   Filed 03/20/26   Page 116 of 146

Wilson v. County of Ulster, Not Reported in Fed. Supp. (2022)
2022 WL 813958

an action, 'a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right.' " *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995) (quoting *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983)). Where, as here, there is no formal policy officially promulgated by the municipality in issue, municipal policy may arise from

> action taken by the official responsible for establishing policy with respect to a particular issue, *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483–84 (1986); unlawful practices by subordinate officials so permanent and widespread as to practically have the force of law, *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127–30 (1985); or a failure to train or supervise that amounts to "deliberate indifference" to the rights of those with whom the municipality's employees interact, *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).

*Hill v. Cty. of Montgomery*, No. 9:14-CV-00933 (BKS/DJS), 2019 WL 5842822, at *17 (N.D.N.Y. Nov. 7, 2019).

A single act by a municipality may amount to municipal policy "if ordered by a person 'whose edicts or acts may fairly be said to represent official policy.' " *Rookard v. Health & Hosps. Corp.*, 710 F.2d 41, 45 (2d Cir. 1983)(quoting *Monell*, 436 U.S. at 694); *see Montero v. City of Yonkers, New York*, 890 F.3d 386, 403 (2d Cir. 2018)("[W]hen a municipality 'chooses a course of action tailored to a particular situation,' this may also 'represent[ ] an act of official government 'policy' as that term is commonly understood.' ")(quoting *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 125 (2d Cir. 2004), in turn quoting *Pembaur*, 475 U.S. at 480-81). "Where an official has final authority over significant matters involving the exercise of discretion, the choices he makes represent government policy." *Rookard*, 710 F.2d at 45*; see Montero*, 890 F.3d at 403 (" '[E]ven a single action by a decisionmaker who possesses final authority to establish municipal policy with respect to the action ordered' may deprive the plaintiff of his or her constitutional rights.")(quoting *Amnesty Am.*, 361 F.3d at 126, in turn quoting *Pembaur*, 475 U.S. at 481). "An official has final authority if his decisions, at the time they are made, for practical or legal reasons constitute the municipality's final decisions." *Rookard*, 710 F.2d at 45 (citation omitted). "An allegation of policy-making authority thus requires proof of the official's scope of employment and his role within the municipal or corporate organization." *Id.* (citation omitted). "An official's title, though not dispositive of his authority to make policy, is relevant for the inferences fairly to be drawn therefrom." *Id.* (citation omitted). Here, Plaintiff has not asserted in other than conclusory fashion that a municipal policy maker was involved in the lone remaining alleged constitutional violation - Defendant Faulkner's false arrest.

"When a non-decisionmaker committed the constitutional violation, however, the plaintiff must show that the decisionmaker ordered or ratified such a subordinate's conduct or 'was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions.' " *Montero*, 890 F.3d at 403 (quoting *Amnesty Am.*, 361 F.3d at 126); *see Bowers v. City of Salamanca*, No. 20-CV-1206-LJV, 2021 WL 2917672, at *3 (W.D.N.Y. July 12, 2021)(" '[A] municipal policy may be inferred from the informal acts or omissions of supervisory municipal officials,' such as 'the persistent failure to discipline subordinates who violate [persons'] civil rights.' ")(quoting *Zahra*, 48 F.3d at 685). "[W]here senior personnel have knowledge of a pattern of constitutionally offensive acts by their subordinates but fail to take remedial steps, the municipality may be held liable for a subsequent violation if the superior's inaction amounts to deliberate indifference or to tacit authorization of the offensive acts." *Turpin v. Mailet*, 619 F.2d 196, 201 (2d Cir. 1980). However, to state a *Monell* claim premised on ratification, a plaintiff must plausibly allege that the unconstitutional conduct which the municipal policymaker ratified was part of "a pattern of constitutionally offensive acts," rather than an isolated event. *Ocasio*, 513 F. Supp. 3d at 325. "In order to state a claim for ratification of repeated unconstitutional acts, there must be 'well-pleaded allegations in the complaint supporting the inference that the City employed a policy of ratifying the unlawful conduct of its officers': a 'single instance' of ratification is insufficient." *Id.* (quoting *Waller v. City of Middletown*, 89 F. Supp. 3d 279, 287 n.3 (D. Conn. 2015), in turn quoting *Batista*, 702 F.2d at 398). Plaintiff has not alleged facts plausibly indicating that Faulkner's false arrest was part of a pattern of constitutionally offensive acts, and his conclusory allegations to the contrary are insufficient.

2022 WL 813958

 **\*15** Plaintiff has also not adequately alleged a *Monell* claim premised on a theory of acquiescence by a policy maker or senior supervisory personnel. "[W]here a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a 'deliberate choice,' that acquiescence may 'be properly thought of as a city 'policy or custom' that is actionable under § 1983.' " *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 126 (2d Cir. 2004)(quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)) (internal citation omitted). "To prove such deliberate indifference, plaintiffs must show that the need for more or better supervision to protect against constitutional violations was obvious." *Ocasio*, 513 F. Supp. 3d at 325 (citing *Canton*, 489 U.S. at 390). " 'An obvious need may be demonstrated through proof of repeated complaints of civil rights violations [and] deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents.' " *Id.* (quoting *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995), in turn citing *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991)).

Furthermore, under *Zahra* and the cases it cites, municipal policy arises from supervisory officials' conduct involving "persistent failure to discipline subordinates who violate [persons'] civil rights," "evidence that the municipality had notice of but repeatedly failed to make any meaningful investigation into charges that police officers had used excessive force," and "where senior personnel have knowledge of a pattern of constitutionally offensive acts by their subordinates but fail to take remedial steps." *See Zahra*, 48 F.3d at 685. [7] Indeed, in concluding that "Zahra failed to establish that the Town had a municipal policy that rendered it liable for any deprivation of Zahra's constitutional rights," the Circuit cited to *Turpin* in concluding that "Zahra did not present evidence demonstrating that the Town's purported inaction constituted deliberate indifference or tacit encouragement of a violation of his constitutional rights." *Zahra*, 48 F.3d at 685 (citing *Turpin*, 619 F.2d at 201). *Turpin* stands for the proposition that municipal liability can arise from senior supervisory personnel's inaction in situations concerning a pattern of constitutionally offensive conduct. *See Turpin*, 619 F.2d at 201 ("where senior personnel have knowledge of a pattern of constitutionally offensive acts by their subordinates but fail to take remedial steps, the municipality may be held liable for a subsequent violation if the superior's inaction amounts to deliberate indifference or to tacit authorization of the offensive acts"); *Lucente v. County of Suffolk*, 980 F.3d 284, 306 (2d Cir. 2020)(" '[E]ven if a policy can be inferred from omissions of a municipality, such as where it acquiesces in a pattern of illegal conduct, such a policy cannot be inferred from the failure of those in charge to discipline a single police officer for a single incident of illegality'; instead, there must be 'more evidence of supervisory indifference, such as acquiescence in a prior pattern of conduct.' ")(quoting *Turpin*, 619 F.2d at 201-02).

7    In *Zahra*, the Second Circuit stated:
      We have previously ruled that a municipal policy may be inferred from the informal acts or omissions of supervisory municipal officials, *Turpin v. Mailet*, 619 F.2d 196, 200 (2d Cir.), *cert. denied*, 449 U.S. 1016, 101 S.Ct. 577, 66 L.Ed.2d 475 (1980), and that "municipal inaction such as the persistent failure to discipline subordinates who violate [persons'] civil rights could give rise to an inference of an unlawful municipal policy of ratification of unconstitutional conduct," *Batista*, 702 F.2d at 397. *See also* [*Ricciuti v. New York City Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991)] (policy may be inferred from "evidence that the municipality had notice of but repeatedly failed to make any meaningful investigation into charges that police officers had used excessive force in violation of the complainants' civil rights"); *Turpin*, 619 F.2d at 201 ("where senior personnel have knowledge of a pattern of constitutionally offensive acts by their subordinates but fail to take remedial steps, the municipality may be held liable for a subsequent violation if the superior's inaction amounts to deliberate indifference or to tacit authorization of the offensive acts").
      48 F.3d at 685.

 **\*16** Here, there are no plausible allegations of a persistent failure to discipline subordinates or a pattern of constitutionally offensive acts by Town police officers. Instead, Plaintiff's remaining claims involve the singular event of his arrest. Under these circumstances, the acts or omissions of some policy maker or other senior supervisory personnel do not represent official City policy. *See Deferio*, 770 Fed. Appx. at 591 (holding that a *Monell* claim premised on a theory of ratification of illegal acts requires allegations that constitutional liberties were "systematically" violated: a "single incident of illegality" cannot, by itself, evidence a "custom")(quoting *Turpin*, 619 F.2d at 202); *Ocasio*, 513 F. Supp. 3d at 325 ("Plaintiffs have not plausibly alleged that the unconstitutional conduct which Hedworth ratified was part of a pattern of constitutionally offensive acts, rather than an isolated event. In order to state a claim for ratification of repeated unconstitutional acts, there must be well-pleaded allegations

2022 WL 813958

in the complaint supporting the inference that the City employed a policy of ratifying the unlawful conduct of its officers: a single instance of ratification is insufficient.")(internal quotation marks and citation omitted).

Plaintiff has not plausibly alleged that the purportedly unconstitutional conduct of arresting and charging him despite his claims of innocence amounted to ratification by a policy maker or senior supervisory personnel of "a pattern of constitutionally offensive acts," rather than an isolated event. Plaintiff's conclusory allegation that a policy should be inferred because the "flagrant deprivations of constitutionally protected rights could not and would not occur without the tacit approval or deliberate indifference regarding the commission of such violations by the policymakers or supervisors of the Town and County of Ulster," SAC ¶ 73, is insufficient. *See Odom v. Poirier*, 2004 WL 2884409, at \*13 (S.D.N.Y. 2004) ("[I]nferences must be supported by 'explicit factual allegations'; a mere assertion that a municipality has such a custom or policy is insufficient."); *Maloney v. Cty. of Nassau*, 623 F. Supp. 2d 277, 289-90 (E.D.N.Y. 2007)("Although plaintiff in this case alleges that various County Defendants were acting 'pursuant to official policy,' ... plaintiff's Amended Complaint does not even identify a municipal policy or custom that resulted in the alleged Constitutional violations. Moreover, the Amended Complaint does not allege facts which suggest the existence of a municipal policy or custom. At most, plaintiff's pleading describes a single incident in which municipal employees allegedly violated plaintiff's Constitutional rights. However, proof of a single incident of unconstitutional activity is not sufficient to impose liability on a municipality unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy that can be attributed to a municipal policymaker.")(citation omitted). Accordingly, the municipal policy claim against the Town of Ulster is dismissed.

### b. County Defendants' Motion, Dkt. No. 44

#### 1. Claims Against Individual County Defendants

With respect to the personal involvement of any individual County of Ulster defendants, Plaintiff specifically identifies acts of Defendants Kyle Faulkner, William Moylan, Steven Fellows, and Police Officers Sickler, Gramoglia and Reavy – all of whom are or were employees of the Town of Ulster Police Department. *See* SAC at ¶¶ 15-18. These defendants are not under the supervision of or employed by the County. The only individual defendants that may have been connected to the County include some of the John or Jane Doe 1-10 defendants, who Plaintiff broadly described as "police officers, detectives, sheriffs, deputy sheriffs, supervisors, policymakers or officials employed by the Town of Ulster, County of Ulster or the State of New York." SAC at ¶¶ 19-20. As demonstrated by the SAC, Plaintiff broadly lumps together defendants Faulkner, Moylan, Sickler, Gramoglia, Reavy and John or Jane Doe 1-10 in each allegation of the Complaint in which the John or Jane Doe 1-10 defendants were mentioned. Nowhere does the SAC differentiate the facts that describe the specific acts or omissions of any of the John or Jane Doe 1-10 defendants, either from each other or from the rest of the defendants. Thus, the SAC fails to allege any personal involvement by the John or Jane Doe 1-10 defendants in any state action which could have violated Plaintiff's Constitutional rights, or caused any injury sufficient to demonstrate any cognizable claim pursuant to § 1983. Furthermore, as discussed above, this broad "group pleading" fails to provide sufficient notice of the bases for the claims against these individuals. Thus, all claims against the John or Jane Doe 1-10 defendants must be dismissed.

#### 2. *Monell* Claim Against Ulster County

**\*17** Because Plaintiff fails to sufficiently plead a constitutional violation by any Ulster County employee, the *Monell* claim against Ulster County must be dismissed. *See Morgan v. Cty. of Warren*, No. 1:21-CV-0278 (LEK/DJS), 2022 WL 195065, at \*6 (N.D.N.Y. Jan. 21, 2022). [8]

8    In Morgan, Judge Kahn wrote:
     A *Monell* claim for municipal liability cannot survive absent an underlying constitutional violation. *See Pinter v. City of New York*, 448 F. App'x 99, 106 (2d Cir. 2011) (summary order) (citing *City of Los Angeles v. Heller*, 475 U.S. 796,

799 (1986)) (dismissing *Monell* claim because "if [the officer] inflicted no constitutional injury on respondent, it is inconceivable that [the city] could be liable to respondent."); see also Lopez v. City of New York, No. 19-CV-3887, 2021 WL 466974, at \*7 (S.D.N.Y. Feb. 9, 2021) ("An underlying constitutional violation is a prerequisite to [Monell] municipal liability.") (citing Segal v. City of New York, 459 F.3d 207, 219 (2d Cir. 2006)). Because Plaintiff's § 1983 causes of action have been dismissed, Defendant County of Warren cannot be liable under *Monell*.

2022 WL 195065, at \*6.

## V. CONCLUSION

For the reasons set forth above, the Town Defendants' motion to dismiss, Dkt. Nos. 43, 45, in **GRANTED** in part and **DENIED** in part. The motion is denied in that claims asserting the false arrest/improper seizure of Plaintiff by Defendant Faulkner remain viable, but is granted in that all other claims against Town Defendants are **DISMISSED**. The County Defendants' motion to dismiss, Dkt. No. 44, is **GRANTED**, and all claims against the Town Defendants are **DISMISSED**.

Because many of Plaintiff's claims are dismissed due to pleading deficiencies, Plaintiff is granted leave of thirty (30) days in which to move to amend the Second Amended Complaint. The failure of the Plaintiff to move for amendment within thirty (30) days will cause this case to move forward only on the remaining claims.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2022 WL 813958

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 2703562

2017 WL 2703562
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Rodolfo ARAGON, Plaintiff,

v.

State of NEW YORK, City of New York, Department of Correctional Services, Defendants.

14-CV-9797 (ER)

|

Signed 06/22/2017

**Attorneys and Law Firms**

Rodolfo Aragon, Fishkill, NY, pro se.

Agnetha Elizabeth Jacob, New York City Law Department, New York, NY, for Defendants.

**OPINION AND ORDER**

Edgardo Ramos, U.S.D.J.

**\*1** Rodolfo Aragon ("Plaintiff"), acting *pro se* and *in forma pauperis*, brings this action against the State of New York ("New York"), the City of New York ("City"), and the Department of Corrections and Correctional Supervision ("DOCCS", and collectively, "Defendants") pursuant to 42 U.S.C. § 1983 ("Section 1983"). Plaintiff alleges that the conditions of his confinement at the Otis Bantum Correctional Center ("Bantum") amount to cruel and unusual punishment in violation of the Eighth Amendment. Plaintiff further claims false imprisonment as a result of an unlawful conviction in state court. The City brings the instant motion to dismiss Plaintiff's Amended Complaint ("Am. Compl.") and Second Amended Complaint ("Sec. Am. Compl.") pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth below, the City's motion to dismiss is hereby GRANTED.

**I. FACTUAL BACKGROUND** [1]

[1] The following facts, accepted as true for purposes of the instant motion, are based on Plaintiff's allegations in his Complaint ("Compl.") (Doc. 1), Am. Compl. (Doc. 34), Sec. Am. Compl. (Doc. 43), and Plaintiff's Opposition Memorandum to Defendant's Motion to Dismiss ("Opp. Mem.") (Doc. 48). *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012); *Walker v. Schult*, 717 F.3d 119, 122 n. 1 (2d Cir. 2013) ("[a] district court deciding a motion to dismiss may consider factual allegations made by a *pro se* party in his papers opposing the motion.").

Liberally construed, Plaintiff alleges that he was subject to unconstitutional conditions of confinement at Bantum on Rikers Island starting on October 22, 2014. Compl., at 2. Specifically, Plaintiff claims that he was "forced to live in inhumane conditions" due to "insects, ants, roaches, lead poisoning, asbestos, etc." and a "lack of vitamins and food, [and] non-privacy." Am. Compl., at 1. As a result, Plaintiff states he suffers from "external and internal f[u]ngus and [rashes] to body," infections to his lungs and throat as well as mental anguish. Am. Compl., at 1–2.

On October 22, 2014, Plaintiff requested to be moved from Bantum due to these conditions, but was ignored by two prison officials. Compl., Doc. 1-1, at 2. Plaintiff alleges to have requested medical attention on October 22, 2014 due to his exposure to the "inhumane conditions," and claims to have submitted medical grievances on October 23, 2014. Compl., Doc. 1-2, at 1.

2017 WL 2703562

In addition, Plaintiff seeks damages based on a false imprisonment claim resulting from an unlawful conviction in state court. Sec. Am. Compl., at 2. Plaintiff claims that he was falsely imprisoned based on "Defendant's guidelines, practices, patterns and procedures," without any further explanation. *Id.*

## II. PROCEDURAL BACKGROUND

Plaintiff filed the instant action on December 8, 2014 against Jane Doe 1, Jane Doe 2, Bantum, and Rikers Island. Compl. On March 20, 2015, the Court dismissed Plaintiff's claims against Bantum because it is not an entity that can be sued. Doc. 13. The Court instructed the Clerk of the Court to replace Bantum with the City of New York pursuant to Federal Rule of Civil Procedure 21. *Id.*

**\*2** On August 17, 2015, the Court granted the City's request for an order to show cause on why this action should not be dismissed for want of prosecution pursuant to Federal Rule of Civil Procedure 41(b) based on Plaintiff's failure to keep the Court apprised of his current residence. Doc. 22. After Plaintiff failed to respond to this and two subsequent orders to show cause dated September 4 and October 20, 2015, respectively, Docs. 22–24, the action was dismissed by the Court without prejudice on December 2, 2015. Doc. 25.

Having received a letter from Plaintiff on December 4, 2015 explaining that he had not responded because he had been incarcerated, Doc. 27, the Court vacated the dismissal, requested the Clerk of the Court to reopen the case, and directed Plaintiff to file an Amended Complaint. Doc. 28. On February 22, 2016, Plaintiff filed his Amended Complaint. Doc. 34. On that same day, the Court terminated Plaintiff's claims against Rikers Island, Jane Doe 1, and Jane Doe 2 pursuant to Rule 21.

On March 10, 2016, the Court held an initial conference, during which Plaintiff was granted leave to file a second amended complaint to cure the factual deficiencies in his prior complaints. Doc. 37. The Court provided specific instructions to Plaintiff on the details to be included in the amended pleading.[2] After receiving several extensions of time, *see* Docs. 41–42, Plaintiff filed his Second Amended Complaint on November 15, 2016. On that same day, the Court terminated Plaintiff's claims against the Department of Correctional Services.

[2]     Specifically, the Court advised: "If you were placed in a cell that was subject to infestation, you should indicate precisely what facility you were in; to the extent that you can describe the cell or state which cell you were in, indicate where you were housed; indicate the dates that this happened; indicate who, if anyone, you complained to; indicate what their response was, if any. [...] If there are particular individuals who you say you complained to and who ignored your complaints, you need to indicate who they are because if you only sue the City, then you have a slightly tougher case to make because then you would have to establish that the conditions under which you were housed were part of a practice or policy or custom of the city to keep you and perhaps others in those unsafe conditions." Doc. 37, at 6:16–8:3.

On December 1, 2016, the City filed a motion to dismiss Plaintiff's Amended Complaint and Second Amended Complaint pursuant to Rule 12(b)(6). Docs. 44–45. On January 20, 2017, Plaintiff filed an opposition to Defendant's motion. Opp. Mem. To date, the City has not replied to Plaintiff's opposition memorandum.

## III. LEGAL STANDARD

### A. Rule 12(b)(6) Motion to Dismiss Standard

On a motion to dismiss pursuant to Rule 12(b)(6), the Court is required to accept as true all factual allegations in the complaint and to draw all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014). However, the Court is not required to credit legal conclusions, bare assertions or conclusory allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 681 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint must contain enough factual matter to state a claim to relief that is plausible on its face. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows

Case 9:22-cv-00638-DNH-CBF    Document 80    Filed 03/20/26    Page 122 of 146

Aragon v. New York, Not Reported in Fed. Supp. (2017)
2017 WL 2703562

the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Accordingly, a plaintiff is required to support its claims with sufficient factual allegations to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Iqbal*, 556 U.S. at 680 (quoting *Twombly*, 550 U.S. at 570).

### B. *Pro Se* Plaintiff

**\*3**  The same standard applies to motions to dismiss for *pro se* plaintiffs. *See Zapolski v. Fed. Republic of Germany*, 425 Fed.Appx. 5, 6 (2d Cir. 2011). The Court remains obligated to construe a *pro se* complaint liberally, and to interpret a *pro se* plaintiff's claims as raising the strongest arguments that they suggest. *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d. Cir. 2006). The obligation to be lenient while reading a *pro se* plaintiff's pleadings "applies with particular force when the plaintiff's civil rights are at issue." *Jackson v. N.Y.S. Dep't of Labor*, 709 F. Supp. 2d 218, 224 (S.D.N.Y. 2010) (citing *McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004)). Nevertheless, "*pro se* status 'does not exempt a party from compliance with relevant rules of procedural and substantive law.' " *Triestman*, 470 F.3d at 477 (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). To survive a motion to dismiss pursuant to Rule 12(b)(6), a *pro se* plaintiff's pleadings still must contain "more than an unadorned, the defendant-unlawfully-harmed me accusation." *Iqbal*, 566 U.S. at 678. A *pro se* complaint that "tenders naked assertion[s] devoid of further enhancement" will not suffice. *Id.* (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted).

### C. 42 U.S.C. § 1983

To state a claim under Section 1983, a plaintiff must allege that: (1) defendants were state actors or were acting under color of state law at the time of the alleged wrongful action; and (2) the action deprived plaintiff of a right secured by the Constitution or federal law. *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999). Section 1983 does not create any rights, but merely provides "a procedure for redress for the deprivation of rights [already] established." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citation omitted). Accordingly, a civil rights action brought under Section 1983 will stand only insofar as the plaintiff can prove an actual violation of his rights under the Constitution or federal law. *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150 (1970)).

## IV. DISCUSSION

Liberally construing his pleadings, Plaintiff brings a conditions-of-confinement claim under the Eighth Amendment and a false imprisonment claim against the Defendants. Compl.; Am. Compl.; Sec. Am. Compl. [3] Plaintiff also seeks to impose liability on the City pursuant to Section 1983. Sec. Am. Compl., at 2–3. Plaintiff raises a number of new claims in his opposition to Defendant's motion, including the violation of his constitutional rights under the First, Second, Fifth, Ninth, Fifteenth, Twenty-Fourth and Twenty-Sixth Amendments. Opp. Mem. However, even granting Plaintiff the liberal construction afforded to the submissions of a *pro se* plaintiff, he does not offer any plausible support for such claims. As such, the Court confines its analysis to the conditions-of-confinement claim under the Eighth Amendment, false imprisonment, and the municipal liability.

[3]     Plaintiff has failed to plead the same claims or factual allegations in his amended pleadings as in his earlier complaints. The City acknowledges that Plaintiff appears to treat his amended pleadings as supplements to, not replacements of, his earlier complaints. Doc. 45, at 3. "[I]mplicit in the right of self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training." *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983). Accordingly, the Court liberally construes Plaintiff's pleadings by addressing the claims and factual allegations contained in all three of his complaints, regardless of their inconsistency.

### A. Eighth Amendment Claim

Case 9:22-cv-00638-DNH-CBF   Document 80   Filed 03/20/26   Page 123 of 146

Aragon v. New York, Not Reported in Fed. Supp. (2017)
2017 WL 2703562

**\*4**  Plaintiff alleges that he was subjected to cruel and unusual punishment in violation of the Eighth Amendment due to the "inhumane conditions" of his confinement at Bantum. Am. Compl., at 1; Opp. Mem., at 17. Although the Constitution does not mandate comfortable prison settings, prisoners are entitled to "basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety." *Helling v. McKinney*, 509 U.S. 25, 32 (1993) (quoting *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 199–200 (1989)). Accordingly, prison officials are required to take "reasonable measure[s] to guarantee the safety of inmates in their custody." *Hayes v. New York City Dep't of Corrections*, 84 F.3d 614, 620 (2d Cir. 1996). To establish an Eighth Amendment claim based on conditions of confinement, a plaintiff must allege two elements: (1) objectively, that the deprivation the plaintiff suffered was "sufficiently serious" to deny "the minimal civilized measure of life's necessities," and (2) subjectively, that the defendant acted with a "sufficiently culpable state of mind" associated with the "deliberate indifference" to plaintiff's health or safety. *Trammel v. Keane*, 338 F.3d 155, 161 (2d Cir. 2003) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

#### i. Objective Element

To establish the objective element of an Eighth Amendment violation, a plaintiff "must prove that the conditions of his confinement violate contemporary standards of decency." *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (citing *Helling*, 509 U.S. at 35–6). More specifically, a plaintiff must show that the conditions of confinement "pose an unreasonable risk of serious damage" to plaintiff's health or safety. *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (citing *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)). Generally, the "[n]ormal conditions of ... confinement do not constitute an Eighth Amendment violation," but "[s]uch confinement is not abnormal unless it is 'without penological justification, grossly disproportionate, or involving the unnecessary and wanton infliction of pain.' " *Branch v. Goord*, No. 05 Civ. 6495 (WHP), 2006 WL 2807168, at \*5 (S.D.N.Y. Sept. 28, 2006) (quoting *Smith v. Coughlin*, 784 F.2d 783, 787 (2d Cir. 1984)).

In support of its motion to dismiss, the City argues that Plaintiff has failed to provide sufficient details to determine whether the conditions he was subject to constitute a constitutional deprivation. Doc. 45, at 5. Despite the specific instructions provided by this Court to the Plaintiff on the necessity to include details in his amended pleadings, *see* Doc. 37, Plaintiff submits only scant factual matter to support his claim. Plaintiff solely alleges that he suffered from "inhumane conditions" as a result of "insects, ants, roaches, lead poisoning, [and] asbestos." Am. Compl., at 1. However, courts have recognized that contemporary standards of decency currently allow for some amount of exposure to vermin and asbestos in prison settings. *See Pack v. Artuz*, 348 F. Supp. 2d 63, 32 (S.D.N.Y. 2004) (plaintiff alleging a conditions-of-confinement claim under Section 1983 may be exposed to "low levels of asbestos exposure" "as reflected in the New York State Industrial Code and OSHA regulations"); *Solomon v. Nassau County*, 759 F. Supp. 2d 251, 258 (E.D.N.Y. 2011) ("conditions that are temporary or occasional have been found not to constitute a sufficiently serious deprivation to sustain a Section 1983 deliberate indifference claim"); *Wang v. Vahldieck*, No. 09 Civ. 3783 (ARR), 2012 WL 119591 at \*9 (E.D.N.Y. Jan 9, 2012) (temporary exposure to cockroaches in a dirty cell "does not rise to the sort of conduct held repugnant to the conscience of mankind") (internal quotations omitted). Without offering any details to substantiate the extent of the alleged exposure, Plaintiff's bare allegations do not sufficiently demonstrate that the conditions he was exposed to constitute a substantial risk of serious harm necessary to satisfy the objective element of an Eighth Amendment violation. *Pack*, 348 F. Supp. 2d at 84; *see also Farmer*, 511 U.S. at 837. Therefore, Plaintiff's Eighth Amendment claim must be dismissed.

 **\*5**  Determining that a plaintiff failed to satisfy the objective component of an Eighth Amendment claim, courts may dismiss the claim without passing judgment on the subjective component. *See Martinez v. Schriro*, No. 14 Civ. 3965 (KMW), 2017 WL 87049, at \*5 (S.D.N.Y. Jan. 9, 2017) (dismissing plaintiff's Eighth Amendment claim solely based on plaintiff's failure to plead the objective element in his pleadings without analyzing the subjective element).

#### B. False Imprisonment Claim

In analyzing false imprisonment claims under Section 1983, the Second Circuit has generally looked to the law of the state in which the arrest occurred. *Jaegly v. Couch*, 439 F.3d 149, 151 (2d Cir. 2006) (citing *Davis v. Rodriguez*, 364 F.3d 424, 433 (2d

2017 WL 2703562

Cir. 2004)). Accordingly, to establish a claim for false imprisonment in New York, a plaintiff must allege: (1) that the defendant intentionally confined plaintiff; (2) that plaintiff was conscious of the confinement and did not consent to it, and (3) that the confinement was not otherwise privileged. *See Jocks v. Tavernier*, 316 F.3d 128, 134–35 (2d Cir. 2003) (quoting *Broughton v. State*, 37 N.Y.2d 451, 373 N.Y.S.2d 87, 335 N.E.2d 310, 314 (N.Y. 1975)).

The Court finds that Plaintiff has failed to satisfy any of the requisite elements to establish a cognizable claim for false imprisonment. Nowhere in his pleadings does Plaintiff substantiate his claim with any factual allegations; he simply states that he was falsely imprisoned. Sec. Am. Compl., at 2. Such a threadbare assertion does not state a plausible claim to relief. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557); *see also Navarra v. Marlborough Gallery, Inc.*, 820 F. Supp. 2d 477, 485 (S.D.N.Y. 2011) (stating that allegations pled upon belief must be accompanied by facts upon which the belief relies).

Furthermore, Plaintiff's false imprisonment claim is barred by *Heck v. Humphrey*, 512 U.S. 477 (1994). Doc. 45, at 6. In *Heck*, the Supreme Court held that a complaint must be dismissed if "judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence ... unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated." 512 U.S. at 477, 486–7. Thus, to recover damages for a false imprisonment claim under Section 1983, a prisoner must demonstrate that his conviction "has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." *Id.* at 486–7.

Here, Plaintiff alleges that he was falsely imprisoned and requests relief in the form of his "immediate release/liberty" as well as monetary damages amounting to $9.8 million dollars. Am. Compl., at 1; Sec. Am. Compl., at 2–3. Pursuant to *Heck*, however, he must first demonstrate that said conviction was already invalidated. 512 U.S. at 487. This he fails to do. Therefore, Plaintiff is barred by *Heck* from seeking monetary relief under Section 1983 based on his alleged false imprisonment.

### C. Monell Liability

Plaintiff's constitutional claims against the City are brought pursuant to Section 1983. Sec. Am. Compl., at 3. Although a municipality cannot be held liable under Section 1983 solely on a theory of *respondeat superior*, a Section 1983 claim may be brought against a municipality if the alleged unconstitutional action was the result of an official policy, practice or custom. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690–692 (1978). The Second Circuit has established a two prong test for Section 1983 claims brought against a municipality. First, the plaintiff must prove " 'the existence of a municipal policy or custom in order to show that the municipality took some action that caused his injuries beyond merely employing the misbehaving [official].' " *Johnson v. City of New York*, No. 06 Civ 09426 (GBD), 2011 WL 666161, at *3 (S.D.N.Y. Feb. 15, 2011) (quoting *Vippolis v. Vill. of Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985)). Second, the plaintiff must establish a causal connection between the policy or custom and the alleged deprivation of his constitutional rights. *Id.*

**\*6** To satisfy the first prong of the municipal liability test, a plaintiff must allege the existence of at least one of the following elements: (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation; (3) a practice so consistent and widespread that constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees. *Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–7 (S.D.N.Y. 2010) (citations omitted).

The Court finds that Plaintiff has failed to meet any of the requisite elements to satisfy the first prong of a municipal liability claim. Plaintiff submits no allegations to indicate the existence of either a formally recognized policy or a consistent and widespread practice adopted by the City. Further, Plaintiff neither alleges that the Bantum prison officials have policymaking authority nor claims that the City failed to train and supervise its employees. Liberally construing the pleadings, Plaintiff seems to allege the existence of a practice adopted by the City solely based on Plaintiff's alleged experience. However, a "single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a

2017 WL 2703562

municipal policy." *DeCarlo v. Fry*, 141 F.3d 56, 61 (2d Cir. 1998) (quoting *Ricciuti v. New York City Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991)). Without offering any factual support for his conclusory allegations, this Court cannot "infer more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 557). Therefore, Plaintiff's claims against the City must be dismissed on this basis as well.

### D. Leave to Amend

In its motion to dismiss, the City requests that the Court deny Plaintiff any further leave to amend his pleading due to his repeated failure to cure the factual deficiencies. Doc. 45, at 8. Denying leave to amend is proper where the amendment would be futile or would result in undue prejudice to the opposing party. *Holmes v. Grubman*, 568 F.3d 329, 334–35 (2d Cir. 2009). An amendment is considered futile where the plaintiff is unable to demonstrate that he would be able to cure the defects in a manner that would survive a motion to dismiss. *Hayden v. Cnty. Of Nassau*, 180 F.3d 42, 53–54 (2d Cir. 1999).

Here, Plaintiff has been afforded two opportunities to amend his complaint pursuant to orders from this Court that contained specific instructions as to what he was required to plead for his claims to survive. Plaintiff failed to follow the directions contained in those orders. Given that Plaintiff's amended pleadings suffer from the same defects as his initial complaint, leave to file a third amended complaint would be futile. Therefore, the Amended and Second Amended Complaints will be dismissed with prejudice.

## V. CONCLUSION

For the reasons set forth above, the City's motion to dismiss Plaintiffs Amended Complaint and Second Amended Complaint is GRANTED. The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith, and therefore in forma pauperis status is denied for the purpose of an appeal. *See Coppedge v. United States,* 369 U.S. 438, 444-45 (1962).

The Clerk of the Court is respectfully directed to terminate the motion, Doc. 44, to mail a copy of this Opinion and Order to Plaintiff, and to close the case.

It is SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 2703562

---

**End of Document**                                         © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2026 WL 35505
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Devon HILLMAN, Plaintiff,

v.

The CITY OF OSWEGO; Oswego City Police Department; Sergeant Tom Rupert; Investigator
Kevin Hadcock; Officer Stephen Weber; Officer Joshua Martin; Officer John Doe #1; Sergeant
John Doe #1; Investigator John Doe #1; Officers John Doe #2-5; Dispatcher John Doe, Defendants.

5:24-CV-1448
|
Signed January 6, 2026

**Attorneys and Law Firms**

ANNE L. LABARBERA, ESQ., ANNE LABARERA PROFESSIONAL CORPORATION, Attorneys for Plaintiff, 405 Lexington Ave, 9th Floor, New York, NY 10174.

DANIEL CARTWRIGHT, ESQ., DAVID H. WALSH IV, ESQ., FOTI HENRY PLLC, Attorneys for Defendants, 403 Main Street, Suite 225, Buffalo, NY 14203.

**DECISION & ORDER**

DAVID N. HURD, United States District Judge

**I. INTRODUCTION**

 **\*1**  On November 27, 2024, plaintiff Devon Hillman ("Hillman" or "plaintiff") filed this nine-count civil action against defendants the City of Oswego (the "City"), Oswego City Police Department ("Oswego Police"), Sergeant Tom Rupert ("Sgt. Rupert"), Investigator Kevin Hadcock ("Investigator Hadcock"), Officer Stephen Weber ("Officer Weber"), Officer Joshua Martin ("Officer Martin"), Officer John Doe #1, Sergeant John Doe #1, Investigator John Doe #1, Officers John Doe #2-5, and Dispatcher John Doe (the "Dispatcher") (collectively the "defendants") for violations of his civil rights that occurred when he was arrested during a dispute that arose on December 1, 2023. Dkt. No. 1.

On February 3, 2025, defendants moved to dismiss plaintiff's complaint pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6). Dkt. No. 13. The motion has been fully briefed and will be considered on the basis of the submissions and without oral argument. Dkt. Nos. 1, 13, 15, 18.

**II. BACKGROUND**

On or around December 1, 2023, Hillman was present at a garage located in Oswego, NY (the "Garage"). Compl. ¶ 14. Hillman alleges the Garage was a part of his deceased father's estate, and that he was present that day to remove certain personal effects for estate-related matters. *Id*. But when he arrived at the Garage, Hillman found an unfamiliar lock installed on the door that prevented his access. *Id*. ¶ 19. According to plaintiff, this was not the first time this had occurred—there was one prior incident where plaintiff arrived at the Garage to find an unfamiliar lock installed by a "then unknown [s]uspect [(the "Suspect")]" attempting to take possession of and exercise dominion over the assets of the estate of [p]laintiff's deceased father." *Id*. ¶ 20. Plaintiff alleges the Suspect had an accomplice (the "Accomplice") call the Oswego Police to report plaintiff's presence, who subsequently arrived on the scene. *Id*. ¶ 21. The Accomplice is a woman who rented a home in Oswego, New York from

plaintiff's father while his father maintained sole occupancy of the nearby Garage, which served as his residence prior to his death. *Id*. ¶ 25–27. Plaintiff contends that, after his father's death, the Accomplice perceived him as the *de facto* landlord while also engaging in a dispute with the father's estate due to a planned sale of the property she was renting.

When unspecified police officers from the Oswego Police responded to the first incident at the Garage, plaintiff contends the officers ordered the Accomplice "not to interfere with [p]laintiff's access to the garage."[1] *Id*. ¶¶ 21–22. Plaintiff also asserts the Suspect was also contacted by the Oswego Police and similarly directed not to impede plaintiff's access to the Garage, while plaintiff was instructed to contact the Oswego Police in the event that it happened again. *Id*. ¶¶ 23–24.

[1]    Making all inferences in favor of the plaintiff, and as best as can be discerned from the complaint, the Garage was in close proximity to the residence the Accomplice leased from plaintiff's father. However, the backstory of the relationship between plaintiff and the Suspect, aside from his alleged intentions as to Hillman's father's estate and allegedly having placed one or more "foreign locks" on the garage, is entirely unclear.

 **\*2**  But on December 1, 2023, when Hillman observed the second foreign lock on the Garage, he became embroiled in a verbal dispute with the Accomplice regarding his right to access the garage. Compl. ¶¶ 32, 35. Plaintiff alleges he then proceeded to kick down the locked door to the access the Garage. *Id*. ¶ 33. Once he had kicked the door down, plaintiff feared the Accomplice would lodge a second police report. *Id*. ¶ 38. As a result, plaintiff contacted the Police to clarify what was happening and prevent further interference. *Id*. ¶ 39. Plaintiff was instructed by an Oswego Police Dispatcher to go sit in his car and wait for police to arrive, which he did. *Id*. ¶¶ 40–41.

A few minutes later, Officer Weber, Officer Martin, Officer John Doe #1, and Investigator Hadcock (the "Officers") arrived on the scene in police vehicles with lights and sirens activated. Compl. ¶¶ 43, 45. According to plaintiff, the Officers proceeded to surround plaintiff's car, with their tasers out and pointed towards him, demanding that he exit the vehicle, which he did. *Id*. ¶¶ 46–47. Plaintiff alleges when he exited his vehicle, he began recording the encounter with his cell phone out of concern that his civil rights were being violated, informing the Officers of his intention to record the encounter. *Id*. ¶¶ 50–51, 53–55. In addition, plaintiff contends that, upon exiting his vehicle, he: (1) made no attempt to leave the scene; (2) repeatedly informed the Officers he had called in the report to the Oswego Police seeking assistance; (3) complied with every lawful request made by the Officers; (4) informed them he waited in his vehicle as directed by dispatch; and (5) requested the Officers contact dispatch to confirm this. *Id*. ¶¶ 56–61. Thereafter, Investigator Hadcock requested that plaintiff move closer to him. *Id*. ¶ 62.

When plaintiff complied and moved closer, Investigator Hadcock then "gave an unlawful demand" that Hillman turn around and be "detained." Compl. ¶¶ 62–63. At some point thereafter, Hillman contends the Officers "lunged towards him" and "assault[ed] him violently" before handcuffing him.[2] *Id*. ¶¶ 70–71. Specifically, plaintiff contends Officer Weber kicked across his body, hitting Hillman's right lower leg with enough force to throw the leg into the air before swiftly moving behind plaintiff, placing his knee on plaintiff's Achilles tendon, and pinning plaintiff's leg to the pavement. *Id*. ¶ 73. Hillman's right arm was restrained by Officer Martin as Officer Weber kicked plaintiff's right foot into the air who then pinned his left foot, all the while holding plaintiff's left arm. *Id*. ¶ 74.

[2]    Notably, plaintiff does not specify whether this involved every defendant who was present at the scene or only certain of the defendants.

When plaintiff began to lose his balance, Officers Weber and Martin held up his arms until seconds before he landed on the pavement, at which point Hillman alleges that Investigator Hadcock grabbed his shoulder from his from the front. *Id*. ¶¶ 75–76. Plaintiff contends this combination of actions by the Officers was done to prevent him from using his arms to break his fall, and that his right knee ultimately struck the pavement with sufficient force to cause injury. *Id*. ¶¶ 76–78. The Officers then descended upon plaintiff, pinning him down and handcuffing him. *Id*. ¶ 79. Once Hillman was handcuffed, Officer Weber picked up plaintiff's mobile device and stopped the video recording. *Id*. ¶ 80.

Thereafter, the Officers conducted a custodial interrogation during which plaintiff repeatedly stated both that he had called the Officers as instructed after the first incident and that he had a legal right to enter the garage. Compl. ¶ 81. But Hillman contends the Officers refused to remove his handcuffs for approximately twenty-five minutes while also denying that he was under arrest. *Id*. ¶¶ 82–83. Hillman further alleges the Officers refused to confirm with Dispatcher John Doe that plaintiff ever called in a report. *Id*. ¶ 84.

 **\*3** Ten minutes into the encounter between Hillman and the Officers, plaintiff alleges Sgt. Rupert arrived at the scene. Compl. ¶ 85. Thereafter, plaintiff contends that Officer Weber asked Officer Martin and Officer John Doe #1 to place Hillman into a squad car while Officer Weber followed Sgt. Rupert into the property near the Garage where the Accomplice resided. *Id*. ¶ 87. Then, plaintiff alleges overhearing the following interaction between Sgt. Rupert and Officer:

SGT. RUPERT: "Are they just getting him outta here?"

OFFICER WEBER: "We don't know what we have yet but he's being a complaining asshole."

*Id*. ¶ 88. Plaintiff contends he was the "him" and "he" being discussed, and that this suggests that the Officers held him in custody for revenge rather than on the basis of either probable cause or reasonable suspicion. *Id*. ¶ 89. Over the next ten to fifteen minutes, plaintiff alleges the Officers and Sgt. Rupert "worked together, at times with the active participation of the Suspect and Accomplice, to manufacture a legal theory upon which [p]laintiff could have been the perpetrator of a crime for entering the garage." *Id*. ¶ 92. Further, plaintiff alleges that "[a]t one point during this time [Sgt.] Rupert made a phone call to an unknown person and appeared to be brainstorming theories upon which [p]laintiff may have committed a crime." *Id*. ¶ 93.

At this same time, the Accomplice, a female, detailed the ongoing civil dispute between her, the Suspect, and Hillman at Investigator Hadcock's request. Compl. ¶ 94. After this, plaintiff contends that Investigator Hadcock called the Suspect by phone and "engaged in a polite discussion" in an attempt to "establish a legal theory upon which the Suspect could press charges against [the p]laintiff." *Id*. ¶¶ 95–96.

Plaintiff alleges that Investigator Hadcock discussed and theorized with Accomplice what rights plaintiff might have in the Garage given his mother was not married to his father at the time of his death. Compl. ¶ 103. Despite plaintiff's contention that the Accomplice admitted to the Officers that she had previously given plaintiff permission to enter her property "for the legitimate purpose of checking the [circuit] breakers," he claims one of the Officers suggested to Accomplice that plaintiff had no right to access her apartment under any circumstances. *Id*. ¶ 104. Further, and unlike his own experience, plaintiff alleges that at no point did the Police treat the Accomplice as a suspect, point a taser at her, put her in handcuffs, detain her, or arrest her — even in light of her prior false report. *Id*. ¶ 105–108.

Plaintiff contends that, "in an attempt to manufacture a crime to justify their unlawful treatment of [him], the [Officers] theorized that [plaintiff] might have been stealing from [his father's] estate to prevent his sister from taking her part of the estate [...]." Compl. ¶ 109. But plaintiff alleges the officers "[e]ventually ran out of outrageous theories upon which they could justify their actions" and told the Accomplice that "[p]laintiff had done nothing wrong." *Id*. ¶ 110. Nevertheless, plaintiff contends that "the Accomplice was not treated as a suspect" for her false reporting or for assisting the Suspect in taking possession of plaintiff's property in light of prior police orders not to interfere with plaintiff's right to it. Compl. ¶ 111.

Plaintiff was treated in an ambulance for the knee injury he suffered while being handcuffed. Compl. ¶ 112. Police removed plaintiff's handcuffs approximately twenty-five to forty minutes after the initial encounter. *Id*. ¶ 113. Around this time, plaintiff contends Officer Weber "communicated an unsupportable belief" that plaintiff had illegally entered Accomplice's home despite Officer Weber knowing plaintiff, as the *de facto* landlord of the property, had been permitted to do so for the purpose of fixing "a breaker." *Id*. ¶ 114.

 **\*4** While plaintiff was handcuffed, he contends Officer Martin and Officer John Doe #1, though insistent he was not under arrest but merely detained, attempted to place him inside the back of a police cruiser against his will while he was handcuffed.

2026 WL 35505

Compl. ¶¶ 116–17. At or around this time, plaintiff alleges suffering from trauma symptoms stemming from both an earlier arrest as a teenager and recently discovering his father died by suicide during an encounter with police. *Id*. ¶ 118. Plaintiff contends he repeatedly asked Officers to be released from the police cruiser on the basis of his emotional distress before removing himself from the cruiser while displaying apparent indicators of emotional distress. *Id*. ¶¶ 119–20. Although Officer Martin and Officer John Doe #1 tried to stop plaintiff from exiting the cruiser, Hillman nevertheless "extracted himself from" the cruiser and stood outside of it. *Id*. ¶¶ 121–22. Only then was plaintiff questioned by anyone about his trauma and distress. *Id*. ¶ 123. He also contends that Officer Martin stated: "I don't want to have to have to shove you in that car." *Id*. ¶ 124. Plaintiff reiterated he was the party who called the police for assistance. *Id*. ¶ 125. At this point, plaintiff contends Officer Martin admitted that the Accomplice had likely made a false report but "denied police were responsible for acting, and continuing to act, on false information." *Id*. ¶ 126.

Plaintiff then inquired why the officers did not have names or badges. Compl. ¶ 127. Officer John Doe #1 replied he was more comfortable without these identifiers showing, while Officer Martin indicated it was now Oswego Police Department policy that officers are not required to display their name and badge. *Id*. ¶¶ 128–29. Martin then asked the plaintiff if he had any suspects in mind who broke into the garage. *Id*. ¶ 130. Plaintiff contends these events contributed to his emotional distress. *Id*. ¶ 131.

Further, plaintiff alleges the health care he received after the incident was interfered with when Officer Martin omitted any discussion of his colleague kicking plaintiff's legs out from underneath him during the arrest. Compl. ¶ 132. In support, plaintiff contends that, before the arrest, he was not walking with a limp yet had a significant limp after the incident. *Id*. ¶ 133. While plaintiff alleges this omission was not particularly impactful on the quality of his medical treatment, he asserts "the [Police] did not make the ambulance staff aware that they had violently assaulted [plaintiff]." *Id*. ¶ 134. Around this same time, plaintiff contends that Sgt. Rupert informed his mother, who was present on the scene, that his injury was the result of having kicked in the Garage door. *Id*. ¶ 135. When plaintiff's mother asked Sgt. Rupert whether charges could be brought against the Suspect, plaintiff contends Sgt. Rupert replied that they could not. *Id*. ¶ 136.

## III. LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, the complaint's factual allegations must be enough to elevate the plaintiff's right to relief above the level of speculation. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). While legal conclusions can provide a framework for the complaint, they must be supported with meaningful allegations of fact. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). In short, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

To assess this plausibility requirement, the court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in the non-movant's favor. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). In doing so, the court generally confines itself to the facts alleged in the pleading, any documents attached to the complaint or incorporated into it by reference, and matters of which judicial notice may be taken. *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016).

## IV. DISCUSSION

Plaintiff asserts that: (1) he was falsely arrested by the individual defendants in violation of his Fourth and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983 ("§ 1983"); (2) all individual defendants exercised the use of excessive force in violation of § 1983; (3) each individual defendant failed to intervene or intercede as to the constitutional violations plaintiff allegedly suffered in violation of § 1983; (4) each individual defendant engaged in a conspiracy to deprive him of his constitutional rights and engaged in overt acts to advance that conspiracy in violation of 42 U.S.C. § 1985 ("§ 1985"); (5) the individual defendants failed to prevent the alleged conspiracy against his constitutional rights in violation of 42 U.S.C. § 1986 ("§ 1986"); (6) the individual defendants interfered with a recording device—plaintiff's phone—which he allegedly used to record his interaction with the Officers immediately before the arrest in violation of New York Civil Rights Law § 79-p; (7) defendants conduct resulted in plaintiff's severe and ongoing emotional distress in violation of New York law; (8) he was

falsely detained, arrested, and imprisoned in violation of New York law; and (9) all individual defendants committed assault and battery during his arrest and detention in violation of New York law. Compl. ¶¶ 148–228.

**\*5** Defendants now move to dismiss plaintiff's complaint pursuant to Rule 12(b)(6). Dkt. No. 13. In defendants' view: (1) plaintiff's official capacity claims against both the City and the Oswego Police are redundant and must be dismissed; (2) plaintiff's claims against the named defendants and Doe Defendants must be dismissed as the Officers had probable cause to arrest defendant and because "it is undisputed that Officer Longo" and the other Doe defendants acted in their official capacity when the incident occurred; (3) plaintiff fails to state a plausible claim for false arrest; (4) plaintiff fails to state a plausible excessive force claim; (5) plaintiff's conspiracy claims should be dismissed as conclusory; (6) in the event that plaintiff's federal causes of action are dismissed, the Court should decline to exercise supplemental jurisdiction over plaintiff's state law claims; (7) plaintiff's New York Civil Rights Law § 79-p claim should be dismissed because defendants' had probable cause—an affirmative defense—and, alternatively, plaintiff failed to mention this claim in their notice of claim; (8) plaintiff's intentional infliction of emotional distress ("IIED") claims should be dismissed because it is duplicative and was not plausibly alleged; (9) plaintiff's state law assault and battery and false arrest claims should be dismissed "given that the analyses for these claims mirror those of their federal counterparts"; and (10) plaintiff's punitive damages claim against the City and its officials be dismissed because municipalities are immune from punitive damages under § 1983, and such damages cannot be recovered from government officials sued in their official capacities. Defs' Mem, Dkt. No. 13-1 at 8–21. [3]

[3]    Pagination corresponds to CM/ECF headers.

### A. Oswego Police

As an initial housekeeping matter, Hillman has named the Oswego Police as a defendant. Defendants contends that the Oswego Police is merely an administrative arm of the City and must be dismissed. Defs.' Mem.13-1 at, Dkt. No.

Rule 17 governs the capacity of an individual or entity to sue or be sued in federal court. FED. R. CIV. P. 17(b). Further, Rule 17(b) requires that an entity have an independent legal existence. *See Fund Liquidation Holdings LLC v. Bank of Am. Corp.*, 991 F.3d 370, 382–83 (2d Cir. 2021) (citing *Brown v. Fifth Jud. Dist. Drug Task Force*, 255 F.3d 475, 477 (8th Cir. 2001)) ("Rule 17(b)(3)(A) permits courts to imbue unincorporated associations and partnerships with the capacity to sue. But this power does not extend to entities that lack legal existence.").

The question of whether an entity has an independent legal existence is resolved by reference to state law. FED. R. CIV. P. 17(b)(3). "Under New York law, departments that are merely administrative arms of a municipality do not have a legal identity separate and apart from the municipality and, therefore, cannot sue or be sued." *Rose v. Cnty. of Nassau*, 904 F. Supp. 2d 244, 247 (E.D.N.Y. 2012) (citation omitted). Indeed, police departments are an administrative arm of the municipal corporations they serve. *See Faggins v. McDole*, 2025 WL 2933529 at *6 (N.D.N.Y. July 10, 2025) (citing *Loria v. Town of Irondequoit*, 775 F.Supp. 599, 606 (W.D.N.Y. 1990)). Given this, a city's police department does not stand "separate and apart from the municipality" and cannot be sued separately. *Faggins*, 2025 WL 2933529 at *6. Thus, plaintiff's claims against defendant Oswego City Police Department will be dismissed with prejudice.

### B. Official Capacity Claims & Municipal Liability

Turning to the next issue, Hillman brings only a single § 1983 claim for false arrest against the City while also bringing each of his § 1983 claims against all individual defendants. [4] Defendant contends that § 1983 claims against officers in their official capacity are redundant because they constitute a suit against the municipality and are redundant. [5] Defs.' Mem., Dkt. No. 13-1 at 8. This is incorrect.

[4]    More specifically, the operative complaint indicates that the first § 1983 claim for false arrest is asserted against *all* defendants while plaintiff's four other federal claims are only brought against "all individual defendants." By contrast,

plaintiff's four state-law claims are also brought against the Officers as well as the City under a *respondeat superior* theory of liability.

5    Defendant also requests certain individual capacity claims be dismissed because an "Officer Longo" and certain Doe defendants acted solely in their official capacities. However, having reviewed defendants' motion papers, it is entirely unclear to this Court who Officer Longo is or what role he played in this matter. Further, given defendants have not pointed to any law to support their argument, that request will be denied.

**\*6**  To bring a § 1983 claim for municipal liability, *i.e.*, a *Monell* claim, a plaintiff "must plausibly allege" that "an official policy or custom" existed which "caused him to be denied a constitutional right." *Thomas v. Town of Lloyd*, 711 F. Supp. 3d 122, 138 (N.D.N.Y. 2024) (cleaned up). In the context of § 1983, municipalities are considered to be persons. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). Further, under § 1983, a municipality *cannot* be held vicariously liable for the constitutional torts of their employees nor liable under a theory of *respondeat superior*. *Id*. at 691 (emphasis added); *see also Faggins v. McDole*, 2025 WL 2933529 at \*6 (N.D.N.Y. July 10, 2025).

It is instead "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 694. "[T]he Supreme Court has recognized that *Monell* liability may be established through: (1) a policy formally adopted and endorsed by the municipality; (2) actions taken by policymaking officials that caused the particular deprivation alleged; (3) practices by subordinate officials that are not expressly authorized but are so widespread and consistent that policymakers must have been aware of them; or (4) a failure by policymakers to train or supervise that amounts to deliberate indifference to the rights of those who come into contact with the inadequately trained or supervised municipal employees." *Thomas*, 711 F. Supp. 3d at 139 (quoting *Crawley v. City of Syracuse*, 496 F. Supp. 3d 718, 729 (N.D.N.Y 2020) (cleaned up)). "[B]oilerplate statements that county employees were acting in accord with a municipal policy, with no facts to support these statements, are not sufficient to support a *Monell* claim." *Id*. (quoting *Forrest v. Cnty. of Greene*, 676 F. Supp. 3d 69, 76 (N.D.N.Y. 2023)).

While plaintiff need not "show that the municipality had an explicitly stated rule or regulation, a single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy." *Raymond v. Bunch*, 136 F. Supp. 2d 71, 77 (N.D.N.Y. 2001) (quoting *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir.1991) (cleaned up)). " 'The inference that a policy existed may, however, be drawn from circumstantial proof, such as evidence that the municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction, or evidence that the municipality had notice of but repeatedly failed to make any meaningful investigation into charges' that its agents were violating citizens' constitutional rights." *Raymond*, 136 F. Supp. 2d at 77 (quoting *DeCarlo v. Fry*, 141 F.3d 56, 61–62 (2d Cir.1998) (cleaned up)).

By contrast, "to establish individual liability in a § 1983 action, plaintiffs must show that [an] official, acting under color of state law, caused the deprivation of a federal right." *Coon v. Town of Springfield, Vt.*, 404 F.3d 683, 686 (2d Cir. 2005) (quoting *Kentucky v. Graham,* 473 U.S. 159, 166 (1985)). [6]

6    As stated *supra*, aside from plaintiff bringing a § 1983 false arrest claim against both the City and all other individual defendants, each of plaintiff's remaining claims based in federal law are solely directed towards "all individual defendants."

**\*7**  Upon review, Hillman has failed to plausibly allege a *Monell* claim against the City. Rather, plaintiff's scant allegations against the City are limited to boilerplate language. Compl. ¶¶ 149–50. First, plaintiff asserts that "[a]t all times material to this complaint, [d]efendant [City] was acting through its police department and through [d]efendants, had in effect actual and/or *de facto* policies, practices, customs and usages which were a direct and proximate cause of the unconstitutional conduct alleged herein." Compl. ¶ 149. Next, Hillman contends the City "had in effect and/or *de facto* policies, customs, and usages of failing

2026 WL 35505

to properly train, screen, supervise, and discipline employees and the individual defendants [...] and of failing to inform the Individual Defendants' supervisors of the need to train, screen, supervise and discipline said Defendants." Compl. ¶ 150.

Hillman's claims against the City set forth no factual allegations to satisfy the requirements set forth in *Monell*.[7] As stated *supra*, boilerplate statements that the City's employees acted in accordance with a municipal policy, absent any supporting facts to describe the policy, are insufficient to support a *Monell* claim. *Forrest*, 676 F. Supp. 3d at 76. The Court also finds Hillman's allegations as to the City to be entirely conclusory and devoid of any specific facts from which a plausible allegation of municipal liability under *Monell* could be found. Accordingly, defendants' motion to dismiss plaintiff's § 1983 claim for false arrest as to the City will be granted.

[7]     Although Hillman's allegations include language that roughly aligns with certain of the *Monell* requirements—*i.e.*, asserting that a policy was in effect which led to unconstitutional conduct and/or that there was a failure by policymakers to train or supervise employees 0which led to an infringement of plaintiff's constitutional rights—those allegations are still limited to bare conclusions that are entirely unsupported by facts. Compl. ¶¶ 149–50.

### C. Doe Defendants

As an initial matter, while plaintiff does bring certain allegations regarding unnamed defendant Officer John Doe #1 as to the second incident at the Garage, plaintiff's complaint contains no allegations directed toward defendants Sergeant John Doe #1, Investigator John Doe #1, Officers John Doe #2-5, and Dispatcher John Doe (collectively the "Doe Defendants"). Because plaintiff's complaint fails to allege that the Doe Defendants were "personally involved" in any actionable misconduct, those defendants must be dismissed without prejudice. *Darby v. Greenman*, 14 F.4[th] 124, 130 (2d Cir. 2021).

### D. § 1983 Claims

Next, Hillman asserts three claims under § 1983 against the Officers for false arrest, use of excessive force, and failure to intervene. Defendants now seek to dismiss each of these claims arguing plaintiff has failed to state a plausible claim for which relief can be granted.

§ 1983 itself is not a source of substantive federal rights, but rather a statutory mechanism to sue state actors where they are personally involved in deprivations of constitutional rights. *Whitton v. Williams*, 90 F. Supp. 2d 420, 427 (S.D.N.Y. 2000); *see also Hulett v. City of Syracuse*, 253 F. Supp. 3d 462, 489 (N.D.N.Y. 2017). "To establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show ... the defendant's personal involvement in the alleged constitutional deprivation." *Kravitz v. Purcell*, 87 F.4th 111, 129 (2d Cir. 2023) (quotation omitted).

State actors are considered "personally involved" under § 1983 when they either participate directly in or when they fail to intervene to prevent a constitutional deprivation. *See Figueroa v. Mazza*, 825 F.3d 89, 106 (2d Cir. 2016); *see also Martinez v. City of N.Y.*, 564 F. Supp. 3d 88, 106 (E.D.N.Y. 2021) ("Police officers have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence.") (cleaned up).

**\*8**  Indeed, Hillman's § 1983 claims are premised on theories of both direct participation and a failure to intervene. Plaintiff brings claims against all individual defendants for: (1) false arrest; (2) excessive force; and (3) failure to intervene. Compl ¶ 148–170. Defendants maintain they were not personally involved in, nor failed to intervene in order to prevent, any of the purported constitutional violations. Defs.' Mem. at 13–15.

#### 1. False Arrest

Turning to plaintiff's first § 1983 claim, it will be construed as a claim for false arrest in violation of his Fourth Amendment right to be free from unreasonable search and seizure against the Officers. Plaintiff contends that the Officers lacked either probable cause or his consent when they arrested him during the second encounter at the Garage. Rather, plaintiff alleges that, upon their

2026 WL 35505

arrival, the Officers immediately surrounded his vehicle with tasers in hand, that he was arrested by the Officers even though he contacted the Oswego Police about this incident and was merely complying with a dispatcher's instructions—to sit in his car and await the Oswego Police's arrival. Compl. ¶¶ 24, 41–42, 46–47.

Defendants contend the false arrest claim must be dismissed because plaintiff's own complaint establishes the defendants' probable cause. Defs.' Mem. at 9–10. In support, defendants argue probable cause is found where police respond to calls from home dwellers regarding "potential activity" on their property, and that in such circumstances, police officers possess the requisite reasonable belief of an offense to warrant finding probable cause. [8] *Id*. Defendants claim the Accomplice, who was the tenant of a residence proximate to the Garage, properly called the police on the plaintiff when he entered the property. [9] *Id*.

[8]   In advancing their argument that the Officers had probable cause when they detained Hillman based on a reasonable belief that a burglary was being attempted, defendants notably rely on *Henry v. N.Y.C.* 2003 WL 22077469 at **1–2 (S.D.N.Y. 22077469); *see also* Defs' Mem., Dkt. No. 13-1 at 9–10. But *Henry* resolved a motion for summary judgment and the Court's reasoning relied heavily on testimony, whereas this is a pre-answer motion.

[9]   As addressed *infra*, defendants also point to body cam footage accompanying their motion where plaintiff admits to attempting to kick open the Garage door as further support that the police had probable cause to arrest Hillman when they arrived on the scene. *Id*.

"A § 1983 false arrest claim is grounded in the Fourth Amendment right of an individual to be free from unreasonable seizures." *LaFever v. Clarke*, 525 F. Supp. 3d 305, 329 (N.D.N.Y. 2021) (quoting *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)). "To establish a claim under § 1983 for false arrest a plaintiff must show that: (1) the defendant intended to confine the plaintiff; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the confinement was not otherwise privileged." *LaFever*, 525 F. Supp. 3d at 329 (cleaned up).

Confinement is considered "privileged" if the arresting officer had probable cause or is otherwise protected under the doctrine of qualified immunity. *Simpson v. City of N.Y.*, 793 F.3d 259, 265 (2d Cir. 2015). Additionally, police officers have probable cause to arrest where they have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Hulett v. City of Syracuse*, 253 F. Supp. 3d 462, 494 (N.D.N.Y. 2017) (internal quotations and citations omitted).

 **\*9**  Upon review, plaintiff has plausibly alleged that the Officers directly participated in in his arrest. Compl. ¶ 70–79. Hillman has alleged that Officer Martin, Officer Weber, and Investigator Hadcock worked together to hold plaintiff's arms, remove him from his feet, and ultimately bring him to the ground for the purpose of handcuffing him. *Id*. Plaintiff has also plausibly alleged that, after being handcuffed, he was placed into a police cruiser against his will by Officer Martin and Officer John Doe #1. *Id*. ¶ 87. Further, after being handcuffed, plaintiff plausibly alleged that he remained in handcuffs for at least twenty-five minutes while also being told by one or more of the Officers that he was not under arrest. *Id*. ¶¶ 82–83.

Plaintiff has also plausibly alleged that the Officers did not have probable cause. Hillman alleged that there was a prior incident at the Garage where Oswego Police were called to the scene, where they instructed the Accomplice for filing a false report and instructed plaintiff to contact them if there were any further disputes. *Id*. ¶¶ 20–24. Plaintiff also plausibly alleges that, when the second dispute at the Garage arose, he contacted the Oswego Police as instructed, wherein he was advised to go sit in his vehicle and wait for the police to arrive on the scene. *Id*. ¶¶ 39–41. Plaintiff further alleges that he complied with that instruction, but that the Officers nevertheless surrounded his vehicle with tasers drawn immediately upon arriving at the scene. *Id*. ¶¶ 40–47.

Accordingly, plaintiff has plausibly alleged a § 1983 false arrest claim as to the Officers, and defendants' motion to dismiss this claim will be denied.

## 2. Excessive Force

2026 WL 35505

Turning to plaintiff's second claim, Hillman brings an excessive force claim pursuant to § 1983 against the Officers. Compl. at ¶¶ 155–58. Plaintiff contends his constitutional rights were violated where, during his arrest, Officers Weber and Martin, acting under the color of state law, each held one of his arms before Officer Weber kicked his right leg out from under him causing him to fall and suffer a knee injury. *Id*. Defendants argue the officers were acting in the scope of their employment and cannot be held liable. Defs' Mem., Dkt. No. 13-1 at 6–7. In addition, defendants ask the Court to consider the body camera footage they have included with their motion, arguing it conclusively disproves plaintiff's excessive force claims. Defs.' Mem. at 11–12. In support, defendants cite a past decision where this Court's own review of video footage supported dismissal of the excessive force claim. *Id*. at 12; *see also LaFever*, 525 F. Supp. 3d at 335. [10]

[10]    Notably, however, the matter defendants point to did not involve the resolution of a pre-answer motion as is the case here. *See generally LaFever*, 525 F.Supp.3d 305.

Courts may consider video footage at the motion to dismiss stage when the footage is referenced in the complaint and "[k]ey allegations in the complaint rest[ ] on the [...] video." *Santiago v. City of Rome*, 2025 WL 553347, at *3 (N.D.N.Y. Feb. 19, 2025) (cleaned up). But courts in this Circuit have repeatedly refused to consider video evidence not attached to, referenced in, or mentioned in the complaint in deciding a motion to dismiss. *Id*. at *3 (citing *O'Brien v. City of Syracuse*, 2023 WL 6066036, at *6, (N.D.N.Y. Sep. 8, 2023)) (collecting cases).

As an initial matter, plaintiff has made no allegations of excessive force as to any defendants aside from the Officers. [11] Turning to plaintiff's claims as to Officer Weber, Officer Martin, and Investigator Hadcock, Hillman contends that prior to being detained and handcuffed, the Officers "lunged towards him" and "assault[ed] him violently." Compl. ¶ 70. Specifically, plaintiff contends that Officer Weber kicked across plaintiff's body, hitting Hillman's right lower leg with force sufficient to throw his right leg into the air before swiftly moving behind plaintiff and place his knee on plaintiff's Achilles tendon and pinning it to the pavement. Compl. ¶ 73. Thereafter, Hillman's right arm was restrained by Officer Martin as Weber kicked plaintiff's right foot into the air and pinned his left foot, simultaneously holding onto to plaintiff's left arm. Compl. ¶ 74.

[11]    Further, while plaintiff did not make in specific allegations regarding Officer John Doe #1 in the context of his excessive force allegations, he has plausibly alleged that this defendant was present at the scene before, during, and after his arrest. However, in making all inferences in favor of plaintiff, the Court will not dismiss plaintiff's claims against Officer John Doe #1 at this juncture.

**\*10**  When plaintiff started to lose his balance and fall, Officers Weber and Martin allegedly held his arms until seconds before landing on the pavement, at which point Investigator Hadcock allegedly grabbed plaintiff's shoulder from the front. Compl. ¶¶ 75, 76. Plaintiff contends this was all done to prevent the use of his arms to break a fall, and that his right knee ultimately struck the pavement with enough force to injure him. Compl. ¶¶ 76–78. Plaintiff alleges the Officers then descended upon plaintiff, pinning him down and handcuffing him. Compl ¶ 79. Plaintiff contends he injured his knee and was later walking with a limp as a result. Compl. ¶¶ 76–78, 133. He received medical attention after his arrest while remaining handcuffed. Compl. ¶¶ 112.

Defendants request the Court consider the body camera video footage they have included with their motion. However, no mention of body camera footage or video evidence is either attached to, referenced in, or mentioned in plaintiff's complaint. Thus, defendants' request that this Court consider it at this stage will be denied.

Plaintiff has plausibly alleged an excessive force claim pursuant to § 1983 against the Officers. Specifically, Hillman contends that the Officers: (1) grabbed him and kicked his leg out from under him; (2) injured his knee during the handcuffing when his leg hit the ground; (3) caused an injury that resulted in him walking with a limp; and (4) injured him despite his compliance with their commands and absent any resistance. Compl. ¶¶ 70–78, 133. Accordingly, defendants' motion to dismiss plaintiff's § 1983 excessive force claim will be denied as to the Officers but granted without prejudice as to all other defendants.

### 3. **Failure to Intervene**

2026 WL 35505

Plaintiff also brings § 1983 claims against the Officers for their failure to intervene as to both false arrest and excessive force, arguing that defendants had opportunities to intervene but failed to do so. Compl. ¶¶ 159–164. Defendants did not squarely address this claim, instead focusing on why plaintiff failed to make out plausible § 1983 claims for false arrest and excessive force. Defs.' Mem. at 9–15.

Nevertheless, to bring a failure to intervene claim, a plaintiff must plausibly allege: "(1) the defendant had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the defendant's position would have known that the plaintiff's constitutional rights were being violated; and (3) the defendant did not take reasonable steps to intervene." *Cornell v. Vill. of Clayton*, 691 F. Supp. 3d 608, 620 (N.D.N.Y. Sept. 13, 2023).

Hillman has successfully pleaded a failure to intervene claim as to false arrest. He has alleged that the Officers were present both prior to and during his arrest. *Supra*. In sum, plaintiff's allegations support a finding that the Officers should have known that his rights were being violated because he was being arrested without probable cause, and his complaint does not contain any allegations that any Officer made any attempt to intervene on plaintiff's behalf, particularly in light of his allegation that he remained in handcuffs for at least twenty-five minutes. *Id*.

Similarly, with respect to plaintiff's failure to intervene as to excessive force claim, plaintiff has plausibly alleged a constitutional violation when he sustained an injury while being arrested by the officers. *Supra*. And he has alleged that the Officers were present before and during the arrest but does not allege that any of the Officers took any steps to intervene. *Id*. To the contrary, Hillman alleges sustaining an injury during the arrest that ultimately required medical attention. Compl. ¶¶ 132–33. Accordingly, defendants' motion to dismiss plaintiff's § 1983 failure to intervene claim as to false arrest will be denied. *Supra*.

### D. Conspiracy Claims

**\*11**  Plaintiff's fourth and fifth causes of action allege a civil rights conspiracy against all individual defendants pursuant to § 1985 and a failure to prevent a civil rights conspiracy pursuant to § 1986. Compl. ¶¶ 165–175. Defendants contend both claims should be dismissed because plaintiff has offered nothing beyond bare conclusions that defendants entered into an agreement to conspire against him.

#### 1. § 1985 Civil Rights Conspiracy

*First*, Hillman contends that defendants acted in concert to deprive him of his civil rights and either engaged in or facilitated numerous overt acts such as false arrest, emotional distress, excessive force, and submitting false evidence to do so. Compl. ¶¶ 165–170.

To bring a conspiracy claim under § 1985(3), a plaintiff must allege: "1) a conspiracy; 2) for the purpose of depriving ... any person ... of the equal protection of the laws[;] ... and 3) an act in furtherance of the conspiracy; 4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Cooper v. N.Y.*, 2020 WL 1140500, at \*5 (N.D.N.Y. Mar. 9, 2020) (quoting *Britt v. Garcia*, 457 F.3d 264, 269 n.4 (2d Cir. 2006)). In addition, "[v]ague and conclusory allegations that defendants entered into an unlawful agreement will not suffice to state a conspiracy claim under either § 1983 or § 1985(3)." *Trombley v. O'Neill*, 929 F. Supp. 2d 81, 97 (N.D.N.Y. 2013) (citing *Kiryas Joel All. v. Vill. of Kiryas Joel*, 495 F. App'x 183, 190–91 (2d Cir. 2012) (internal citations omitted). Rather, plaintiffs "must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Trombley*, 929 F.Supp.2d. at 97 (quoting *Kiryas Joel All.*, 495 F. App'x. at 190) (cleaned up).

Plaintiff's complaint contains no allegations, either express or tacit, that defendants entered into an agreement to conspire to violate plaintiff's civil rights. Although plaintiff makes certain conclusory statements that specific defendants appeared to be colluding with or conspiring with the Accomplice and Suspect to manufacture a claim against him, plaintiff has not brought any specific allegations to support a finding that a purported conspiracy, aimed at interfering plaintiff's civil rights, existed. To the contrary, plaintiff's vague and conclusory assertions that defendants collaborated with the Accomplice and/or the Suspect

2026 WL 35505

to manufacture a claim against him are insufficient. Accordingly, plaintiff's § 1985 claims against the individual defendants will be denied without prejudice.

### 2. § 1986 Failure to Prevent Civil Rights Conspiracy

Plaintiff also brings a claim pursuant to § 1986 alleging defendants failed to prevent a civil rights conspiracy where they knew acts which violated plaintiff's constitutional rights were about to take place and had the power to prevent them but refused to do so. Compl. ¶¶ 171–175.

§ 1986 claims may proceed only where there is "a viable conspiracy claim under [§] 1985." *Feacher v. Intercontinental Hotels Grp.*, 563 F. Supp. 2d 389, 401 (N.D.N.Y. 2008) (quoting *Gagliardi v. Vill. of Pawling,* 18 F.3d 188, 194 (2d Cir.1994)). As plaintiff's § 1985(3) were dismissed *supra*, their § 1986 claims necessarily must also be dismissed.

### E. Plaintiff's State-Law Claims

Plaintiff also brings four state-law claims against the City and the Officers for: 1) unlawful interference with recording law enforcement activity in violation New York Civil Rights Law § 79-P; 2) IIED; 3) false arrest; and 4) assault and battery. Compl. ¶¶ 176–200.

**\*12** As a threshold matter, given that plaintiff's excessive force and failure to intervene as to excessive force claims survive at this pre-answer stage, the Court retains subject matter jurisdiction over these claims at this stage. 28 U.S.C. § 1367(a). These claims will be addressed in turn.

### 1. Unlawful Interference with Recording Law Enforcement

*First*, defendants move to dismiss plaintiff's state-law claim pursuant to New York Civil Rights Law § 79-p against the City and the Officers. Defs.' Mem. at 16–18. Plaintiff alleges that the Officers and the City violated his right to record police activity pursuant to New York's Right to Monitor Act, Civil Rights Law § 79-p. Compl. ¶¶ 176–203. Defendants argue they had probable cause to arrest plaintiff in order to investigate a potential burglary. Defs.' Mem. at 18. In the alternative, plaintiff argues that the Notice of Claim, which they have attached as an exhibit to their motion, Dkt. No. 13-2, failed to plead this claim or facts to support their claim.

The Right to Monitor Act provides that "[a] person not under arrest or in the custody of a law enforcement official has the right to record law enforcement activity." N.Y. Civ. Rts. L. § 79-p(2). It also gives rise to a private cause of action for "unlawful interference with recording a law enforcement activity" when: (1) "a person demonstrates that he or she exercised or attempted to exercise the right established in subdivision two" and (2) "an officer acted to interfere with that person's recording of a law enforcement activity." *Id.* at (3). An officer acts to interfere with the right to where they "intentionally prevent[s] or attempt[s] to prevent that person from recording law enforcement activity." *Id.* at (3)(i).

Plaintiff has plausibly alleged that, when the police arrived and ordered him to exit his vehicle, he exited and began recording the incident with his cellular phone. Compl. ¶¶ 55, 64, 176–183. Plaintiff also contends that it was only after he began to record the incident that an Officer stated they were going to detain him. *Id.* ¶ 182. Plaintiff alleges the Officers proceeded to seize him, bring him to the ground, handcuff him, and stop the recording. Dkt. No. 13–2. Thus, plaintiff has plausibly alleged that an officer acted to interfere with his recording of law enforcement activity.

Even further, a review of plaintiff's Notice of Claim, included with defendants' motion as an exhibit, suggests that defendants' contention is in error. Notice of Claim, Dkt. No. 13-2. A review of this exhibit clearly shows factual allegations that "one of the officers found a device on the ground belonging to claimant [who] was filming the incident. *Id.* at 3. The officer then took possession of the device without permission or authority and stopped the recording just after it recorded an officer admitted that his actions were motivated by answers obtained from the custodial interrogation." *Id.* at 3. The Notice of Claim also states

"the [c]laimant will assert all other damages allowed by New York State laws and statutes as a result of the conduct of the Respondents, their detectives, police officers, supervisors, and employees[.]" *Id*. at 4.

Accordingly, the Court finds plaintiff has plausibly alleged that his recording of the incident was interfered with by law enforcement, and that proper notice was provided to defendants in the Notice of Claim. Accordingly, defendants' motion to dismiss this claim will be denied.

### 2. IIED Claim

**\*13** *Next*, defendants move to dismiss plaintiff's IIED claims against the City and the Officers. Defs.' Mem. at 18. Defendants contend that well-settled public policy dictates that IIED claims against government entities are barred and that Hillman's IIED claims against the Officers should fail since they are duplicative of his false arrest claims and

The state-law tort of IIED has four elements: (1) extreme and outrageous conduct; (2) intent to cause severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress. *Bender v. City of N.Y.*, 78 F.3d 787, 790 (2d Cir. 1996) (citing *Howell v. N.Y. Post Co.,* 81 N.Y.2d 115, 121 (1993)). Under New York law, the bar is high for alleging conduct that is "extreme and outrageous" enough to constitute IIED. *Id*. (citing *Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 303 (1983)) (" 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized [society]' "). [12] Finally, under New York law, it is well-settled public policy that IIED claims against government entities are barred. *Endemann v. City of Oneida*, 2020 WL 1674255 at \*7, n. 2 (N.D.N.Y. Apr. 6, 2020) (quoting *Frederique v. Cnt. of Nassau*, 168 F. Supp. 3d 455, 483 (E.D.N.Y. 2016)).

[12]  In the alternative, plaintiff's IIED claim against the City must be dismissed as it is well-settled under New York Law that public policy bars IIED claims against governmental entities. Endemann v. City of Oneida, 2020 WL 1674255 at \*7, n.2 (N.D.N.Y. Apr. 6, 2020) (citing *Frederique v. Cnt. of Nassau*, 168 F. Supp. 3d 455, 483 (E.D.N.Y. 2016)).

Upon review, the Court finds that plaintiff has failed to plausibly allege any of the requisite elements of an IIED claim as to any of the Officers. *See generally* Compl. Namely, the complaint is devoid of any allegations of conduct that would be considered "extreme or outrageous." Lastly, plaintiff's IIED claim against the city is barred as a matter of well-established public policy. Accordingly, defendants' motion to dismiss plaintiff's IIED claims against the Officers and the City will be granted.

### 3. False Arrest & Assault and Battery

*Finally*, defendants move to dismiss plaintiff's state-law claims for false arrest and assault and battery. Defs.' Mem. at 20–21. As to both claims, defendants' sole contention is that the New York legal standard for both claims under are effectively the same as their analogs under § 1983, *i.e.*, false arrest and excessive force, respectively.

"Under New York law, a plaintiff claiming false arrest must show, *inter alia*, that [defendants] intentionally confined him without his consent and without justification." *Weyant*, 101 F.3d at 852 (collecting cases). A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause [...] is substantially the same as a claim for false arrest under New York law. *Id*.

Similarly, federal excessive force claims [under § 1983] and state-law assault and battery claims against police officers are nearly identical. *Graham v. City of N.Y.*, 928 F. Supp. 610, 624 (citing *Humphrey v. Landers*, 344 F.App'x. 686, 688 (2d Cir. 2009)) ("[E]xcept for § 1983's requirement that the tort be committed under color of state law, the essential elements of [excessive force and state law assault and battery claims are] substantially identical.") (cleaned up).

**\*14** Finally, employers, including the State, can be held vicariously liable for torts, including intentional torts, committed by employees acting within the scope of their employment. *Rivera v. State*, 34 N.Y.3d 383, 389 (2019) (collecting cases).

2026 WL 35505

Given plaintiff has plausibly alleged § 1983 claims for false arrest and excessive force claim for the reasons stated *supra*, his state-law false arrest and assault and battery claims must survive at this pre-answer stage. Accordingly, defendants' motion to dismiss will be denied as to Hillman's state-law false arrest and assault and battery claims.

### F. Punitive Damages against *the* City

Defendant next argues that plaintiff cannot bring punitive damages claims against the City. Defs.' Mem. at 21. Plaintiff did not address this argument in their reply brief. *See* Pl's. Reply, Dkt. No. 18. Defendant is correct. § 1983 does not permit the recovery of punitive damages against a municipality. *Downing v. Town of Cicero*, 2025 WL 641570 at *17 (N.D.N.Y. Feb 27, 2025) (citing *Gilead Cmty Servs., Inc. v. Town of Cromwell*, 112 F.4th 93, 103 (2d Cir. 2024) (cleaned up)). New York Courts similarly disallow such recovery, instead finding municipalities immune from punitive damages. *See Carney v. City of Utica*, 148 A.D.2d 927 (1989) (collecting cases); *see also City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981) ("[W]e find that considerations of history and policy do not support exposing a municipality to punitive damages for the bad-faith actions of its officials.") Accordingly, insofar as plaintiff requests punitive damages from the City, that request will be rejected.

### V. CONCLUSION

In sum, plaintiff has plausibly alleged § 1983 claims against the Officers for false arrest, excessive force, and failure to intervene as to both false arrest and excessive force. In addition, Hillman has plausibly alleged state-law claims against the Officers for unlawful interference with recording law enforcement, false arrest, and assault and battery. However, plaintiff has failed to plausibly allege §§ 1985 and 1986 conspiracy claims or a state-law IIED claim against the Officers.

As to the City, plaintiff has failed to plausibly allege a § 1983 claim for municipal liability. However, plaintiff has plausibly alleged a theory of *respondeat superior* against the City for the state-law claims against the Officers. Plaintiff's request for punitive damages from the City will be rejected. All other defendants will be dismissed from this matter for the reasons stated *supra*.

Therefore, it is

ORDERED that

1. Defendants' motion to dismiss plaintiff's complaint (Dkt. No. 1) is GRANTED in part and DENIED in part.

2. Defendants' motion to dismiss plaintiff's claims against the Oswego Police is GRANTED;

3. Defendants Sergeant John Doe #1, Investigator John Doe #1, Officers John Doe #2-5, and Dispatcher John Doe are *sua sponte* dismissed without prejudice;

4. Defendants' motion to dismiss plaintiff's § 1983 false arrest claim against the City is GRANTED;

5. Defendants' motion to dismiss plaintiff's § 1983 false arrest claim against the Officers is DENIED;

6. Defendants' motion to dismiss plaintiff's § 1983 failure to intervene as to false arrest claim against the Officers is DENIED;

**\*15** 7. Defendants' motion to dismiss plaintiff's § 1983 excessive force claim against the Officers is DENIED;

8. Defendants' motion to dismiss plaintiff's § 1983 failure to intervene as to excessive force claim against the Officers is DENIED;

9. Defendants' motion to dismiss plaintiff's § 1985 conspiracy against civil rights claim against the Officers is GRANTED;

2026 WL 35505

10. Defendants' motion to dismiss plaintiff's § 1986 failure to prevent conspiracy against civil rights claim against the Officers is GRANTED;

11. Defendants' motion to dismiss plaintiff's New York Civil Rights Law § 79-p claim against the City and the Officers for unlawful interference with recording law enforcement is DENIED;

12. Defendants' motion to dismiss plaintiff's IIED claims against the City and the Officers is GRANTED;

13. Defendants' motion to dismiss plaintiffs' state-law false arrest claims against the City and the Officers is DENIED;

14. Defendants' motion to dismiss plaintiffs' state law assault and battery claims against the City and the Officers is DENIED;

15. Plaintiff's request for punitive damages from the City is DENIED;

16. The City and the Officers are ordered to file an answer to plaintiff's remaining claims on or before January 20, 2026.

The Clerk of the Court is further directed to terminate the pending motion and set deadlines accordingly.

IT IS SO ORDERED.

**All Citations**

Slip Copy, 2026 WL 35505

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 8640829

2017 WL 8640829
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Dennis Douglas DAVIS, Plaintiff,

v.

Joe DOE Correctional Officer, et al., Defendants.

Civ. No. 9:16-cv-0994 (MAD/DJS)
|
Signed December 28, 2017
|
Filed 12/29/2017

**Attorneys and Law Firms**

DENNIS DOUGLAS DAVIS, 16-A-1016, Sullivan Correctional Facility, Box 116, Fallsburg, New York 12733, pro se.

HON. ERIC T. SCHNEIDERMAN, Attorney General of the State of New York, OF COUNSEL: CHRISTOPHER J. HUMMEL, ESQ., The Capitol, Albany, New York 12224, Attorney for Defendants.

## REPORT-RECOMMENDATION and ORDER

DANIEL J. STEWART, United States Magistrate Judge

**\*1** On June 28, 2016, *pro se* Plaintiff Dennis Douglas Davis commenced this action pursuant to 42 U.S.C. § 1983, asserting claims arising from his confinement at Great Meadow Correctional Facility ("Great Meadow") in the custody of the Department of Corrections and Community Supervision ("DOCCS"). Dkt. No. 2, Compl. Following an initial review of the Complaint, counsel for Gary Woodruff, the then-sole named Defendant, submitted documents to assist Plaintiff in identifying the John Doe Defendant, and Plaintiff amended his complaint to include an additional defendant, Correction Officer R. Livingston. Dkt. Nos. 10, 19, 24, 26, & 27. Presently before this Court is the Motion for Summary Judgment of Defendants Livingston and Woodruff ("Named Defendants"), Dkt. No. 35, Defs.' Mot. Summ. J., which Plaintiff has opposed.[1] Dkt. No. 39, Pl.'s Resp. The Named Defendants contend that Plaintiff has failed to exhaust his administrative remedies, and that Plaintiff has failed to establish a failure to intervene claim against Defendant Woodruff. Dkt. No. 35-6, Defs.' Mem. of Law. The Court finds that the Named Defendants have established that Plaintiff has failed to exhaust his administrative remedies and therefore recommends that the Named Defendants' Motion be **granted**. In addition, as discussed below, the Court recommends that Plaintiff's claims against the still unidentified Defendant be **dismissed** *sua sponte*.

1      Defendant Joe Doe has not appeared in this action because Plaintiff has not identified this individual; accordingly, he has not been served with a Summons and remains unnamed.

## I. LEGAL STANDARD

Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no

2017 WL 8640829

genuine issue of material fact. *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin*, 344 F.3d at 289 (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) and *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)).

**\*2** When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). Furthermore, where a party is proceeding *pro se*, the court must "read his supporting papers liberally, and [ ] interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994); *accord*, *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995). Nonetheless, summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II. EXHAUSTION

### A. Exhaustion Procedure

The Prison Litigation Reform Act ("PLRA") provides, in pertinent part, that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court has held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002) (citation omitted). Exhaustion in prisoner cases covered by § 1997e(a) is mandatory. *Id.* at 524; *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016) (stating that the mandatory language of § 1997e(a) forecloses judicial discretion to craft exceptions to the requirement). Furthermore, § 1997e(a) requires "proper exhaustion," which means using all steps of the administrative process and complying with "deadlines and other critical procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). The defendant bears the burden of proving that the administrative remedies available to the plaintiff were not exhausted prior to the initiation of a civil action. *Howard v. Goord*, 1999 WL 1288679, at \*3 (E.D.N.Y. Dec. 28, 1999).[2]

[2]     Exhaustion of administrative remedies is an affirmative defense which must be raised by the defendant. *See Jenkins v. Haubert*, 179 F.3d 19, 28-29 (2d Cir. 1999). The Named Defendants properly raised the affirmative defense in their Answer to the Amended Complaint. Dkt. No. 34 at ¶ 14.

In New York, the administrative remedies consist of a three-step Inmate Grievance Program ("IGP"). First, a grievance is submitted to the Inmate Grievance Resolution Committee ("IGRC"), a committee comprised of both inmates and facility employees. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5(b). An inmate must submit a grievance "within 21 calendar days of the alleged occurrence." *Id.* at § 701.5(a). In addition, an inmate may request an extension of the time limit within forty-five days of the date of the alleged occurrence. *Id.* at § 701.6(g). The IGRC reviews and investigates the formal complaint and then

2017 WL 8640829

issues a written determination. *Id.* at § 701.5(b). Second, upon appeal of the IGRC decision, the superintendent of the facility reviews the IGRC's determination and issues a decision. *Id.* at § 701.5(c). Finally, upon appeal of the superintendent's decision, the Central Office Review Committee makes the final administrative determination. *Id.* at § 701.5(d). Only upon exhaustion of all three levels of review may a prisoner seek relief in federal court. *Bridgeforth v. Bartlett*, 686 F. Supp. 2d 238, 239 (W.D.N.Y. 2010) (citing, *inter alia*, *Porter v. Nussle*, 534 U.S. at 524); *see also Neal v. Goord*, 267 F.3d 116, 121 (2d Cir. 2001), *overruled on other grounds by Porter v. Nussle*, 534 U.S. 516.

#### B. Plaintiff's Failure to Exhaust Administrative Remedies

**\*3** In this case, Plaintiff admits that he did not exhaust his administrative remedies relative to his claims. Dkt. No. 39-1, Pl.'s Mem. of Law, at p. 1. At the time of the relevant events of this action, Great Meadow had a grievance program to which inmates had full access. Dkt. No. 35-5, Decl. of Jeffery Hale, dated Aug. 2, 2017, at ¶¶ 4-9. Plaintiff never filed a grievance regarding his claims. *Id.* at ¶¶ 11 & 12, Ex. A.

Instead of utilizing the grievance procedure, Plaintiff submitted a disciplinary appeal form to Commissioner Annucci regarding a Tier 3 Superintendent's Hearing, a copy of which he includes with his opposition. Pl.'s Mem. of Law, at pp. 1 & 12. He also states that he was interviewed by Todd Johnson, a representative of the Office of the Inspector General regarding the facts alleged in this action. *Id.* at p. 1. This interview was not conducted at Plaintiff's request, but on the officials' initiative. *Id.* Plaintiff also states that he was called to the infirmary without his request to have photographs taken of his face and body after the assault, and that the attending Sergeant and three or four other corrections officers informed him that they were aware of the assault. *Id.* Plaintiff therefore asks that the Court "determine if administrative remedy was already in progress by staff and authorities collectively." *Id.* at p. 2.

The parties' submissions establish that Plaintiff did not exhaust his administrative remedies. The above-described interactions, indicating that prison officials were likely aware of the nature of Plaintiff's complaint, are insufficient to constitute "proper exhaustion." *Macias v. Zenk*, 495 F.3d 37, 44 (2d Cir. 2007) ("Alerting the prison officials as to the nature of the wrong for which redress is sought, does not constitute 'proper exhaustion.'") (internal citation omitted). "Regardless of whether ... informal complaints put the prison officials on notice of his grievance '*in a substantive sense*,' ... to satisfy the PLRA a prisoner must also *procedurally* exhaust his available administrative remedies." *Id.* at 43. The Court will discuss below whether Plaintiff's contentions may state a valid excuse for his failure to exhaust his administrative remedies.

#### C. Whether Plaintiff's Failure to Exhaust Administrative Remedies May be Excused

A prisoner's failure to exhaust administrative remedies may nonetheless be excused if remedies were unavailable to the inmate. *Ross v. Blake*, 136 S. Ct. at 1858. As the Supreme Court recently stated, "[a]n inmate ... must exhaust available remedies, but need not exhaust unavailable ones." *Id.* The Court provided three potential circumstances in which administrative remedies may be unavailable: (1) where the administrative procedure technically exists but operates as a "dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) where the administrative scheme is "so opaque that it becomes, practically speaking, incapable of use"; and (3) where prison administrators "thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1859-60. [3]

[3]    The Second Circuit previously set forth a three-part inquiry for when a failure to exhaust may be excused: "(1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement." *Ruggiero v. Cty. of Orange*, 467 F.3d 170, 175 (2d Cir. 2006) (citing *Hemphill v. New York*, 380 F.3d 680, 686 (2d

Case 9:22-cv-00638-DNH-CBF   Document 80   Filed 03/20/26   Page 143 of 146
Davis v. Doe, Not Reported in Fed. Supp. (2017)
2017 WL 8640829

Cir. 2004)). The Second Circuit has stated that "*Ross* largely supplants our *Hemphill* inquiry by framing the exception issue entirely within the context of whether administrative remedies were actually available to the aggrieved inmate." *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 123 (2d Cir. 2016).

**\*4** In his opposition papers, Plaintiff contends that he did not follow the exhaustion procedure because (1) he feared retaliation; (2) he believed that utilizing the grievance procedure would be futile; and (3) he did not understand the purpose of the grievance procedure. Pl.'s Mem. of Law, at pp. 1 & 2. None of his arguments, however, are sufficient to raise an issue of material fact as to the availability of administrative remedies that would excuse his failure to exhaust.

Plaintiff first alleges that he did not submit a grievance at Great Meadow because he feared that the staff would retaliate against him for pursuing a charge against them. *Id.* Under *Ross*, threats or other intimidation by prison employees may render administrative remedies unavailable. *Ross v. Blake*, 136 S. Ct. at 1860, n.3. Plaintiff's claims, however, amount to nothing more than a "generalized fear of retaliation," which is insufficient to excuse a failure to exhaust. *See Brown v. Napoli*, 687 F. Supp. 2d 295, 297 (W.D.N.Y. 2009) ("[P]laintiff's mere allegation of a generalized fear of retaliation is insufficient to excuse his failure to file a grievance."); *see also Rodriguez v. Cty. of Suffolk*, 2014 WL 3531897, at \*5 (E.D.N.Y. June 30, 2014) ("Courts tend to find mere 'generalized fear' when no actual threat was made.") (internal citation omitted). As the Second Circuit has stated, "[t]he test for deciding whether the ordinary grievance procedures were available must be an objective one: that is, would 'a similarly situated individual of ordinary firmness' have deemed them available." *Hemphill v. New York*, 380 F.3d 680, 688 (2d Cir. 2004). Here, Plaintiff has merely stated a "generalized fear of retaliation," without allegations of any specific threats or other actions that would prevent him from filing a grievance. As such, Plaintiff's fear of retaliation is insufficient to excuse his failure to exhaust.

Similarly, Plaintiff's contention that he believed it would be more effective to file a complaint in court is unavailing. Plaintiff states that he believed that the grievance program was applicable to "typical" or "minor grievances," and that "[i]n short, Plaintiff Davis had assumed that a serious or major offense by a staff member of the institution upon an inmate, demanded a direct channel to an outside authority." Pl.'s Mem. of Law, at p. 2. The case law is clear that "[p]risoners are required to exhaust their administrative remedies 'even if they believe that administrative remedies would be ineffective or futile.' " *Harrison v. Goord*, 2009 WL 1605770, at \*4 (S.D.N.Y. June 9, 2009); *see also Woodford v. Ngo*, 548 U.S. at 89-90 (stating that "exhaustion requirements are designed to deal with parties who do not want to exhaust," including those who "conclude—correctly or incorrectly—that exhaustion is not efficient in that party's particular case.").

Finally, Plaintiff states that he "was not familiar with the prerequisite procedure of the DOCCS Inmate Grievance Program." Pl.'s Mem. of Law, at p. 2. Plaintiff acknowledged receiving information regarding the grievance program during orientation and expressed a basic understand of the grievance program; he does not contend that he lacked access to the administrative remedies. Dkt. No. 35-2, Aff. of Christopher J. Hummel, dated Aug. 16, 2017, Ex. A, Dep. of Dennis Douglas Davis, dated May 5, 2017, at pp. 74-75. Rather, Plaintiff's less than complete understanding of the purpose of the administrative remedies does not render them not "capable of use." *Ross v. Blake*, 136 S. Ct. at 1859.

**\*5** Plaintiff has not provided any evidence that could satisfy any of the three circumstances that could excuse failing to exhaust under *Ross*. Plaintiff does not demonstrate, or allege, that the grievance procedure operated as a dead end in that officers were unable or unwilling to provide relief, or that the administrative scheme was so opaque that it was incapable of use. *Ross v. Blake*, 136 S. Ct. at 1853-54. Nor does Plaintiff allege that prison officials 'misled, threatened, or otherwise deterred' him from utilizing the IGP." *Hooks v. Howard*, 2010 WL 1235236, at \*7 (N.D.N.Y. Mar. 30, 2010).

Accordingly, for the foregoing reasons, the Court finds that Plaintiff has not established an issue of material fact as to the availability of administrative remedies. The Court therefore recommends that the Named Defendants' Motion be **granted** based upon Plaintiff's failure to exhaust. [4]

4    Because the Court recommends that the Named Defendants' Motion be granted based upon Plaintiff's failure to exhaust his administrative remedies, it does not reach the Named Defendants' contentions regarding the merits of Plaintiff's failure to intervene claim.

As to Plaintiff's claims against the John Doe Defendant, I recommend these claims be **dismissed** for a number of reasons: (1) Plaintiff's failure to comply with a court order under FED. R. CIV. P. 16(f);[5] (2) Plaintiff's failure to prosecute under FED. R. CIV. P. 41(b) and N.D.N.Y. L.R. 41.2(a); and (3) Plaintiff's failure to serve within 90 days under FED. R. CIV. P. 4(m). I also note that even if Plaintiff had properly named the John Doe Defendant, it would be of no consequence because, as noted above, Plaintiff has failed to exhaust his administrative remedies.

5    In connection with assisting Plaintiff in identifying the John Doe Defendants, the District Judge ordered Plaintiff to "take reasonable steps through discovery to identify him and, if identified, seek to amend the complaint to add this individual as a defendant in this action." Dkt. No. 10.

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that the Named Defendants' Motion for Summary Judgment (Dkt. No. 35) be **GRANTED** and that Plaintiff's claims against the Named Defendants be **DISMISSED**; and it is further

**RECOMMENDED**, that Plaintiff's claims against Defendant Joe Doe be **DISMISSED** *sua sponte*; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14)[6] days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

6    If you are proceeding *pro se* and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. FED. R. CIV. P. 6(a)(1)(C).

**All Citations**

Not Reported in Fed. Supp., 2017 WL 8640829

**End of Document**                              © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Davis v. Doe, Not Reported in Fed. Supp. (2018)

2018 WL 1582230

Case 9:22-cv-00638-DNH-CBF   Document 80   Filed 03/20/26   Page 145 of 146

2018 WL 1582230
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Dennis Douglas DAVIS, Plaintiff,

v.

Joe DOE Correctional Officer, c/o State of New York, Sgt. Woodruff, Correctional Officer c/o State of New York, and R. Livingston, Correction Officer, Defendants.

9:16-cv-994 (MAD/DJS)
|
Signed 03/27/2018

**Attorneys and Law Firms**

DENNIS DOUGLAS DAVIS, 16-A-1016, Sullivan Correctional Facility, Box 118, Fallsburg, New York 12733, pro se.

OFFICE OF THE NEW YORK STATE ATTORNEY GENERAL, OF COUNSEL: CHRISTOPHER J. HUMMEL, AAG, The Capitol, Albany, New York 12224, Attorney for Defendants.

## ORDER

Mae A. D'Agostino, U.S. District Judge

**\*1** On June 28, 2016, Plaintiff *pro se* Dennis Douglas Davis ("Plaintiff"), an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), commenced this civil rights action against Defendants Sgt. Woodruff, R. Livingston, and Joe Doe (collectively, "Defendants"), pursuant to 42 U.S.C. § 1983, asserting claims arising out of his incarceration at Great Meadow Correctional Facility. *See* Dkt. No. 2.[1]

[1] The cited page numbers for docket entries in this Order refer to those assigned by the Court's electronic filing system ("ECF").

On August 16, 2017, Defendants filed a motion for summary judgment on the grounds that Plaintiff failed to exhaust his administrative remedies. *See* Dkt. No. 35-6 at 5. In a December 29, 2017 Report-Recommendation and Order, Magistrate Judge Stewart recommended granting Defendants' motion for summary judgment. *See* Dkt. No. 41. Magistrate Judge Stewart found that Plaintiff admitted that he did not file an administrative grievance and Plaintiff's explanations did not excuse him from the exhaustion requirement. *See* Dkt. No. 41 at 5-6, 8-10.

In reviewing a report-recommendation and order, a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). When a party makes specific objections to a magistrate judge's report, the district court engages in *de novo* review of the issues raised in the objections. *See id.; Farid v. Bouey*, 554 F. Supp. 2d 301, 307 (N.D.N.Y. 2008). When a party fails to make specific objections, the court reviews the magistrate judge's report for clear error. *See Farid*, 554 F. Supp. 2d at 307; *see also Gamble v. Barnhart*, No. 02-CV-1126, 2004 WL 2725126, *1 (S.D.N.Y. Nov. 29, 2004).

On January 10, 2018, Plaintiff filed objections to Magistrate Judge Stewart's Report-Recommendation and Order. *See* Dkt. No. 43. However, Plaintiff's sole objection went to the merits of his claims without contesting Magistrate Judge Stewart's exhaustion determination. *See id.* at 2-3. As such, Plaintiff has made no specific objections.

**Davis v. Doe, Not Reported in Fed. Supp. (2018)**

2018 WL 1582230

A court may grant a motion for summary judgment only if "the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law." *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the court " 'cannot try issues of fact; it can only determine whether there are issues to be tried.' " *Id.* at 36-37 (quotation and other citation omitted).

Having reviewed Magistrate Judge Stewart's December 29, 2017, Report-Recommendation and Order, the record, and the applicable law, the Court concludes that Magistrate Judge Stewart correctly recommended that the Court should grant Defendants' motion for summary judgment.

Accordingly, the Court hereby

**ORDERS** that Magistrate Judge Stewart's Report-Recommendation and Order (Dkt. No. 41) is **ADOPTED** in its entirety for the reasons stated therein; and the Court further

 **\*2  ORDERS** that Defendants' motion for summary judgment (Dkt. No. 35) is **GRANTED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 1582230

---

**End of Document**                                        © 2026 Thomson Reuters. No claim to original U.S. Government Works.